**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY**

RYAN HYSELL and CRYSTAL HYSELL,
on behalf of their daughter, A.H., a minor,

       Plaintiffs,

v.                                Civil Action No. 5:18-cv-01375

RALEIGH GENERAL HOSPITAL,
and THE UNITED STATES OF AMERICA,

       Defendants.

<u>**DEFENDANT UNITED STATES OF AMERICA'S
MOTION FOR SUMMARY JUDGMENT**</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and applicable law, defendant United States of America ("United States") moves the Court to enter summary judgment in its favor against the plaintiffs on the following grounds:

1.      This is an action arising under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

2.      Under the FTCA, the substantive law of the State of West Virginia applies to this case because the tortious conduct alleged by plaintiffs in the Complaint is alleged to have occurred in West Virginia. 28 U.S.C. § 2672.

3.      Under W. Va. Code § 55-7B-3, plaintiffs must prove by a preponderance of evidence that the United States was negligent and that such negligence proximately caused the injuries alleged by the plaintiffs.

4.      The plaintiffs are unable to prove that the negligence that they have alleged in this action proximately caused the injuries alleged by the plaintiffs.

5.      Since the plaintiffs are unable to prove proximate causation as required by W. Va.

Code § 55-7B-3, the United States is entitled to judgment as a matter of law.

6.     The United States also relies on the following exhibits to support this motion:

A.     Exhibit A which is an excerpt from the deposition testimony of John Fassett.

B.     Exhibit B which is an excerpt from the deposition testimony of Patricia Connors.

C.     Exhibit C which is an excerpt from the deposition testimony of Dr. A.M. Iqbal O'Meara.

D.     Exhibit D which is an excerpt from the deposition testimony of Laura Lampton.

E.     Exhibit E which is an excerpt from the deposition testimony of Chad Staller.

F.     Exhibit F which is an excerpt from the deposition testimony of Dr. Jerome Barakos.

G.     Exhibit G which is an excerpt from the deposition testimony of Dr. Thomas Rugino.

H.     Exhibit H which is an excerpt from the deposition testimony of Elizabeth Schorry.

I.     Exhibit I which is an excerpt from the deposition testimony of Dr. Todd Arthur.

Therefore, the United States requests that the Court enter an order granting summary judgment and dismissing this civil action.   The United States also requests such other and further relief as this Court deems appropriate under the law.

Respectfully submitted,

**MICHAEL B. STUART**
**United States Attorney**

**s/Fred B. Westfall, Jr.**
Fred B. Westfall, Jr. (WV Bar No. 3992)
Assistant United States Attorney
P.O. Box 1713
Charleston, WV   25326
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: fred.westfall@usdoj.gov
Counsel for Defendant United States of America

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT BECKLEY**

RYAN HYSELL and CRYSTAL HYSELL,
on behalf of their daughter, A.H., a minor,

      Plaintiffs,

v.                                                                Civil Action No. 5:18-cv-01375

RALEIGH GENERAL HOSPITAL,
and THE UNITED STATES OF AMERICA,

      Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2020, I electronically filed the foregoing

**DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY**

**JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification

to the following CM/ECF participants:

      Christopher T. Nace
      Barry J. Nace
      Matthew A. Nace
      Paulson & Nace, PLLC
      1025 Thomas Jefferson Street NW
      Suite 810
      Washington, D.C. 20007
      Counsel for Plaintiffs

      D.C. Offutt, Jr.
      I. Matthew Mains
      David L. Shuman, Jr.
      Offutt Nord PLLC
      949 Third Avenue, Suite 300
      P. O. Box 2868
      Huntington, WV 25728-2868
      Counsel for defendant Raleigh General Hospital

**s/ Fred B. Westfall, Jr.**
Fred B. Westfall, Jr. (WV Bar No. 3992)
Assistant United States Attorney
P.O. Box 1713
Charleston, WV    25326
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: fred.westfall@usdoj.gov
*Counsel for Defendant United States of America*

5

# Exhibit A

JOHN FASSETT, RN, CNM                                    January 06, 2020
RYAN HYSELL vs RALEIGH GENERAL HOSPITAL                                 1

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                         AT BECKLEY

4

5

6

   RYAN HYSELL and CRYSTAL
7  HYSELL, on behalf of their
   daughter, A.H., a minor,
8
                      Plaintiffs,      No. 5:18-cv-01375
9
   vs.
10

11 RALEIGH GENERAL HOSPITAL, et
   al,
12
                      Defendants.
13 ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

14

15

16                    DEPOSITION OF

17              JOHN FASSETT, RN, CNM

18                   January 6, 2020

19                     10:00 a.m.

20

21          44 Montgomery Street, Ste. 1100

22             San Francisco, California

23

24
        Joan Theresa Cesano, CSR No. 2590
25



JOHN FASSETT, RN, CNM                                    January 06, 2020
RYAN HYSELL vs RALEIGH GENERAL HOSPITAL                            12

| | | |
|---|---|---|
| 1 | this, mark this as Deposition Exhibit Number 3 for the | 10:08AM |
| 2 | moment.  Are these notes? | 10:08AM |
| 3 | (Exhibit 3 marked) | 10:08AM |
| 4 | MR. NACE:  Counsel, what was 2? | 10:08AM |
| 5 | MR. WESTFALL:  2 is going to be the strip. | 10:08AM |
| 6 | MR. NACE:  Okay. | 10:08AM |
| 7 | BY MR. WESTFALL: | 10:08AM |
| 8 | Q   The notes that you handed us, I'll show that as | 10:08AM |
| 9 | Exhibit Number 3.  Is that a copy of the notes that you | 10:08AM |
| 10 | gave to us prior to the deposition? | 10:08AM |
| 11 | A   They are. | 10:09AM |
| 12 | Q   And those notes, looks like, refer to kind of | 10:09AM |
| 13 | your running thoughts on the depositions and also on the | 10:09AM |
| 14 | electronic fetal monitoring strip; is that correct? | 10:09AM |
| 15 | A   Correct. | 10:09AM |
| 16 | Q   Anything else in those notes covers anything else | 10:09AM |
| 17 | other than that? | 10:09AM |
| 18 | A   No. | 10:09AM |
| 19 | Q   Have you relied on any factual information not | 10:09AM |
| 20 | contained in anything that you've reviewed? | 10:09AM |
| 21 | A   No. | 10:09AM |
| 22 | Q   Are you intending to give any opinions on | 10:09AM |
| 23 | causation in this case? | 10:09AM |
| 24 | A   I am not. | 10:09AM |
| 25 | Q   Now, you mentioned that you had an electronic | 10:09AM |



# Exhibit B

Ryan Hysell et al. vs Raleigh General Hospital et al.
CONNORS, PATRICIA on 01/13/2020

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA


RYAN HYSELL and CRYSTAL          )
HYSELL, on behalf of their       )
daughter, A.H., a minor,         )
                                 )
          Plaintiffs,            )
                                 ) Case No.
v.                               ) 5:18-cv-01375
                                 )
RALEIGH GENERAL HOSPITAL,        )
COMMUNITY HEALTH SYSTEMS,        )
INC., D/B/A ACCESS HEALTH,       )
DEBRA CROWDER, CNM, and          )
THE UNITED STATES OF             )
AMERICA,                         )
                                 )
          Defendants.            )


     VIDEOTAPED AND TELECONFERENCED DEPOSITION OF:

               PATRICIA CONNORS

     Taken before Andrea B. Davison, RPR,

Notary Public in and for the State of Maine,

pursuant to notice dated December 16, 2019, at

the offices of Gaige & Feliccitti, LLC, 205

Woodford Street, Portland, Maine, on January

13, 2020, commencing at 10:00 a.m.




          Andrea B. Davison, RPR
          GAIGE & FELICCITTI, LLC
     205 Woodford Street - Portland, ME   04103
  scheduling@gandfreporting.com ~ (207) 854-5296
          www.gandfreporting.com

```
 1    A.   No.
 2    Q.   Okay.  All right.  Fair enough.  All right.
 3         We had -- we had just marked your expert
 4         statement as Exhibit 2.  And you had told me
 5         that in addition to the original material you
 6         reviewed in this case, you had reviewed the
 7         deposition of Ms. Hysell's mother, the
 8         grandmother of the child, and also the
 9         deposition testimony that was taken last week
10         in California of John Fassett, who's the
11         nursing-midwife expert, correct?
12    A.   Correct.
13    Q.   And that -- that neither of those depositions
14         had changed your opinions in this case,
15         correct?
16    A.   That's right.
17    Q.   All right.  Let's go over your deposition
18         statement or your expert statement then as
19         shown in Exhibit 2.
20              You start off with a brief summary, and
21         you have some observations about what happened
22         after birth, after the delivery, to the child.
23         Let me ask you if you intend to offer any
24         opinions regarding causation or damages in
25         this case.
```

Ryan Hysell et al. vs Raleigh General Hospital et al.
CONNORS, PATRICIA on 01/13/2020

Page 28

```
 1   A.   No, I don't.

 2   Q.   All right.  You make a comment about the Apgar

 3        scores of 7 and 8, and you say it in your

 4        report.  It is, "It appears that with regard

 5        to those Apgar scores the ones that were,

 6        quote, 1 and not a 2 were:  respiratory

 7        effect, muscle tone, and color."

 8             By making that statement, are you any --

 9        in any way critical of the Apgar scoring

10        itself?

11   A.   Yes, I -- yes, I am.

12   Q.   In -- in what regard?

13   A.   Well, the baby was not completely pink, so you

14        should not have gotten a tube.  They had to

15        give the baby some blow by.  And there was

16        also some muscle tone.  The baby was also

17        taken to the nursery for four hours, and mom

18        did not see the baby for four hours.  That's

19        what my concerns were.

20   Q.   All right.  So your comment there, just so I

21        understand, you're saying that those were

22        marked 2 and you believe they should have been

23        1's?

24   A.   Yes.

25   Q.   Okay.  So what would your Apgar scoring at one
```

# Exhibit C

1        IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                    AT BECKLEY

3

4   RYAN HYSELL and          :
    CRYSTAL HYSELL,           :
5                            :
          Plaintiffs,        :
6                            : Civil Action No:
    v.                       :   5:18-cv-01375
7                            :
    RALEIGH GENERAL          :
8   HOSPITAL, et al.,        :
                             :
9         Defendants.        :

10

11

12      DEPOSITION OF AM IQBAL O'MEARA, M.D.

13

14           Tuesday, January 28, 2020

15                  1:09 p.m.

16

17              Paulson & Nace
       1025 Thomas Jefferson Street, N.W.
18                Suite 810
             Washington, D.C

19

20

21      Terry L. Bradley, Court Reporter

22



800.211.DEPO (3376)
EsquireSolutions.com

AM IQBAL O'MEARA, M.D.                                    January 28, 2020
HYSELL vs RALEIGH GENERAL HOSPITAL                                    50

1   that that primary responsibility is not nurse

2   midwife Crowder's responsibility.  So given

3   that, then no.

4        Q.    Do you have any training as a

5   certified nurse midwife?

6        A.    No.

7        Q.    Are you familiar with the standards

8   of care that apply to certified nurse midwives

9   at the time of the events involved in this

10  case?

11       A.    No.

12       Q.    Have you ever supervised a certified

13  nurse midwife?

14       A.    No.

15       Q.    And in fact, in your current

16  practice you don't deal with certified nurse

17  midwives, do you?

18       A.    That's correct.

19       Q.    All right.  Let's take a look at the

20  No. 1 opinion that you have in this case.

21            Oh.  Let me go back.

22            Are you intending to give causation



1    opinions in this case?

2         A.    No.

3         Q.    So let's take a look at opinion No.

4    1:   Failure to identify a nonreassuring fetal

5    heart tracing and intervene accordingly.

6              I take it you were given copies of

7    the electronic fetal monitor strip to review in

8    this case?

9         A.    That's correct.

10        Q.    Let me show you what's been marked

11   as Exhibit No. 4.  This is a copy of the fetal

12   heart tracings that I received from plaintiffs'

13   counsel.

14             (Exhibit 4 marked for

15   identification.)

16             I'd like for you to take a look at

17   those and compare that with what you received

18   to see if they're one and the same.

19        A.    If they're one and the same?

20        Q.    Yes.

21        A.    Okay.

22        Q.    You can probably tell by the page



# Exhibit D

1          IN THE UNITED STATES DISTRICT COURT

2      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3              CASE NO. 5:18-CV-01375

4             HON. JUDGE IRENE BERGER

5

6

7         RYAN HYSELL AND CRYSTAL HYSELL,

8        ON BEHALF OF THEIR DAUGHTER, A.H.,

9                  A MINOR,

10                 PLAINTIFFS

11

12                    V.

13

14           RALEIGH GENERAL HOSPITAL,

15      COMMUNITY HEALTH SYSTEMS, INC.,

16        D/B/A ACCESS HEALTH, DEBRA

17           CROWDER, CNM, AND

18       THE UNITED STATES OF AMERICA,

19                 DEFENDANTS

20

21

22

23   DEPONENT:  LAURA LAMPTON

24   DATE:      JANUARY 16, 2020

25   REPORTER:  LACEE TOWNSEND

Laura Lampton
January 16, 2020                                      18

1    reviewed?

2         A     No.

3         Q     You would agree with me that you're not a

4    physician?

5         A     Correct.

6         Q     You're not able to make medical diagnoses?

7         A     Correct.

8         Q     You're not able to prescribe medicine?

9         A     Correct.

10        Q     You're not able to order treatment?

11        A     Correct.

12        Q     In terms of opinions with respect to the issue

13   of life expectancy, you previously testified that you

14   would defer to a physician?

15        A     Correct.

16        Q     Is that still the case?

17        A     Yes.

18        Q     You do not plan to offer any opinions about

19   this -- applicable standard of care for a hospital or

20   nurses?

21        A     Correct.

22        Q     You're not rendering opinions as to the cause

23   of A.H.'s alleged injuries in this case?

24        A     Correct.

25        Q     Explain to me your general methodology in

# Exhibit E

Chad Staller, JD, MBA, MAC, CVA
January 21, 2020                                                1

1          IN THE COURT OF COMMON PLEAS

2      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                   -   -   -

4   RYAN HYSELL and CRYSTAL:
    HYSELL, on behalf of   :
5   their daughter, A.H.,  :
    a minor                :
6       Plaintiffs         :
                           :
7       V.                 :
                           :
8   RALEIGH GENERAL HOSPITAL,:
    COMMUNITY HEALTH SYSTEMS,:
9   INC. d/b/a ACCESS HEALTH,:
    DEBRA CROWDER, CNM and:
10  THE UNITED STATES OF   :
    AMERICA                :
11      Defendants.        :
                           : NO. 5:18-CV-01375
12

13                  -   -   -

14          Tuesday, January 21, 2020

15                  -   -   -

16   Videotape deposition of CHAD STALLER, JD, MBA,

17   MAC, CVA, held in the offices of Center for

18   Forensic Economic Studies, 1608 Walnut Street,

19   Suite 801, Philadelphia, Pennsylvania 19103,

20   commencing at 11:13 a.m. on the above date,

21   before Maryanne S. Gorham, Court Reporter and

22   Notary Public in the Commonwealth of

23   Pennsylvania.        -   -   -
             U.S. LEGAL SUPPORT
24       1818 Market Street, 14th floor
             Philadelphia, PA 19103
25           (877) 479-2484

Chad Staller, JD, MBA, MAC, CVA
January 21, 2020                                    25

1        A.    Agreed.

2        Q.    You're not qualified to make a

3   medical diagnosis?

4        A.    Agreed.

5        Q.    Not able to prescribe medicine?

6        A.    True.

7        Q.    Order treatment?

8        A.    Yes.

9        Q.    In this case and we will get into

10  this more specifically, is it fair to say you

11  deferred to either Dr. Rugino and/or Nurse

12  Lampton with respect to Aubrie Hysell's life

13  expectancy?

14       A.    Yes.

15       Q.    You made no independent conclusions

16  about Aubrie Hysell's life expectancy; correct?

17       A.    True.

18       Q.    You would agree that you're not

19  qualified to give opinions on the applicable

20  standard of care for a hospital or a nurse?

21       A.    Sure.

22       Q.    As you sit here today, you do not

23  tend to render opinions as to the cause of

24  Aubrie Hysell's alleged injuries in this case?

25       A.    Nothing with regard to cause.

# Exhibit F

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                          AT BECKLEY

4

5   RYAN HYSELL and CRYSTAL
    HYSELL, on behalf of their
6   daughter, A.H., a minor,

7                    Plaintiffs,

8   vs.                           Case No. 5:18-cv-01375

9   RALEIGH GENERAL HOSPITAL,
    et al.
10
                    Defendants.
11   _____/

12

13

14

15          DEPOSITION OF JEROME A. BARAKOS, M.D.

16               Thursday, January 30, 2020

17                San Francisco, California

18                    Pages 1 to 36

19

20

21

22

23   REPORTED BY:

24   Richard M. Raker

25   CSR No. 3445



1    insult.  The location, distribution, morphology and

2    signal is consistent with that, most specifically a

3    hypoperfusional and hypoxic event, and are not in

4    keeping with a genetic basis.

5        Q.  Now, you mentioned that your findings are

6    from a remote injurious insult; is that correct?

7        A.  Yes, sir.

8        Q.  Are you able to time the insult to any

9    degree other than the fact it's a remote injurious

10   insult?

11       A.  No, sir.  Typically we're in a position to

12   state that this is an abnormal finding that would be

13   associated with hypoperfusion hypoxia, and then turn

14   it over to the clinical experts or the clinicians

15   caring for the child to ascertain what potential

16   sentinel event would be associated with this process.

17       Q.  And in this particular case, are you going

18   to come to trial and give an opinion any more

19   definitive about the timing of the insult other than

20   what you've just mentioned?

21       A.  No, sir.

22       Q.  All right.  Now, in terms of your other

23   opinions in this case that we haven't discussed, can

24   you tell me what they are, please?

25       A.  I think I pretty much covered it.  There's



1   confined essentially to the white matter of the

2   brain?

3       A.   Yes, sir.

4       Q.   You mentioned that you did review a report

5   from Dr. Gordon Sze; is that correct?

6       A.   Yes, sir.

7       Q.   Do you have any disagreements with his

8   report?

9       A.   I would say that I agree with Dr. Sze that

10  these findings are in keeping with periventricular

11  leukomalacia.  I would disagree with Dr. Sze in his

12  statement that -- so the way he phrases it, so I

13  disagree with the statement that these findings of

14  periventricular leukomalacia or gliosis can be

15  consistent with a genetic cause.

16      Q.   Any other disagreements with his report

17  other than that?

18      A.   No, sir.

19      Q.   Doctor, my understanding is that you were a

20  contributor to the textbook "Fundamentals of

21  Diagnostic Radiology"; is that correct?

22      A.   Yes.

23      Q.   And in the latest edition, did you author

24  the chapter on "Pediatric Neuroimaging"?

25      A.   If it's edition -- the latest edition,



1   matter from inheritable, genetic and metabolic

2   conditions do damage white matter, do give signal

3   abnormality, do cause tissue dropout, but it's simply

4   not in this pattern.

5          So that's why I would state, for example, if

6   the case goes to court and someone on the other side

7   is saying, "Jerry, I believe this could be genetic,"

8   well, then, I would be in a position to pull all the

9   literature I could find on the vast array of

10  dysmyelinating and demyelinating conditions to show

11  that no such genetic condition exists that gives you

12  this morphologic pattern of PVL.  But at the end of

13  the day I wouldn't disagree with the fact that, yeah,

14  this could be PVL, which I'm stating it is, but there

15  may be a genetic process as well, but that genetic

16  process would not and could not be accounting for the

17  white matter changes that we've described on the

18  imaging study.

19      Q.    Doctor, you were asked about how many

20  depositions in terms of percentages in which you

21  testified.  I guess -- let me go back a step further.

22  How many cases do you review per year?

23      A.    On the neighborhood of about six or eight a

24  year.

25      Q.    And I would assume that review follows the



# Exhibit G

1                THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                          AT BECKLEY

4

5    RYAN HYSELL and CRYSTAL HYSELL,

6    ON BEHALF OF THEIR DAUGHTER, A.H.,

7    A MINOR

8          Plaintiffs,

9    -v-                                    Civil Action No:

10   RALEIGH GENERAL HOSPITAL, ET AL.    5:18-cv-01375

11         Defendants.

12

13        Deposition of Thomas Andrew Rugino, M.D.

14                     Washington, DC

15               Saturday, February 1, 2020

16                       9:40 a.m.

17

18

19   Job No: J4786812

20   Pages:  1-132

21   Reported by:  Kenneth Norris



THOMAS ANDREW RUGINO, M.D.                    February 01, 2020
HYSELL vs RALEIGH GENERAL HOSPITAL                        37

1    from the calvarium and mild enlargement of the

2    ventricle.

3         Q.    All right.

4              Let's talk about the March -- well, first of

5    all, is that pretty much the sum total of your

6    understanding of what was shown on the April 2012 MRI

7    scan?

8         A.    I think that's a good summary.

9         Q.    Let's talk about the March 2016 MRI scan.

10   What's your understanding of what that scan showed?

11        A.    It showed pretty much the same thing, signal

12   changes in the periventricular region and volume loss.

13        Q.    Is it your understanding that these scans

14   show that periventricular leukomalacia or PVL?

15        A.    Yes.   That's a -- that's a reasonable

16   interpretation.

17        Q.    Now, let's take a look at the next section.

18   After the neurological you have got

19   neurodevelopmental.

20              This particular information, where did it

21   come from?



THOMAS ANDREW RUGINO, M.D.                     February 01, 2020
HYSELL vs RALEIGH GENERAL HOSPITAL                          69

1    manifestation of muscle dyscontrol along with the

2    dysphagia.  Those are aspects of muscle dyscontrol

3    that you just don't see with autism spectrum disorder.

4            Even the tremors.  They're not

5    characteristic at all of individuals with autism

6    spectrum disorder.

7        Q.   Now, in terms of the hypoxic injury that you

8    believe occurred in this case, are you intending to

9    come to trial and express an opinion as to when it

10   occurred?

11       A.   No.

12       Q.   So, as we sit here today, you're not going

13   to come to trial and testify to a reasonable degree of

14   medical probability as to when the hypoxic injury

15   occurred; is that correct?

16       A.   No.

17       Q.   That's not correct or that's correct?

18       A.   Oh, I'm sorry.

19       Q.   I mean --

20       A.   I have no intention of testifying at trial

21   as to the timing of the injury.



# Exhibit H

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                      *   *   *

4    RYAN HYSELL and CRYSTAL HYSELL,

5    on behalf of their daughter, A.H.,

6    a minor,

7            Plaintiffs,

8        vs.              CASE NO. 5:18-cv-01375

9    RALEIGH GENERAL HOSPITAL,

10   COMMUNITY HEALTH SYSTEMS, INC.,

11   D/B/A/ ACCESS HEALTH, DEBRA

12   CROWDER, CNM, and THE UNITED

13   STATES OF AMERICA,

14           Defendants.

15                     *   *   *

16           Deposition of ELIZABETH SCHORRY, M.D.,

17   Witness herein, called by the Defendants for

18   cross-examination pursuant to the Rules of Civil

19   Procedure, taken before me, April L. Crites, RPR,

20   RMR, CRR, a Notary Public in and for the State of

21   Ohio, at the offices of Cincinnati Children's

22   Hospital Medical Center, 3333 Burnet Avenue,

23   Conference Room E5.249, Cincinnati, Ohio, 45229,

24   on Monday, November 25, 2019, at 9:51 a.m.

25                     *   *   *

Page 29

1   amount of time that we can say just based on

2   the symptoms.

3         Q.   Okay.  Based on the MRI findings

4   of white matter injury around the ventricles,

5   where -- and just in terms of the MRI, what

6   would that indicate in terms of the timing of

7   that injury?

8              MR. NACE:  Asking for an expert

9   opinion, which I don't think is her expertise.

10             THE WITNESS:  That's correct.  That

11  is not my area of expertise.

12  BY MR. OFFUTT:

13        Q.   Okay.  All right.

14             So did the findings of the white

15  material injury around the ventricles play any

16  part in your diagnosis or assessment of Aubrie?

17        A.   It did play some part in the

18  assessment.

19        Q.   Okay.

20        A.   I mean, I've seen these sorts of

21  changes often.  I see them often in children

22  who are premature, which she was not.

23        Q.   Is this condition also called

24  periventricular leukomalacia?

25        A.   It can be called that, yes.

Page 69

1           MR. NACE:  Yes, I'm still here.

2           MS. KNERR:  Okay.  So we know it's on

3    Barry's end.  Maybe he just needs to try --

4           THE WITNESS:  There it says your

5    speaker is muted.  Un-mute?

6           MR. NACE:  Are you there?

7           THE WITNESS:  Are you back?

8           MR. NACE:  Yeah.

9           THE WITNESS:  We lost you.

10           MR. NACE:  I know, I'm sure you

11    missed us.  Matt did it.

12           THE WITNESS:  Okay, good.

13    BY MR. NACE:

14        Q.   The question I was asking, ma'am,

15    you weren't aware of what the sats were at the

16    time of delivery and in the nursery, were you?

17        A.   No.

18        Q.   You were told that there was some

19    suctioning that took place, but you have no

20    idea what was suctioned or how much, right?

21        A.   Right.  Only what the parents told

22    us was all the information we had at that time.

23        Q.   As a geneticist, do you get into

24    things such as hypoxia causing brain damage?

25    Or is that something outside of your area?

Page 70

1      A.    That is generally outside of my

2    area.  My area is, are there genetic causes for

3    the brain injury?

4      Q.    If there were -- if it was known

5    that there were causes that showed -- that bad

6    sats that showed suctioning of meconium --

7      A.    Oh, was there meconium?  I never

8    heard anything about meconium.

9      Q.    You haven't heard my question yet.

10      A.    Okay.

11      Q.    That would affect your opinions on

12    whether this is genetic history or not, right?

13      MR. WESTFALL:  This is Fred Westfall.

14    I'll place an objection on the record.  The

15    question assumes facts that definitely are not in

16    evidence.

17      MR. NACE:  Okay.

18      MR. OFFUTT:  Join in the objection.

19    BY MR. NACE:

20      Q.    Ma'am, you weren't given

21    information that might indicate a cause of

22    something other than genetics; is that correct?

23      A.    I was not given information at

24    that first visit?  No, I didn't -- I didn't

25    really have any --

# Exhibit I

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                    *    *    *

4    RYAN HYSELL and CRYSTAL HYSELL,

5    on behalf of their daughter, A.H.,

6    a minor,

7          Plaintiffs,

8       vs.                CASE NO. 5:18-cv-01375

9    RALEIGH GENERAL HOSPITAL,

10   COMMUNITY HEALTH SYSTEMS, INC.,

11   D/B/A/ ACCESS HEALTH, DEBRA

12   CROWDER, CNM, and THE UNITED

13   STATES OF AMERICA,

14          Defendants.

15                   *    *    *

16          Deposition of TODD M. ARTHUR, M.D.,

17   Witness herein, called by the Defendants for

18   cross-examination pursuant to the Rules of Civil

19   Procedure, taken before me, April L. Crites, RPR,

20   RMR, CRR, a Notary Public in and for the State of

21   Ohio, at the offices of Cincinnati Children's

22   Hospital Medical Center, 3333 Burnet Avenue,

23   Conference Room E5.249, Cincinnati, Ohio, on

24   Monday, November 25, 2019, at 12:32 p.m.

25                   *    *    *

Page 28

1   global delays or any type of physical

2   manifestation of an injury, neurologic or

3   otherwise, have these same MRI findings as

4   Aubrie?

5           A.    Specific to her imaging, yes, they

6   could -- they could have normal development,

7   not have global developmental delay.

8           Q.    Okay.

9           A.    If I answered your question; I

10  think I did.

11          Q.    Right.

12                If the -- if her brain had been

13  injured at the time of birth would -- by

14  hypoxia or whatever, would you expect it to

15  have been microcephalic at birth?

16                MS. KNERR:  I think we're getting a

17  little close to getting some expert testimony, but

18  go ahead.

19                THE WITNESS:  All right.

20                MS. KNERR:  Go ahead.

21                THE WITNESS:  Would I expect her to

22  be microcephalic at birth?  No.

23  BY MR. OFFUTT:

24          Q.    All right.  Were you able to make

25  a determination as to the cause of Aubrie's

Page 29

1   conditions?  Her global delay and other issues

2   she was having?

3          A.    No.

4          Q.    I note in the records that at one

5   point you say that she has a condition known as

6   cerebral palsy.

7          A.    Correct.

8          Q.    And is it true that that is more a

9   description of a constellation of symptoms than

10  a diagnosis?

11         A.    Correct.

12         Q.    And the fact that it's labeled as

13  cerebral palsy doesn't tell you anything about

14  the cause of the condition, does it?

15         A.    Correct.

16             MR. OFFUTT:  Okay.  Thank you,

17  Doctor.  That's all I have.

18             THE WITNESS:  Okay.

19             MR. OFFUTT:  All right, Fred.

20             MR. WESTFALL:  For some reason, I

21  got -- I got dropped off for part of this.  But I

22  don't have any questions.  Thank you very much.

23             MR. OFFUTT:  You're trusting that I

24  asked all the right questions?

25             MR. WESTFALL:  Hey, I have to.  For