**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

RYAN HYSELL and CRYSTAL HYSELL,
on behalf of their daughter, A.H., a minor,

                Plaintiffs,

*v.*

RALEIGH GENERAL HOSPITAL, *et al.*,

                Defendants.

Case No.  5:18-cv-01375
Judge: Frank W. Volk

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**COME NOW** Plaintiffs, by and through undersigned counsel, and respectfully submit to this Honorable Court their Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgement. In opposition thereto, Plaintiffs state the following:

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs initiated this lawsuit in the State of West Virginia by following the procedural requirements established under the West Virginia Medical Professional Liability Act, W.Va. Code 55-7B-01, *et seq.* and hereinafter referred to as the "MPLA." At the time litigation was initiated, Plaintiffs had no way of knowing if any individuals involved in the care and treatment of the Plaintiffs were afforded the individual protections granted under the Federal Tort Claims Act, 28 U.S. C. §2671, *et seq.* ("FTCA"). It was not until after the filing of the lawsuit that the government intervened on behalf of its employees.

Baby A.H. was born on November 2, 2010. There was nothing significant about the pregnancy of Mrs. Hysell. She and her husband, Ryan, who is a pastor now of a church in Michigan, were having their first pregnancy.

When admitted to Raleigh, Ms. Hysell came under the care of the nurses and a mid-wife, Ms. Crowder. No physician was involved until the day after delivery. Ms. Hysell was placed on a Fetal Monitor, which was to provide information on her contractions and on the baby's heart rate. This information is recorded and printed out on what is generally called the Fetal Monitor Strip ("FMS"). Not only is the FMS supposed to be used and understood by both the attending nurse and the mid-wife, but these health care providers are also required to be noting the clinical picture, providing notes of what is occurring and be prepared to request the assistance of a physician if necessary. Clearly the purpose of the FMS is to provide protection for the baby in the event something begins to go wrong or the risk of something going wrong can be remedied by proper medical action. The nurse and mid-wife have a duty to interpret the strips and know the significance of what is on the strip. The question then becomes whether the health care providers including the nurse and mid-wife followed the standard of care.

For purposes of this motion it is accepted that they did not follow the standard of care. Plaintiffs' experts Nurse Connors and Mid-wife Fassett were not designated to give causation testimony. Both testified concerning the standard of care. Both testified that the FMS showed that it was frequently not showing the baby's heartbeat; that it was frequently *only* showing the mother's heart beat; when it did show the baby's heartbeat, important abnormalities were being missed; and that the FMS was "non-reassuring" (a medical term). Not only was the monitoring below the standard of care, but established guidelines on what a nurse and mid-wife should do under the circumstances were not followed. The healthcare providers were required to move up the chain of command to correct a non-reassuring FMS. The failure to do so is negligence. Mrs. Hysell and A.H. were to be monitored by the fetal monitor and essentially this was not done appropriately such that much of the necessary vital information was not available and what little

was available was ignored or mis-read. Most importantly, the failure to monitor the FMS in conjunction with the clinical presentation of mother and baby caused the health care providers to negligently fail to address a medical condition that was causing damage to the baby.

When A.H. was born, she was noted to have breathing (respiratory) issues, improper color, was "dusky," did not initially cry, and was not moving appropriately. The records do not tell us what happened for the next 15 minutes, but we did learn through depositions of the hospital personnel that the baby was carried from the delivery room to the nursery where an O2 saturation of 68 was recorded. An O2 saturation is the measurement of the baby's oxygen content. An O2 saturation of 68 is considered very low and abnormal. We know the baby was given rudimentary "blow-by" oxygen and needed to be suctioned. We know that for about 4 hours the baby was kept from her mother. We also know from the record that during the delivery, Ms. Hysell's own O2 content was significantly reduced.

While it is not in the record but was developed during depositions of both Mr. Hysell and Mrs. Hysell's mother, who were both present at the birth, in the period of time between four minutes before birth when the nurse mid-wife (finally) appeared at the bedside at 14:51 and the time of birth at 14:55, the mid-wife stated that the baby was stuck and she had to push the cord away so the baby could be delivered. (Exhibit 2 at 20:10: "It was obstructing [A.H.'s] delivery. [A.H.] could not come out until that cord was moved." & Exhibit 2 at 18:22 – 19:8:

> "that's when she [the nurse mid-wife] said, 'Don't push. I got to move something… then she said, 'The cord is around her neck.' And she reached up in there to move the cord and that's when she went to kind of – when she went to pull her out . . ."

Mrs. Hysell had been "pushing" for two hours, which by itself is quite stressful on any baby.

Thereafter Mr. and Ms. Hysell noticed that A.H. was not meeting normal "milestones" and they began a search for why. The child had an MRI that was reported initially as normal at about 17 months. This led to a multi-year search for a reason as to why the child was having cognitive dysfunction and functional disabilities. The health care profession looked for a genetic basis, but none was ever found. At the age of six the child had another MRI which was not normal. Rather it showed periventricular leukomalacia. As Jerome Barakos, M.D., Plaintiffs' expert neuro-radiologist, testified, these findings are a result of "a hypoperfusional and hypoxic event" (Exhibit 3 at 17:24 – 18:4).   A review of the first MRI revealed that it had been misinterpreted and the two MRIs were essentially the same. Hypoxia or insufficient oxygenation resulting in the same findings at birth as what were shown by A.H. is a common cause of cerebral palsy, which is the now-carried diagnosis of A.H.

The question now raised in the pending motion is: "Is there more than a scintilla of evidence and or reasonable inferences to be drawn from the evidence to establish that A.H.'s cerebral palsy and associated damages was caused by the alleged negligence of the healthcare providers in failing to properly monitor the labor and delivery of A.H. and failing to identify and treat the prolapsed cord?" As stated below, there is more than enough evidence to proceed.

## **STANDARD OF REVIEW**

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986).  The relevant substantive law is used to identify the applicable material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if "a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb v.*

*Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 at 248 (1986)). An issue is genuine where the record as a whole could lead a reasonable jury to find for the nonmoving party. See *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The granting of a motion for summary judgment, however, is only appropriate when, viewing the record in a light *most* favorable to the nonmoving party, the Court determines that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV.P. 56(c). Additionally, it has long been established that in viewing the record, the Court must not only view the facts in the light most favorable to the nonmoving party but also any inferences made from those facts. ("Rule 56 provides that summary judgment shall be rendered only if 'there is no genuine issue as to any material fact.' *The inferences to be drawn from the underlying facts contained in the materials before the trial court must be viewed in the light most favorable to the party opposing the motion.* Helm v. Western Maryland Ry. Co.*, 838 F.2d 729, 734 (C.A.4 (Md.),1988) (internal citations omitted) (Emphasis added).

As stated by the United States Supreme Court:

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (U.S.Dist.Col.,1986).

Further, the burden of proof is on the movant to show: 1) that there is no genuine issue as to any material fact; and 2) that the movant is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Defendants have not told us what material facts are undisputed nor support Defendants' Motions. All of the evidence found in pleadings, depositions, answers to interrogatories, admissions and affidavits filed pursuant to discovery is to be viewed in the light most favorable to the non-moving party. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S.

133, 150 (2000). All "reasonable inferences" drawn from the evidence should also be viewed in favor of the non-moving party, and the court may not make credibility determinations or weigh the evidence during this review. *Id.* It is clear that if Plaintiffs present evidence and inferences that create a dispute about a material fact that a reasonable jury could find in their favor; the Court must deny the motion.

## **LEGAL ARGUMENT**

**I.   THE WEST VIRGINIA MEDICAL PROFESSIONAL LIABILITY ACT DOES NOT REQUIRE A HEIGHTENED STANDARD OF CAUSATION BEYOND THAT OF GENERAL TORT LAW.**

"In an action for damages against a physician for negligence or want of skill in the treatment of an injury or disease, the burden is on the plaintiff to prove [by a preponderance of the evidence] such negligence or want of skill and that it resulted in injury to the Plaintiff."  Syl. Pt. 1, *Roberts v. Gale*, 149 W.Va. 166, 139 S.E.2d 272 (1964) citing Syllabus, *White v. Moore*, 134 W.Va. 806, 62 S.E.2d 122 (195); Syl. Pt. 4, *Hundley v. Martinez*, 151 W.Va. 977, 158 S.E.2d 159 (1967); Syl. Pt. 1, *Hinkle v. Martin*, 163 W.Va. 482, 256 S.E.2d 769 (1979) citing Syl. Pt. 4, *Hundley v. Martinez*, 151 W.Va. 977, 158 S.E.2d 159 (1967); *Torrence v. Kusminski*, 185 W.Va 734, 408 S.E.2d 684, 696 (1991); *Short v. Appalachian OH-9, Inc.*, 203 W.Va. 246, 507 S.E.2d 124 (1998). W.Va. Code § 55-7B-3(a) [2003] sets forth the elements of proof of medical negligence in the current MPLA.  That section provides:

**W.Va. Code § 55-7B-3**
**Elements of Proof**

(a) The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care;

(1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

6

(2) Such failure was a proximate cause of the injury or death.

"A party in a tort action is not required to prove that the negligence of one sought to be charged with an injury was the sole proximate cause of an injury.  *Divita v. Atlantic Trucking Co*., 129 W.Va. 267, 40 S.E.2d 324 (1946), is overruled to the extent it states a contrary rule."  Syl. Pt. 2, *Mays v. Change*, 213, W.Va. 220, 579 S.E.2d 561 (2003); Syl Pt. 6, *Stewart v. George*, 216 W.Va. 288, 607 S.E.2d 394 (2004) citing Syl. Pt. 2, *Everly v. Columbia Gas of West Virginia*, 171 W.Va. 534, 301 S.E.2d 165 (1983).  See *Yates v. Mancari*, 153 W.Va. 350, 168 S.E.2d 746 (1969).

In order to prove proximate cause, Plaintiffs need only establish that the evidence presented would warrant a "reasonable inference" that the injury was caused by the defendant's acts, conduct, omissions or breach of the standard of care: "Medical testimony to be admissible and sufficient to warrant a finding by the jury of the proximate cause of an injury is not required to be based upon a reasonable certainty that the injury resulted from the negligence of the defendant.  All that is required to render such testimony admissible and sufficient to carry it to the jury is that it should be of such character as would warrant a reasonable inference by the jury that the injury in question was caused by the negligent act or conduct of the defendant." *Thornton v. CAMC*, 172 W.Va. 360, 305 S.E.2d 316 (1983) citing Syl. Pt. 3, *Hovermale v. Berkeley Springs Moose Lodge*, 165 W.Va. 689, 271 S.E.2d 335 (1980);  *Mays v. Change*, 213 W.Va. 220, 579 S.E.2d 561 (2003)(finding "reasonable inference" sufficient to create jury issue on causation ); Syl. Pt. 2, *Sexton v. Grieco*, 216 W.Va. 714, 613 S.E.2d 81 (2005) citing Syl. Pt. 1, in part, *Pygman v. Helton*, 148 W.Va. 281, 134 S.E.2d 717 (1964).

Defendants' Motion is predicated on the faulty analysis that Plaintiffs' expert witnesses should specify as to the exact "timing" of the injury, *i.e.*, what hour and minute did the event occur. That, however, is not what the MPLA requires nor does any case law support such concept. Such

an analysis is not relevant to the matter before the Court. The question before the Court, and ultimately the fact finder, is "was the negligence a proximate cause of the damages." Despite Defendants' limited recitation of the actual testimony proffered by the expert witnesses, Plaintiff has actually presented ample testimony on causation.

## II.   PLAINTIFFS' EXPERT WITNESSES HAVE OFFERED AMPLE CAUSATION TESTIMONY.

The Defendants' motion is silent on any challenge that there is not sufficient testimony on what the standard of care required and how it was breached. Given such a concession, for the purposes of this Motion, it must be accepted as true that the Defendants were negligent in failing to properly monitor Ms. Hysell's labor and delivery. Specifically, the testimony established that once the FMS stopped appropriately recording the baby's heart rate and the contractions of Ms. Hysell, the Defendants violated the standard of care in failing to report the concerning fetal monitor tracing to the proper personnel. In failing to properly monitor A.H., the Defendants failed to identify the prolapsed cord that was causing restriction of blood flow to A.H.'s brain, which led to a hypoxic event. The question at issue is "was the failure to properly monitor the FMS and to identify the prolapsed cord more likely than not a cause of the hypoxic event and resulting damages that A.H. underwent and still suffers today?" The testimony clearly establishes such causation.

While Defendants assert that certain witnesses identified by Plaintiffs do not offer expert testimony on the issue of causation, they were never identified as doing so. Nurse Mid-wife Fassett and Nurse Connors, the designated nurse mid-wife and nurse, were never so designated because they do not have the proper knowledge, education, and/or training to offer causation testimony on the matter. They are standard of care expert witnesses. The same is true of Nurse Lampton, Plaintiffs' life care planner, and Mr. Staller, Plaintiffs' economist, who simply have nothing to do with liability and are damages expert witnesses.

Dr. Barakos, a neuroradiologist, was identified to discuss the MRI findings and point out that the two MRIs years apart were essentially the same in meaning, which subsequently was confirmed by a treating pediatric neurologist, Dr. Arthur, when he testified in his deposition. Dr. Barakos stated:

> "these findings are characteristic, essentially pathognomic of a hypoperfusion hypoxic insult. They are not consistent with a genetic process or inheritable or metabolic condition. And the findings noted on the latter study of 2016 are there present on the earlier study. And they're static, they're not progressive, which is a feature that you may see in the metabolic or a genetic condition, but it's really the morphology of these findings that afford us as imagers to say this is a hypoperfusional hypoxic injury. It's not due to metabolic or inheritable or genetic condition. And that would be the sum total of my testimony."

(Exhibit 3 at 19:3-16).

"Hypo" means below normal; "perfusional" means distribution of the oxygen being carried in the blood; and "hypoxic" is insufficient oxygenation.

In fact, that point is now undisputed. The MRIs are essentially the same, showing damage caused by hypoxia (insufficient oxygenation). Furthermore, Dr. Barakos did in fact offer appropriate causation testimony when he identified that the cause of the injury was a hypoperfusion hypoxic event that occurred during the time of delivery.

The only testimony then is that the mid-wife and nurse were negligent, there was a prolapsed cord impeding the delivery, and each MRI shows evidence of hypoxic damage as does A.H., clinically.

**a.  Dr. O'Meara Offered Vast Testimony On Causation.**

Dr. O'Meara is Plaintiffs' expert pediatrician. This is her first time serving as an expert witness in a medical malpractice case where she is expressing opinions. Defense counsel pulled one answer from her 134-page deposition *knowing* that such is a misrepresentation of the testimony as a whole. Dr. O'Meara did say "no" when asked a general causation question at page 51 of her

deposition and has now corrected that statement through her errata sheet. (Exhibit 4). Given the copious amounts of causation testimony provided thereafter by Dr. O'Meara in response to the questions on causation asked by Defense counsel, it is clear that this "no" was a misstatement and/or a simple misunderstanding of legal terminology put before a non-hired gun expert witness.

A complete review of her testimony and her Expert Disclosure (Exhibit 5) which was the basis of her examination reveals the following testimony on the issue of causation:

> Q.   Is that your report that you prepared concerning your opinions in this case?
>
> **A.   Yes, this is the report.**

(Exhibit 4 at 5:20 – 22),

> **A.   What are remarkable about these Apgars is that the points that were taken off were for activity and vigor and for irregular breathing.**

(Exhibit 4 at 33:1 - 33:4),

> Q.   Now the last sentence in your summary says: Subsequently, AH manifested neurologic impairments and brain MRI finding consistent with a hypoxemic brain injury. Do you see that on Exhibit No. 1?
>
> **A.   No. But the neurologic impairments that she subsequently manifested are not impairments that you would see immediately after birth.**

(Exhibit 4 at 45:7 - 11 & 46:4 - 7),

> Q.   And the brain MRI that you're talking about, that was performed well after the child was born?
>
> **A.   Correct. When the neurologic impairments would have become apparent and the findings on the MRI would have become apparent.**

(Exhibit 4 at 47:5 - 10),

> **A.   It is my medical opinion within a reasonable degree of medical probability that there was evidence of a fetus in distress on the fetal heart tracings that was not identified. Who did not identify that, and what kind of intervention should have been done, is not what I'm going to testify to, only that there are concerning findings on the fetal heart**

**tracing that required some kind of attention or documentation that they were not concerning.**

(Exhibit 4 at 48:15 – 49:3),

> Q.    Item No. 1 in your report, you indicate: It's necessary for a pediatrician or other qualified provider to be summoned to a delivery for these tracings so they can signal - - as they can signal a fetus in distress and suffering from hypoxemia and acidosis. Do you see that?

> **A.    Yes.**

(Exhibit 4 at 62:1 - 9),

> **A.    There is evidence that this infant had neonatal depressions with irregular respirations, low tone and duskiness after birth, which could be a sign of cord compression.**

> Q.    Can you testify to a reasonable degree of medical probability that that was actually what happened in this case?

> **A.    Given the information and the testimony from the patient's or the - - of Aubrey's father and her grandmother, yes, I could say that within a reasonable degree of medical probability.**

> **A.    This infant had some compromise of the cord and restricted blood flow that caused hypoxemia and acidosis that was evidence by her presentation at birth with irregular respiration, low tone, hypoxemia, documented by low sats and duskiness.**

(Exhibit 4 at 64:20 - 65:5; 65:7 – 11; & 65:17 – 22),

> Q.    In your opinion - - again, I'm asking to a reasonable degree of medical probability, which means more likely than not under the law applicable to this case. - - did that cord prolapse cause any permanent injury to this child?

> **A.    Given the medical records available to me, within a reasonable degree of medical probability, yes.**

> Q.    And what permanent injury did it cause?

> **A.    Neurologic injury resulting in developmental delays.**

(Exhibit 4 at 66:3 – 15),

Q.    What resuscitation do you believe the child should have had that the child did not receive following birth?

A.    **Um, the infant received bulb suctioning and blow-by oxygen and stimulation. Um, I believe that she would have benefitted from and would have had a faster resolution of her hypoxemia that was documented in the nursery of 68 percent had she had suctioning, deep suctioning, in the delivery room, additional stimulation, and she may have required positive pressure ventilation with a mask because of her irregular breathing. Those things would have resulted in faster resolution of her hypoxemia.**

(Exhibit 4 at 68:13 – 69:5),

Q.    Is it your understanding that the baby had respiratory distress after birth in the labor and delivery room?

A.    **Yes, that is my understanding.**

Q.    And what do you base that on?

A.    **The documentation in the chart of Apgars with irregular respirations and low tone.**

(Exhibit 4 at 70:12 – 19),

Q.    Do you believe that (A.H.) required monitoring of oxygen saturation at the time of delivery?

A.    **After a nonreassuring fetal heart tracing, it would be recommended by the NRP.**

(Exhibit 4 at 93:1 – 3 & 9 – 11),

Q.    But in this case we also have in the record, we know that the child is born - - as described in the record - - with some respiratory issues, some color, and that sort of thing. Is that the sort of baby that can be born if the baby has been under stress during the delivery process?

A.    **Yes. That is exactly.**

(Exhibit 4 at 103:3 – 9 & 14),

Q.    And if you're not able to come through the birth canal as necessary, does that put stress on the baby?

12

**A.**     **It would put stress on the baby from: (A).  They're not being able to come down the birth canal, but also because if the reason you cannot come down the birth canal is that the umbilical cord is being compressed in a life threatening way, then yes, that would put a great deal of stress on the baby.**

**The condition of the infant that is documented after birth is consistent with the grandmother and father's description of there being some issue with the cord. And that issue with the cord would produce a hypoxemia and acidosis that would produce the clinical picture of this infant when she was born with irregular respirations, low tone, duskiness, and low sat of 68 percent when she gets to the nursery.**

(Exhibit 4 at 104:13 - 15 & 19 – 105:5 & 18 – 106:5),

**A.**     **Yes. So hypoxemia and acidosis from prolonged stress would produce all of those findings.**

(Exhibit 4 at 109:5 - 7),

**Q.**     I believe in this chart we also see that the mother had her sat taken a couple times early on and the findings were 86 and 87 percent.  What's the significance of that? If anything.

**A.**     **So that puts the baby at risk for hypoxemia.**

(Exhibit 4 at 109:13 – 110:3),

**Q.**     And in your opinion then what effect would the failure to not do those things that we've been talking about have with respect to causing hypoxemia?

**A.**     **The hypoxemia and acidosis, which is what contributes to the depression of the infant, occurred -- would have occurred before birth. So it simply would have been a prolongation of the hypoxemia and acidosis that the infant was experiencing.**

(Exhibit 4 at 114:4 - 17),

**Q.**     And is there anything –

**A.**     **-- is the standard of care.**

**Q.**     -- in this chart that would indicate you would not have been successful had the standard of care been followed?

Q.      Assuming according to doctors whose depositions you read, Dr. Arthur in particular, and plaintiffs' expert who will testify, that the MRIs were about the same and they show signs consistent with hypoxemia, in your opinion would there be a relationship between that hypoxemia shown on the MRIs, so the results of the hypoxemia shown on the MRIs – and what you see in the record here at birth?

**A.      Within a reasonable degree of medical probability, yes.**

(Exhibit 4 at 115:3 – 7 & 16; 116:1 & 4 - 5 & 10 - 11),

**A.      Within a reasonable degree of medical probability the inciting event to cause hypoxemia and acidosis had already occurred.  Yes.**

Q.      Okay.  In your opinion, within a reasonable degree of medical probability, is what was found when the child was born as reflected in the records -- just what the record says -- is that a result, more likely than not, of what happened in the last couple of hours before the delivery?

**A.:      That's correct.  Yes.**

(Exhibit 4 at 120:4 - 15 & 19).

In her Expert Disclosure, Exhibit 5, Dr. O'Meara summed up with this:

> "It is my opinion that it in this period when deviations from the standard of care occurred that were more likely than not a substantial cause of the hypoxemia that was eventually discovered and resulting damages incurred by this child…within a reasonable degree of medical probability."

Monitoring did not take place as required; the FMS is non-reassuring; no physician is called; the failure to get a physician prolongs the stress; the failure to recognize the cord blocking the egress prolongs the stress; and the failure to give proper care after the delivery prolongs the stress. This all contributes to the hypoxic event. Causation is simply all over the testimony and Dr. O'Meara's Statement.

**b. <u>Dr. Barakos Offered Testimony Establishing That The Hypoxic Injury Was Caused During the Delivery.</u>**

Dr. Barakos made it clear that the MRIs taken on April 16,22012 (about 17 months of age) and March 3, 2016 were virtually the same and consistent with a hypoxic event and that the specific findings indicated only a hypoxic event caused the findings.

> Q.    When you compare this scan, the one that was performed on March the 3rd of 2016 with the scan of April 6, 2012, are there any significant differences between the scans?

> **A.    I would say not significant. In other words, certainly there's been significant growth of the child's brain, so some of the shape and morphology is different as would be expected for interval growth, but the pathologic findings remain essentially the same.**

(Exhibit 3 at 16:3 – 12),

> **A.    Yes sir. These findings are the result of a remote injurious insult or the sequelae of a remote insult. The location, distribution, morphology and signal is consistent with that, most specifically a hypoperfusional and hypoxic event, and are not in keeping with a genetic basis.**

(Exhibit 3 at 17:24 - 18:4),

> **A.    No, sir. Typically we're in a position to state that this is an abnormal finding that would be associated with hypoperfusion hypoxia, and then turn it over to the clinical experts or the clinicians caring for the child to ascertain what potential sentinel event would be associated with this process.**

(Exhibit 3 at 18:11 - 16),

> **A.    I think I pretty much covered it. There's some – there's some substantiation and some factors that allow me or afford me the ability to make the statements, that these findings are characteristic; essentially pathognomic of a hypoperfusion hypoxic insult.**
>
> **They are not consistent with a genetic process or inheritable or metabolic condition. And the findings noted on the latter study of 2016 are there present on the earlier study. And they're static, they're not progressive, which is a feature that you may see in the metabolic or a genetic condition, but it's really the morphology of these findings that afford us as imagers to say this is a hypoperfusional hypoxic injury. It's not due to a metabolic or inheritable or genetic condition. And that would be the sum total of my opinions.**

15

(Exhibit 3 at 18:24 – 19:23).

At this point, the expert testimony tells us that there was a hypoxic event that was a cause of the claimed injuries and damages, which seems to be undisputed. There was only one hypoxic event in this child's life.

**c. Dr. Rugino Testified That The Damages Were A Result Of Hypoxia and Trauma Sustained During Delivery That Was A Result Of The Negligence**

Dr. Rugino is board certified in general pediatrics, physical medical and rehabilitation, and neurodevelopmental disabilities. His testimony is clear that A.H. suffered a brain injury caused by the hypoxia. Following are some excerpts of his sworn testimony:

> A.    **Again, I think we have ample evidence to show that hypoxia and ischemia resulted in brain injury, yes. I think we have more than ample evidence to suggest that.**
>
> Q.    -- it is your opinion to a reasonable degree of medical probability that she did suffer hypoxia and she did suffer a brain injury as a result of that hypoxia; correct?
>
> A.    **Yeah. Again, I think hypoxia and ischemia is the only reasonable mechanism for her brain injuries.**

(Exhibit 6 at 116:5 - 8 & 13 - 16 & 20 – 117:1),

> A.    **To put it in a nutshell, she sustained a hypoxic brain injury which resulted in – which resulted in motor dysfunction, global developmental delays, and very -- if not caused, very substantially worsened the autism. That's putting it in a nutshell.**

(Exhibit 6 at 62:21 - 63:4),

> Q.    In this particular case did you ever reach an opinion to a reasonable degree of medical probability as to what the cause of Aubrie Hysell's autism was?
>
> A.    **What I would say is if the brain injury -- if the hypoxia and the resultant chemical and epigenetic changes were not the cause of the autism, they were certainly factors in making the autism symptoms worse unquestionably. To with a reasonable degree of medical certainty with the understanding of the medical data available in 2019, 2020.**

16

(Exhibit 6 at 64:3 - 11),

Q.      And just so I make sure I understand, but it's your position or your opinion that some hypoxic insult at some time in the past has aggravated or exacerbated her autism; is that correct?

**A.      Unquestionably.**

(Exhibit 6 at 66:19 - 67:2),

Q.      But what the PVL that we've talked about on the MRI scans from 2012 to 2016, that's the radiographic evidence of the hypoxic injury; is that correct?

**A.      Again, that's -- that is the -- that is part of the radiographic evidence of the hypoxia. The other part is volume loss.**

(Exhibit 6 at 77:10 - 16),

**A.      The hypoxia occurred through the whole brain.  It didn't just occur to these areas of the white matter.**

Q.      Is there any evidence of any gray matter injury in this case?

**A.      Yes.**

(Exhibit 6 at 78:5 - 10),

**A.      The epigenetic changes occur at the time of the insult.**

(Exhibit 6 at 91:19 - 20),

Q.      Just so I'm clear as to what your opinion is, you believe -- it's your opinion that exposure to hypoxic ischemic events causes epigenetic changes in the brain and therefore causes autism or, in fairness to you, exacerbates an already autistic condition or predisposition, I guess would be a better way to put it?

**A.      That's a very good way to put it.**

(Exhibit 6 at 94:7 - 14),

**A.      If I hold my breath, no.  But if you have sustained hypoxia, then of course you're going to get brain structural and function changes.**

(Exhibit 6 at 113:12 - 14),

Q.     I want you to take a look at what's been marked previously as [deposition] Exhibit 5. If you can just read through it quickly, I'm going to ask you a couple of questions.

**A.     Okay.**

Q.     Basically what I want to ask you, Doctor, is it still your -- the opinion that you have expressed in there, are they still your opinions within a reasonable degree of medical certainty?

**A.     Yes.**

(Exhibit 6 at 114:8 - 17),

Q.     All the examinations, all the studies that the child has gone through, no one has found any genetic cause, have they?

**A.      Correct.**

Q.     So everybody seems to be agreeing on certain points as we go through here. That there is no indication of genetic injury and there appears to be hypoxic injury; correct?

**A.     Yeah.  I think that was pretty universally agreed upon by all the depositions I read and reports that I've read.  It is.**

(Exhibit 6 at 118:5 - 8 & 118:14 - 20),

**THE WITNESS: What I would say is that, yes, the hypoxic ischemic injury had clearly exacerbated the severity of -- had caused or exacerbated the motor problems, had caused or exacerbated the developmental deficits, had caused or exacerbated the autism symptoms.**

**THE WITNESS:   Again, there is no doubt.   The motor injuries are unquestionably due to the hypoxic ischemic injury.**

Q.     And the child also has cognitive dysfunction; correct?

**A.     Yes.**

Q.     Is there any question that the cognitive dysfunction that she has is also at least substantially contributed to by the hypoxia that occurred?

**A.     Absolutely unquestionable.**

(Exhibit 6 at 119:19 - 120:2 & 120:13 - 21 & 121:3),

18

**THE WITNESS: So the brain injury caused motor problems. The brain injury causes cognitive and developmental deficits, which impair her and give her tons of needs.**

(Exhibit 6 at 126:2 - 4),

Dr. Rugino's report is attached hereto as Exhibit 7. He states in his report that:

"It is my opinion within a reasonable degree of medical probability and certainty that in utero fetal distress followed by post-delivery respiratory distress and consequential cumulative hypoxia directly resulted in brain injury manifested clinically with profound developmental defects and developmental disability."

Defendants suggestion that there is lack of causation testimony to meet 55-7B-3(a)(2) is erroneous. The records such as the MRIs show the evidence of hypoxia and so to do the clinical findings. The standard of care testimony that is to be accepted as true establishes that the Defendants failed to properly monitor the labor and delivery process and to recognize abnormalities that would have identified the prolapsed cord. The testimony cited provides far more than a scintilla of evidence that as a direct and proximate result of the negligence, the prolapsed cord was allowed to cause a disruption of oxygenated blood to reach the brain; thus, causing the hypoperfusion hypoxic event that created the damages that A.H. suffers. The only hypoxic event is shown by the baby's condition at birth and then confirmed by the MRIs and clinical findings.

Thus, while Defendants wish to present this motion under the summary judgment standard, they fail to grasp that there are clearly material facts in dispute that alone require the Court to deny this motion under the standards set for under FRCP 56. What is shocking is that Defendants have not even filed a statement of material facts not in dispute in this matter to establish the basis for their motion. It is suggested that no such statement was filed because in actuality it is undisputed that 1) the FMS was non-reassuring and demonstrated signs of fetal distress; 2) the health care providers admitted that the cord was in the way of the delivery; 3) the MRI results all show

evidence of a hypoxic injury; and 4) the clinical picture of A.H. at the time of delivery and thereafter is wholly in line with a patient who suffered from a hypoxic injury during labor and delivery. Any reasonable jury presented with these facts is well within his or her rights and duties as a juror to find that as a result of the failure to properly monitor the FMS and to timely diagnose the prolapsed cord, A.H.'s brain was deprived of proper oxygenation and was damaged. Any finder of fact can, and will, come to that same conclusion based upon the testimony of Plaintiffs' expert witnesses.

## **CONCLUSION**

Plaintiffs have clearly met the requirements of W.Va Code §55-7B-3 (a) (1and 2). Standard of care violations are admitted for the purposes of the motions. The evidence on causation is not only present but overwhelming, and there is not even any conflicting evidence. The child developed hypoxia during the delivery process, which was negligently identified and treated, and the hypoxia caused the brain damage and injuries. That is causation. Dr.  Barakos, Dr. O'Meara, and Dr. Rugino provide the necessary expert testimony. There is no requirement in the Rules or case law in West Virginia that requires the second, the minute, or the exact hour when the damage occurred. And even so, Dr. O'Meara testified that the initial insult occurred at the time the cord was prolapsed during delivery and further testified that the standard of care was not met subsequent to delivery and that had it been appropriately met the hypoxia would have resolved faster and would not have resulted in the damages that we have today.

The Motions must be denied.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court Deny Defendants' Motions to Dismiss.

Respectfully submitted,

PAULSON & NACE, PLLC


*/s/ Matthew A. Nace*
Matthew A. Nace, Esq. #13072
Barry J. Nace, Esq. #7313
1025 Thomas Jefferson St., NW
Suite 810
Washington, DC 20007
202-463-1999 – Telephone
202-223-6824 – Facsimile
*man@paulsonandnace.com*
*bjn@paulsonandnace.com*
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of February, 2020, I caused a true and exact copy of the foregoing to be served via the CM/ECF upon:

D. C. Offutt, Jr., Esq.
I. Matthew Mains, Esq.
Shawna N. Pinkerton, Esq.
Offutt Nord Ashworth, PLLC
949 Third Avenue
Suite 300
PO Box 2862
Huntington, WV  25728
Phone: (304) 529-2868
Fax: (304) 529-2999
Email: dcoffutt@offuttnord.com
Email: immains@offuttnord.com
Email: snpinkerton@offuttnord.com
*Counsel for Raleigh General Hospital*

Fred B. Westfall, Jr., Esq.
Jason S. Bailey, Esq.
Jennifer M. Mankins, AUSA
United States Department of Justice
Robert C. Byrd United States Courthouse
300 Virginia Street, East
Suite 4000
Charleston, WV  25301
Phone: (304) 345-2200
Fax: (304) 347-5443
Email: fred.westfall@usdoj.gov
Email: jason.bailey2@usdoj.gov
Email: Jennifer.mankins@usdoj.gov
*Counsel for USA*

/s/ Matthew A. Nace
Matthew A. Nace, Esq.