## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

### AT BECKLEY

RYAN HYSELL and CRYSTAL HYSELL, on
behalf of their daughter, A.H., a minor,

      Plaintiffs,

v.                               CIVIL ACTION NO.  5:18-cv-01375

RALEIGH GENERAL HOSPITAL and
THE UNITED STATES OF AMERICA,

      Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

      Pending are Plaintiffs' Partial Motion for Summary Judgment and to Strike Defendant USA's Twelfth Affirmative Defense [Doc. 117], Defendant United States of America's Motion for Summary Judgment [Doc. 119], and Defendant Raleigh General Hospital's Motion for Summary Judgment [Doc. 121]. The matter is ready for adjudication.

### I.

#### A.    Introduction

      A.H. is the daughter of Plaintiffs Ryan and Crystal Hysell. She was born at Raleigh General Hospital ("Raleigh General") on October 29, 2010. The Hysells allege that Raleigh General employees failed to properly respond to a fetal monitor warning of irregularities during the birthing process and failed to identify (or negligently omitted or misled the Hysells as to) brain abnormalities resulting from hypoxemia during birth.

**B.     Factual Background**

At the time of delivery, Mrs. Hysell was forty-one weeks pregnant [Doc. 129-4 at 18]. Labor lasted approximately ten hours; Mrs. Hysell was actively pushing for the last two hours [Doc. 129-4 at 26]. Approximately five minutes before A.H. was delivered, Debra Crowder, a certified nurse midwife employed by Access Health, noted that the cord was impeding delivery and took steps to reposition A.H. [Doc 129-2 at 4; Doc. 129-4 at 20].

During the delivery, Mrs. Hysell's oxygen saturation level ("Sa02") was between 86% and 87% [Doc. 129-4 at 24]. Following birth, A.H.'s first APGAR score at one minute was a 7, which indicated deficits in respiratory effect, muscle tone, and color. A.H.'s second APGAR score at five minutes was an 8 [Doc. 119 at 12]. Approximately ten minutes after delivery, A.H. was given blow-by oxygen and bulb suction, bringing her Sa02 level up to an acceptable level (at least 85%) from 68% [Doc. 129-4 at 18; Doc. 129-7 at 2]. A.H. was taken to the nursery and given oxygen via a face mask, along with deep suctioning which produced thick mucus [Doc. 129-5 at 4]. A.H.'s Sa02 levels did not reach a normal threshold until after these two more intensive actions were deployed [*Id.* at 5]. A.H. was not returned to the Hysells until four hours after birth and was not seen by a pediatrician until the day after her birth [*Id.*].

Throughout her life, A.H. consistently failed to meet developmental milestones. Her parents embarked on a quest to determine the underlying cause. For example, A.H. was given an MRI that was reported as normal [Doc. 129-7 at 2]. As a result of the "normal" MRI, however, the Hysells obtained genetic and other testing. In March 2016, A.H. was diagnosed with a global developmental delay. The same month, another MRI revealed periventricular white matter gliosis, or low white matter volume [*Id.*]. Upon a more careful review, the earlier MRI exhibited the same

2

abnormalities [*Id.* at 3]. Ultimately, A.H. was diagnosed with cerebral palsy and autism spectrum disorder [Doc. 129-6 at 7].

## C.      Procedural History

On October 23, 2018, the Hysells, on behalf of A.H., instituted this action against Raleigh General. On March 11, 2019, the United States moved to substitute itself as the party Defendant in lieu of Access Health and Debra Crowder [Doc. 35]. The motion was predicated on Access Health and Debra Crowder being deemed federal employees by the United States Department of Health and Human Services [Doc. 35-1].[1] On July 16, 2019, the Court dismissed Access Health and Debra Crowder, substituting the United States in their steads [Doc. 73].

In keeping with the limited waiver of sovereign immunity in the Federal Tort Claims Act (the "FTCA"), the Court bifurcated the trial [Doc. 72]. First, the parties will present evidence to both the Court and a jury. The jury will render findings concerning Raleigh General's liability and damages, if any. The Court, separately, will adjudicate the United States' liability and damages, if any. But, as noted in the March 30, 2020, Amended Scheduling Order, "The Court is additionally considering utilization of th[e] . . . jury [as to the claims against the United States] in an advisory capacity pursuant to Federal Rule of Civil Procedure 39(c)" [Doc. 186 at 2].

On February 12, 2020, the parties moved for summary judgment. Respecting the Hysells' partial motion, they seek a striking order eliminating the United States' twelfth affirmative defense; the targeted defense invokes the noneconomic damages cap found in the West

---

[1] The Hysells originally named several other parties. First, they named three nurses who attended to A.H.'s birth. These parties were voluntarily dismissed on January 11, 2019 [Docs. 22, 23]. Second, they alleged wrongdoing by Community Health Systems, Inc. d/b/a Access Health, and a certified nurse midwife employed by Access Health. As noted, Access Health and Ms. Crowder were dismissed after the United States was substituted in their steads [Doc. 73].

Virginia Medical Professional Liability Act (the "MPLA"). The Hysells contend the United States' failure to carry medical professional liability insurance of at least one million dollars precludes its reliance upon the MPLA cap [Doc. 118 at 3]. In the alternative, the Hysells assert the MPLA is preempted, resulting in the applicable cap rising to $50 million under the FTCA.

The United States responds that applicable precedent permits imposition of the MPLA's non-economic damages cap in FTCA medical negligence cases. Regarding the professional liability insurance contention, the United States asserts that it provides "the functional equivalent" through the FTCA [Doc. 123 at 3]. Further, the United States asserts that the Hysells have misconstrued the source of the United States' liability, namely, the FTCA rather than state law. And, despite that federal source of liability, precedent yet permits the United States "to take advantage of the cap on damages even though the state law analog under the FTCA is not totally identical to all of the requirements that must be met by private parties under state law due to the sovereign immunity of the United States." [*Id.* at 4].

The Hysells reply that the United States ignores its intervening party status, which places it squarely in the shoes of its agents and representatives. And those agents and representatives, the Hysells assert, are "not of the class that the provisions of the West Virginia [MPLA] on non-economic damages were put in place to protect." [Doc. 126 at 1]. The Hysells additionally asserts that, while the "functional equivalent" standard upon which the United States relies has been applied to other states' laws, it has not been applied to West Virginia law.

Respecting the United States' motion [Doc. 119], judgment as a matter of law is sought on the single medical negligence claim based upon the Hysells' putative failure to prove proximate cause. Raleigh General's motion for summary judgment [Doc. 121], joins in the United States' motion, and contends the Hysells offer no sound expert proof of proximate cause. Raleigh

4

General additionally incorporates by reference its motion to exclude the expert testimony of Dr. A.M. Iqbal O'Meara [Docs. 144, 145], asserting she "is unqualified to render opinions in this case" and "the opinions she does offer do not pass muster under the reliability requirements of *Daubert* and Rule 702 of the Federal Rules of Evidence." [Doc. 151 at 6].

## II.

Federal Rule of Civil Procedure 56 provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The nonmoving party must do so by offering 'sufficient proof in the form of admissible evidence' rather than relying solely on the allegations of her pleadings." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)). If the nonmoving party fails to make a sufficient showing on an essential element, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The Court must "view the evidence in the light most favorable to the [nonmoving] party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (internal quotation marks omitted); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). "The court . . . cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *see also Lee v. Town of Seaboard*, 863 F.3d 323, 327

(4th Cir. 2017). In general, if "an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment.

"When the principles of summary judgment are applied in a medical malpractice case, one of the threshold questions is the existence of expert witnesses opining the alleged negligence." *Neary v. Charleston Area Med. Ctr., Inc.*, 194 W. Va. 329, 334, 460 S.E.2d 464, 469 (1995). Indeed, where the parties tender qualified experts whose testimony conflicts, "[t]he evidence . . . sets up a battle of the experts, which should not be resolved at summary judgment." *Reyazuddin v. Montgomery Cty., Md.*, 789 F.3d 407, 417 (4th Cir. 2015); *see also Anderson*, 477 U.S. at 249 ("At the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## III.

The pending cross motions for summary judgment raise two fundamental issues. First, whether the Hysells' proposed expert testimony gives rise to a genuine issue of material fact on the issue of proximate cause. Second, whether the MPLA's cap on damages applies to a suit prosecuted against the United States by way of the FTCA. Inasmuch as the MPLA requires expert testimony on proximate cause, the Court will first consider whether Dr. O'Meara is qualified to offer an expert opinion on proximate cause. The Court will then address the remaining issues.

A.      **Expert Qualification**

1.   **Standard**

In cases heard in federal district courts, "the Federal Rules of Evidence . . . generally control the admissibility of expert witness testimony." *Creekmore v. Maryview Hosp.*, 662 F.3d 686, 690 (4th Cir. 2011); *see also In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Products Liab. Litig.*, 810 F.3d 913, 919 n.1 (4th Cir. 2016). However, "there are circumstances in which a question of admissibility of evidence is so intertwined with a state substantive rule that the state rule . . . will be followed in order to give full effect to the state's substantive policy." *Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 110 (4th Cir. 1995) (internal quotation marks omitted); *see also Creekmore*, 662 F.3d at 690 ("[B]ecause the testimony at issue here was required for a medical malpractice claim under Virginia law, the sufficiency of its substance to meet plaintiff's prima facie case is governed by state law."). Inasmuch as qualified expert testimony is required by the West Virginia MPLA, the Court will apply West Virginia law.

"Rule 702 of the West Virginia Rules of Evidence is the paramount authority for determining whether or not an expert is qualified to give an opinion." Syl. Pt. 6, *Mayhorn v. Logan Med. Found.*, 193 W. Va. 42, 44, 454 S.E.2d 87, 89 (1994). Rule 702 provides, in pertinent part,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

W. Va. R. Evid. 702(a). The Supreme Court of Appeals of West Virginia has recognized that "Rule 702 states that a broad range of knowledge, skills, and training qualify an expert as such, and . . . we have rejected any notion of imposing overly rigorous requirements of expertise." *San Francisco v. Wendy's Int'l, Inc.*, 221 W. Va. 734, 745, 656 S.E.2d 485, 496 (2007). Critically,

7

"there is no 'best expert' rule" and, "[b]ecause of the 'liberal thrust' of the rules pertaining to experts, circuit courts should err on the side of admissibility." *Gentry v. Mangum*, 195 W. Va. 512, 525, 466 S.E.2d 171, 184 (1995) (quoting II Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 7-2(A) at 24).

The West Virginia Court has stated "that a medical expert, otherwise qualified, is not barred from testifying merely because he or she is not *engaged in practice* as a specialist in the field about which his or her testimony is offered[.]" *Foster v. Sakhai*, 210 W. Va. 716, 731, 599 S.E.2d 53, 68 (2001) (internal quotation marks omitted) (alterations in original) (affirming admission of expert testimony by board certified neurosurgeon, although he had not operated on a patient for several years or performed the specific procedure at issue); *see also Walker v. Sharma*, 221 W. Va. 559, 567, 655 S.E.2d 775, 783 (2007) ("Following a trial court's decision that a physician is qualified to offer expert testimony in a given field, issues that arise as to the physician's personal use of a specific technique or procedure to which he or she offers expert testimony go only to the weight to be attached to the testimony and not its admissibility."). Further, "[w]hile a physician does not have to be board certified in a specialty to qualify to render an expert opinion, the physician must have some experience or knowledge on which to base his or her opinion." *Farley v. Shook*, 218 W. Va. 680, 687, 629 S.E.2d 739, 746 (2006).

## 2.  Analysis

Raleigh General has asserted in a separate motion, incorporated in its motion for summary judgment, that Dr. O'Meara's expert testimony must be excluded, as she is not qualified to offer testimony on labor and infant resuscitation. Specifically, Raleigh General asserts that Dr. O'Meara is unqualified, as she is "a pediatric critical care physician, who last participated in the care and treatment of newborn infants in 2004" and since then "was either training to become or

8

was a pediatric critical care physician, rendering care and treatment to patients exclusively in a pediatric intensive care unit." [Doc. 145 at 6]. Further, Raleigh General asserts that, by her own admission, Dr. O'Meara "has some limited training in interpreting electronic fetal monitoring ("EFM") strips from 2000–2004" but "admits that she does not do so as part of her current practice and the last time she reviewed fetal heart monitor slips was in 2004." [*Id.*]. Moreover, RGH states that Dr. O'Meara "has not been called to attend to a delivery of a newborn child since 2004," has not been "called to respond to a delivery for purposes of performing neonatal resuscitation for a child immediately after delivery" since 2004, and would defer to an OB/GYN in interpreting EFM strips [*Id.* at 6–7].

From a qualification standpoint, Dr. O'Meara earned her undergraduate degree in biology and her medical degree at the University of Missouri in 2000. Dr. O'Meara undertook a pediatric internship at the Children's Mercy Hospital in 2001. In 2003, Dr. O'Meara completed a pediatric residency at the Eastern Virginia Medical School. From 2003 to 2004, Dr. O'Meara was the Chief Pediatric Resident at the Eastern Virginia Medical School. Then, from 2004 to 2007, Dr. O'Meara completed a Pediatric Critical Care Fellowship at the University of Pittsburgh's Department of Critical Care Medicine.

From 2003 to 2004, Dr. O'Meara was a Pediatrician in Labor and Delivery at the Children's Specialty Group in Norfolk, Virginia. She also practiced pediatric critical care medicine for four years, including as a Staff Physician for four years in the Department of Pediatrics at the Naval Medical Center Portsmouth. Dr. O'Meara spent a year as a Locum Tenens in various states, also practicing pediatric critical care. Finally, since March 2013, Dr. O'Meara has practiced pediatric critical care as a Staff Physician at the Children's Hospital of Richmond at Virginia Commonwealth University ("VCU").

During her career, Dr. O'Meara has also taught and volunteered in the pediatric field. Specifically, from 2007 to 2011, Dr. O'Meara worked as a volunteer Pediatric Intensivist with the Cardiac Intensive Care Team from the International Children's Heart Foundation. This volunteer work took her to seven different countries, some on multiple occasions. Additionally, she served as a volunteer pediatrician in Haiti in 2010. Dr. O'Meara was employed as a clinical instructor at the University of Pittsburgh School of Medicine from 2008 to 2009, and at the Eastern Virginia Medical School from 2003 to 2004. Dr. O'Meara returned to the Eastern Virginia Medical School as an Assistant Professor from 2009 to 2011. She currently serves as an Assistant Professor at both the Uniformed Services Health Sciences University and at the Medical College of Virginia, also located at VCU.

Dr. O'Meara's research interests include "trauma resuscitation and neuro-intensive care," [Doc. 129-5 at 9], and she has published two articles addressing the impacts of experimental traumatic brain injury on mice. She has also presented on the subject multiple times. Additionally, she has served on the Pediatric Trauma Care Committee at the Children's Hospital of Richmond at VCU for the past seven years. Prior to that, she spent a year on the Hospital Resuscitation Committee at the Portsmouth Naval Center. Finally, Dr. O'Meara is board certified in Critical Care Medicine and Pediatrics. She is also a member of the Pediatric Neuro Critical Care Research Group, the Pediatric Acute Lung Injury and Sepsis Investigators, and the Society of Critical Care Medicine. In sum, since obtaining her medical license in 2000, Dr. O'Meara's education, training, and experience has focused on pediatric critical care and neurological injuries.

Prior to formulating her opinion herein, Dr. O'Meara reviewed the "medical records of Crystal Hysell while a patient at Raleigh General Hospital for the delivery of A.H.," the

"medical records of her daughter A.H., birth to 3 years," as well as the "depositions of Mr. and Mrs. Hysell, nurses Perkowski and Buchanon, and midwife Crowder." [Doc. 129-5 at 4].

As West Virginia courts have routinely noted, there is no requirement that an expert witness share the same specialty as a defendant. While Dr. O'Meara may not be familiar with all the techniques employed by the hospital personnel in this case, that is not disqualifying. It is, instead, a matter for cross examination. *See Foster*, 210 W. Va. at 731, 599 S.E.2d at 68. Indeed, the "liberal thrust" of Rule 702 errs on the side of admissibility, not careful excision of expert testimony based on precisely defined fields and specialties. *See Gentry*, 195 W. Va. at 525, 466 S.E.2d at 184. Further, West Virginia courts do not require a defendant to be board-certified in a medical field to testify on a subject, *Farley*, 218 W. Va. at 687, 629 S.E.2d at 746, although board certification is certainly relevant to an expert's qualification to offer an opinion. *See Foster*, 210 W. Va. at 731, 599 S.E.2d at 68. Indeed, a doctor who has not practiced in the field recently may yet be qualified to offer an opinion: "a medical expert, otherwise qualified, is not barred from testifying merely because he or she is not *engaged in practice* as a specialist in the field about which" the testimony is offered. *Foster*, 210 W. Va. at 731, 599 S.E.2d at 68 (internal quotation marks omitted) (affirming admission of expert testimony by board certified neurosurgeon, although he had not operated on a patient for several years or performed the specific procedure at issue).

Based upon her deposition, written report, and curriculum vitae, Dr. O'Meara is sufficiently familiar with the standards and practices for infant resuscitation and pediatric care and is experienced in pediatric critical care. Dr. O'Meara is qualified through her education, experience, and training as a physician to offer an opinion on causation. Questions respecting the recency or depth of her experience may be scrutinized on cross examination. *See San Francisco*,

221 W. Va. at 745, 656 S.E.2d at 496.

**B.     Proximate Cause**

### 1.  Standard

While the FTCA provides for the waiver of sovereign immunity and accordant jurisdiction to the district courts, it does not create a claim for relief. *See Florida Auto Auction of Orlando, Inc. v. United States*, 74 F.3d 498, 502 (4th Cir. 1996) ("The Act does not create new causes of action" but "only serves to convey jurisdiction where the alleged breach of duty is tortious under state law."). Indeed, "an action under [the] FTCA exists only if the State in which the alleged misconduct occurred would permit a cause of action for that misconduct to go forward." *Carlson v. Green*, 446 U.S. 14, 23 (1980). Thus, the substantive law of the case is that of the state where the alleged negligence occurred. *See* 28 U.S.C. § 1346(b)(1).

In this case, the alleged negligence happened in West Virginia. *See Johnson v. United States*, 394 F. Supp. 2d 854, 856–57 (S.D.W. Va. 2005) (finding the MPLA applicable to a claim against the United States – in the shoes of a health care provider – under the FTCA). In West Virginia, the failure of a health care provider to follow the standard of care gives rise to a medical negligence claim under the MPLA. But it is incumbent upon the plaintiff to prove:

> (1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and
>
> (2) Such failure was a proximate cause of the injury or death.

W. Va. Code § 55-7B-3(a). The plaintiff bears the burden of demonstrating "by a preponderance of the evidence that the defendant was negligent and that such negligence was the proximate cause of the injury." *Sexton v. Grieco*, 216 W. Va. 714, 716, 613 S.E.2d 81, 83 (2005) (internal quotation marks omitted). That burden is "satisfied when the plaintiff shows the physician's acts or omissions increased the risk of harm to the plaintiff and that such increased risk of harm was a substantial factor in bringing about the ultimate injury to the plaintiff[.]" *Bellomy v. United States*, 888 F. Supp. 760, 766 (S.D.W. Va. 1995) (internal quotation marks omitted) (quoting Syl. Pt. 5, *Thornton v. CAMC*, 172 W. Va. 360, 361, 305 S.E.2d 316, 318 (1983)).

"Proof that the negligence or want of professional skill was the proximate cause of the injury of which the plaintiff complains must ordinarily be by expert testimony as well." *Hicks v. Chevy*, 178 W. Va. 118, 121, 358 S.E.2d 202, 205 (1987). But, "[w]here a physician is testifying as to the causal relation between a given physical condition and the defendant's negligent act, he need only state the matter in terms of a reasonable possibility." *Dellinger v. Pediatrix Med. Grp., P.C.*, 232 W. Va. 115, 123, 750 S.E.2d 668, 676 (2013) (internal quotation marks omitted).

"Proximate cause" is defined as "that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained, without which the wrong would not have occurred." *Mays v. Chang*, 213 W. Va. 220, 224, 579 S.E.2d 561, 566 (2003) (quoting Syl. Pt. 3, *Webb v. Sessler*, 135 W. Va. 341, 63 S.E.2d 65 (1950)). The plaintiff need not show that the defendant's negligence was the only proximate cause – only that it was *a* proximate cause. *See, e.g.*, *Mays*, 213 W. Va. at 224, 579 S.E.2d at 566. Further, the West Virginia Court has held that, inasmuch as the MPLA codified the common law of causation, proximate cause may be established through a "reasonable inference" of causation. *Sexton*, 216 W. Va. at 718–20, 613 S.E.2d at 85–87; *see also id.* at 720, 613 S.E.2d at 87 (internal quotation marks omitted) (noting that the Supreme

Court of Appeals rejected "the requirement that the [expert] tie the injury to the negligence by way of . . . any rigid incantation or formula[.]"); *Estate of Fout-Iser v. Hahn*, 220 W. Va. 673, 678–79, 649 S.E.2d 246, 251–52 (2007). *But see Dellinger*, 232 W. Va. at 122, 750 S.E.2d at 675 (rejecting argument that the jury could infer proximate cause where expert testimony was conditioned upon "the existence of facts of which petitioner offered no proof" and would have required "the jury to engage in absolute speculation.").

Finally, the Supreme Court of Appeals has emphasized "that '[q]uestions of negligence, due care, proximate cause and concurrent negligence present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them.'" *MacDonald v. City Hosp., Inc.*, 227 W. Va. 707, 726, 715 S.E.2d 405, 424 (2011) (quoting Syl. Pt. 5, *Hatten v. Mason Realty Co.*, 148 W. Va. 380, 381, 135 S.E.2d 236, 238 (1964)); *see also Stewart v. George*, 216 W. Va. 288, 293, 607 S.E.2d 394, 399 (2004) ("This Court has also consistently recognized that questions of proximate cause are often fact-based issues best resolved by a jury."); *Mays*, 213 W. Va. at 224, 579 S.E.2d at 565 (internal quotation marks omitted) ("[P]roximate cause is an elastic and mystical term that is meaningless unless it is applied to the facts of a particular case.").

## 2.  Analysis

The parties' proximate cause dispute has its genesis in their sharply divergent theories of the case. The Hysells contend that they have produced competent expert testimony to establish their theory of causation: "Monitoring did not take place as required; the FMS is non-reassuring; no physician is called; the failure to get a physician prolongs the stress; the failure to

recognize the cord blocking the egress prolongs the stress; and the failure to give proper care after the delivery prolongs the stress." In contrast, the Defendants contend that the Hysells' proof falls short of the proximate cause marker. Rather, the Defendants charge that the Hysells are – quite impermissibly – relying upon *res ipsa loquitor* principles.[2]

The Hysells have mustered evidence from which a reasonable jury could conclude that Raleigh General medical personnel breached a duty of care to A.H. in a manner which proximately caused her injuries. The Hysells primarily rely on the expert testimony of Dr. A.M. Iqbal O'Meara to establish causation.

Dr. O'Meara asserts that Raleigh General medical personnel breached a duty of care by failing to act on non-reassuring fetal heart tracing, failing to identify that A.H. was at risk for neonatal depression, and failing to provide appropriate resuscitation, causing hypoxic injury [Doc. 129-4 at 11; Doc. 129-5 at 5]. Dr. O'Meara testified it was her "medical opinion within a reasonable degree of medical probability that there was evidence of a fetus in distress on the fetal heart tracings that was not identified." [Doc. 129-4 at 26]. Dr. O'Meara further testified that "deviations from the standard of care" that occurred during this time "were more likely than not a substantial cause of the hypoxemia that was eventually discovered and resulting damages incurred

---

[2] Briefly, the doctrine allows a finder of fact under certain circumstances to infer that the plaintiff's injury was caused by the defendant's negligence. The doctrine is typically invoked when "(a) the event is of a kind which ordinarily does not occur in the absence of negligence; (b) other responsible cause, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff." Syl. Pt. 4, *Foster v. City of Keyser*, 202 W. Va. 1, 4, 501 S.E.2d 165, 168 (1997); *see also* Syl. Pt. 2, *Farley v. Meadows*, 185 W. Va. 48, 49, 404 S.E.2d 537, 538 (1991) (internal quotation marks omitted) ("The doctrine applies only in cases where defendant's negligence is the only inference that can reasonably and legitimately be drawn from the circumstances."). The doctrine is inapplicable here. Indeed, while the Hysells have presented evidence excluding some possible genetic causes of A.H.'s injury, there is also evidence to suggest that the genetic tests undertaken would not reveal all possible causes. Moreover, hypoxemia – even continued hypoxemia – can occur with or without negligence.

by" A.H. [*Id.* at 6]. Specifically, Dr. O'Meara opined that had Raleigh General personnel performed the proper intensive resuscitation, "faster resolution of her hypoxemia" would have resulted [*Id.* at 26]. Indeed, Dr. O'Meara stated that the failure to immediately remediate the crisis "would have been the prolongation of the hypoxemia and acidosis that the infant was experiencing" [*Id.*]. Another expert for the Hysells, Dr. Thomas Andrew Rugino, opined "that the trauma and stress that [A.H.] suffered through during the period of time surrounding delivery was a direct cause of (or in the very least, a cause of significant exacerbation of) her autism spectrum disorder." [Doc. 129-7 at 4].

Reduced to its essence, this controversy has resulted in a looming battle of qualified experts. The outcome will be decided at trial, not by one of the combatants' premature exclusion. While the expert reports of each party contradict each other at many points, that is often the gist of the contest in medical negligence cases. This is particularly true where the dispute centers on proximate cause. *See Stewart*, 216 W. Va. at 293, 607 S.E.2d at 399 ("This Court has also consistently recognized that questions of proximate cause are often fact-based issues best resolved by a jury."). At summary judgment, the Court may not pick and choose which experts are credited. *See Reyazuddin*, 789 F.3d at 417.

## C.    Sovereign Immunity

### 1.  Standard

Barring consent, the United States is immune from suit. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and

16

its agencies from suit."); *Robinson v. U.S. Dep't of Educ.*, 917 F.3d 799, 801 (4th Cir. 2019) (noting the "allocation of resources must be left to the will of the people" and "[o]ne way the people may exercise their will . . . is to consent to suit by waiving sovereign immunity."). The FTCA waives sovereign immunity when federal employees negligently perform their employment duties but "only on terms and conditions strictly prescribed by Congress." *Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 741 (4th Cir. 1990); *see also Lehman v. Nakshian*, 453 U.S. 156, 161 (1981) ("[L]imitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied."). District courts are authorized to exercise jurisdiction over

> claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). The FTCA imposes liability on the United States "in the same manner and to the same extent as a private individual under like circumstances" but not "for interest prior to judgment or for punitive damages." *Id.* § 2674.

Importantly, "[s]overeign immunity is jurisdictional in nature," *Meyer*, 510 U.S. at 475, thus the "terms of [the Government's] consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").

## 2. Analysis

The parties' final dispute turns on whether the United States enjoys the MPLA's cap on damages. The Hysells assert that, because the United States has not complied with the insurance requirements of the MPLA, it is not entitled to benefit from the cap. The United States responds that its "self-insured" status obviates the need for insurance.

As noted, the FTCA waives sovereign immunity "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA imposes liability in limited circumstances but does not create a claim – rather, liability is determined "in accordance with the law of the place where the act or omission occurred." *Id.*; *see also United States v. Olson*, 546 U.S. 43, 44 (2005) (interpreting the words of the FTCA "to mean what they say, namely, that the United States waives sovereign immunity 'under circumstances' where local law would make a '*private person*' liable in tort.").

The FTCA further provides that, "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner *and to the same extent* as a private individual under like circumstances." 28 U.S.C. § 2674 (emphasis added). Courts do not require *identical* circumstances: "The national government is never situated identically to private parties. Our task is to find a fitting analog under private law." *Carter v. United States*, 982 F.2d 1141, 1144 (7th Cir. 1992); *see also Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1118 (10th Cir. 2004) ("[T]o hold that the United States is not entitled to the protection of [the state's law] would place it in a differently situated position than private parties" which would "undermin[e] the conditions precedent to the United States' waiver of sovereign immunity in the FTCA."). Thus, "[u]nder 28

18

U.S.C. § 2674 of the Tort Claims Act, damages generally are determinable under state law, for the United States is to be held liable 'to the same extent as a private individual under like circumstances.'" *Flannery ex rel. Flannery v. United States*, 718 F.2d 108, 110 (4th Cir. 1983) (quoting 28 U.S.C. § 2674).

Other courts have applied the MPLA's damages cap in the FTCA setting. *See, e.g.*, *Osborne v. United States*, 166 F. Supp. 2d 479, 495 (S.D.W. Va. 2001) (in suit under FTCA, limiting plaintiff's recovery against doctor employed by the United States to the statutory cap); *Wilson v. United States*, 375 F. Supp. 2d 467, 472 (E.D. Va. 2005). Further, our Court of Appeals has previously held, in an FTCA case governed by Virginia law, that the state's noneconomic damages cap applied, "[s]ince private health care providers in Virginia would in 'like circumstances' be entitled to the benefit of [the Virginia damages cap], so, too, is a federally operated hospital in that state." *Starns v. United States*, 923 F.2d 34, 37 (4th Cir. 1991). The result is not unlike that reached by other courts of appeals. *See, e.g.*, *Haceesa v. United States*, 309 F.3d 722, 726 (10th Cir. 2002) (rejecting argument that state cap did not apply due to government's "failure to file proof of financial responsibility and to contribute to a compensation fund" and finding the government entitled to the benefit of damages cap as a private party would be); *Carter*, 982 F.2d at 1143–44 (holding that, "A 'private individual in like circumstances' would receive the benefit of the cap; so too does the United States."); *Lozada v. United States*, 974 F.2d 986, 988 (8th Cir. 1992) (holding that "the federal government is in 'like circumstances' with 'qualified health care providers' and entitled to liability protection under the Nebraska Act."); *Owen v. United States*, 935 F.2d 734, 737–38 (5th Cir. 1991) (concluding the United States had "met the objectives" of the state statute and "it [was] in 'like circumstances' with private individuals who have contributed to the fund and therefore enjoyed capped liability."); *Hoffman v. United States*,

19

767 F.2d 1431 (9th Cir. 1985) (applying California's cap on non-economic damages to the United States). Indeed, the mere fact that the United States does not comply with a statute's aggregate insurance or compensation fund requirements does not obviate this conclusion, inasmuch as the United States is functionally self-insured. *See, e.g.*, *Rayonier Inc. v. United States*, 352 U.S. 315, 320 (1957) (stating that FTCA damages are paid from public treasury); *United States v. Whitcomb*, 314 F.2d 415, 418 (4th Cir. 1963).

The West Virginia MPLA expressly provides that "[t]he amendments to this article . . . apply to *all* causes of action alleging medical professional liability." W. Va. Code § 55-7B-10 (emphasis added). Such amendments include the cap on damages. The "FTCA assures the federal government of that treatment accorded private parties," *Starns*, 923 F.2d at 37, and the MPLA unambiguously applies the cap to private parties. Applying the statute according to its terms, the MPLA cap applies to the United States. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 30 U.S. 1, 6 (2000) (internal quotation marks omitted) ("[W]hen the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms.").

## IV.

Based upon the foregoing discussion, it is, accordingly, **ORDERED** as follows:

1. That Plaintiffs' Partial Motion for Summary Judgment and to Strike Defendant USA's Twelfth Affirmative Defense [**Doc. 117**] is **DENIED;**

2. That Defendant United States of America's Motion for Summary Judgment [**Doc. 119**] is **DENIED;**

3. That Raleigh General Hospital's Motion for Summary Judgment [**Doc. 121**] is **DENIED;** and

4.  Raleigh General Hospital's *Daubert* Motion *in Limine* to Exclude the Report, Testimony and Opinions of AM Iqbal O'Meara, M.D. [**Doc. 144**] is **DENIED**.

        The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and to any unrepresented party.

ENTERED:    June 12, 2020

Frank W. Volk
United States District Judge