UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

RYAN HYSELL and CRYSTAL HYSELL, on
behalf of their daughter, A.H., a minor,

       Plaintiffs,

v.                           CIVIL ACTION NO.  5:18-cv-01375

RALEIGH GENERAL HOSPITAL and
THE UNITED STATES OF AMERICA,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending are (1) Defendant Raleigh General Hospital's ("RGH") (a) *Daubert* Motion in Limine to Exclude Certain Opinions and Testimony of Thomas A. Rugino, M.D., and to Exclude the Opinions and Testimony of Laura Lampton and Chad Staller [Docs. 146, 147], filed February 2, 2020, (b) Motion *in Limine* to Exclude Certain Opinions and Testimony of Chad Staller [Doc. 142], filed February 21, 2020, and (2) Plaintiffs Ryan and Crystal Hysell's Motion in Limine to Preclude and/or Strike Expert Testimony of Gordon Sze, M.D., and any Assertion of a Pre-Existing Injury as the Cause of Damages [Doc. 148], filed February 21, 2020. The Hysells responded in opposition to RGH's motions on February 28, 2020. [Docs. 166-168]. The United States responded in opposition to the Hysells' motion on February 28, 2020. [Doc. 153].

I.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court observed that the admissibility of scientific evidence was no longer cabined by knowledge or evidence "generally accepted" as reliable in the relevant scientific community.

*Daubert*, 509 U.S. at 588–89. Courts were instead instructed to evaluate proposed expert testimony according to Rule 702, to "ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The analysis requires the gatekeeper at the bench to perform a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

The touchstone of reliability is testimony "based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (citing *Daubert*, 509 U.S. at 590, 592–93). Multiple factors guide the determination of whether expert testimony is sufficiently reliable to be admissible:

> First, "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." A second question . . . is "whether the theory or technique has been subjected to peer review and publication." Publication regarding the theory bears upon peer review; "the fact of publication (or lack thereof) in a peer reviewed journal will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." Third, "in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error." Fourth, . . . "'general acceptance'" is . . . relevant to the reliability inquiry. "Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support with the community may properly be viewed with skepticism."

*Daubert*, 509 U.S. at 593–94.  The factors are non-exclusive and their application depends upon the experts and circumstances in each case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). This is in keeping with the "flexible" nature of the inquiry under the "broad discretion" that governs the ultimate determination respecting "relevance and reliability." *Oglesby*, 190 F.3d at 250.

## II.

### A.     RGH's Motion Respecting Dr. Rugino, Ms. Lampton and Mr. Staller

RGH moves to exclude the expert testimony of Dr. Thomas Rugino as unreliable and irrelevant insofar as it addresses the causal impact the care and treatment of A.H. during her delivery had on A.H.'s subsequent autism spectrum disorder (ASD) diagnosis. Initially, at his July 21, 2018, evaluation of A.H., Dr. Rugino concluded that A.H. would have been diagnosed with Autism Spectrum Disorder ("ASD") regardless of her static brain injury. [Doc. 146-1 at 13]. However, on January 20, 2020, Dr. Rugino supplied an Addendum to his report adding a conclusion that the circumstances of A.H.'s delivery were either a direct cause or significant exacerbation of A.H.'s ASD:

> However, in light of the developing and evolving scientific knowledge concerning the role of epigenetics as an etiology of autism spectrum disorder (specifically the well documented relationship between a hostile intra-uterine environment in the perinatal period / maternal stress reactions in the perinatal period / distress in the period immediately following delivery, and the ultimate development of later autism spectrum disorder), as well as the depositions of Drs. Arthur and Scholly, it is my opinion that the trauma and stress that she suffered through during the period of time surrounding delivery was a direct cause of (or in the very least, a cause of significant exacerbation of) her autism spectrum disorder.

[Doc 146-3]. Dr. Rugino explained that he submitted the Addendum because his prior conclusions had been supplanted by current medical knowledge. [Doc 146-2 at 6–7]. RGH requests the Court enter an Order *in limine* excluding Dr. Rugino's opinion that the stress A.H. experienced during delivery caused or exacerbated her ASD. [Doc. 147 at 2].

RGH contends that this conclusion is speculative and unreliable because scientific literature does not show a consensus that hypoxic-ischemic conditions *in utero* or during the perinatal period cause ASD. [*Id.* at 12].  It claims that scientific literature recognizes a multitude

3

of risk factors associated with ASD. [*Id.* at 10–11]. The risk factors are numerous but include umbilical cord complications, fetal distress, and birth injury or trauma, as well as other factors like toxic exposures and viral infections. [Doc 146-4 at 4–9]. Although Dr. Rugino offered scientific articles in support of his conclusion, he stated that the articles were illustrative, not authoritative, of his conclusion. [Doc. 146-2 at 8–9]. Overall, RGH submits that Dr. Rugino has offered insufficient evidence to support his opinion about the causation of ASD, and so his conclusion should be excluded. [Doc. 147 at 17].

Because the opinions, reports, and testimony of Laura Lampton and Chad Staller—who are additional experts offered by the Hysells--are based on Dr. Rugino's conclusions, RGH contends that, if Dr. Rugino's opinion is excluded, the Lampton and Staller opinions, reports, and testimony should likewise be stricken.

The Hysells respond that A.H's ASD diagnosis is actually not certain and that Dr. Rugino's causal conclusion for A.H.'s injury is based on reliable methodology, a solid foundation, and will assist the trier of fact. [Doc. 168 at 2, 7]. First, the Hysells contend that A.H.'s ASD diagnosis was improper because, when doctors conducted an MRI to determine the cause of A.H.'s developmental delay, an MRI of A.H.'s brain was erroneously read as normal. [*Id.* at 2]. Because the physicians needed a diagnosis, they placed A.H. in the catch-all category of ASD. [*Id.*]. However, an MRI administered later showed brain damage caused by hypoxia, and when Dr. Todd Arthur, a pediatric neurologist, reviewed the first MRI, it too showed brain damage caused by hypoxia. [*Id.*]. Thus, it is disputed whether A.H. was properly diagnosed with ASD or should have been diagnosed with hypoxia-induced brain damage.

Second, Plaintiffs contend that Dr. Rugino's expert testimony is sufficiently reliable to be presented to the trier of fact. [*Id.* at 7]. Although the articles Dr. Rugino offered are

not authoritative, they are reliable authorities which Dr. Rugino used in formulating his conclusion. [*See id.* at 6–7]. Dr. Rugino, as a medical expert, may offer testimony based on a reliable foundation, even if that foundation is not subject to general acceptance by the scientific community. [*Id.* at 8]. Thus, it is sufficient that Dr. Rugino provided the medical literature upon which he relied, in addition to his professional experience, in formulating his opinion. [*Id.* at 9–10]. The Hysells contend that whether the articles and methodology are sufficient to support Dr. Rugino's conclusion can be challenged by RGH at trial, and Dr. Rugino's conclusion should not be excluded simply because it is not based upon an absolute certainty. [*Id.* at 9].

Dr. Rugino asserts he arrived at his conclusions based upon "developing and evolving scientific" knowledge, along with deposition testimony from other medical experts whose opinions will not be excluded on evidentiary grounds.  RGH has offered no reply to counter that assertion or the other matters raised in the Hysells' response brief.  Dr. Rugino's January 20, 2020, Addendum appears to be a candid attempt to align his earlier, and perhaps incomplete or mistaken, views in the case with later rising evidentiary developments, current scientific thought on the matter, and the opinions of other, unchallenged medical experts. Dr. Rugino's opinions, his alteration of course, and the explicit reasons underlying the same will doubtless be the subject of vigorous cross examination and likely testimony from counter-experts. But they are not the type of unsupported and speculative testimony to which Rule 702 and the remaining grounds are aimed.

Accordingly, the Court **DENIES** RGH's *Daubert* Motion in Limine to Exclude Certain Opinions and Testimony of Thomas A. Rugino, M.D., and to Exclude the Opinions and Testimony of Laura Lampton and Chad Staller [Docs. 146, 147].

**B.      RGH's Motion Respecting Chad Staller**

          Pursuant to *Federal Rules of Evidence* 702 and 703, and *Daubert*, RGH next moves to preclude the Hysells from "presenting, mentioning or referencing in any form, the loss of earning capacity claims under scenario two (2) and scenario (3) as contained in Mr. Staller's report." [Doc. 142 at 2]. Chad Staller, JD, MBA, MAC, CVA, is a forensic economist designated as an economic loss expert by the Hysells.

          Mr. Staller has disclosed a report which assesses the economic loss suffered by A.H. and presents three separate scenarios of lost earning capacity, each representing a different form of autism spectrum disorder ("ASD") from which A.H. might suffer. [Doc. 142-1]. At issue in the pending motion are scenarios two and three. The second scenario considers that A.H. would have a mild form of ASD, which would have allowed her to graduate high-school and gain full-time employment at a pay rate equal to her similarly aged peers. [*Id*.]. The third scenario considers a more severe form of ASD, which would have allowed A.H. to enjoy full-time employment at minimum wage. [*Id*.].

          RGH argues that scenarios two (2) and three (3) are insufficient to meet the requirements of *Daubert* and Rules 702 and 703. RGH contends that the Hysells have the burden of showing that "the testimony is based on sufficient facts or data" and "the testimony is the product of reliable principles and methods." [*Id*]. To support its assertion that the Hysells have not discharged this burden, RGH cites Mr. Staller's deposition [Doc. 142-2], where he was allegedly "unable to articulate a basis for an assumption" that an individual with mild autism would be able to complete school, gain employment, and work full-time, or that an individual with severe autism would be able to work full-time at a minimum wage job. [Doc. 142 at 3]. RGH asserts that this

6

alleged inability to articulate a definition for mild and severe autism renders Mr. Staller's opinions "illusory." [*Id.*]. Accordingly, RGH asserts that neither Mr. Staller nor the Hysells can "demonstrate that his report and opinion testimony is based on sufficient facts or data or . . . are the product of reliable principles and methods." [*Id.* at 4].

The Hysells respond that RGH's challenge is "baseless and solely speak[ing] to the weight of the evidence to be addressed in cross-examination and in no way is a *Daubert* issue." [Doc. 166 at 1]. In response to RGH's confusion about the use of the terms "mild autism" and "severe autism," the Hysells offer that Mr. Staller was utilizing the terms to describe individuals who would be able to perform particular tasks. [*Id.*] The term "mild autism" was used to describe an individual who would have completed high school and had employment. [*Id.* at 1-2]. This was based upon Mr. Staller's "understanding that autism affects individuals differently and that some are still capable of attaining a high school degree and working." [*Id.* at 4.]. The term "severe autism" was used to describe an individual who would work full-time at a minimum wage job. [*Id.* at 2]. It was based upon Mr. Staller's understanding that some people more significantly affected by ASD can only hold minimum wage jobs. [*Id.* at 4].

The Hysells further assert that RGH "has not criticized Mr. Staller's qualifications, has not argued that the proposed testimony would not assist the trier of fact, nor . . . that Mr. Staller failed to utilize a reliable methodology in arriving at his opinion within a reasonable degree of economic certainty." [*Id.* at 2]. They contend that "there is absolutely nothing about the calculations that were advanced by Mr. Staller . . . that is challenged by the Defendant to warrant preclusion under *Daubert*." [*Id.*]. In creating his expert report, Mr. Staller "looked at the various potential levels of employment of an individual with ASD, [and] applied an appropriate and acceptable methodology to those various levels in arriving at a damage calculation." [*Id.* at 5]. It

is not apparent that RGH challenges Mr. Staller's qualifications or status as an expert or the methodology employed to arrive at his calculations.

Again, RGH did not reply. The Court is thus left with a response unchallenged by RGH. That response provides the necessary, preliminary grounds to satisfy the Court that the opinions offered by Mr. Staller possess sufficient relevance and reliability to pass through the Rule 702 gate.

The Court **DENIES** the Motion in Limine to Exclude Certain Opinions and Testimony of Chad Staller [Doc. 142].

## C.    The Hysells' Motion Respecting Dr. Sze

Pursuant to *Federal Rules of Evidence* 401, 402, 403, and 702, the Hysells move to preclude and/or strike the expert testimony of Dr. Gordon Sze and any assertion of a pre-existing injury as the cause of A. H.'s damages. The Hysells contend that the United States has designated Dr. Sze as a neuroradiologist to offer opinions that the MRI studies of A.H. are "consistent with genetic causes." Specifically, Dr. Sze offered the following conclusion regarding A.H.'s abnormalities:

> In conclusion, within a reasonable degree of medical certainty, the imaging examinations . . . demonstrate findings typical of periventricular leukomalacia. Within a reasonable degree of medical certainty, the abnormalities are also consistent with genetic causes. Within a reasonable degree of medical certainty, the abnormalities are consistent with an injury that occurred in substantially prior to labor and delivery, many weeks prior to her birth at 41 weeks.

[Doc. 149-1 at 4]. The Hysells contend that inasmuch as the United States seeks to introduce the affirmative defense that a pre-existing condition caused A.H.'s damages, it bears the burden "to provide appropriate expert testimony that establishes that any such pre-existing condition was more likely than not within a reasonable degree of medical probability a cause of the damages."

[Doc. 149 at 3]. They assert, however, that Dr. Sze's use of the phrase "consistent with" fails to establish that A.H.'s damages were more likely than not caused by a pre-existing condition or an injury prior to her birth. Specifically, the Hysells contend that "consistent with" is inappropriate *ipse dixit* testimony, as the phrase is analogous to "possible," and not "probable" as required. Thus, they assert that Dr. Sze's testimony "demonstrates an analytical gap and an incomplete and faulty methodology in the creating of a differential diagnosis." [Doc. 149 at 5].

Additionally, the Hysells assert that Dr. Sze "fails to identify whether or not the damages seen on the MRI scan were also consistent with a hypoxic injury or any other type of injury." [Doc. 149 at 6]. As such, they assert that Dr. Sze's methodology is faulty, incomplete, and cannot be presented to the jury. In sum, the Hysells contend that inasmuch as Dr. Sze's testimony fails to demonstrate A.H.'s damages were "more likely than not" caused by a pre-existing condition or injury predating the alleged negligence, his opinion is "faulty, not relevant, unsupported by proper differential diagnosis, and inadmissible." [*Id.*].

The United States respond that the Hysells' challenge merely takes issue with Dr. Sze's conclusions and the weight his opinion should be given, which would be more properly challenged through cross-examination at trial. It asserts that while the Hysells set forth the standard for the admission of expert testimony under *Daubert* and West Virginia's Medical Professional Liability Act ("MPLA"), their motion fails to challenge Dr. Sze's qualifications as an expert.

The United States additionally asserts that the Hysells do not challenge the methodologies upon which Dr. Sze relied to formulate his opinion, and that their assertion he should have used different wording in his report "symbolizes nothing more than pure semantics," as the *Federal Rules of Evidence* do not require that an expert testify that his conclusion is "more likely than not" the cause of the plaintiff's injuries before such testimony can be admitted. [Doc.

153 at 3]. The United States specifically asserts that "[e]xpert testimony stating that certain evidence is 'consistent with' a particular conclusion warrants a reasonable inference that the evidence results in that conclusion," thus such an opinion is admissible. [*Id*. at 4]. Moreover, it notes the Hysells ignore the relevant portion of Dr. Sze's report that carefully describes the method and medically-supported science behind his ultimate conclusions. [*Id.* at 3].

The United States concludes that Dr. Sze's report "lays a reliable foundation supporting findings that he holds the opinions contained therein within a reasonable degree of medical probability, that he clearly possesses professional knowledge and expertise, and that he meets the other requirements of West Virginia Code § 55-7B-7 and relevant federal and state law to testify as a competent expert witness in this case." [*Id.* at 3].

The Court concurs with the position espoused by the United States. As with the two challenges preceding the opposition to Dr. Sze, no extended factoring or other analysis is necessary to conclude that it is unquestionably cross examination and counter proof, not categorical exclusion, that is the proper means to address the evidentiary challenges offered.

The Court **DENIES** the Hysells' Motion in Limine to Preclude and/or Strike Expert Testimony of Gordon Sze, M.D., and any Assertion of a Pre-Existing Injury as the Cause of Damages [Doc. 148].

### III.

Based upon the foregoing discussion, and consideration of the applicable record in its entirety, it is **ORDERED** as follows:

1. The Court **DENIES** RGH's *Daubert* Motion in Limine to Exclude Certain Opinions and Testimony of Thomas A. Rugino, M.D., and to Exclude the Opinions and Testimony of Laura Lampton and Chad Staller [Docs. 146, 147];

2. The Court **DENIES** the Motion in Limine to Exclude Certain Opinions and Testimony of Chad Staller [Doc. 142]; and

3. The Court **DENIES** the Hysells' Motion in Limine to Preclude and/or Strike Expert Testimony of Gordon Sze, M.D., and any Assertion of a Pre-Existing Injury as the Cause of Damages [Doc. 148].

ENTER: September 30, 2020

Frank W. Volk
United States District Judge