**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY**

RYAN HYSELL and CRYSTAL HYSELL,
on behalf of their daughter, A.H., a minor,

       Plaintiffs,

v.                                Civil Action No. 5:18-cv-01375

RALEIGH GENERAL HOSPITAL,
and THE UNITED STATES OF AMERICA,

       Defendants.

**<u>INTEGRATED PRETRIAL ORDER</u>**

      Pursuant to Rule 16 of the Federal Rules of Civil Procedure, Rule 2.04 of the Local Rules

of Civil Procedure, and the Scheduling Order previously entered by the Court, the parties submit

the following integrated pretrial order to the Court:

1.      **RULE 26(a)(3) PRETRIAL DISCLOSURES AND OBJECTIONS**

      A.      **<u>Plaintiffs</u>**

      (1)      **WITNESSES**

            **<u>Witnesses Expected to Testify</u>**

            Plaintiff may call any of the following witnesses:

1. Ryan Hysell
2. Crystal Hysell
3. A.H.
4. Cindy Remines
5. Debra Crowder
6. Alyce Perkowski
7. Elizabeth Schorry, M.D.
8. Todd Arthur, M.D.
9. Heather Buchanan, R.N.
10. Robert Wayne
11. Teresa Noland
12. Katana Jackson
13. John Fassett, MS, CNM

14. Patricia Connors, RN
15. John Barakos, M.D.
16. Alia M.I. O'Meara, M.D.
17. Thomas Rugino, M.D.
18. Chad Staller
19. Laura Lampton, R.N., C.N.L.P.

**Witnesses Who May Be Called If The Need Arises**

See above.

**(2)   WITNESSES TO BE PRESENTED BY DEPOSITION TESTIMONY**

Plaintiff reserves the right to utilize the deposition of the Defendant and any other witness not available, pursuant to the Rules of Court. Specifically, Plaintiff also intends to read portions of the following depositions:

1. Dr. Schorry
2. Dr. Arthur
3. Dr. Barakos

**(3)   EXHIBITS**

**Exhibits Expected To Be Offered**

Plaintiffs expect to identify and introduce some or all of the following records:

1. Pre-natal records of Crystal Hysell from Access
2. Crystal Hysell's Delivery records at RGH
3. A.H. Birth Records at RGH
4. Fetal Monitor Strips at RGH during delivery
5. Enlargements of Fetal Monitor Strips
6. Examples of normal fetal monitor strips
7. Dr. Hummell records 13004-13005
8. Access Pediatric Records
9. Birth to Three Records
10. Milestones PT records
11. Portions of Children's National Medical Center Records
12. Portions of CAMC Records
13. First MRI and Report
14. Second MRI and Report
15. Portions of Wilmington Medical Association Records
16. Portions of Akron Children's Hospital Records
17. Report of Laura Lampton
18. Report of Dr. Rugino

19. Report of Chad Staller
20. Enlargements of Medical Records
21. Photographs of the minor
22. Past medical bills
23. Plaintiffs retain the right to identify any Deposition Exhibits as Trial Exhibits
24. Plaintiffs retain the right to supplement this exhibit list.
25. CVs of Expert witnesses. These are hearsay but defendant Government has listed CVs as evidence, to which plaintiff will object. It is Plaintiffs' position that no CVs should be admitted.
26. Charts pertaining to Fetal Monitor Strips
27. Chart of microcephaly findings
28. Chronological Chart
29. Policies and Procedures re Delivery produced during discovery
30. Letter of Mr. Mains concerning deliveries on the days of the minor's delivery including shifts.
31. Portions of "Fetal Heart Monitoring" and particularly these pages: 106,114, 115, 116, 144, and 145. That is the 4th Edition.

Plaintiffs state that the identification of these exhibits does not indicate that all such records will be or necessarily can be admitted into evidence. These exhibits have simply been identified at this time.

### Exhibits That May Be Offered

See above.  Plaintiff also reserves the right to utilize pleadings and discovery responses for purposes of impeachment, rebuttal and/or evidence at trial in accordance with this Court's Rules and Orders.

**B.**    **Defendant Raleigh General Hospital**

**(1)  WITNESSES**

### Witnesses Expected to Testify

Raleigh General Hospital reserves the right to call the following witnesses:

1.  Alyce Perkowski, RN
     c/o Offutt Nord, PLLC
     949 Third Avenue, Suite 300
     P.O. Box 2868
     Huntington, WV 25728

2.  Debra Crowder, CNM
     Access Health
     410 Carriage Drive
     Beckley, WV 25801

3. Todd Arthur, M.D.
   Cincinnati Children's Hospital Medical Center
   3333 Burnet Avenue
   Cincinnati, Ohio 45229

4. Elizabeth Shorry, M.D.
   Cincinnati Children's Hospital Medical Center
   3333 Burnet Avenue
   Cincinnati, Ohio 45229

5. Kathy Ball, RN
   *Raleigh General Hospital*
   1710 Harper Road
   Beckley, West Virginia 25801

6. Heather Buchanan, RN
   *Raleigh General Hospital*
   1710 Harper Road
   Beckley, West Virginia 25801

7. Robert Wayne
   *Raleigh General Hospital*
   1710 Harper Road
   Beckley, West Virginia 25801

8. Teresa Noland
   *Raleigh General Hospital*
   1710 Harper Road
   Beckley, West Virginia 25801

9. Katana Jackson
   *Raleigh General Hospital*
   1710 Harper Road
   Beckley, West Virginia 25801

10. Peter Giannone, M.D.
    University of Kentucky
    Department of Pediatrics
    Division of Neonatology
    800 Rose Street
    Lexington, KY 40536

11. Ernest Graham, M.D.
    Department of Gynecology & Obstetrics
    Johns Hopkins University School of Medicine
    600 North Wolfe Street

Baltimore, MD 21287

12. Andrea Gropman, M.D.
Children's National Medical Center
Department of Neurology
111 Michigan Ave., N.W.
Washington, D.C. 20010

13. Shanna Huber, RN, BSN
4700 Reed Road
Suite J
Columbus, OH 43220

14. Dan Selby, CPA
Selby & Associates
218 6th Avenue
St. Albans, WV 25177

15. Joshua Shimony, M.D.
Washington University Medical School
Queeny Tower 16th Floor, Suite 16109
510 S. Kingshighway Blvd.
St. Louis, MO 63110

16. Gary Trock, M.D.
3555 West 13 Mile Rd.
Suite N120
Royal Oak, MI 48703

17. Any witness identified by the plaintiffs

18. Any witness identified by the United States


**(2)        WITNESSES TO BE PRESENTED BY DEPOSITION TESTIMONY**

1.        The testimony of any of the witnesses listed above by the Raleigh General
         Hospital may be presented by deposition at trial if they are unable to appear at
         trial and/or are beyond the subpoena power of this court.  Raleigh General
         Hospital also reserves the right to present at trial the prior deposition testimony
         (taken during discovery in this civil action) of any of the witnesses listed above or
         any purpose permitted under the Federal Rules of Civil Procedure and/or
         the Federal Rules of Evidence and/or other applicable federal law, including as
         evidence of an admission, impeachment, or other purpose permitted by law.

2.      The depositions of any witnesses listed by the plaintiffs who have been previously deposed in this civil action may be used at trial for any purpose permitted under the Federal Rules of Civil Procedure and/or the Federal Rules of Evidence and/or other applicable federal law.

3.      Raleigh General Hospital also reserves the right to present the testimony of any of the witnesses listed above by videoconference, if permitted by the Court, due to the COVID-19 situation.

**(3)     EXHIBITS**

Raleigh General expects to identify and introduce some or all of the following records as exhibits:

1.      Pre-natal records of Crystal Hysell from Access Health
2.      Crystal Hysell's Delivery records at RGH
3.      A.H. Birth Records at RGH
4.      Fetal Monitor Strips at RGH during delivery
5.      Enlargements and animations of Fetal Monitor Strips
6.      Portions of A.H.'s medical records from Access Health
7.      Portions of A.H.'s medical records from Akron Children's Hospital
8.      Portions of A.H.'s medical records from Ohio – Help Me Grow
9.      Portions of A.H.'s medical records from WV Birth to Three
10.     Portions of A.H.'s medical records from KidCare Pediatrics
11.     Portions of A.H.'s medical records from Kanawha Valley Neurology (Teravath)
12.     Portions of A.H.'s medical records from WVU Genetics
13.     Portions of A.H.'s medical records from Cincinnati Children's Hospital
14.     Portions of A.H.'s MRI records from CAMC
15.     Portions of A.H.'s medical records from Nationwide Children's Hospital
16.     Portions of A.H.'s medical records from Ohio Dept. of Dev. Disabilities
17.     Portions of A.H.'s medical records from Clinton County Health District
18.     Portions of A.H.'s medical records from Christian Healthcare Centers
19.     Portions of records concerning plaintiff A.H. from Milestones.
20.     Portions of records concerning plaintiff A.H. from WVU Healthcare.
21.     Portions of records concerning plaintiff A.H. from Wilmington Medical Associates.
22.     Portions of records concerning plaintiff A.H. from Dayton Children's Hospital.
23.     Portions of records concerning plaintiff A.H. from Sara's Garden.
24.     Portions of records concerning plaintiff A.H. from Schaefer Education Solutions.
25.     Portions of records concerning plaintiff A.H. from Miami Valley Hospital
26.     Portions of records concerning plaintiff A.H. from ABC Pediatrics.

27. Portions of records concerning plaintiff A.H. from Centerville Pediatric Dentistry.
28. Portions of records concerning plaintiff A.H. from Clinton Memorial Hospital.
29. Portions of records concerning plaintiff A.H. from ENT Associates of Charleston.
30. Portions of records concerning plaintiff A.H. from Family Practice Center of Wadsworth.
31. Portions of records concerning plaintiff A.H. from Family Tree Chiropractic.
32. Portions of records concerning plaintiff A.H. from Forbes Rehab.
33. Portions of records concerning plaintiff A.H. from Greater Tomorrow Health.
34. Portions of records concerning plaintiff A.H. from Healthsource Lebanon Family Practice.
35. Portions of records concerning plaintiff A.H. from Help Me Grow Ohio.
36. Portions of records concerning plaintiff A.H. from Nike Center.
37. Portions of records concerning plaintiff A.H. from Sarah's Garden.
38. Portions of records concerning plaintiff A.H. from Schaefer Education Solutions.
39. Portions of records concerning plaintiff A.H. from Medical and other records concerning plaintiff A.H. from Summa Wadsworth-Rittman Hospital.
40. Portions of records concerning plaintiff A.H. from The Cole Center for Healing.
41. Portions of records concerning plaintiff A.H. from Christian Health Care Centers.
42. Portions of Records regarding A.H. from Clinton Board of Developmental Disabilities.
43. Portions of Records regarding A.H. from Clinton County Health District.
44. Portions of Records regarding A.H. from Clinton-Massie School District.
45. Portions of records regarding A.H. from Manser Medical.
46. Portions of Records from WV DHHR regarding the plaintiffs.
47. Documents and medical records produced during the course of discovery.
48. Anatomical drawings and diagrams of the brain.
49. Curriculum vitae and expert report(s) of Peter Giannone, M.D.
50. Curriculum vitae and expert report(s) of Earnest Graham, M.D.
51. Curriculum vitae and expert report(s) of Andrea Gropman, M.D.
52. Curriculum vitae and expert report(s) of Shanna Huber, R.N.
53. Curriculum vitae and expert report(s) of Joshua Shimony, M.D.
54. Curriculum vitae and expert report(s) of Gary Trock, M.D.
55. Curriculum vitae and expert report(s) of Dan Selby, CPA.
56. All treatises and literature relied upon, cited, or referenced by any expert witness of Raleigh General Hospital including any treatises and literature referenced or cited in those treatises and literature.

57.   All treatises and/or literature relied upon, cited, or referenced by any expert witness called by the plaintiffs.

58.   Any treatises and/or literature authored by any expert witness called by Raleigh General Hospital.

59.   All treatises and literature relied upon, cited, or referenced by any expert witness called by the United States.

60.   Any treatises and/or literature authored by any expert witness called by the United States.

61.   Excerpts from medical and other treatises, journal articles, publications and recognized sources for the purposes of impeachment, cross-examination, and related purposes involving plaintiff's expert witnesses.

62.   Exhibits attached to depositions of witnesses.

63.   Any pleadings and discovery responses served and/or filed by any party.

64.   Depositions and/or excerpts of any depositions of any parties and/or witnesses.

65.   All head circumference charts and records regarding A.H.

66.   Portions of A.H.'s educational records

67.   Demonstrative exhibits to illustrate A.H.'s diagnosis and medical condition

68.   Labor and delivery demonstrative exhibits

51.   Demonstrative exhibits to illustrate birth asphyxia

## C.   **Defendant United States**

**(1) WITNESSES**

### **Witnesses Expected to Testify**

A.   Debra Crowder, CNM
     Access Health
     410 Carriage Drive
     Beckley, WV 25801

B.   Mark Bruce Landon, M.D.
     Ohio State University College of Medicine
     Department of Obstetrics and Gynecology
     395 W 12th Avenue, 5th Floor
     Columbus, Ohio 43210

C.   Mark Steven Scher, M.D.
     Rainbow Babies & Children's Hospital
     University Hospitals Case Medical Center
     Division of Pediatric Neurology, RBC 6090
     11100 Euclid Avenue
     Cleveland, Ohio 44106

D.    Alan Bedrick M.D.
      Professor, Pediatrics and Chief, Section of Neonatology and
      Developmental Biology
      Department of Pediatrics
      University of Arizona Medical Center
      1501 N. Campbell Avenue
      Room 3341
      Tucson, AZ  85724

E.    Gordon Sze, M.D.
      Department of Diagnostic Radiology
      Yale University School of Medicine
      Section of Neuroradiology
      333 Cedar Street
      New Haven, CT  06510

F.    Cathlin Vinett Mitchell, RN, BSN, CRRN, CM
      Care Management Consultants, Inc.
      214 Overlook Circle
      Suite 100
      Brentwood, TN    37027

G.    Michael L. Brookshire, Ph.D.
      George Barrett, MBA, MSRC, CRC, CVE
      4511 Kanawha Turnpike
      P. O. Box 9338
      South Charleston, WV 25309

**<u>Witnesses Whom May Be Called To Testify If Need Arises</u>**

A.    Stacey D. Dickenson, M.D.
      Access Health Rural Acres
      252 Rural Acres Drive
      Beckley, WV 25801

B.    Alyce Perkowski, R.N.
      Raleigh General Hospital
      Beckley, WV 25801

C.    Heather Buchanan, R.N.
      Raleigh General Hospital
      Beckley, WV 25801

D.    Any witnesses listed or disclosed by any of the parties to this civil
      action.

E.     Physicians, nurses and medical personnel involved in the care and treatment of the plaintiffs.

F.     Any other health care providers and health or medical personnel who have been disclosed during the course of discovery as having been involved in the care and treatment of the plaintiffs.

G.     Anyone who has testified by deposition in discovery.

H.     The plaintiffs.

**(2)     WITNESSES TO BE PRESENTED BY DEPOSITION TESTIMONY**

A.     The testimony of any of the witnesses listed above by the United States may be presented by deposition at trial if they are unable to appear at trial and/or are beyond the subpoena power of this court.  The United States also reserves the right to present at trial the prior deposition testimony (taken during discovery in this civil action) of any of the witnesses listed above or any purpose permitted under the Federal Rules of Civil Procedure and/or the Federal Rules of Evidence and/or other applicable federal law, including as evidence of an admission, impeachment, or other purpose permitted by law.

B.     The depositions of any witnesses listed by the plaintiffs who have been previously deposed in this civil action may be used at trial for any purpose permitted under the Federal Rules of Civil Procedure and/or the Federal Rules of Evidence and/or other applicable federal law.

C.     The United States also reserves the right to present the testimony of any of the witnesses listed above by videoconference, if permitted by the Court, due to the COVID-19 situation.

**(3)     EXHIBITS**

**<u>Exhibits Expected To Be Offered</u>**

The United States expects to offer the following exhibits:

A.     Plaintiffs' SF 95 Claim Form.

B.     Medical and other records concerning plaintiff Crystal Hysell from Access Health.

C.     Medical and other records concerning plaintiff A.H. from Access Health.

10

D.      Medical and other records concerning plaintiff Crystal Hysell from Raleigh General Hospital.

E.      Medical and other records concerning plaintiff A.H. from Raleigh General Hospital.

F.      Medical and other records concerning plaintiff A.H. from Cincinnati Children's Hospital.

G.      Medical and other records concerning plaintiff A.H. from Milestones.

H.      Medical and other records concerning plaintiff A.H. from CAMC.

I.      Medical and other records concerning plaintiff A.H. from West Virginia Birth to Three.

J.      Medical and other records concerning plaintiff A.H. from WVU Healthcare.

K.      Medical and other records concerning plaintiff A.H. from Wilmington Medical Associates.

L.      Medical and other records concerning plaintiff A.H. from Kid Care Pediatrics.

M.      Medical and other records concerning plaintiff A.H. from Akron Children's Hospital.

N.      Medical and other records concerning plaintiff A.H. from Dayton Children's Hospital.

O.      Medical and other records concerning plaintiff A.H. from Sara's Garden.

P.      Medical and other records concerning plaintiff A.H. from Schaefer Education Solutions.

Q.      Medical and other records concerning plaintiff A.H. from Miami Valley Hospital.

R.      Medical and other records concerning plaintiff A.H. from ABC Pediatrics.

S.      Medical and other records concerning plaintiff A.H. from Centerville Pediatric Dentistry.

T.      Medical and other records concerning plaintiff A.H. from Clinton Memorial Hospital.

U.      Medical and other records concerning plaintiff A.H. from ENT Associates of Charleston.

V.      Medical and other records concerning plaintiff A.H. from Family Practice Center of Wadsworth.

W.      Medical and other records concerning plaintiff A.H. from Family Tree Chiropractic.

X.      Medical and other records concerning plaintiff A.H. from Forbes Rehab.

Y.      Medical and other records concerning plaintiff A.H. from Greater Tomorrow Health.

Z.      Medical and other records concerning plaintiff A.H. from Healthsource Lebanon Family Practice.

AA.     Medical and other records concerning plaintiff A.H. from Help Me Grow Ohio.

BB.     Medical and other records concerning plaintiff A.H. from Kidcare Pediatrics.

CC.     Medical and other records concerning plaintiff A.H. from Nike Center.

DD.     Medical and other records concerning plaintiff A.H. from Sarah's Garden.

EE.     Medical and other records concerning plaintiff A.H. from Schaefer Education Solutions.

FF.     Medical and other records concerning plaintiff A.H. from Medical and other records concerning plaintiff A.H. from Summa Wadsworth-Rittman Hospital.

GG.     Medical and other records concerning plaintiff A.H. from The Cole Center for Healing.

HH.     Medical and other records concerning plaintiff A.H. from Christian Health Care Centers.

II.     Documents and medical records produced during the course of discovery.

JJ.     Anatomical drawings and diagrams of the brain.

KK.     Curriculum vitae and expert report(s) of Mark Landon, M.D.

LL.    Curriculum vitae and expert report(s) of Mark Scher, M.D.

MM.    Curriculum vitae and expert report(s) of Alan Bedrick, M.D.

NN.    Curriculum vitae and expert report(s) of Dr. Gordon Sze.

OO.    Curriculum vitae and expert report(s) of Cathlin Mitchell.

PP.    Curriculum vitae and expert report(s) of Dr. Michael Brookshire.

QQ.    All treatises and literature relied upon, cited, or referenced by any expert witness of the United States, including any treatises and literature referenced or cited in those treatises and literature.

RR.    All treatises and/or literature relied upon, cited, or referenced by any expert witness called by the plaintiffs.

SS.    Any treatises and/or literature authored by any expert witness called by the defendant Raleigh General Hospital.

TT.    All treatises and literature relied upon, cited, or referenced by any expert witness called by defendant Raleigh General Hospital.

UU.    Any treatises and/or literature authored by any expert witness called by defendant Raleigh General Hospital.

VV.    Excerpts from medical and other treatises, journal articles, publications and recognized sources for the purposes of impeachment, cross-examination, and related purposes involving plaintiff's expert witnesses.

WW.    Exhibits attached to depositions of witnesses.

XX.    Any pleadings and discovery responses served and/or filed by any party.

YY.    Depositions and/or excerpts of any depositions of any parties and/or witnesses.

ZZ.    All head circumference charts and records regarding A.H.

AAA.    Records regarding A.H. from Clinton Board of Developmental Disabilities.

BBB.    Records regarding A.H. from Clinton County Health District.

CCC.    Records regarding A.H. from Clinton-Massie School District.

13

DDD.  Medical records regarding A.H. from Manser Medical.

EEE.  Records from WV DHHR regarding the plaintiffs.

FFF.  Exhibits from MRI Scans performed on A.H.

GGG.  Enlargements, digital or computerized copies, summaries, and excerpts of and from the above listed exhibits.

**Exhibits That May Be Offered**

Defendant United States may, if needed, offer the following exhibits:

A.  Deposition transcripts, deposition exhibits, pleadings, discovery responses, and other documents produced during discovery.

B.  Excerpts of deposition transcripts, deposition exhibits, pleadings, discovery responses, and other documents produced during discovery.

C.  Medical records and other documents concerning the plaintiffs produced by plaintiffs during discovery and through the use of the medical consent provided by the plaintiffs (including any excerpts thereof).

D.  Pleadings served by the plaintiffs.

E.  Excerpts from medical treatises and articles from medical journals used for the purposes of direct examination, impeachment, cross-examination, and related purposes in connection with any witnesses or as needed in rebuttal.

F.  Any exhibits listed and/or disclosed by the plaintiffs.

G.  Any exhibits listed and/or disclosed by defendant Raleigh General Hospital.

H.  Enlargements, digital or computerized copies, summaries, and excerpts of and from the above listed exhibits that may be offered if the need arises.

I.  Any social media materials concerning the plaintiffs.

J.  Social Security Administration records concerning A.H.

14

### C.  Objections

#### 1.  By Plaintiffs

Plaintiffs object to Defendants' listing of every record obtained from a health care provider as clearly not being appropriate and requests what in good faith Defendants do intend to use as exhibits.
Plaintiffs also object to exhibits that are clearly not admissible such as the Government's Ex. 1.as well as "QQ-WW" which are not admissible pursuant to the Rules. Also "AAA-GGG". Plaintiffs also object to any identified exhibits that are not admissible pursuant to the Rules

#### 2.  Defendant Raleigh General Hospital

Raleigh General Hospital reserves its right to inspect and examine any exhibits or demonstrative aides used or offered by the Plaintiffs or the USA prior to displaying the exhibit or demonstrative aide to the jury in order to register an objection to the exhibit or demonstrative aide, if required.

#### 3.  Defendant United States

Defendant United States' objections, if any, to the evidence, testimony, and exhibits presented by the plaintiffs or RGH at trial will be disclosed in accordance with the Federal Rules of Evidence and the Federal Rules of Civil Procedure.  The United States also reserves the right to object to the use of any demonstrative exhibit or aid prior to its display and use as demonstrative evidence before the Court or the jury.

## 2.  CONTESTED ISSUES OF LAW REQUIRING A RULING BEFORE TRIAL

### A.  Plaintiffs

Plaintiffs believe that the Court had ruled on all of the filed Motions.

### B.  Defendant Raleigh General Hospital

The Court has issued rulings on all pre-trial motions, including motions in limine. Raleigh General Hospital does not anticipate any other legal issues which need to be resolved before trial.

### C.  Defendant United States

Since the Court has issued rulings on all pretrial motions and motions in limine previously pending before the Court, the United States does not anticipate any other legal issues which need to be resolved prior to trial unless certain evidentiary matters need to

be addressed due to issues arising from any testimony of witnesses who are deposed in *de bene esse* depositions taken prior to trial.

3.   **STATEMENT OF ESSENTIAL ELEMENTS**

   A.   <u>**Plaintiffs**</u>

The substantive elements of Plaintiffs' medical negligence claims in this case are governed by the provisions of the Medical Professional Liability Act, W.Va. Code §§ 55-7B-1, *et seq.* (hereinafter MPLA).  The fundamental elements of Plaintiff's cause of action are:

   1.  Negligence or deviation from the standard of care by health care providers.

   2.  Proximate cause of injury.

   3.  Damages.

W.Va. Code § 55-7B-3(2003).

   1.   <u>**Standards for Proof of Negligence and Deviation From Standard of Care**</u>

      i.<u>Burden of Proof</u>

"In an action for damages against a physician for negligence or want of skill in the treatment of an injury or disease, the burden is on the plaintiff to prove [by a preponderance of the evidence] such negligence or want of skill and that it resulted in injury to the Plaintiff."  Syl. Pt. 1, *Roberts v. Gale*, 149 W.Va. 166, 139 S.E.2d 272 (1964) citing Syllabus, *White v. Moore*, 134 W.Va. 806, 62 S.E.2d 122 (195); Syl. Pt. 4, *Hundley v. Martinez*, 151 W.Va. 977, 158 S.E.2d 159 (1967); Syl. Pt. 1, *Hinkle v. Martin*, 163 W.Va. 482, 256 S.E.2d 769 (1979) citing Syl. Pt. 4, *Hundley v. Martinez*, 151 W.Va. 977, 158 S.E.2d 159 (1967); *Torrence v. Kusminski*, 185 W.Va 734, 408 S.E.2d 684, 696 (1991); *Short v. Appalachian OH-9, Inc.*, 203 W.Va. 246, 507 S.E.2d 124 (1998).

ii. <u>Standard of Care</u>

W.Va. Code § 55-7B-3(a) [2003] sets forth the elements of proof of medical negligence in the current MPLA.  That section provides:

### W.Va. Code § 55-7B-3
### Elements of Proof

(a) The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care;

(1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

(2) Such failure was a proximate cause of the injury or death.

### W. Va. Code § 55-7B-7
### Testimony Of Expert Witness On Standard Of Care

(a) The applicable standard of care and a defendant's failure to meet the standard of care, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court. Expert testimony may only be admitted in evidence if the foundation therefore is first laid establishing that: (1) The opinion is actually held by the expert witness; (2) the opinion can be testified to with reasonable medical probability; (3) the expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed; (4) the expert witness maintains a current license to practice medicine with the appropriate licensing authority of any state of the United States: *Provided,* That the expert witness' license has not been revoked or suspended in the past year in any state; and (5) the expert witness is engaged or qualified in a medical field in which the practitioner has experience and/or training in diagnosing or treating injuries or conditions similar to those of the patient. If the witness meets all of these qualifications and devoted, at the time of the medical injury, sixty percent of his or her professional time annually to the active clinical practice in his or her medical field or specialty, or to teaching in his or her medical field or specialty in an accredited university, there shall be a rebuttable presumption that the witness is qualified as an expert. The parties shall have the opportunity to impeach any witness' qualifications as an expert. Financial records of an expert witness are not discoverable or relevant to prove the amount of time the expert witness spends in active practice or teaching in his or her medical field unless good cause can be shown to the court. (b) Nothing contained in this section may be construed to limit a trial court's discretion to determine the competency or lack of competency of a witness on a ground not specifically enumerated in this section.

A medical expert is qualified to testify concerning standard of care issues if it is established that he or she has more than a casual familiarity with the standard of care and treatment commonly practiced by physicians engaged in defendant's specialty.  See *Walker v. Sharma*, 221 W.Va. 559, 655 S.E.2d 775 (2007); *Fortney v. Al-Hajj*, 188 W.Va. 588, 425 S.E.2d 264 (1992)(expert need not be board certified in the same specialty as defendant to testify on standard of care issues); *Mayhorn v. Logan Medical Foundation*, 193 W.Va. 42, 454 S.E.2d 87 (1994)(paramount authority for determining whether expert is qualified to give opinions in a medical malpractice action is the rule of evidence governing expert testimony, not MPLA).  Accord: *Taylor v. Cabell Huntington Hospital, Inc.*, 208 W.Va. 128, 538 S.E.2d 719(2000); *Farley v. Shook*, 218 W.Va. 680, 629 S.E.2d 739(2006).

Medical testimony alleged to reflect "scientific knowledge" is admissible provided the evidence is both reliable and relevant.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993); *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert denied*, *Buracker v. Wilt*, 511 U.S. 1129, 114 S. Ct. 2137, 128 L.Ed..2d 867 (1994), *dismissed sub nomine at Wilt v. State Auto. Mut. Ins. Col.*, 203 W.Va. 165, S.E.2d 608 (1998); *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171 (1995); *State ex rel. Wiseman v. Henning*, 212 WS.Va. 128, 569 S.E.2d 204 (2002).

iii. Negligence/Duty

In a medical malpractice case, plaintiff's duty is to prove that "[t]he health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances…"  W.Va. Code § 55-7B-3(a).  The "locality rule" was abolished in *Paintiff v. City of Parkersburg*, 176 W.Va. 469, 345 S.E. 2d 564 (1986)(the

standard of care is a national standard of care).  Affirmed: *Walker v. Sharma*, 221 W.Va. 559, 655 S.E.2d 775 (2007).

"A patient … is entitled to such reasonable care and attention for his safety as his mental and physical condition may require."  *Hogan v. Hospital Company*, 63 W.Va. 84, 59 S.E. 943 (1907).  Cited in *Duleing v. Bluefield Sanitarium, Inc.*, 149, W.Va. 567, 142 S.E.2d 754 (1965) and *Utter v. United Hospital Center, Inc.*, 160 W.Va. 703, 236 S.E.2d 213 (1977).

"It is the duty of a physician, who has undertaken the treatment of a patient, to give to the patient such care and attention as the known exigencies of the case require."  Syl. Pt. 1, *Young v. Jordan*, 106 W.Va. 139, 141, 145 S.E. 41, Syl. Pt. 1 (1928).

In determining the degree of care and skill the law exacts of physicians, regard must be had to the state of advancement of the profession at the time of treatment; a physician is required to exercise the ordinary care and skill of his or her profession in the light of modern learning and enlightenment on the subject.  *Browning v. Hoffman*, 86 W.Va. 468, 103 S.E.2d 484 (1920), *modified on another point by Belcher v. Charleston Area Medical Ctr.*, 188 W.Va. 105, 422 S.E.2d 827 (1992).

A health care provider is liable for negligence resulting from a failure of monitoring or of diagnosis needed to disclose an existing condition causing detriment to the patient: if by inadequate investigation a physician fails to discover what a careful investigation would necessarily have disclosed, such failure is evidence of lack of due care and diligence.  *Jenkins v. Charleston General Hospital & Training School*, 90 W.Va. 230, 110 S.E. 560 , 563 (1922), *Hicks v. United States*, 368 F.2d 626 (4th Cir. 1966).

If a physician, as an aid to diagnosis, does not avail him or herself of the scientific means and facilities open to him or her for the collection of the best factual data upon which to arrive at

the diagnosis, the result is negligence in failing to secure an adequate factual basis upon which to support her diagnosis. *Clark v. United States*, 402 F.2d 950 (4th Cir. 1968).

A negligent physician is liable for the aggravation of injuries resulting from subsequent negligent medical treatment, if foreseeable, where that subsequent medical treatment is undertaken to mitigate the harm caused by the physician's own negligence. *Thornton v. Charleston Area Medical Center*, 158 W.Va. 504, 213 S.E.2d 102 (1975).

## 2.    Standards for Proof of Proximate Cause.

"The proximate cause of an injury is the last negligent act contributing to the injury and without which the injury would not have occurred." Syl. Pt. 8, *Judy v. Grant County Health Department*, 210 W.Va. 286, 557 S.E.2d 340 (2001) citing Syl. Pt. 5, *Hartley v. Crede*, 140 W.Va. 133, 82 S.E.2d 672 (1954), *overruled on other grounds, State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983). Syl. Pt. 5, *Sergent v. City of Charleston*, 209 W.Va. 437, 549 S.E.2d 311 (2001). Accord: Syl. Pt. 1, *Mays v. Chang*, 213 W.Va. 220, 579 S.E.2d 561 (2003); Syl. Pt. 5, *Stewart v. George*, 216 W.Va. 288, 607 S.E.2d 394 (2004); Syl. Pt. 5 *Wilkinson v. Duff*, 212 W.Va. 740, 575 S.E.2d 350 (2002).

"The proximate cause of an event is that cause which in actual sequence unbroken by any independent cause produces an event, and without which the event would not have occurred. It is not necessary that the jury find that a particular defendant's negligence, if any, was the only cause of Plaintiff's injury. It is only necessary that [the jury] find by a preponderance of the evidence that such negligence was a proximate cause of the injury." *Reynolds v. City Hospital, Inc.*, 207 W.Va. 101, 529 S.E.2d 341 (2000).

"A party in a tort action is not required to prove that the negligence of one sought to be charged with an injury was the sole proximate cause of an injury. *Divita v. Atlantic Trucking Co.*,

129 W.Va. 267, 40 S.E.2d 324 (1946), is overruled to the extent it states a contrary rule."  Syl. Pt. 2, *Mays v. Change*, 213, W.Va. 220, 579 S.E.2d 561 (2003); Syl Pt. 6, *Stewart v. George*, 216 W.Va. 288, 607 S.E.2d 394 (2004) citing Syl. Pt. 2, *Everly v. Columbia Gas of West Virginia*, 171 W.Va. 534, 301 S.E.2d 165 (1983).  See *Yates v. Mancari*, 153 W.Va. 350, 168 S.E.2d 746 (1969).

"An intervening cause, in order to relieve a person charged with negligence in connection with an injury, must be a negligent act, or omission, which constitutes a new effective cause and operates independently of any other act, making it and it only, the proximate cause of the injury." Syl. Pt. 5, *Postlewait v. Ohio Valley Medical Center, Inc.*, 214 W.Va. 668, 591 S.E.2d 226 (2003) Syl. Pt. 12, *Riffe v. Armstrong*, 197 W.Va. 626, 477 S.E.2d 535 (1996), *modified on other grounds by Moats v. Preston County Comm'n*, 206 W.Va. 8, 521 S.E.2d 180 (1999); Syl. Pt. 3, *Wehner v. Weinstein*, 191 W.Va. 149, 444 S.E.2d 27 (1994).

One who is shown to have breached a duty of care is liable for its natural and proximate effects, "which may be immediate or through the subsequent media of natural forces or other innocent causes."  *Riffe v. Armstrong*, 197 W.Va. 626, 477 S.E.2d 535 (1996), *modified on other grounds by Moats v. Preston County Comm'n*, 206 W.Va. 8, 521 S.E.2d 180 (1999); *Mills v. Indemnity Insurance Company of North America*, 114 W.Va. 263, 171 S.E. 532 (1933); Syl. Pt. 7, *Fry v. McCrory Stores Corporation*, 144 W.Va. 123, 107 S.E.2d 378 (1959).  Proof of proximate cause is not negated by a protracted series of events if such events "flowed naturally" from the breach of duty.  *Riffe v. Armstrong*, 197 W.Va. 626, 477 S.E.2d 535 (1996), *modified on other grounds by Moats v. Preston County Comm'n*, 206 W.Va. 8, 521 S.E.2d 180 (1999).

In order to prove proximate cause, Plaintiffs need only establish that the evidence presented would warrant a reasonable inference that the injury was caused by the defendant's acts, conduct, omissions or breach of the standard of care: "Medical testimony to be admissible and sufficient to

warrant a finding by the jury of the proximate cause of an injury is not required to be based upon a reasonable certainty that the injury resulted from the negligence of the defendant.  All that is required to render such testimony admissible and sufficient to carry it to the jury is that it should be of such character as would warrant a reasonable inference by the jury that the injury in question was caused by the negligent act or conduct of the defendant." *Thornton v. CAMC*, 172 W.Va. 360, 305 S.E.2d 316 (1983) citing Syl. Pt. 3, *Hovermale v. Berkeley Springs Moose Lodge*, 165 W.Va. 689, 271 S.E.2d 335 (1980); Syl. Pt. 5, *Totten v. Adongay*, 175 W.Va. 634, 337 S.E.2d 2 (1985) citing Syl. Pt. 1, *Pygman v. Helton*, 148 W.Va. 281, 134 S.E.2d 717 (1964); *Mays v. Change*, 213 W.Va. 220, 579 S.E.2d 561 (2003)(finding "reasonable inference" sufficient to create jury issue on causation ); Syl. Pt. 2, *Sexton v. Grieco*, 216 W.Va. 714, 613 S.E.2d 81 (2005) citing Syl. Pt. 1, in part, *Pygman v. Helton*, 148 W.Va. 281, 134 S.E.2d 717 (1964).

"Where a physician is testifying as to the causal relation between a given physical condition and the defendant's negligent act, he need only state the matter in terms of a reasonable probability." *Hovermale v. Berkeley Springs Moose Lodge*, 165 W.Va. 689, 271 S.E.2d 335 (1980).  See Syl. Pts. 1 and 2, *Sexton v. Grieco*, 216 W.Va. 714, 613 S.E.2d 81 (2005).

Recognition of the rule requiring proof of causation does not impose upon the Plaintiffs a duty to exclude every other plausible theory as to the cause and effect of the injury or death. *Long v. City of Weirton*, 158 W.Va. 741, 214 S.E.2d 832, 848 (1975).  Rather he must merely prove a causal connection between his injury and a negligent act to a reasonable degree of medical probability.  W.Va. Code § 55-7B-7; *Hovermale v. Berkeley Springs Moose Lodge No. 1483*, *supra.*

A negligent physician is liable for the aggravation of injuries resulting from subsequent negligent medical treatment, if foreseeable, where that subsequent medical treatment is undertaken

to mitigate harm caused by the physician's own negligence. *Rine v. Irisari*, 187 W.Va. 550, 420 S.E.2d 541 (1992); *Thornton v. Charleston Area Medical Center*, 158 W.Va. 504, 213 S.E.2d 102 (1975)(liability for aggravated or successive damages by health care provider as proximate result).

A patient's negligence in causing his or her own injury prior to negligent medical care does not constitute contributory negligence and does not serve as proximate cause of injury to reduce recovery. *Rowe v. Sisters of the Pallotine Missinary Society*, 211 W.Va. 16, 560 S.E.2d 491 (2001).

### 3.     Standards for Proof of Damages

Elements of recoverable compensatory damages in personal injury cases include:

a)    Lost wages, lost household services, and lost income and employment benefits;
b)    Medical expenses;
c)    Gratuitous nursing services;
d)    Physical pain and suffering;
e)    Scarring and disfigurement;
f)    Mental and emotional distress and anguish;
g)    Inability to function as a whole man;
h)    Loss of enjoyment of life/loss or inability to perform usual activities and services;
i)    Humiliation and embarrassment;
j)    Annoyance and inconvenience;
k)    Loss of consortium; and
l)    Such other damages as the evidence may show.

Authorities: *Robinson v. Charleston Area Medical Center, Inc.*, 186 W.Va. 720, 414 S.E.2d 877 (1991); *Jordan v. Bero*, 158 W.Va. 716, 559 S.E.2d 53 (2001); *Ilosky v. Michelin Tire Corp.*, 172 W.Va. 435, 307 S.E.2d 603, 613 – 14 (1983); *Adkins v. Foster*, 187 W.Va. 730, 421 S.E.2d 271, 274 – 76 (1992); *State ex rel. Packard v. Perry*, 221 W.Va. 526, 655 S.E.2d 548 (2007); *Andrews v. Reynodls Memorial Hospital, Inc.*, 201 W.Va. 624, 499 S.E. 2d 849 (1997); *Liston v. University of West Virginia Board of Trustees*, 190 W.Va. 410, 414, 438 S.E.2d 590, 594 (1993); *Gerver v. Benavides*, 207 W.Va. 228, 530 S.E.2d 701 (1999), *cert. denied*, 529 U.S. 1131, 120 S.Ct. 2008, 146 L.Ed. 2d 958 (2000); *Reager v. Anderson* , 179 W.Va. 691, 371 W.E.2d 619 (1988); *Flannery*

*v. United States*, 171 W.Va. 27, 297 S.E.2d 433 (1982), *later proceeding at* 718 F.2d 108 (4th Cir.

1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984); *Ricottilli v.*

*Summersville Memorial Hospital*, 188 W.Va. 674, 425 S.E.2d 629 (1992) quoting *Whitehair v.*

*Highland Memory Gardens, Inc*., 174 W.Va. 458, 463 327 S.E.2d438, 443 (1985).  See also

*Tanner v. Rite Aid of W.Va. Inc.*, 194 W.Va. 643, 461 S.E.2d 149 (1995); *Mace v. Charleston Area*

*Medical Ctr. Found., Inc.*, 188 W.Va. 57, 67, 422 S.E.2d 624, 634 (1992); *Criss v. Criss*, 177

W.Va. 749, 751, 356 S.E.2d 620, 622 (1987); *Lenox v. McCauley*, 188 W.Va. 203, 423 S.E.2d

606, 611 (1992); *Johnson v. WVU Hospitals, Inc.*, 186 W.Va. 648, 413 S.E.2d 889 (1991).

"Future damages are those sums awarded to an injured party for, among other things: (1)

Residuals or future effects of an injury which have reduced the capability of an individual to

function as a whole man; (2) future pain and suffering; (3) loss or impairment of earning capacity;

and (4) future medical expenses."  Syl. Pt. 2, *Adkins v. Foster*, 19=87 W.Va. 730, 421 S.E.2d 271

(1992) citing Syl. Pt. 10, *Jordan v. Bero*, 158 W.Va. 28, 210 S.E.2d 618 (1974) and Syl. Pt. 2,

*Flannery v. United States*, 171 W.Va. 27, 297 S.E.2d 433 (1982), *later proceeding at* 718 F.2d

108 (4th Cir. 1983), *cert denied*, 467 U.S. 1226, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984); *Listion v.*

*University of West Virginia Board of Trustees*, 190 W.Va. 410, 428, S.E.2d 590 (1983) citing Syl.

Pt. 10,  *Jordan v. Bero*, 158 W.Va. 28, 210 S.E.2d 618 (1974) and Syl. Pt. 2, *Flannery v. United*

*States*, 171 W.Va. 27, 297 S.E.2d 433 (1982), *later proceeding at* 718 F.2d 108 (4th Cir. 1983),

*cert denied*, 467 U.S. 1226, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984), and Syl. Pt. 2, *Adkins v. Foster*,

187 W.Va. 730, 421 S.E.2d 271 (1992).

Future medical and other care costs are recoverable when appropriately supported by

evidence of permanent injury and of reasonable necessity as through the testimony of a life care

planner and physician, and when reduced to present value.  *Robinson v. Charleston Area Medical*

*Center, Inc.*, 186 W.Va. 720, 414 S.E.2d 877 (1991); *Adkins v. Foster*, 187 W.Va. 730, 421 S.E.2d 271 (1992); *See Reager v. Anderson*, 179 W.Va. 691, 371 S.E.2d 619 (1988); *Bower v. Westinghouse*, 206 W.Va. 133, 522 S.E.2d 424 (1999)(re medical monitoring).

Plaintiffs who have suffered emotional distress damages are not required to buttress such claims by corroborative evidence. *Tanner v. Rite Aid of W.Va. Inc.*, 194 W.Va. 643, 461 S.E.2d 149 (1995); *Mace v. Charleston Area Medical Ctr. Found., Inc.*, 188 W.Va. 57, 67, 422 S.E.2d 624, 634 (1992); *Criss v. Criss*, 177 W.Va. 749, 751, 356 S.E.2d 620, 622 (1987).

"Aggravations of pre-existing conditions warrant the inclusion of the aggravated preexisting condition as a compensable element of the injury." *Stephe v. Wagner*, 2014 W.Va. LEXIS 33 (W.Va. 2014), *Charlton v. SWCC*, 160 W.Va. 664, 236 S.E.2d 241 (1977);

### 4.    Standards for Proof of Defendants' Affirmative Defenses

The defendant carries the burden of proving any affirmative defense by a preponderance of the evidence. Cleckley, F., Handbook on Evidence for West Virginia Trial Lawyers, 2nd Ed.; Syl. Pt. 4, *Rowe v. Sisters of the Pallottine Missionary Society*, 211 W.Va. 16, 560 S.E.2d 491 (2001) citing Syl. Pt. 6, *Leftwich v. Wesco Corp.*, 146 W.Va. 196, 119 S.E.2d 401 (1961), *overruled on other grounds by Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979); *Judy v. Grant County Health Department*, 210 W.Va. 286, 557 S.E.2d 340 (2001),.

Such affirmative defenses include, but are not limited to, allegations of contributory/comparative negligence, *Rowe v. Sisters of the Pallottine Missionary Society*, 211 W.Va. 16, 560 S.E.2d 491 (2001), and any "multiple methods of treatment"/"two schools of thought" defense. *Yates v. Univ. of West Virginia Bd. Of Trustees*, 209 W.Va. 487, 549 S.E.2d 681 (2001).

25

Under the substantive law of West Virginia, "A party is not barred from recovering damages in a tort action so long as his negligence or fault does not equal or exceed the combined negligence or fault of the other parties involved in the accident." *Rowe*, *supra*, citing Syl. Pt. 3, *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979).

"Contributory negligence on the part of the plaintiff is an affirmative defense. There is a presumption of ordinary care in favor of the plaintiff, and where the defendant relies upon contributory negligence, the burden of proof rests upon the defendant to show such negligence unless it is disclosed by the plaintiff's evidence or may be fairly inferred by all of the evidence and circumstances surrounding the case." *Rowe*, *supra*, *citing* Syl. Pt. 6, *Leftwich v. Wesco Corp.*, 146 W.Va. 196, 119 S.E.2d 401 (1961) *overruled on other grounds by Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979).

For a health care provider to establish the defense of comparative negligence, the health care provider must prove, with respect to the plaintiff's conduct after medical treatment is initiated, that: (1) the plaintiff owed himself a duty of care; (2) the plaintiff breached that duty; and (3) the breach was a proximate cause of the damages the plaintiff sustained. *Rowe, supra*, Syl. Pt. 5.

Absence of proof of causation has been held fatal to this defense. *Matheny v. Fairmont General Hosp.*, 212 W.Va. 740, 575 S.E.2d 350 (2002); *Judy v. Grant Co. Health Dept.*, 210 W.Va. 286, 557 S.E.2d 340 (2001).

Under the common law, "[i]n order to obtain a proper assessment of the total amount of the plaintiff's contributory negligence under our comparative negligence rule, it must be ascertained in relation to all of the parties whose negligence contributed to the accident, and not merely those defendants involved in the litigation." *Rowe, supra, citing* Syl. Pt. 3, *Bowman v.*

*Barnes*, 168 W.Va. 111, 282 S.E.2d 613 (1981).  However under the current MPLA, Code § 55-7B-9(b):

> (b) In assessing percentages of fault, the trier of fact shall consider only the fault of the parties in the litigation at the time the verdict is rendered and shall not consider the fault of any other person who has settled a claim with the plaintiff arising out of the same medical injury. *Provided,* That, upon the creation of the patient injury compensation fund provided for in article twelve-c, chapter twenty-nine of this code, or of some other mechanism for compensating a plaintiff for any amount of economic damages awarded by the trier of fact which the plaintiff has been unable to collect, the trier of fact shall, in assessing percentages of fault, consider the fault of all alleged parties, including the fault of any person who has settled a claim with the plaintiff arising out of the same medical injury.

"It is improper for counsel to make arguments to the jury regarding a party's omission from a lawsuit or suggesting that the absent party is solely responsible for the plaintiff's injury where the evidence establishing the absent party's liability has not been fully developed."  *Groves v. Compton*, 167 W.Va. 873, 280 S.E.2d 708 (1981); *Fortney v. Al-Hajj*, 188 W.Va. 588, 425 S.E.2d 264 (1992); *Matney v. Lowe*, 191 W.Va. 220, 444 S.E.2d 730 (1994); *Rowe, supra,* citing Syl. Pt. 2, *Doe v. Wal-Mart Stores, Inc.*,210 W.Va. 664, 558 S.E.2d 663 (2001).

A health care provider may not escape a finding of negligence on the basis of a "mere mistake in judgment."  Syl. Pt. 5, *Pleasants v. Alliance Corp.*, 209 W.Va. 39, 543 S.E.2d 320 (2000)(allowing "mistake in judgment" defense inappropriately injects subjectivity into objective standard of care); Syl. Pt. 4, *Mays v. Chang*, 213 W.Va. 220, 579 S.E.2d 561 (2003).

Ordinarily, questions concerning negligence and causation are for the jury to determine at trial.  *Arbogast v. Mid-Ohio Valley Medical Corp.*, 214 W.Va. 356, 589 S.E.2d 498 (2003); *Mays v. Chang*, 213 W.Va. 220, 579 S.E.2d 561 (2003); *Stewart v. George*, 216 W.Va. 288, 607 S.E.2d 394 (2004).

27

### B.     **Defendant Raleigh General Hospital**

Raleigh General Hospital agrees that the West Virginia Medical Professional Liability Act (MPLA), W. Va. Code §§55-7B-1-12, governs the trial of this case.

W. Va. Code §55-7B-3 requires the Plaintiffs to prove that:

(1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

(2) Such failure was a proximate cause of the injury or death.

W. Va. Code § 55-7B-7 requires Plaintiffs to establish the standard of care through expert testimony by an expert witness with the following qualifications:

(a)     The applicable standard of care and a defendant's failure to meet the standard of care, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court. A proposed expert witness may only be found competent to testify if the foundation for his or her testimony is first laid establishing that:

(1)     the opinion is actually held by the expert witness;

(2) the opinion can be testified to with reasonable medical probability;

(3) the expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed;

(4) the expert witness's opinion is grounded on scientifically valid peer-reviewed studies if available;

(5) the expert witness maintains a current license to practice medicine with the appropriate licensing authority of any state of the United States: *Provided,* That the expert witness's license has not been revoked or suspended in the past year in any state; and

(6) the expert witness is engaged or qualified in a medical field in which the practitioner has experience and/or training in diagnosing or treating injuries or conditions similar to those of the patient. If the witness meets all of these qualifications and devoted, at the time of the medical injury, sixty percent of his or her professional time annually to the active clinical practice in his or her medical field or specialty, or to teaching in his or her medical field or specialty in an accredited university, there shall be a rebuttable presumption that its witness is qualified as an expert. The parties shall have the opportunity to impeach any witness's qualifications as an expert. Financial records of an expert witness are

28

not discoverable or relevant to prove the amount of time the expert witness spends in active practice or teaching in his other medical field unless good cause can be shown to the court.

Plaintiffs must prove all alleged past damages to a reasonable degree of probability and all potential future damages to a reasonable degree of certainty.  Under W.Va. Code § 55-7B-9d, damages for past medical expenses are (1) limited to the amounts actually paid for or on behalf of the plaintiffs and (2) to those medical expenses which have been incurred but not paid by or on behalf of the plaintiffs for which the plaintiffs or someone on the plaintiffs' behalf is obligated to pay.  W. Va. Code § 55-7B-8(b) limits plaintiffs' non-economic damages recovery to $500,000.00, adjusted for inflation which, as of January 1, 2021, is $719,818.00.

## C.   **Defendant United States of America**

Jurisdiction of this action is predicated on the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2401(b) and 2671, et seq.  This case and the plaintiff's claims are governed by the FTCA 28 U.S.C. § 1346, et seq., and the West Virginia Medical Professional Liability Act ("MPLA"), W.Va. Code § 55-7B-1, et seq.  The legal provisions and cases interpreting those statutes are the authorities upon which the defendant will rely in the trial of this civil action.

The plaintiffs are required to prove by a preponderance of the evidence that the United States was negligent under the terms set forth in the MPLA, W.Va. Code §55-7B-1, *et seq.*, and that such negligence proximately caused an injury to the plaintiffs.  Plaintiff must establish by competent and admissible expert testimony (by a preponderance of the evidence) that the United States failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the class(es) to which the health care providers at Access Health, belong acting in the same or similar circumstances.  Further, plaintiffs must establish by a preponderance of the evidence through expert witness testimony that any alleged negligence by the United States proximately caused an injury to the plaintiffs.  W.Va. Code §§ 55-7B-3, 55-7B-7.

Plaintiffs must also prove all alleged past damages to a reasonable degree of probability and all potential future damages to a reasonable degree of certainty. Under W.Va. Code § 55-7B-9d, damages for past medical expenses are (1) limited to the amounts actually paid for or on behalf of the plaintiff and (2) to those medical expenses which have been incurred but not paid by or on behalf of the plaintiff for which the plaintiff or someone on the plaintiff's behalf is obligated to pay.  Plaintiff's noneconomic damages are limited by the $500,000 cap set forth in W.Va. Code § 55-7B-8(a) (as adjusted per W.Va. Code § 55-7B-8(c)).  In addition, plaintiffs' overall potential damages are also limited by the amounted stated in plaintiffs' SF 95.  28 U.S.C. § 2675(b).  *See* Kielwien v. United States, 540 F.2d 676 (4th Cir. 1976).

The United States contends that the health care providers at Access Health were not negligent and did not proximately cause an injury to the plaintiffs. Furthermore, the defendant denies all claims of negligence and proximate causation alleged by the plaintiffs.

The United States also incorporates herein all of the factual and legal arguments set forth in its dispositive motions on the various theories of liability alleged by the plaintiffs. The United States denies that it is liable to the plaintiffs, and further denies that it proximately caused an injury to the plaintiffs.

4.    **BRIEF SUMMARY OF MATERIAL FACTS AND THEORIES OF LIABILITY OR DEFENSE**

A.    <u>**Plaintiffs**</u>

This case involves a child with cerebral palsy which plaintiffs contend is a result of malpractice that took place during the latter stages of delivery and immediately post-delivery. Plaintiffs contend that nurses and a nurse midwife were negligent during the delivery process and nurses were responsible and negligent immediately post-delivery and thereby together caused the child's injuries. The hospital was the employee of the nurses and the Government represents the interest of the Mid-wife and her employer. The parents in this case are Crystal and Ryan Hysell. Their daughter who has cerebral palsy is A.H.

The nurse assigned to the delivery was Ms. Perkowski and the mid-wife was Ms. Crowder. After the delivery, the nurse involved was Ms. Buchanan. From the record, Ms. Crowder was seldom in the delivery room and in fact appeared only 4 minutes before the birth. The Government represents Ms. Crowder as the case against her and her employer, Access Health, created a FTCA case against her, only.

Crystal and her baby were being monitored through a fetal monitor which consists of an exterior belt on the abdomen of the mother which measures and shows the fetal heartbeat and the mother's uterine contractions, including their depth and how long they last. In this case, however, the fetal monitor was not being monitored properly and was

basically useless because it was not providing the proper information and when it did so, it was being ignored.  Much of the time the fetal monitor was showing the mother's heartbeat instead of the baby's heartbeat.  Other times it was showing both heart beats.  At times it was showing abnormalities. Even the uterine contractions were not being appropriately monitored such that it was extremely difficult to tell what was going on with respect to the baby. Plaintiffs' expert midwife and expert nurse will both testify that the fetal monitor was not being used appropriately and that the necessary information was not being obtained, which is negligence.  They will both testify that there were times that one could see that there were abnormalities that needed to be addressed and were not and that such fetal monitoring was done below the necessary standard of care.

Crystal had been in labor for about 10 hours when the baby was born. During the last two of those hours she was "pushing," which is a very stressful situation on both the baby and the mother.  Four minutes before the baby was born midwife Crowder returned to the room and was heard to comment by both Crystal's mother and Pastor Hysell (the father) that the baby couldn't come out because the cord was blocking her egress into the world and she needed to push the cord and the baby back up in the canal so the baby could get out.  That is in fact what happened.  She pushed the cord and the baby back in the canal and the baby was then delivered; however, this was after 2 hours of pushing. The description given of the cord is that of a prolapsed cord, which means a cord was blocking egress and whenever mother pushed, the baby's head would impinge upon the cord stopping the flow of blood with its oxygen. This all diminished the flow of oxygen to A.H.'s brain.

In addition, Crystal's SaO2, which is a measurement of the oxygen in the blood, was taken and reported twice during labor.  Normally, an SaO2 would be above 93 percent. In this case, it was dramatically lower at 87 and 89 percent during the labor, and then not checked further.  This meant that Crystal's blood (which was circulating to A.H.) also had diminished oxygen.

When A.H. was born, she was blue, dusky, not moving appropriately, not crying, and, most important, having respiratory difficulties. A.H. was taken from the mother, cleaned off, and carried to the nursery.

She arrived at the nursery about 14 minutes after birth.  There is no record of what transpired during that 14 minute period of time. At that time, the SaO2 for the  baby  was only 68 percent, an exceptionally low reading.  The baby was still dusky, was still blue, was still having difficulty breathing, and needed blow-by oxygen and suctioning, which removed thick mucus from the airway.  All of these things are signs and symptoms of hypoxia.  Hypoxia is insufficient oxygenation to the brain.  When hypoxia occurs, one of the results can be cerebral palsy, which can result in inappropriate motor function and cognitive dysfunction.

On that delivery day of the minor plaintiff there were nine deliveries at RGH and we are attempting to learn how many of those were done by midwife Crowder. That information is yet to be forthcoming. There will also be testimony that the hospital was understaffed in labor and delivery.

In addition, the baby was kept from her parents for more than 4 hours without any explanation and the record is relatively sparse as to what happened in those four hours.

The blue coloring, the duskiness, the poor oxygen content and the lack of crying did cease before discharge, but the crying became quite continuous after discharge.   The parents reported to the pediatrician (who was not present to even see the child until the next day) at the regular appointments that the child was having trouble feeding, was crying all the time, and seemed to not be getting to the proper "milestones."   Eventually, the pediatrician decided that she would send the baby for an MRI.   The purpose of an MRI in this situation was to see if there was any damage to the brain.   The MRI was reported by the radiologist to be negative and showing nothing.   As we will see later, that was wrong.   But the result of the report was to send the parents and physicians on a several year chase trying to determine what was wrong with the baby who kept missing more and more milestones, was not speaking, was very delayed globally in  turning, sitting up, walking, etc.   Doctors searched for what was going on with this child and performed numerous genetic tests.   No genetic problem was found and all genetic test results were negative.   At the age of 6, a physician at Cincinnati Children's Hospital requested another MRI.   It showed signs consistent with hypoxia. When the doctor compared it with the first MRI, the conclusion was that they were the same and that the first one done also showed leukomalacia, which is injury to the brain   caused by hypoxia.   It appears, at this point in time, that both of the MRIs essentially showed the same thing.   This then produced evidence that there was hypoxia at some point which was responsible for the cerebral palsy.   At one point there was a question of whether or not the child was autistic which is really not that important in this case because the damages were caused by hypoxia.

A.H. has a diagnosis today of cerebral palsy.   She cannot function like other children her age or even younger and it is unquestioned that her condition is permanent.

33

In addition to a nurse midwife and a registered nurse who will testify about the negligence, plaintiffs will also produce a neuroradiologist who will testify that the MRIs both show hypoxia and what it means.  They will also produce a pediatrician who will testify about what was needed by this child at the delivery and what should have been done. She will also testify that the results that were available in the hospital and then subsequently when the MRI was done, as well as the clinical picture, clearly indicate that there was a hypoxic event at the time of labor and delivery that was caused by the negligence and improperly remedied and that it was this negligence that was the cause of the cerebral palsy.  There is no evidence in this case of any hypoxia or a hypoxic event occurring other than at the one time just explained.

Plaintiffs will also produce a triple board-certified pediatric neurologist who will testify  that the cause of these injuries is hypoxia and more likely than not a hypoxic event during labor and delivery and that the injuries will be permanent.  Plaintiffs will also produce a life care planner who will testify as to what is needed by this child for the rest of her life and an economist will calculate the value of that cost and will also produce the value of the lost earning capacity.  These damages exclusive of noneconomic damages will be in the range of $7.8 – 10.0 million plus past medical bills.

Plaintiffs will also produce evidence of the required standard of care, violations of the standard of care, testimony connecting the violations with the injuries, i.e.  "causation" and damages.

All of Plaintiffs' experts have been deposed. Simply put, Nurse Connors will testify concerning the deviations from the standard of care of the nurses; Mr. Fassett, a nurse midwife will testify concerning the deviations from the standard of care of the nurse mid-

wife, Ms. Crowder; Dr. O'Meara, a pediatrician will also testify concerning he standard of care of a nurse and a mid-wife in these circumstances, including the appropriate standard of care after the delivery and on the issue of causation; DR. Barakos will explain the findings in the MRIs; Dr. Rugino who examined the child will testify on the issue of causation as well as the child's injuries and necessary medical treatment; Ms. Lampton will testify concerning the cost of what is necessary for the child in then future; and Mr. Staller will testify as an economist as to the present value of the costs as established by Ms. Lampton. All of Plaintiffs' experts will express their opinions within a reasonable degree of medical certainty or probability.

## B.     Defendant Raleigh General Hospital

On October 29, 2010, Crystal Hysell, who was pregnant with her first child, presented to RGH at forty-one (41) weeks gestation with a chief complaint of active uterine contractions. Ms. Hysell was evaluated in RGH's Obstetrics Department at 5:45 a.m., by Access Health's Certified Nurse Midwife Potcher. At the time of her initial evaluation, Ms. Hysell had normal heart and respiratory sounds, moderate contractions, and was noted as being three (3) cm dilated. Ms. Hysell was admitted in stable condition with a diagnosis of "Active Labor Anticipate SVD" at 5:50 a.m. She was noted as receiving an epidural at 8:54 a.m., after which Access Health's Certified Nurse Midwife Debra Crowder performed a vaginal examination, ruptured Ms. Hysell's membranes, and noted a small amount of clear amniotic fluid to be present. At 12:12 p.m., Ms. Hysell was noted to be dilated to 9 cm. She was further noted to be fully dilated at 12:50 p.m. and was instructed to begin pushing. At 2:19 p.m., the chart notes that Labor & Delivery Nurse Perkowski placed internal fetal scalp electrodes to monitor the fetal heart rate replacing the external fetal heart monitor which had been used up until that time. At 2:51 p.m., Certified Nurse Midwife Crowder

was noted to be bedside assisting Ms. Hysell with pushing.  At 2:55 p.m., A.H. was delivered vaginally.

According to the Newborn Evaluation completed by Nurse Perkowski, A.H.'s Apgar scores in the delivery room were seven (7) and eight (8) at 1 and 5 minutes respectively.  At 3:08 p.m., the infant was evaluated in the nursery.  The Newborn Admission Assessment was performed by Nurse Heather Buchanan.  A.H.'s color was noted to be acrocyanotic and dusky (before blow-by oxygen) upon arrival to the nursery.  A.H.'s oxygen saturation was noted to be 68% upon arrival on room air.  Nurse Buchanan notes that she initiated mouth suctioning with a bulb and removed a small amount of thick clear mucus.  A.H.'s oxygen saturation was noted to increase to over 90% within 60 seconds of initiating blow-by oxygen (via mask).  She subsequently performed deep suctioning and noted the removal of a moderate amount of thick clear mucus.  She was able to wean A.H. from blow-by oxygen at ten minutes and A.H.'s oxygen saturation at room air was noted to be at 96%.  A.H. was evaluated by a pediatrician, Dr. Bennett, on October 30, 2010.  Dr. Bennett's physical exam was normal with positive reflexes bilaterally and full range of motion noted in A.H.'s extremities.  Dr. Bennett's discharge exam performed on October 31, 2010, was also noted as normal.  Importantly, A.H.'s head circumference at birth measured at 31.9 cm (12.5 inches) was at or below the 1st percentile, making her microcephalic at birth.

A.H.'s medical records reflect that she was delayed in reaching various developmental milestones.  It was reported that A.H. rolled over at the age of 10 months, sat independently at the age of 19 months, crawled at the age of 22 months and walked at the age of 31 months.  A.H. was noted by A.H.'s family to be limited in the ability to self-feed and had limited ability to communicate, including an inability to vocalize any meaningful words.  A.H.'s last pediatric neurology assessment performed by Dr. Arthur at Cincinnati Children's Hospital notes multiple

diagnoses, including static encephalopathy, cerebral palsy, global developmental delay, autism spectrum disorder, microcephaly, and soft upper motor neuron signs.

With regard to A.H.'s microcephaly diagnosis, during Crystal Hysell's pregnancy, a June 9, 2010, fetal ultrasound reports reflect that A.H. was undersized relative to her fetal age. This was also reflected in notations made on A.H.'s pre-natal assessment sheet where it is noted that A.H. was "small for dates" with respect to an ultrasound performed on October 29, 2010. In addition, to the comment "small for dates," there is a notation of 656.53, which is an ICD-9 Code, reflecting a diagnosis of poor fetal growth. At birth, A.H.'s head circumference was 31.9 cm, which is at or below the 1st percentile. At the age of one year, A.H.'s head circumference was 42.5 cm, which is well below the 5th percentile for age. At close to the age of two, A.H.'s head circumference was noted to be 45.5 cm, which continued to be well below the 5th percentile for age. Records from Cincinnati Children's Hospital note a diagnosis of microcephaly at the age of 4 years, 7 months of age and note a head circumference of 48 cm, which continued to well below the 5th percentile. At the approximate of 5 years, 9 months, A.H.'s head circumference measured 48.5 cm, which continued to be well below the 5th percentile. More recently, physical examinations conducted for purposes of evaluating A.H. for this case revealed that she had a head circumference of 49 cm on July 21, 2018, which remained constant on her October 31, 2019, examination, all of which are considered microcephalic. Experts recognize that microcephaly at birth is strongly associated with an *in utero* insult that occurred during the prenatal period prior to labor and deliver and/or due to a genetic condition.

Raleigh General Hospital will present a Maternal Fetal Medicine expert, Dr. Earnest Graham, who will opine that the RGH obstetrical and nursery nursing staff, met or exceeded the applicable standard of care of A.H. both during labor and after delivery. Dr. Graham believes

37

there was no indication during Ms. Hysell's course in labor and delivery which necessitated an obstetrician, pediatrician, neonatologist or neonatal resuscitation team to be present at delivery. He will opine that labor and delivery were unremarkable.  Specifically, he will opine that the fetal heart tracing was not abnormal and any decelerations present on the fetal heart monitoring are to be expected.  The fetal heart tracing shows no evidence of hypoxia or a fetus in distress.  Further, as evidenced by the fetal heart tracing and lack of a distressed fetus at birth, Dr. Graham will testify that there was no indication that an emergent delivery and/or emergent cesarean section needed to be performed.

Dr. Graham will further opine that there are no notations of any seizure activity, respiratory distress or failure, organ damage/organ failure, A.H. becoming comatose, an abnormal state of consciousness, or any other complications during A.H.'s birth admission to Raleigh General Hospital.  As discussed, the Apgar scores were normal and there were no signs of encephalopathy present.  Quite simply, Dr. Graham believes there is no evidence of hypoxia or infection at the time of birth that would have required additional treatment or observation.  Dr. Graham will further opine that keeping A.H. in the newborn nursery for a period of four hours for observation before taking her to bond with her mother is completely normal and within the standard of care.  He believes A.H. was appropriately discharged on October 31, 2010, as this was a routine delivery with no signs of abnormalities or concerns about her condition.

Raleigh General Hospital will also call a board certified neonatologist, Dr. Peter Giannone, who will opine Raleigh General Hospital met or exceeded the applicable standard of care of A.H. both during labor and after delivery.  He will opine there was no indication during Ms. Hysell's course in labor and delivery that necessitated a pediatrician, neonatologist or neonatal resuscitation team to be present at delivery.  After delivery, A.H. received an appropriate assessment in the

delivery room and had Apgar scores of 7 and 9.  A.H. was appropriately and timely transferred to the nursery in which evaluation showed the need for suctioning and supplemental oxygen.  A.H. timely received appropriate suctioning and supplemental oxygen wherein her oxygen saturation increased from 68% to over 90%.  After ten minutes of receiving supplemental oxygen, A.H. was able to maintain an oxygen saturation level on room air in excess of 95%.  At all times after delivery, A.H.'s heart rate and the respiratory rate remained within normal limits for a neonate. There was no notation of seizure activity, respiratory distress or failure, organ damage/organ failure, A.H. becoming comatose, abnormal state of consciousness, or any other complications during A.H.'s birth admission to Raleigh General Hospital.  A.H. was appropriately discharged on October 31, 2010, and it was  appropriate to monitor and/or manage her elevated bilirubin levels as an outpatient through her pediatrician.

Raleigh General Hospital will call a pediatric neuroradiologist, Dr. Joshua Shimony, who will opine that the MRI performed in 2012 at CAMC and the MRI performed in 2016 at Cincinnati Children's Hospital both demonstrate subtle brain abnormalities.  The MRI findings in 2012 and those demonstrated in the 2016 study remained static during that time period.  Based upon his review of both studies, Dr. Shimony will disagree with the findings of the 2016 MRI study to the extent the findings suggest "moderate" white matter loss as he would classify the finding as only being "mild."  Further, Dr. Shimony will opine that while the studies do show that the posterior ventricles are somewhat enlarged, the findings are subtle and represent a nonspecific set of findings.  Specifically, the set of findings demonstrated on the 2012 and 2016 MRI studies could represent the sequela of a host of potential causes and it cannot be stated, to a reasonable degree of medical probability and/or certainty, that the findings and injury were caused due to a lack of oxygen or a hypoxic injury.  Further, the findings and injuries that are demonstrated on the 2012

and 2016 MRI studies cannot be pinpointed to the time of birth or labor process.  Dr. Shimony is expected to opine, based upon the medical records, which indicate a normal birth process, subsequent medical records that indicate the child was microcephalic and had delayed milestones, and his experience with pediatric patients and fetal imaging, the most likely cause and/or contributing factor to the findings and injury shown on both MRI studies is either an in utero insult occurring prior to the time of labor and delivery or a genetic abnormality.

Raleigh General Hospital will call a pediatric neurologist, Dr. Gary Trock, who has personally examined A.H.  In addition to testifying about his examination of the child, Dr. Trock will testify that A.H. sustained an in utero insult prior to the time of labor and delivery, based on the congenital microcephaly and the findings on her MRI scans.  Dr. Trock also believes the fact that A.H. was microcephalic at birth is further evidence that she had some insult     and     injury which occurred well before her labor and delivery.  Dr. Trock will point out to the jury that A.H. at the time of birth did not have any signs of newborn encephalopathy (brain damage, disease or disfunction). She quickly responded to blow-by oxygen and suctioning. She was feeding on the first day and was discharged from the hospital in a time expected for a normal newborn. She did not have multi-organ failure. She did not have seizures. She did not require intensive care in the nursery.  All these factors are against an acute insult to the time of birth.

Raleigh General Hospital also will call a pediatric neurogeneticist, Dr. Andrea Gropman, as a witness at trial.  Dr. Gropman will testify that taking A.H.'s entire medical history into account, including her birth admission which was unremarkable for an hypoxic-ischemic birth injury, her reported developmental delays, the constellation of her cognitive, language and motor deficits, her March 3, 2016, MRI, and photographs, A.H. did not have an hypoxic-ischemic injury at birth.  In Dr. Gropman's opinion, to a reasonable degree of medical probability, A.H.'s condition is most

likely the result of a genetic disorder.  While A.H. has had genetic testing that ruled out many genetic disorders, including Angelman and Rhett syndromes, such testing was insufficient to rule out many Mendelian single-gene disorders.  Alternatively, a second, less likely, cause of A.H.'s condition is exposure to a "TORCH" agent, infection or other insults that occurred in utero, which in my experience can cause the developmental delays, deficits, and MRI findings observed in A.H.  Mrs. Hysell worked at pet store during her pregnancy and her pre-natal records reflect a possible exposure to toxoplasmosis.

### C.   Defendant United States

On October 29, 2010, Crystal Hysell was admitted to Raleigh General Hospital ("RGH") for the labor and delivery of her child, A.H.  Ms. Hysell was at 41 weeks of gestation.  Ms. Hysell was admitted to RGH at 05:35.  The fetal heart rate tracing on admission was normal with normal baseline, variability and absence of any significant decelerations.  At 07:30, the cervix was 4 cm dilated and completely effaced with the vertex at minus 2 station.  At 08:27, an epidural was placed. Labor progressed rapidly such that Ms. Hysell felt rectal pressure at 12:25.  At 13:10, the fetal tracing reveals a mildly elevated baseline to 170 bpm. No significant decelerations were noted and variability was normal.  At 13:50, the tracing was entirely reassuring.  At 14:00, Ms. Hysell was instructed at pushing.  At 14:01, the tracing revealed a baseline elevated to 180 bpm.

Debra Crowder, CNM, a certified nurse midwife employed by Access Health, attended to Ms. Hysell.  At 11:40, CNM Crowder noted that Ms. Hysell was feeling pressure status-post epidural, a vaginal examination was 8/100/0, spontaneous rupture of the membranes revealed clear fluid, the fetal heart rates was in the 150s with accelerations and moderate variability, uterine contractions were every 2-4 minutes, and labor was progressing.  She recommended a position change to the left side, and she anticipated a single vaginal delivery.

41

CNM Crowder's note at 14:10 indicated Ms. Hysell was pushing with good effort, the fetal heart rate was in the 140s to 150s with variables to 60-80 when pushing and moderate variability, and uterine contractions every 2 minutes.  Her plan was for Ms. Hysell to continue to push, and she anticipated a single vaginal delivery.

Ms. Hysell's labor progressed normally with no indication of any fetal distress or problems according to Debbie Crowder, CNM from Access Health, and the RGH nursing staff.  The tracing remained one of a well-oxygenated fetus.  At 14:30, the tracing was entirely reassuring and remained so for the duration of the labor and delivery.  CNM Crowder was present at 14:51.

After a normal second stage of labor, Ms. Hysell delivered a female child (A.H.) through a vaginal delivery at 14:55. The child weighed 6 lb. 13 oz. at birth.   Debbie Crowder, CNM, handed A.H. to the RGH nursing staff after the delivery and had no further contact with A.H.

A.H. had Apgar scores of 7 at 1 minute and 8 at five minutes (considered normal scores) with acrocyanosis (some bluish discoloration on her extremities caused by post-birth circulatory system development--not an unusual finding and not a finding indicating a medical problem).  An Apgar score of 7, 8, or 9 is normal and is a sign that the newborn is in good health.  A score of 10 is very unusual, since almost all newborns lose at least one point for blue hands and feet (acrocyanosis), which is normal after birth.

The electronic fetal monitoring strip did not indicate any fetal distress or unusual problems during the progression of Ms. Hysell's labor.  The electronic fetal monitoring strip had moderate variability throughout.  The electronic fetal monitoring strip pattern was not consistent with hypoxia.

RGH nursery personnel were present at delivery and took over the management of the child after delivery.  A.H. was cleaned, suctioned, and warmed.  After this process was completed, the child was transported by the RGH nursery staff to the nursery.

Upon arrival to the nursery, A.H. appeared to be a little dusky and her oxygen saturation was measured at 68%.  The nursery staff suctioned her again and removed a small amount of mucus and applied blow-by oxygen.  A.H.'s oxygen saturation rate then rose into the mid to high 90s range (normal for a baby).  The nursing staff then suctioned the child with a catheter and removed a moderate amount of thick clear mucus.  A.H. was weaned from the blow-by oxygen after ten minutes and continued to have a normal oxygen saturation rate.  She had no other respiratory problems during the remainder of her course in the nursery prior to discharge from the hospital.

The nursery staff performed a physical examination which was essentially normal except in one important respect.  The child's head circumference was 31.9 centimeters.  This measurement indicated that the child was born with microcephaly, a term to describe a severely small head (defined as less than two standard deviations below the mean).  Microcephaly at birth suggests a prenatal insult early in pregnancy or abnormal development of the brain.

A.H.'s course after birth in the nursery was otherwise normal, her pediatrician found no problems, and she was released after a normal hospital stay.  Her acrocyanosis resolved in a normal fashion.  She did not have any seizures, organ failure, or other medical issues after birth.

At approximately 6 months of age, A.H. appeared to begin missing some developmental milestones.  An MRI performed at CAMC in 2012 was interpreted as normal, and early genetic testing did not reveal any genetic anomalies to explain her developmental delay.  Her parents took her to Cincinnati Children's Hospital for additional testing.  A further genetic work-up did not

detect any genetic anomalies, and the child was eventually diagnosed as having Autism Spectrum Disorder.

In 2016, the physicians at Cincinnati Children's Hospital decided to have another MRI performed of the child's brain after she continued to miss some developmental milestones.  The neuroradiologist at Cincinnati Children's Hospital interpreted that MRI Scan as showing periventricular white matter anomalies more commonly referred to as periventricular leukomalacia ("PVL").  That neuroradiologist reviewed the MRI Scan performed at CAMC in 2012 and determined that MRI Scan had not been accurately interpreted.  The neuroradiologist concluded that the 2012 MRI Scan showed essentially the same findings discovered in the 2016 MRI Scan.

PVL is a particular type of white matter disorder caused by an infectious or inflammatory hypoxic-ischemic event which occurs between 26 and 34 weeks of gestation.  Some children who experience PVL are born prematurely while others are born at term.  The injury is not caused by hypoxia at birth.  The effects of PVL may not manifest themselves until many months after birth. PVL can cause cerebral palsy, developmental delays, cognitive disorders, motor problems, and other types of deficits.

A.H. has developmental disorders, cognitive delay, cerebral palsy (motor issues), and related deficits.  Her physicians continue to consider her to have Autism Spectrum Disorder.

The United States will call several expert witnesses to testify at trial.  Dr. Mark Landon, Chairman of OB/GYN at The Ohio State University School of Medicine, is board certified in obstetrics and gynecology and maternal-fetal medicine.  He will testify that midwife Debra Crowder, CNM, met the standard of care.  Dr. Landon has supervised and taught midwives as part of his practice (including at the time of the events involved in this case) and was familiar with the standards of care that were applicable to midwives at the time of the events involved in this case.

44

He will also testify that the obstetrical management rendered by Ms. Crowder met the standard of care, that the plaintiffs' experts were incorrect in their opinions regarding the interpretation of the electronic fetal monitoring strip and the obstetrical management provided by the midwife, and that there was no indication of the need for an earlier or expedited delivery.   Dr. Landon will opine that the child's condition at birth and Apgar Scores and that the patterns seen on the electronic fetal monitoring strip were inconsistent with an intrapartum hypoxic ischemic injury to A.H.  He has concluded, to a reasonable degree of medical certainty, that the child's brain injury predated Ms. Hysell's admission to labor and delivery.  Dr. Landon was a consultant for the ACOG and AAP Joint Tasks Force Report on Neonatal Encephalopathy and Neurologic Outcome (2d ed.).

Dr. Alan Bedrick is a board certified pediatrician and neonatologist and Professor of Pediatrics and Emeritus Division Chief of Neonatology and Developmental Biology at the University of Arizona Medical Center - Diamond Children's Medical Center.  He has served as the Medical Director of the Neonatal Intensive Care Unit at Diamond Children's Medical Center/University of Arizona Medical Center, and the Special Care Nursery at Northwest Medical Center, Tucson, AZ.  He has also served in the capacity of a neonatal intensive care unit medical director in various hospitals since the late 1980's. In addition, he cares for babies who are transferred neonatal intensive care because they are suspected as having experienced hypoxia during labor and delivery.

Dr. Bedrick will provide the following opinions at trial to a reasonable degree of medical certainty:

        A.     A.H.'s current neurologic and developmental status was unrelated to any events in the perinatal labor and delivery, and neonatal nursery time frames.

B.      AH did not suffer an acute hypoxic ischemic brain injurious event during the labor and delivery time frame during her mother's admission to Raleigh General Hospital, nor during the infant's neonatal hospital stay.

C.      A.H. Apgar scores were not consistent with a brain injurious event during the labor time frame prior to delivery. The infant had brief resuscitative efforts, not consistent with an acute event before delivery. In addition, the neurologic aspects of the physical examinations noted at multiple times during the neonatal hospital stay, notably the normal feeding behavior, activity, and tone were not consistent with an acute hypoxic ischemic brain injurious event during the labor and delivery nor nursery time frame.

D.      It was clear that an acute hypoxic ischemic brain injury operative during the mother's labor and delivery and during the neonatal time frame does not explain this infant's current neurodevelopmental status.

E.      It was critically important to note that the infant's multiple documented physical observations in the nursery at Raleigh General Hospital were not consistent with a perinatal brain injurious process.  Infants with such a brain injurious event in this time frame often require intubation and mechanical ventilation and have persistent and prolonged hypotonia, stupor, depression, or coma.

F.      He concluded that baby A.H.'s physical examination and early clinical course strongly argue against a perinatal/neonatal etiology for her brain injury. There was no clinical evidence of an acute neonatal encephalopathy immediately

46

after delivery. More likely than not, A.H. did not sustain a hypoxic ischemic event during labor and delivery, which resulted in brain injury.

G.      A.H.'s Apgar scores, the lack of need for intubation or positive pressure ventilation, her initial and subsequent normal neurologic documentation, and her physical examinations do not indicate an operative brain injurious process during labor and delivery or as a neonate.

H.      There was absolutely no clinical evidence of an acute neonatal neurologic syndrome or evidence of an encephalopathic clinical picture in the immediate time frame post-delivery. Such an observation is a clear requirement in order to make an associative link between a brain injurious process during labor and delivery or early neonatal period and subsequent permanent neurologic injury.

I.      Babies who subsequently develop developmental delay or chronic neurologic impairment following an acute hypoxic ischemic process in the perinatal/neonatal time frame are not discharged from the hospital in 48 hours, nor do they have a totally normal newborn nursery course and a normal newborn neurologic physical examination at a discharge time of 48 hours.

J.      The hyperbilirubinemia noted at Raleigh General Hospital and subsequently noted on post-hospital follow up are in no way injurious or dangerous. Such values are commonly seen in healthy term newborn infants and do not result in subsequent brain injury. There is no evidence of acute or chronic bilirubin encephalopathy.

K.      It was also significant to note that the infant was born with microcephaly with a head circumference less than the 3rd percentile. This represents a profound

disturbance of brain growth in utero, long pre-dating the labor and delivery and newborn time frame.

L.      He also did not agree with Dr. O'Meara's opinions that A.H.'s subsequent neurologic difficulties were due to an acute perinatal hypoxic ischemic event.  Dr. Bedrick testified that given the total absence of any neurologic symptoms or neurologic abnormalities in the newborn course, one cannot make any causal association between perinatal events and subsequent neurodevelopmental impairment.

Dr. Mark Scher, a board certified pediatric neurologist with over 36 years' experience as a clinician, educator and researcher, also testified at trial. He is presently a tenured Full Professor of Pediatrics and Neurology at Case Western Reserve University.  Dr. Scher served as Division Chief of Pediatric Neurology from 1997-2017, and continues to participate in an active medical practice, education and research.  He has extensive clinical and research expertise in fetal and neonatal neurology, establishing and directing two fetal/neonatal neurology programs at the University of Pittsburgh, Magee-Women's Hospital from 1983-1997, and at Rainbow Babies and Children's Hospital/Macdonald Hospital for Women at University Hospitals Cleveland Medical Center from 1997 to the present time.

Dr. Scher will provide the following opinions to a reasonable degree of medical certainty at trial:

A.      A.H. has a neurological condition that occurred on a developmental basis during fetal life with no relationship to the events at or around the time of delivery as a full-term infant. She was born with no evidence of significant neurological depression at birth nor did she later express evidence of a neonatal encephalopathy

48

with or without seizures during the first several days of life.  She lacked clinical signs, laboratory abnormalities and later brain MRI findings to support a diagnosis of intrapartum hypoxic-ischemic encephalopathy (HIE) at a full term gestational age as discussed in a multidisciplinary consensus report.

B.      A.H. was microcephalic on her first postnatal day of life and postnatal head circumference measurements subsequently remained less than the 2%. Congenital microcephaly noted at birth strongly supports the diagnosis of significant delay in fetal head growth that more likely than not began during the first half of mother's pregnancy from genetic and/or acquired causes.

C.      A.H. subsequently exhibited a severe neurodevelopmental disorder across all four developmental domains of motor, communication, social-adaptive and cognitive abilities, highlighting specifically abnormal language and social developmental abnormalities supporting the diagnosis of autistic spectrum disorder (ASD).  Her specific abnormalities in social- adaptive skills together with other abnormal standardized developmental testing results by 3 ½ years of age confirmed the diagnosis of ASD.  Up to the present time, she continues to display this specific neurodevelopmental disorder.  This repertoire of abnormal behaviors is only later expressed during early childhood as the child's brain connections continue to mature, occurring because of a prenatal abnormality in brain development early in pregnancy of the mother.

D.      ASD is a developmental disorder with a prenatal onset.  Brain connectivities responsible for the postnatal neurobehavioral expression of ASD occur during the first half of pregnancy from genetic and/or acquired conditions.  Abnormalities in

49

development within specific areas of the fetal brain, including the ganglionic eminence and subplate zone affect precursor neuronal and glial populations that alter both gray and white matter development. Alterations in migrating interneurons, microglia and pre-oligodendrocytes occur as early as the end of the first trimester of brain maturation adversely affect brain connectivities between deeper white matter and overlying cortical mantle as the pregnancy progresses though the second and third trimesters. This abnormal brain development has been termed a mini-columnopathy, since the developing cortical mantle, built as columns of cells across six layers, is disrupted. These prenatal anatomical abnormalities represent the abnormal brain circuitries that will later be functionally expressed as ASD during early childhood.

E.     The two brain MRI scans for A.H. documented reduced brain volume with altered white matter signals consistent with this early developmental disorder of fetal brain maturation.   These findings alternatively reflect a developmental disorder of brain connectivity that preferentially involves precursor brain structures that initially alter progenitor neuronal cells that subsequently adversely alter white matter followed by gray matter regions as brain maturation progresses through the pregnancy.   There was a preferential loss of brain substance in the posterior head regions resulting in disproportionate enlargement of the occipital horns of the lateral ventricles (i.e.,colpocephaly). This occipital ventricular enlargement indicates that arrest or delay in posterior brain regions affecting gray and white matter regions occurred during the first half of pregnancy. While these findings could be an early sign of asphyxia (i.e. hypoxic-ischemic injury) in a preterm brain,

there is no indication of a clinical adverse event affecting mother's pregnancy. Alternatively, the neuroimaging finding could be a marker of a developmental anomaly affecting brain maturation due to a genetic disorder as early as at the time of conception.

F.      A.H.'s ASD behaviors are unrelated to any acquired injury on the basis of hypoxia-ischemia at any time during pregnancy, labor or delivery. There were no clinical signs, laboratory testing results or neuroimaging findings that support a hypoxic-ischemic encephalopathy from an event or events that occurred during labor and delivery.

Dr. Gordon Sze, Professor of Radiology at Yale University School of Medicine for twenty-two years, will also testify at trial. He has served as Chief of Neuroradiology for thirty years. Dr. Sze was past-President of the American Society of Neuroradiology (2014-2015) and of the American Society of Spine Radiology (2004-2005). He served as an Associate Editor or a member of the Editorial Advisory Board of all the major radiology journals in our field, including Radiology, American Journal of Neuroradiology, American Journal of Roentgenology, and Investigative Radiology. Dr. Sze has authored over 130 peer reviewed publications, and he lectures and teaches courses at universities and the major radiology meetings, both nationally and internationally.

Dr. Sze will testify to the following opinions to a reasonable degree of medical certainty at trial:

A.      The initial imaging study available for review is an MR examination of the brain from 4/16/12. This study demonstrates prominent ventricles, especially posteriorly, and mild thinning of the posterior body and splenium of the corpus

callosum.  There is mild malrotation of the hippocampi.  After the administration of intravenous contrast, there is no abnormal enhancement.

B.     A follow-up MR examination of the brain was obtained on 3/3/16. This study does not demonstrate significant interval change. Again seen is prominence of the ventricles, especially posteriorly, and mild thinning of the posterior body and splenium of the corpus callosum.  Also re-demonstrated is mild malrotation of the hippocampi.  The susceptibility weighted sequences and MR spectroscopy are normal.

C.     This series of imaging examinations demonstrates an appearance consistent with hypoxic ischemic injury of the partial prolonged pattern in a premature stage of development.  Involvement of the basal ganglia and/or thalami is consistent with an acute profound type pattern of hypoxic ischemic injury. This distribution of abnormalities generally occurs when there has been a high-grade loss of oxygenated blood reaching the fetus for a relatively short amount of time, typically 10 to 25 minutes.  In contrast, the partial prolonged pattern of hypoxic ischemic injury is characterized by involvement of the cortical and subcortical regions, affecting both white matter and grey matter, in term infants.  The injury can be localized to the watershed regions or involve nearly all the cortex and subcortical white matter. In premature infants, the periventricular regions constitute the watershed regions and the abnormalities are typically periventricular in distribution.  The partial prolonged pattern of hypoxic ischemic injury typically arises from a reduction, but not near-total cessation, of oxygenated blood reaching the fetus. The time period of the injury is more variable but takes at least 30 minutes and usually over an hour.

D.     In A.H.'s case, there is involvement of the periventricular regions, typical of the partial prolonged pattern of hypoxic ischemic injury in a premature infant. These is little involvement of the cortex.  This pattern is typical of periventricular leukomalacia (PVL).

E.     A.H. was born at 41 weeks of gestational age but her imaging findings are typical of a premature pattern of injury.  Thus, it is likely that the inciting events took place in utero, substantially prior to labor and delivery.

F.     Periventricular leukomalacia is a hypoxic ischemic injury that typically occurs in the late second or early third trimester of pregnancy. The textbook, "Fundamentals of Diagnostic Radiology," states that "Periventricular leukomalacia (PVL) is a distinct pattern of white matter injury that affects the developing brain between 24 and 34 weeks of gestational age."  That textbook also points out that "it should be recognized that the injury can and does occur in utero."  The textbook, "Pediatric Neuroimaging," states that "White matter injury of prematurity (is) often called periventricular leukomalacia, or PVL." PVL can occur during the development of the brain in utero before a child is born at term.

G.     Although the injuries are consistent with hypoxic ischemic events between 24 and 34 weeks of gestational age, the imaging appearance could also be due to genetic causes. Genetic causes can produce a multitude of radiographic abnormalities. Certain disorders, especially inborn errors of metabolism, can result in predominant white matter involvement, as in this case.

H.     The radiographic evidence established that A.H.'s injury to her brain occurred in utero substantially prior to labor and delivery, many weeks prior to her birth at 41 weeks of gestation.

In summary, the medical evidence to be presented by the United States at trial will demonstrate that A.H.'s neurological problems were not proximately caused by hypoxia during labor and delivery.  The electronic fetal monitoring strip pattern and Apgar scores were not consistent with hypoxia occurring during the labor process.  In addition, A.H. was born with microcephaly, a clear indicator that her brain had not developed normally in utero.  The MRI scans also revealed that A.H. had PVL which is an abnormality that occurs between 24 and 34 weeks of gestational age, and, thus, was not caused by labor and delivery which occurred at 41 weeks of gestation.  A.H.'s clinical course at the time of delivery is simply not indicative or consistent with hypoxia during labor and delivery.

5.     **CONTESTED ISSUES OF FACT**

A.     <u>**Plaintiffs**</u>

1.   Plaintiff contends that the child developed hypoxia as a result of a failure to properly monitor the child and recognize the problems that the cord was causing and that it was below the standard of care to not have proper personnel present at the delivery.

2.   Plaintiff also contends that once the child was delivered, she was in need of serious respiratory measures to remedy the hypoxic event and that that did not occur.

3.   Plaintiff contends that Nurse Perkowski and the nurses in the nursery including nurse Ball were employees of defendant hospital which appears to be admitted.

54

4.  Plaintiff also contends that Midwife Crowder was an employee of Access Health  and that the Government has entered the case on its behalf pursuant to the Federal Tort Claims Act and was thereby substituted on behalf of Access, her employer as a defendant.

5.  Plaintiff further contends that while an employee of Access Health, Midwife Crowder was also an agent of the hospital.

6.  Plaintiff claims damages as set forth in their economic evaluation.

7.  Plaintiff also contends that A.H. is entitled to noneconomic damages of the maximum amount allowed by law in West Virginia.

8.  Plaintiff contends that there is no evidence to establish that A.H.'s injuries are a result of a genetic condition.

9.  Plaintiff contends that there is no evidence to establish that A.H. suffered a hypoxic event prior to the labor and delivery process.

**B.**     **Defendant Raleigh General Hospital**

Defendant Raleigh General Hospital believes that the following factual issues will be in dispute at trial:

1.  Whether the nurses and other professional healthcare employees of Raleigh General Hospital met the applicable standard of nursing care their care and treatment of Crystal Hysell and A.H.

2.  Whether negligence, if any, on the part of the nurses and other professional healthcare employees of Raleigh General Hospital was a proximate cause or substantial contributing factor to the injuries and damages sustained by A.H.

3.  Whether plaintiffs were guilty of contributory or comparative negligence.

4.  Whether the plaintiffs failed to mitigate their alleged damages and injuries.

5.  The amount of damages to reasonably compensate the Plaintiffs if the jury finds liability on the part of Raleigh General Hospital.

6.  The allocation of percentages of comparative fault between the USA defendants and Raleigh General Hospital for an apportionment of liability if the jury finds liability on the part of Raleigh General Hospital.

## C.  **Defendant United States**

Defendant United States believes that the following factual issues will be in dispute at trial:

1.  Whether defendant United States or its deemed employees under 42 U.S.C. § 233 were negligent in providing health care services to the plaintiffs.

2.  Whether any alleged failure to follow the accepted standards of care by the United States and its deemed employees under 42 U.S.C. § 233 proximately caused an injury to the plaintiffs (W.Va. Code § 55-7B-3(b)).

3.  Whether plaintiffs were guilty of contributory or comparative negligence.

4.  Whether the plaintiffs failed to mitigate their alleged damages and injuries.

5.  The extent, if any, to which the plaintiffs are entitled to recover damages.

## 6.  **CONTESTED ISSUES OF LAW**

### A.  **Plaintiffs**

All issues of liability and damages are in dispute.  See also the previous section.

### B.  **Defendant Raleigh General Hospital**

1.  Whether defendant Raleigh General Hospital and its employees were negligent in providing health care services to the plaintiffs.

2.  Whether some or all of plaintiffs' claims must be dismissed for lack of jurisdiction under the FTCA.

3.  Whether any alleged failure to follow the accepted standards of care by defendant United States and its deemed employees under 42 U.S.C. § 233 proximately caused an injury to the plaintiffs (W.Va. Code § 55-7B-    3(b)).

4.  Whether plaintiffs were guilty of contributory or comparative negligence.

5.  Whether the plaintiffs failed to mitigate the alleged damages and injuries.

6.      The extent, if any, to which the plaintiffs are entitled to recover damages.

7.      Whether the plaintiffs have established a prima facie case of negligence under the MPLA.

**C.      Defendant United States**

1.      Whether defendant United States and its deemed employees under 42 U.S.C. § 233 were negligent in providing health care services to the plaintiffs.

2..     Whether any alleged failure to follow the accepted standards of care by defendant Raleigh General Hospital and its employees proximately caused an injury to the plaintiffs (W.Va. Code § 55-7B-3(b)).

4.      Whether plaintiffs were guilty of contributory or comparative negligence.

5.      Whether the plaintiffs failed to mitigate the alleged damages and injuries.

6.      The extent, if any, to which the plaintiffs are entitled to recover damages.

7.      Whether the plaintiffs have established a prima facie case of negligence under the MPLA.

8.      Whether plaintiffs exhausted their administrative remedies under the FTCA.

9.      Whether the United States has waived its sovereign immunity with regard  to all of the claims asserted by the plaintiffs in this civil action.

10.     Whether some or all of the plaintiffs' claims are subject to dismissal for failure to comply with the pre-litigation requirements imposed by the MPLA.

11.     Whether plaintiffs' claims are time-barred under 28 U.S.C. § 2401(b).

12.     Contested issues of law listed in defendant United States' dispositive motions and motions in limine.

**7.      STIPULATIONS**

**A.      Plaintiffs**

1.    Plaintiffs request that the parties stipulate to the authenticity of all medical records and

      bills produced through discovery in this matter.

2.    Plaintiffs request that the parties stipulate that the past medical bills are fair and

      reasonable and in the amount of _____.

3. Plaintiffs request that the defendants stipulate that the nurses were employees of RGH and Ms. Crowder was an employee of Access Health.

4. Plaintiffs request that the Defendants stipulate that A.H. suffered hypoxia.

5. Plaintiffs request that Defendants stipulate that A.H. suffers from cerebral palsy.

6. Plaintiffs request that Defendants stipulate that during her pregnancy Ms. Hysell was not diagnosed with an infection.

**B.** **Defendant Raleigh General Hospital**

Raleigh General Hospital will stipulate that the nurses involved in the labor and delivery of A.H. were employees of the hospital. Raleigh General Hospital will also stipulate to the authenticity of the medical records produced during discovery, reserving the right to object the admissibility of certain medical records based on substantive grounds, their relevancy, their content, and their admissibility under the Federal Rules of Evidence.

**C.** **Defendant United States**

Defendant United States of will stipulate to the authenticity of the medical records already produced during discovery, reserving the right to object the admissibility of medical records and other exhibits presented by the plaintiffs based on substantive grounds, their relevancy, their content, and their admissibility under the Federal Rules of Evidence.

**8.** **SUGGESTIONS FOR AVOIDANCE OF UNNECESSARY PROOF AND CUMULATIVE EVIDENCE**

**A.** **Plaintiffs**

None at this time.

**B.** **Defendant Raleigh General Hospital**

None at this time.

**C.** **Defendant United States**

None at this time.

**9.** **SUGGESTIONS FOR ADOPTING SPECIAL PROCEDURES**

**A.** **Plaintiffs**

None at this time.

**B.**     **<u>Defendant Raleigh General Hospital</u>**

Raleigh General Hospital knows of no special procedures that need to be taken during trial other than the appearance of some witnesses remotely due to the COVID-19 situation and other measures to reduce the risk of COVID-19 exposure to the parties, jury venire, witnesses, counsel, and court personnel.

**C.**     **<u>Defendant United States</u>**

The United States is not aware at this time of the need to adopt any special procedures other than the special procedures necessary to avoid risk of exposure to COVID-19.

**10.**    **SPECIAL VOIR DIRE QUESTIONS**

**A.**     **<u>Plaintiffs</u>**

See Exhibit A attached to this integrated pretrial order.

**B.**     **<u>Defendant Raleigh General Hospital</u>**

See Exhibit B attached to this integrated pretrial order.

**C.**     **<u>Defendant United States</u>**

This section is not applicable since the FTCA bars any right to a jury trial, 28 U.S.C. §2402.

**11.**    **ESTIMATED NUMBER OF TRIAL DAYS**

**A.**     **<u>Plaintiffs</u>**

Plaintiffs anticipate that trial will take 10 days.

**B.**     **<u>Defendant Raleigh General Hospital</u>**

Raleigh General Hospital estimates the trial will last 10-12 days.

**C.**     **<u>Defendant United States</u>**

The United States estimates that the trial of this case will take 10-15 trial days.

12. **COURTROOM TECHNOLOGY REQUESTED FOR USE AT TRIAL**

A. **Plaintiffs**

Plaintiffs do intend to use live feeds into the courtroom for several expert witnesses.

B. **Defendant Raleigh General Hospital**

Raleigh General Hospital requests to use a digital projector during opening statements and closing arguments to display PowerPoint slides and agreed exhibits, such as stipulated medical records, to the jury. The projector also may be used to display stipulated medical records to witnesses as they testify from the stand or remotely. The projector will not be used to present remote witnesses' testimony to the jury. The Court's technology will be used for that purpose.

Counsel is mindful of the Court's concern that material not be displayed to the jury before it has been ruled admissible by the Court. Counsel work with counsel for the plaintiffs and the USA to insure that anything to be displayed to the jury using the digital projector will be agreed upon in advance by counsel or, if there is an objection to the material, to take the objection up with the Court for a ruling prior to displaying the material to the jury. Raleigh General's counsel agrees to share the projector and screen with other counsel so the Courtroom will not be cluttered with unnecessary equipment and will be responsible for getting the equipment into and out of the courtroom and will not rely on the Court's technology staff for any assistance in setting up or operating the equipment.

C. **Defendant United States**

Defendant United States would like to use the ELMO and potentially other technology available in the Courtroom during the course of the trial to present, display, and view any exhibits introduced into evidence at trial and for presenting, displaying, and viewing any impeachment or other materials introduced and/or used at trial. The United States will comply with L.R.Civ.P. 7.1(a)(9) and will request any such technology and file a certification that the court's technology staff has been notified. The certification regarding such notification shall be filed with the clerk no later than 7 days before the scheduled commencement of the trial. Due to COVI-19 and other issues, the United States does anticipate that some of its witnesses will need to testify by live videoconference during the course of the trial.

13. **OTHER MATTERS**

A. **Plaintiffs**

None.

B.     **Defendant Raleigh General Hospital**

Raleigh General Hospital is agreeable to allowing witnesses to be taken out of turn with advance notice to accommodate the scheduling of witnesses.

C.     **Defendant United States**

Defendant United States believes that the defendants should be able to take some of their witnesses out of turn (with advance notice to the plaintiffs' counsel) to be able accommodate scheduling and videoconference arrangements.

Entered: This 12th day of May, 2021.

**FRANK W. VOLK, UNITED STATES
DISTRICT JUDGE**

**APPROVED FOR ENTRY:**

**RYAN HYSELL and CRYSTAL HYSELL,**
**on behalf of their daughter, A.H., a minor,**

**Plaintiffs,**

**s/Barry J. Nace**
Barry J. Nace (W.Va. Bar No.7313)
Matthew A. Nace (W.Va. Bar No. 13072)
Paulson & Nace, PLLC
1025 Thomas Jefferson Street NW
Suite 810
Washington, D.C. 20007
Counsel for Plaintiffs

**RALEIGH GENERAL HOSPITAL,**

**Defendant,**

**/s/D.C. Offutt, Jr.**
D.C. Offutt, Jr. (W.Va. Bar No. 2773)
Jody Offutt Simmons (W.Va. Bar No. 9981)
Offutt Nord, PLLC
949 Third Avenue, Suite 300
P. O. Box 2868
Huntington, WV 25728-2868
Counsel for Defendant Raleigh General Hospital

**THE UNITED STATES OF AMERICA,**

**Defendant,**

**LISA G. JOHNSTON**
**Acting United States Attorney**

**s/Fred B. Westfall, Jr.**
Fred B. Westfall, Jr. (WV Bar No. 3992)
Jennifer M. Mankins (W.Va. Bar No. 9959)
Assistant United States Attorneys
P.O. Box 1713
Charleston, WV  25326
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: fred.westfall@usdoj.gov
Counsel for Defendant United States of America

# Pretrial Order Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

RYAN HYSELL and CRYSTAL HYSELL, on
behalf of their daughter, A.H., a minor,

          Plaintiffs,

*v.*

RALEIGH GENERAL HOSPITAL, et al.,

          Defendants.

Case No.  5:18-cv-01375
Judge: Frank W. Volk

### PLAINTIFFS' PROPOSED *VOIR DIRE*

1. This is a civil action in which Plaintiff is seeking damages that she contends arise out of negligent medical treatment their daughter received from Defendants Raleigh General Hospital and the United States of America.

2. Does any member of the jury panel know Ryan Hysell?

3. Does any member of the jury panel know Crystal Hysell?

4. Does any member of the jury panel know or been treated at Raleigh General Hospital?

5. Has any member of the jury panel been treated at Access Health?

6. The Plaintiffs in this case are represented by Barry J. Nace and Christopher T. Nace of the law firm of Paulson & Nace. The Nace's have an office in Martinsburg at Aikens Center and one in Washington, D.C. Defendants are represented by D.C. Offutt and C.J. Gideon, Jr. and Fred B. Westfall, Jr. from the United States Attorney's office. Does any member of the jury panel know any of these attorneys or their firm or office?

7. The following persons are expected to testify as witnesses during this trial. (The Court is asked to read the parties' witness lists.)  Do any of you know any of the witnesses identified by the parties?

8. Have you or has any member of your immediate family ever received medical care or treatment from the Defendants?

9. Have you or has any member of your immediate family made a claim or had a claim made against you in an action for bodily injury, including medical malpractice?  If so, were you making the claim or was the claim made against you?  Were you satisfied with the disposition of the claim?

10. Have you or has any member of your immediate family served on a jury involving a claim for bodily injury, including medical malpractice?  If so, when and where?  For whom was the verdict?

11. Have you or has any member of your immediate family ever been a witness for either party of a civil lawsuit?  If so, what was the subject matter, the outcome, and for whom did you testify?

12. Have you or has any member of your immediate family ever attended law school?  If so, who, when, and what degree was obtained?

13. Have you or has any member of your immediate family ever attended medical school or become a physician's assistant?  If so, in what specialty and what degrees were obtained?

14. Have you or has any member of your immediate family ever attended nursing school?  If so, what degrees were obtained?

15. Have you or any member of your immediate family ever worked for a physician in any capacity?  If so, who was the physician and in what capacity did you work?

16. Are you or is any member of your immediate family related by blood or marriage to a physician?  If so, what is the relationship?

17. Have you or has any member of your immediate family ever worked in a hospital, patient care facility, clinic, or nursing home?  If so, which institution and in what capacity, and when did you work there?

18. Do you or any members of your family engage in any business which depends in some manner for its profits for the selling of goods or services to a physician, or other member of the health care profession?

19. Do you or any members of your family own any stock or hold any interest in a hospital, medical clinic, or health maintenance organization?

20. Have you or has any member of your family ever done any volunteer or charitable work having anything to do with hospitals or medical institutions generally?  If so, which institution or hospital and what work did you do?

21. Have you or has any member of your immediate family ever been employed by a lawyer?  If so, who, when, and in what capacity?

22. Have you or has any member of your immediate family ever been a claims adjuster or worked for a claims adjuster?

23. Do any of you practice as a mid-wife or have a family member or acquaintance who practices as a mid-wife?

2

24.     Have any of you had a particularly good experience with a hospital or physician?

25.     Do any of you have any feelings against a person who will bring a case in a court of law for damages claiming negligence on the part of a health care provider or physician which caused injury?

26.     Would you have any reluctance in delivering a verdict consistent with the losses suffered, if the plaintiff has proven to have suffered damages?

27.     Do any of you have any feelings against awarding damages for pain and suffering, if the evidence so warranted, or do you feel that damages must only be awarded for monetary losses?

28.     Do any of you believe that awards in personal injury or medical malpractice cases in particular should be limited for any reason or that there should be a "cap" imposed on the amount someone should be allowed to receive?

29.     Do any of you believe that the amount of a jury's verdict can cause insurance rates to rise and hence that awards in medical malpractice cases should be limited by law?

30.     Do any of you believe that doctors should not be held responsible if they are negligent when treating a patient?

31.     Do any of you feel that because more witnesses or doctors testify on one side than on the other side, that the side with the most witnesses or most doctors testifying may be "right" just because that side has the "most"?

32.     Would anything you have read or heard or might see in this courtroom or outside of the courtroom prevent you from making a fair or impartial determination of all parties' rights based solely on the evidence and the Court's instructions?

33.     Do you know of any reason why you could not be fair and impartial to both sides in determining the issues of this case?

34.     This trial is expected to last two weeks and will include medical testimony.  Do you feel that listening to this medical and technical testimony would be uninteresting or boring?

35.     Do you have any feelings based upon any personal, philosophical, or religious belief of your choice that would prevent you from bringing a lawsuit for the negligence of a health care provider or prevent you from sitting in judgment of a health care provider??

36.     At the end of this case, the Court will instruct you on the elements of damages which you may consider in arriving at your verdict in this case.  Will each of you fairly and conscientiously consider each and every element of damage that proof has shown the plaintiff is entitled to recover?

37.   Do each of you understand that this is a civil case, and that there will not be criminal sanctions whatsoever nor anything of that nature as a result of the evidence introduced in this case?

38.   Have you seen or heard on television or on radio any advertisements or information regarding tort reform or medical malpractice lawsuit reform?

   a.   Do you believe that these advertisements or announcements would in any way prevent you from coming to a fair and impartial decision in this case?

39.   Do you believe the advertisements or announcements you have seen or read would prevent you from awarding a substantial verdict in this case if the evidence so warranted?

40.   Do any of you have bumper stickers on your cars or trucks? If so, what does the bumper sticker say?

41.   I'm an attorney who represents injured people- do any of you have any feelings towards such attorneys? How about attorneys in general?

42.   Is there any reason why any of you do not wish to sit as jurors during the trial of this case?

43.   Do you or anyone in your family, or close friend suffer from cerebral palsy or do you know anyone who has a child who has cerebral palsy?

Respectfully submitted,

PAULSON & NACE, PLLC


 /s/  Barry J. Nace
Barry J. Nace, Esq. #7313
Christopher T. Nace, Esq. #13072
1025 Thomas Jefferson St., NW
Suite 810
Washington, DC 20007
202-463-1999 – Telephone
202-223-6824 – Facsimile
bjn@paulsonandnace.com
ctnace@paulsonandnace.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this _____ day of April, 2021 I caused a true and exact copy of

the foregoing to be served via CM/ECF upon:

Fred B. Westfall, Jr., Esq.
Jason S. Bailey, Esq.
Jennifer M. Mankins, Esq.
United States Department of Justice
Robert C. Byrd United States Courthouse
300 Virginia Street, East
Suite 4000
Charleston, WV  25301
Phone: (304) 345-2200
Fax: (304) 347-5443
Email Address: fred.westfall@usdoj.gov
Email Address: jason.bailey2@usdoj.gov
Email Address: jennifer.mankins@usdoj.gov
*Counsel for USA*

D. C. Offutt, Jr., Esq.
Jody O. Simmons, Esq.
Shawna N. Pinkerton, Esq.
Offutt Nord Ashworth, PLLC
949 Third Avenue
Suite 300
PO Box 2862
Huntington, WV  25728
Phone: (304) 529-2868
Fax: (304) 529-2999
Email Address: dcoffutt@offuttnord.com
Email Address: jsimmons@offuttnord.com
Email Address: snpinkerton@offuttnord.com
*Counsel for RGH*

C.J. Gideon, Jr., Esq.
Gideon, Essary, Tardio & Carter PLC
315 Deaderick Street
Suite 1100
Nashville, TN  37238
Phone: (615) 254-0400
Fax: (615) 254-0459
Email Address: cg@getclawfirm.com
*Counsel for RGH*

_/s/  Barry J. Nace_____
Barry J. Nace, Esq.

5

# Pretrial Order Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

RYAN HYSELL and CRYSTAL HYSELL, on
behalf of their daughter, A.H., a minor,

               Plaintiffs,

*v.*

RALEIGH GENERAL HOSPITAL, *et al.*,

               Defendants.

Case No.  5:18-cv-01375
Judge: Frank W. Volk

### RALEIGH GENERAL HOSPITAL'S REQUESTED VOIR DIRE

1.  This is a civil action in which Plaintiffs are seeking damages that they contend arise out of negligent medical treatment that Crystal Hysell and A.H. received from Defendants Raleigh General Hospital and the United States of America.

2.  Does any member of the jury panel know Ryan Hysell, Crystal Hysell & A.H.?

3.  Does any member of the jury panel know any of the attorneys representing the plaintiffs in this case, Barry Nace and Matthew Nace of Paulson & Nace, PLLC?

4.  Does any member of the jury panel know any of the attorneys representing Raleigh General Hospital in this case, D. C. Offutt, Jr., and Jody Simmons of Offutt Nord, PLLC.?

5.  Does any member of the jury panel know any of the attorneys representing the United States defendants in this case, Fred Westfall and Jennifer Mankins, Assistant United States Attorneys?

6.  Does any member of the jury panel know any of the following individuals who may be called as witnesses at trial in this case? (Read witness list).

7.  Have you ever been a party to a lawsuit?

    a.  If so, when and what did the case involve?

    b.  Did the case come to a conclusion?  If so, were you satisfied with the result?

    c.  Who represented you and who represented the other side?

8.  Have any of you ever brought a lawsuit against a corporation or other individual?

    a.  If so, what kind of lawsuit did you bring?

    b.  Where was it filed?

    c.   What was the outcome?  Settled or tried?

    d.   Were you happy with the outcome?

    e.   Would that experience affect your ability to be a fair and impartial juror in this case?

9.     Have any of you ever been sued, that is, been named a defendant, in any kind of law suit for money damages?  I'm asking about auto accidents, employment cases, breach of contract, not divorce cases.

    a.   If so, what kind of lawsuit was it?

    b.   Where was it filed?

    c.   How was it resolved - settled or trial?

    d.   Were you satisfied with the outcome?

    e.   Would that experience affect your ability to be a fair and impartial juror in this case?

10.    Have any of you ever been called as a witness to testify in court?

11.    How many of you, other than to sit on a jury, have had some reason to sit in court during all or part of a trial?

12.    Have any of you any training or experience in connection with the legal profession?

    a.   How would that training or experience help you to be a fair and impartial juror in this case?

13.    Have any of you received any training or employment experience in medicine or health care?

    a.   How would that experience or training help you to be a fair and impartial juror in this case?

14.    Do any of you have any health care professionals in your family or household?  By that, I include doctors, nurses, dentists, medical or dental technicians or technologists, therapists, health counselors, or any other type of business or profession concerned with medical care?

15.    Are there any people in your family or household who have training or experience in the health care field but no longer practice in that profession?

16.    Have any of you ever formally studied any health care field for some reason even though you never practiced in the health care field?

17.    Have any of you, or members of your family, ever done volunteer work in any hospital, or with a hospital auxiliary, or in helping people get medical care?

      a.   How would that experience help you to be a fair and impartial juror in this case?

18.      Do any of you have neighbors or friends in the neighborhood who are employed as any type of health care professional?

19.      Do any of you have social friends who are health care professionals?

20.      Do any of you know anyone who ever sued a doctor, nurse or hospital?

21.      Do any of you know any doctor or nurse or health care provider who has been sued for malpractice?

22.      Do you have any personal problems or commitments which would prevent you from serving on this jury for 2-3 weeks?

23.      How many of you have done research on the internet about medical conditions you or a family member have been diagnosed with?

24.      How many of you who have done medical research on the internet have taken your research results to your doctor's appointment and discussed the research with your physician?

      a.   Do you understand that the Court will not permit you to do any internet research about the issues in the case during the trial?

      b.   Do you understand that you are required to judge this case solely on the evidence that is presented in court and the Court's instructions of the law?

25.      How many of you have a personal physician that you see on a regular basis?

26.      How many of you do not have a personal physician, if you have a medical issue you go to an emergency room or urgent care center?

27.      How many of you always accept your doctor's advice concerning medical treatment without question?

28.      How many of you have sought a second opinion before undergoing a significant medical procedure?

29.      Do any of you believe that the medical care rendered in this community is of less quality than the medical care practiced in other areas of the country?

30.      Do any of you believe that the medical care rendered in University medical centers, such as WVU in Morgantown, UVA, or at Duke is better than the care rendered here at Raleigh General Hospital or in Raleigh County in general?

31.      Have any of you suffered complications following a medical procedure?  If so, what was the procedure and what was the complication?

a. Would that experience affect your ability to be a fair and impartial juror in this case?

32. Do you have any friends or social acquaintances who have suffered complications following a medical procedure?

a. Would that experience affect your ability to be a fair and impartial juror in this case?

33. Have any of you ever been personally dissatisfied with medical care you have received for any reason?

34. a. Would that experience affect your ability to be a fair and impartial juror in this case?

35. Have any of you or any member of your family ever suffered an injury which you felt was due to an error on the part of a doctor, nurse, or hospital employee, or any other health care provider?

a. Would that experience affect your ability to be a fair and impartial juror in this case?

36. Do any of you have a problem or a bias against a healthcare provider who chooses to come into court and defend itself against a medical malpractice claim?

37. Do you understand that doctors and hospitals cannot guarantee that they can cure any disease or ailment?

38. Do you understand that doctors and hospitals are not to be judged on the quality of their care based solely on whether their treatment was successful or not?

39. Do you have a problem accepting that the fact that the outcome of medical treatment is less successful than expected does not mean that the doctor or hospital did not follow good and accepted medical practice in the treatment of the patient?

40. How many of you believe that patients have some responsibility for their own health care?

41. Do you trust your doctor to provide the appropriate medical care that you need?

42. Do you believe that an individual is entitled to receive monetary damages just because they chose to bring a lawsuit?

43. Do you feel that if a defendant is not negligent, then the plaintiff should not receive a monetary award?

44. Would you have any reservations in awarding no money damages to the plaintiffs if the evidence does not support such an award? That is, no matter how much sympathy you may have for A. H. and her family, would you have any reservations in returning a verdict with no damages if the evidence did not support such an award?

45. Do any of you believe that all injured people deserve to be compensated when they claim to have been injured through the negligence of others?

46.     Do you also believe that all injured people deserve to be compensated, even if that means that a defendant who is not at responsible for the injury has to pay the award?

47.     Do you believe that just because a patient isn't cured by a healthcare provider or their isn't a perfect outcome, that the healthcare provider is negligent?

48.     Do you believe that if something goes wrong or there is a poor outcome from medical treatment, it must be the healthcare provider's fault?

49.     Do any of you think that it is unfair to blame or second guess a healthcare provider who is trying to save someone=s life when there is an unexpected outcome?

50.     Do you believe that it is important to wait until the end of the case to make up your mind? Will you wait until you hear all the evidence and the Court instructs you on the law before you decide how you feel about the case?

51.      Would any of you expect Raleigh General Hospital to prove the plaintiffs are wrong, i.e. that is, you would not require the plaintiffs to prove their case?