**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

RYAN HYSELL and CRYSTAL HYSELL, on
behalf of their daughter, A.H., a minor,

          Plaintiffs,

*v.*

RALEIGH GENERAL HOSPITAL, *et al.*,

          Defendants.

Case No.  5:18-cv-01375
Judge: Frank W. Volk

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT, RALEIGH GENERAL HOSPITAL'S MOTION FOR JUDGMENT
AS A MATTER OF LAW UNDER FED. R. CIV. P. 50(B) AND
MOTION FOR A NEW TRIAL[1]**

    ***COME NOW*** Plaintiffs, by and through undersigned counsel, and respectfully submit

their Response in Opposition to Defendant Raleigh General Hospital's (hereafter "RGH") Motion

for Judgment as a Matter of Law Under Fed. Civ. P. 50(B) [Doc. 309] and for a New Trial

[Doc. 312] as well as related Pleadings 306, 307, 309 310, 311 and 312.  Defendants have filed

motions opposing the unanimous verdict of the jury, to which plaintiffs respond through counsel.

## INTRODUCTION

    Defendant does not suggest that: (1) any instruction was in error; (2) any piece of

evidence was improperly admitted or not admitted; (3) Plaintiffs' counsel made any errors or

mistakes that were prejudicial; or (4) their evidence was better and their experts were better.  The

argument about lack of causation is specious at best.

---

[1]    Defendant has filed both a Motion for J.N.O.V. and a separate Motion for a New Trial. Plaintiffs have combined their response to all Pleadings and  Motions that apply to these subjects into this one Response and have asked the Court for leave to exceed the page limitation.

Plaintiffs established at trial that defendants were negligent, and that said negligence was "a" cause of the A.H.'s brain injury, i.e., cerebral palsy, not only through Plaintiffs' evidence and experts, but also through defendants' experts.

Defendant RGH chose to defend this case on the basis that there was no negligence by misrepresenting the science involved with MRI interpretations, creating issues where none had existed before the lawsuit, and that there was no causation.  With respect to negligence, defendant does not seem to seriously question that plaintiff produced testimony on negligence. Not only does the negligence involve the period of time by the nurses subsequent to the delivery, but also includes the failure of the nurse and midwife assigned to Ms. Hysell to monitor her during delivery.  As Nurse Connors stated, it is also required that the nurse assisting the patient monitor the fetal monitor strips and just because there was a midwife involved does not negate the nurse assigned to the plaintiff of responsibility.  The same testimony for the failure to properly monitor because the monitor strips were unreadable, indecipherable, and not trustworthy does not mean that, therefore, the nurse on duty gets a pass for her responsibilities which were the same as the midwife.

With respect to causation, plaintiffs' theory all the way through this case has been that the child was becoming hypoxic during the delivery process which was not being properly monitored, that the defendants did not properly monitor to determine the development of the hypoxia, that the baby suffered some cord issue during delivery, that the hypoxia became evident at birth and was not adequately treated, that the damage caused by the hypoxia became evident once the MRIs were performed, and it was the hypoxia, improperly treated, that was the cause of the A.H.'s brain injury, known as cerebral palsy.  Defendant attempted to avoid responsibility by arguing that there was no hypoxia (which a jury had a right to not believe); that there was

microcephaly which indicated there had to be an event before delivery (which was highly disputed and the jury did not have to accept defendants' allegations), and that the hypoxia could not have caused this kind of injury which was refuted not only by plaintiffs' experts but then also by defendants' own experts.  What became clear at the trial was that the type of hypoxia as shown on the MRIs can and does occur in children at term in their delivery as opposed to what defendants alleged; that there was no other period of hypoxia noted or claimed to be the cause of the injury; and that there was no evidence that any gene or anything else in the child's makeup was a cause of the hypoxia and resulting brain injury.

Basically, defendant does not agree with plaintiffs' theory of the case and doesn't think anyone else should either notwithstanding that the jury verdict was a unanimous 7-0 by a jury that paid unusual attention to the facts in this case (p. 2144) and had a right to accept the plaintiffs' evidence versus defendants'.

Basically, Defendant wants to argue that only its direct testimony should be considered but that Plaintiffs' testimony and cross-examination of Defendants' experts should be ignored. However, all evidence must now be looked at in a light most favorable to Plaintiffs.

    i.    <u>The Law</u>

"In an action for damages against a physician for negligence or want of skill in the treatment of an injury or disease, the burden is on the plaintiff to prove [by a preponderance of the evidence] such negligence or want of skill and that it resulted in injury to the Plaintiff."  Syl. Pt. 1, *Roberts v. Gale*, 149 W.Va. 166, 139 S.E.2d 272 (1964) citing Syllabus, *White v. Moore*, 134 W.Va. 806, 62 S.E.2d 122 (195); Syl. Pt. 4, *Hundley v. Martinez*, 151 W.Va. 977, 158 S.E.2d 159 (1967); Syl. Pt. 1, *Hinkle v. Martin*, 163 W.Va. 482, 256 S.E.2d 769 (1979) citing Syl. Pt. 4, *Hundley v. Martinez*, 151 W.Va. 977, 158 S.E.2d 159 (1967); *Torrence v. Kusminski*,

185 W.Va 734, 408 S.E.2d 684, 696 (1991); *Short v. Appalachian OH-9, Inc.*, 203 W.Va. 246, 507 S.E.2d 124 (1998).

W.Va. Code § 55-7B-3(a) [2003] sets forth the elements of proof of medical negligence in the current MPLA.  That section provides:

**W.Va. Code § 55-7B-3**
**Elements of Proof**

(a) The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care;

(1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

(2) Such failure was a proximate cause of the injury or death.

A medical expert is qualified to testify concerning standard of care issues if it is established that he or she has more than a casual familiarity with the standard of care and treatment commonly practiced by physicians engaged in defendant's specialty.  See *Walker v. Sharma*, 221 W.Va. 559, 655 S.E.2d 775 (2007); *Fortney v. Al-Hajj*, 188 W.Va. 588, 425 S.E.2d 264 (1992).

In a medical malpractice case, plaintiff's duty is to prove that "[t]he health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances…"  W.Va. Code § 55-7B-3(a).

A health care provider is liable for negligence resulting from a failure of monitoring or of diagnosis needed to disclose an existing condition causing detriment to the patient: if by inadequate investigation a physician fails to discover what a careful investigation would necessarily have disclosed, such failure is evidence of lack of due care and diligence. *Jenkins v.*

4

*Charleston General Hospital & Training School*, 90 W.Va. 230, 110 S.E. 560, 563 (1922), *Hicks v. United States*, 368 F.2d 626 (4th Cir. 1966).

"The proximate cause of an event is that cause which in actual sequence unbroken by any independent cause produces an event, and without which the event would not have occurred.  It is not necessary that the jury find that a particular defendant's negligence, if any, was the only cause of Plaintiff's injury.  It is only necessary that [the jury] find by a preponderance of the evidence that such negligence was a proximate cause of the injury." *Reynolds v. City Hospital, Inc.*, 207 W.Va. 101, 529 S.E.2d 341 (2000).

To prove proximate cause, Plaintiffs need only establish that the evidence presented would warrant a reasonable inference that the injury was caused by the defendant's acts, conduct, omissions or breach of the standard of care: "Medical testimony to be admissible and sufficient to warrant a finding by the jury of the proximate cause of an injury is not required to be based upon a reasonable certainty that the injury resulted from the negligence of the defendant.  All that is required to render such testimony admissible and sufficient to carry it to the jury is that it should be of such character as would warrant a reasonable inference by the jury that the injury in question was caused by the negligent act or conduct of the defendant." *Thornton v. CAMC*, 172 W.Va. 360, 305 S.E.2d 316 (1983) citing Syl. Pt. 3, *Hovermale v. Berkeley Springs Moose Lodge*, 165 W.Va. 689, 271 S.E.2d 335 (1980); Syl. Pt. 5, *Totten v. Adongay*, 175 W.Va. 634, 337 S.E.2d 2 (1985) citing Syl. Pt. 1, *Pygman v. Helton*, 148 W.Va. 281, 134 S.E.2d 717 (1964); *Mays v. Change*, 213 W.Va. 220, 579 S.E.2d 561 (2003)(finding "reasonable inference" sufficient to create jury issue on causation ); Syl. Pt. 2, *Sexton v. Grieco*, 216 W.Va. 714, 613 S.E.2d 81 (2005) citing Syl. Pt. 1, in part, *Pygman v. Helton*, 148 W.Va. 281, 134 S.E.2d 717 (1964).

Recognition of the rule requiring proof of causation does not impose upon the Plaintiffs a duty to exclude every other plausible theory as to the cause and effect of the injury or death. *Long v. City of Weirton*, 158 W.Va. 741, 214 S.E.2d 832, 848 (1975).  Rather the plaintiff must merely prove a causal connection between his injury and a negligent act to a reasonable degree of medical probability.  W.Va. Code § 55-7B-7; *Hovermale v. Berkeley Springs Moose Lodge No. 1483*, *supra*

Both direct evidence and circumstantial evidence are "evidence." As stated in the W.Va. Pattern Jury Instructions, "Direct evidence is the testimony given by a witness who has seen or heard the facts about which he or she testifies . . . Indirect or circumstantial evidence is based on an inference that may reasonably arise from facts that have been proven. If a fact has been proven, then you may reasonably infer other related facts that naturally and logically follow. . . . From a legal standpoint, it makes no difference whether the evidence is direct or indirect. . . .(W.Va. P.J.I. §202).

 F.R.C.P. 50 (a) and (b). F.R.C.P. 50(b) states,

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

USCS Fed Rules Civ Proc R 50.

According to the 4th Circuit Court of Appeals, "JNOV should not be granted unless the evidence is so clear that reasonable men could reach no other conclusion than the one suggested by the moving party. *See Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 160 (4th Cir. 1988). This determination must be made while viewing the evidence in the light most favorable to support

the jury verdict, *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 243 n. 14 (4th Cir. 1982)"

*Persinger v. Norfolk & W. R. Co.,* 920 F.2d 1185, 1189 (4th Cir. 1990).

Defendant also seeks to obtain a new trial pursuant to F.R.C.P. 59. F.R.C.P. 59 states that

The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:

**(A)** after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or
**(B)** after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court

USCS Fed Rules Civ Proc R 59.

In general, "a jury's verdict should not be overturned as being against the weight of the evidence unless that verdict was unreasonable." *Holmes v. City of Massillon*, 78 F.3d 1041, 1047, (6th Cir. 1996). According to this Court:

*Rule* 59 standards are well established in this circuit: "on such a motion it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

*Rice v. Community Health Ass'n*, 40 F. Supp. 2d 788, 791, (USDC Wv. So. Dist. 1999).

## FACTS

Crystal Hysell was admitted to RGH on October 9, under the care of Access Medical (Gov't) for a nonstress test at about 27 weeks of her pregnancy (P. Ex. 1, p. 1003) which was normal and no abnormalities were revealed (P. Ex.1., C. Hysell, pp. 1334 - 1335). The pregnancy was normal. (Bedrick, p. 1879). She was admitted at 5:45 A.M. on October 29 to RGH for the delivery of A.H. at about 41 weeks of pregnancy, again under the care of Access Medical and their employees. (P. Ex. 2, p. 1029) The hospital records of Crystal were admitted as Ex.2 and those of A.H. as Ex 3. The pre-natal records of Crystal were admitted as Ex 1.

Ms. Hysell received an epidural at about 8:27 a.m. (P. Ex. 2, p. 1042). An Sa02 test measures the amount of oxygen in the blood. At 8:23, Ms. Hysell's SaO2 was 89, and at 8:36, it was 87. That is before and after the epidural. A normal Sa02 is greater than 95. (Ex. 2, p. 1042, Crowder, p. 179) There are no other SaO2s noted in the record for Ms. Hysell, notwithstanding that Ms. Crowder testified that she would have liked to have seen another. (Crowder, p. 180) After 8:30 am, for many hours, Ms. Hysell was always low on the oxygen content available to A.H. from Crystal Hysell as there was no indication it changed. (Perkowski, p. 90)

After a nurse's shift change in the morning, Mrs. Hysell was thereafter at all relevant times, provided nursing care by Nurse Perkowski and Midwife care by Ms. Crowder. (P. Ex. 2, Perkowski, p. 90) Nurse Perkowski and all the nurses identified herein were stipulated as being employees of RGH. (Stipulation) Midwife Crowder was an employee of Access, i.e., the Gov't. (Stipulation)

During the delivery, Ms. Hysell and her baby were to be monitored by a standard fetal monitor for the purpose of assessing the baby's heart rate AND Ms. Hysell's uterine contractions and it was necessary that both be monitored properly. (Perkowski, p. 119) Ms. Hysell "pushed" for approximately two hours and five minutes to deliver A.H. and Ms. Perkowski agreed that she should be at the bedside the entire time Ms. Hysell was pushing. (P. Ex. 2, p. 1047, Perkowski, pp. 98, 96) The records indicate that Midwife Crowder was present at 11:49 a.m. and then not until 14:51, four minutes before delivery. (P. Ex. 2, pp. 1045, 1049)

### Negligence in Monitoring During Delivery

Plaintiffs presented expert testimony from John Fassett, a certified nurse midwife. He was qualified as an expert in mid-wifery without objection. (Fassett, p. 267) Mr. Fassett had served in both the Air Force and Navy (Fassett, p. 280); had been practicing midwifery since

8

1994 (Fassett, p. 263); and delivered thousands of babies. (Fassett, p. 262) He also reviews records for the California Board of Registered Nurses and for the California Medical Board to determine if the standard of care has been met. (Fassett, p. 264) Mr. Fassett explained in detail each of the fetal monitor strip panels and explained that if there is a late deceleration, less oxygen is being perfused to the fetus. (Fassett, p. 275) He also noted that early decelerations can be a sign of head compression (Fassett, p. 288). He noted that when the mother's SaO2 is at 87 and 89 as in this case, the mother is not sending good oxygen to the fetus (Fassett, p. 293). He noted that when fetal monitor strip 77039 appears, the strips thereafter become uninterpretable (Fassett, p. 300). He explained that it is necessary to know the mother's uterine activity in relationship to the fetal heart rate (Fassett, p. 302). He noted that at panel 77112 there is a deceleration likely due to cord compression (Fassett, p. 312).  He also noted that beginning at about 12:20 pm until 14:19 pm most of the readings are not of the fetus' heart rate, but rather the mother's so that the fetus is not being properly monitored. (Fassett, p. 313) That means the baby's heart rate was not being traced (Fassett, pp. 313, 317), which means that the midwife was not following the standard of care. (Fassett, p. 315) There were contractions but no fetal heart rate being traced, so the strips are uninterpretable (Fassett, p. 319). An uninterpretable strip is below the standard of care. (Fassett, p. 328) He noted that on strip 93317 (P. Ex. 4, p. 3053), there is a variable deceleration which can occur with cord compression (Fassett, p. 327). On p. 3056, there were decelerations but because we do not have contractions being monitored (Fassett, p. 329), the care is below the standard of care. (Fassett, p. 330). This uninterpretable fetal strip could have been remedied with an intrauterine pressure catheter (Fassett, p. 331).

He concluded that the midwife's monitoring actions did not comport with the standard of care as the fetus was not properly monitored. (Fassett, pp. 334 - 335) He believed there was

probably a cord compression caused by an occult cord. (Fassett, p. 339) An uninterpretable or non-reassuring strip is not within the standard of care. (Fassett, p. 343) and thus Mr. Fassett provided testimony showing the standard of care was not met. Defendants' experts agreed that the fetal heart tracing was consistent with a cord compression. (Landon, p. 1843) Mr. Fassett and plaintiffs showed every fetal monitoring strip to the jury and explained the defects. (Fassett, pp. 277 – 334) There was testimony that the monitoring of the delivery via the fetal monitor fell below the standard of care.

### Delivery Facts

Mr. Hysell testified that when Ms. Hysell felt that she needed to push he rushed out of the room to find a nurse, twice, before he found Ms. Perkowski to come into the room and he was told they were understaffed and were busy. (R. Hysell, pp. 1431 - 1432) Mr. Hysell also testified that he noticed when the baby would try to come out of the birth canal, that the head would come out and then go back in and Ms. Crowder said she had to get the cord out of the way (R. Hysell, p. 1434).

Ms. Hysell's mother, Ms. Remines, who was also present at the delivery, testified that Midwife Crowder stated when she arrived at 14:51 that she had to push the baby back because the cord was blocking the child's passage from the birth canal when she came into the room just before delivery and they could see part of her head in the birth canal and that the midwife said the cord was around the neck and the midwife put her hands in the canal and appeared to being doing something.  (Remines, pp. 1110, 1112 - 1113) Mr. Hysell also testified that he, too, heard Midwife Crowder say that the cord was blocking the canal and he could also see her doing something with respect to the baby as she made that statement. (R. Hysell, p. 1434). A fair inference is that this had been ongoing for some time and there was cord compression.

10

Ms. Hysell testified that when the baby was delivered, she was laid on her chest but did not move and did not cry. (C. Hysell, pp. 1334 - 1335, 1346) Her mother, Ms. Remines, and Mr. Hysell confirmed the baby did not cry while in the delivery suite. (R. Hysell, p. 1448; Remines, pp. 1114, 1435) Ms. Hysell also testified she was told the midwife was busy delivering another baby. (C. Hysell, p. 1342) After delivery, the baby was taken from Ms. Hysell for about 4 hours. (C. Hysell, p. 1347)

Mr. Hysell took pictures in the delivery room a few minutes after birth and then about 4 hours later. The former showed a baby not moving and the latter showed arms that were blue. (Ex. 21a, 21b)

According to the Hospital's "Newborn Admission Assessment", the child arrived in the nursery at 15:08, or 13 minutes after birth with a pulse oximetry reading of 68, which is a very low reading, a heart rate of 160, and a respiratory rate of 50. (P. Ex. 3, pp. 2031 - 2032) The Apgar readings provide information about the newborn and the APGAR scores revealed that at 1 minute the baby had irregular breathing, only some movement and blue extremities. At 5 minutes the record indicated the baby was pink. No information was provided after 5 minutes until the baby reached the nursery thirteen minutes after the birth or eight minutes after the last APGAR score was entered. (P. Ex. 3, p. 2005) The Newborn Admission Assessment also indicates that before being provided blow-by oxygen, the baby was dusky and had blue extremities; a round symmetrical skull with soft, flat fontanels; lung ronchi; a weak suck; and needed oxygen which was provided "blow by" with a mask. (P. Ex. 3, p. 2031)

The Neonatal History completed as part of the Newborn Admission Assessment also indicates that the child needed suctioning which produced mucous; the child was initially given blow-by oxygens (the blow by was with a mask); the baby was also deep suctioned producing a

thick moderate amount of mucous; and it took 10 minutes to get the SaO2 into the 90s. (P. Ex. 3, p. 2031; Buchanan, p. 223)

The "Post Procedure Evaluation – Physician's/Certified Nurse Midwife" form was neither completed nor signed and thus does not indicate anything about the amniotic fluid, whether there was a nuchal cord (a cord around the neck) or whether there was a knot in the cord. (P. Ex. 2, p. 2005)

According to the hospital record, the baby was carried to the nursery. (P. Ex. 3, p. 2031; Buchanan, p. 207) where Nurse Buchanan noted that the baby had a dusky color which can be caused by hypoxia (Buchanan, p. 208) and that the baby was not crying when she saw her (Buchanan, p. 215). Nurse Buchanan also noted that the measurement of the child's head circumference did not show anything unusual. (Buchanan, p. 235)

According to the Maternal Labor/Delivery Information Record, the respirations were "irregular" at 1 and 5 minutes; it indicated a neonatologist was called which is incorrect; and that there were no apparent congenital abnormalities. (P. Ex. 3, p. 2007) It appears that for at least 13 minutes after birth, A.H. had irregular respiration, required oxygen and suctioning and was discolored, all of which are signs of hypoxia. (P. Ex. 2 and 3)

According to the Pediatrician's Report the next two days, there was nothing abnormal about the child's head. (P. Ex. 3, p. 2008)

The subsequent history referred to a possible problem with the cord. (Schorry, p.554) and she suspected that there had been a perinatal insult around the time of birth. (Schorry, p. 515)

It was noted that the respiratory efforts were at 1 minute slow and irregular, the extremities were blue, and that there was only some flexion of the extremities. (P. Ex. 3, p. 2005) At 5 minutes, the respiratory effort was still slow and irregular, but the baby was now noted as

12

being pink (notwithstanding that a photograph (P. Ex. 21b) showed blue arms 4 hours later), and there was still just "some" flexion of the extremities. (P. Ex. 3, p. 2005)

Upon Arrival in the nursery, the baby had an SaO2 of 68%, which is considered to be extremely low. (P. Ex. 3, p. 2031) The SaO2 should have been over 90 and the low SaO2 could be caused by hypoxia. (Landon, p. 1944) An SaO2 of 68 suggests lack of proper oxygen perfusion. (Gropman, p. 765)

The baby was a full-term baby at 41 weeks gestational age. (P. Ex. 3, p. 2031) and weighed 6 pounds, 13 ounces with a length of 51 ½ inches and head circumference of 12 ½ inches. (P. Ex. 3, p. 2031)

## Nursing Negligence

Registered Nurse, Patricia Connors, was offered as an expert witness in nursing. There was no objection. (Connors, p. 405) Nurse Connors had been an RN working in Labor and Delivery and nurseries for about 40 years and was a member of numerous nursing organizations, taught proper nursing in labor and delivery and in the nursery, was published, and had reviewed Plaintiffs' Exhibits 1 – 4. She expressed opinions that the nurses during delivery (Connors, pp. 400, 409) and thereafter deviated from the standard of care and also testified that the records indicated that from at least the time of delivery and into the nursery the baby showed signs of not getting sufficient oxygen and being hypoxic. (Connors, pp. 421, 424 - 425) She also testified that following the delivery, the nurses tending the baby were negligent, and that the record does not properly reflect what went on for the period of time that the baby was taken from her mother, but that it was clear that the child had respiratory distress when born and certainly for more than 10 minutes after reaching the nursery, and that the SaO2 makes it clear that the baby was not breathing appropriately and getting appropriate oxygenation.  This, according to Nurse Connors,

was below the standard of care. (Connors, pp. 410, 423, 425) Hypoxia means that sufficient oxygen has not been provided to the baby and signs of inadequate oxygenation include irregular breathing, lack of movement, blue in color, dusky color, lack of crying, a low SaO2 and blue arms 4 hours after delivery. (Connors, pp. 408, 421)

Subsequently on November 1, 2010, at the age of 1 day and November 2 at the age of 2 days, A.H. was seen by an Access Health pediatrician in the hospital. (P. Ex. 3, p. 2008) A.H. continued to be seen by Access Health over the next several months, and at 1 week she was 6 pounds, 6 ounces with a head circumference of 12.75 and the head was listed as "normocephalic". (Ex. 8, p. 3002) At 1 month, at 2 months, 4 months, and 6 months of age, the Access pediatricians noted that the child's head was normocephalic and at no time was the child noted to be microcephalic while in the hospital nor under the care of defendant Access. (P. Ex. 8, pp. 3003, 3011, 3017, 3022, 3032) Clearly the whole microcephalic argument was created for trial and rejected by the jury.

At about 6 months, a pediatrician noted that the child was not meeting the usual "milestones", e.g., rolling over and had a normocephalic head. (P. Ex. 8, p. 3032) The child was then referred to the Kanawha Valley Neurological Group in March of 2012, and an MRI was conducted on 4/16/12 which was reported as normal. (P. Ex 13). However, a second MRI refuted that and on October 22, 2012, at the age of 2, it was noted that A.H. does "not" have microcephaly, and there was an attempt to find some sort of genetic problem. (P. Ex. 14; Shimony, p. 1303) It was agreed by all physicians that the 4/16/12 MRI was reported incorrectly. (Barakos, p. 30; Sze, p. 1036; Scher, p. 1791) Despite numerous tests being done, no genetic cause was ever discovered. (Schorry, p. 493)

**MRIs and Hypoxia**

The MRI findings were consistent with an act of hypoxia, or lack of proper oxygenation. Plaintiffs' expert, Jerome Barakos, a board-certified neuroradiologist and John Rugino, a board-certified pediatric neurologist both so testified. (Barakos, p. 1175; Rugino, p. 1043). Defendants' experts all testified that the findings in the hospital records all occur with hypoxia. The literature indicates that the period around birth accounts for 75% of the causative period of brain damage from hypoxia. (Landon, p. 1930)

It was uncontested that the only signs and symptoms of hypoxia occurred at the time of delivery.

Defendants' experts testified that an SaO2 of 68 can be caused by hypoxia (Landon, p. 1850); that duskiness can be caused by hypoxia (Landon, p. 1851); that the baby had low O2 content in her blood (Giannone, p. 1599); all of the baby's findings are known to be caused by hypoxia (Scher, p. 1807). Many treating doctors concluded the child's condition was due to hypoxia (Gropman, p. 759) and if hypoxia caused the problem, it happened at delivery (Gropman, p. 772).

**Causation**

Dr. O'Meara is a Board-Certified pediatrician who was qualified as an expert without objection (O'Meara, p. 566). Dr. O'Meara's training and experience is in Pediatric Critical Care and she is Board Certified (O'Meara, p. 558).  By definition she specializes in the life support of babies and children from term birth and her research has been in brain injury (O'Meara, p. 558) and she resuscitates babies on a regular basis (O'Meara, pp. 562 - 563).

Dr. O'Meara noted that the SaO2 of 68 when the baby got to the nursery is evidence of hypoxemia. She testified that the baby's condition at birth where the baby is described as having

irregular breathing, not moving appropriately, being blue, the low Sa02 fourteen minutes after birth, etc. were all signs of hypoxia and that within a reasonable degree of certainty, this child had hypoxia which was a cause of her injury. (O'Meara, pp. 577, 580 - 582) She also testified that it was a violation of the standard of care to fail to provide the necessary resuscitative measures right away as was the situation here, as opposed to waiting fourteen minutes after birth which was a violation of the standard of care and a cause of the injury. (O'Meara, pp. 577, 591, 644)

Dr. O' Meara also testified that according to the hospital records and pediatric records after birth as well as the photographs of the baby, the baby was not microcephalic within a reasonable degree of medical certainty (O'Meara, pp. 591, 596 - 597). It was also noted that there was no reference to microcephaly in A.H.'s delivery records. (P. Ex. 3)

Dr. O'Meara testified that within a reasonable degree of medical certainty, that in light of the report in the records and picture at birth and the irregular breathing, blueness, lack of motion and subsequent abnormal MRI's as well as the 13 minutes that each lasted, the SaO2 of 68, the mother's low SaO2 during the delivery and the need for oxygen, that baby A.H suffered from hypoxia, that the nurses failed to timely treat, that A.H. suffered hypoxia during and after the delivery and that the most likely cause of the hypoxia (O'Meara, p. 583) was the failure to properly monitor Ms. Hysell and not take appropriate action during delivery and when she was born then not properly taking care of the baby after birth for the period of time between delivery and arrival in the nursery where the SaO2 was exceptionally low until at least about 14 minutes after birth. (O'Meara, pp. 575, 577, 580) These findings were all indications of hypoxia. (O'Meara, p. 582) She also testified that it was the deviations from the standard of care by the

nurse midwife and the nurse that were a cause of the baby's hypoxia and the failure to properly and promptly treat the hypoxia was below the standard of care. (O'Meara, p. 581)

Dr. Jerome Barakos is a Board-Certified neuro-radiologist who was qualified as an expert in the interpretation of MRIs and the meaning of such interpretation. He had a substantial background in his field of expertise and is the author of the interpretation of MRI's in babies and children in the leading textbook on the subject. (Barakos, pp. 1129 - 1131) He has also written book chapters on "White Matter Disease" and Neuroimaging (Barakos, p. 1134). He has lectured nationally and internationally on the subject of this litigation. (Barakos, p. 1138) Dr. Barakos explained the relationship of white matter, gray matter, hypoxia causing injury to the white matter of the brain and the significance of such an injury (Barakos, pp. 1148 et seq.)

He testified that the two MRIs that were taken on 4/16/12 and on 3/3/16 were both abnormal (Barakos, pp. 1160, 1171), and that both showed effects of hypoxia that occurred between 24 weeks and two years which includes the time of delivery. (Barakos, pp. 1173, 1175) According to Dr. Barakos, there was ventricular leukomalacia and loss of brain volume in both MRI's and both are consistent with a hypoxia event having taken place. (Barakos, p. 1175) With such information, it is then necessary to look at the clinical picture to see when there was a hypoxic event (Barakos, p. 1179).

It was his opinion that the damage shown on the MRIs is consistent with what is found when a term baby has developmental and cognitive delays as result of hypoxia and it was his opinion that the periventricular leukomalacia and brain volume loss as shown by the MRIs is consistent with hypoxia and a term baby/child can have the same MRI picture as shown here. (Barakos, p. 1202) Dr. Barakos testified that an MRI gives us the highest sensitivity in the evaluation of various disorders of the brain and spine (Barakos, p. 1142) After noting that PVL

does not occur in a term infant, Defendant's expert, Dr. Sze agreed that white matter damage can be acquired at the time of birth and such is increasingly recognized in term newborns. There is a wide range of white matter injury severity in newborns, and up to 20% of infants with PVL are full term. (Sze, pp. 1760 - 1768)

Dr. Todd Arthur is a neurologist who treated baby A.H. at Cincinnati Children's Hospital and was called as a witness by the Plaintiffs by deposition, who noted that both MRIs were the same; that the MRI had been stable since 2012, the MRI ruled out genetic causes and that the first MRI showed periventricular leukomalacia and loss of brain volume and the child had cerebral palsy. (Arthur, pp. 463, 470, 479)

There were no signs of dysmorphic features (Graham, p. 1099; Trock, p. 999).

A hypoxic injury depends on the duration and extent of the hypoxia (Bedrick, p. 1837). Hypoxia does cause brain damage (Bedrick, p. 1858).

The Plaintiff called Dr. Thomas Rugino, who is a triple Board-Certified pediatric neurologist (Rugino, p. 682) who examined the child for three hours (Rugino, p. 1024) and was qualified as an expert. Dr. Rugino has extensive experience in evaluating children, with cerebral palsy and autism (Rugino, p. 685) including determining the extent of brain injury and the cause of such injury. (Rugino, p. 687) In his practice he also determines what is necessary for the future medical care and needs of the injured child (Rugino, p. 685). He also reviewed the medical records. (Rugino, p. 1025) He determined that A.H. had extensive developmental delays and wrote a report specifically citing the problems that the child has. (Rugino, p. 1024)  It was his opinion that the developmental delays and cognitive delays were permanent and will continue for the rest of her life, and that she would have a relatively normal life expectancy.  (Rugino, pp. 1045 - 1050) He testified that MRI's conducted on this child in 2012 and 2016 were essentially

the same, and were both consistent with a hypoxia event occurring, within a reasonable degree of probability (Rugino, p. 1029). He also noted that the MRI spectroscopy done in 2016 ruled out a genetic or metabolic cause within a reasonable degree of certainty (Rugino, p. 1030) and he found no sign of any dysmorphology (Rugino, p. 1032).

Dr. Rugino also testified that the motor components of the child's injuries were unrelated to autism. (Rugino, p. 1033) He testified that the motor injuries were due to hypoxia (Rugino, pp. 1035 - 1044). Dr. Rugino went through the extensive injuries of the child including the cognitive issues and explained why those injuries as established by the MRI reports were due to the hypoxic event within a reasonable degree of certainty (Rugino, p. 1043). He noted, also within a reasonable degree of certainty that it was a hypoxic event that got her to where she is today and is responsible for her injuries. (Rugino, pp. 1045 et seq.) He testified that it was the developmental and cognitive delays that necessitated a need for care because the child will not be able to ever appropriately take care of herself and will remain totally and completely dependent. (Rugino, p. 1038) He also believed that the child had autism which he did not believe was the cause of any of the developmental delays, and that if she had had only autism, she would have been able to lead a relatively normal life regardless of the autism. (Rugino, pp. 1039, 1041) Dr. Rugino expressed his opinions within a reasonable degree of medical probability that the developmental and cognitive delays were caused by hypoxia (Rugino, p. 1043) and noted what future medical care would be needed. (Rugino, p. 1043) Dr. Rugino also prepared a report of his findings and observations (Ex 18a, b, and c) and also noted that in the absence of hypoxia, A.H. would have been employable. (Tr., p. 1040 – 1041)

Plaintiff also presented deposition testimony of a treating geneticist, Dr. Schorry. (Schorry, p. 481) Dr. Schorry, as a geneticist, testified that she was unable to find any genetic

defects and also testified that the child's symptoms were consistent with hypoxia being a cause of the global development delays and cognitive dysfunction. She also testified the child did not have microcephaly. (Schorry, pp. 493, 515, 523, 530 – 532, 545)

Plaintiffs also presented testimony of a certified nurse healthcare planner by the name of Laura Lampton, (Lampton, p. 779), who qualified as an expert witness, without objection, and who also wrote a report using accepted methodology after interviewing the plaintiffs, examining medical records and indicated after consulting with Dr. Rugino and reviewing his report what the child would need from a health care perspective for the rest of her life. Ms. Lampton was an expert whose business involved doing many such evaluations, and she had been previously qualified to provide such testimony in the Northern District of West Virginia. (Lampton, pp. 777, 785 – 787; P. Ex. 17a) Her testimony was also revealed in her report that she prepared. (Ex 17)

The plaintiff then presented testimony of a Mr. Staller, an economist, who was qualified as an expert, without objection, in the field of economics. He explained the basics of what he does. Mr. Staller took the report and testimony of Ms. Lampton and assuming its accuracy calculated both lost earning capacity and the cost of future medical care and reduced each to the present value. He also did a report. (P. Ex. 19) which was explained to the jury.  His findings indicated that the reduced value of the lost earnings for minimum wage earners in the amount of $837,577 to $2,091,923 with a high school diploma and the need for future health care reduced to present value of the Lampton projections was $10,660,012. (Staller, pp. 873, 875; Ex. 19a, pp. 879, 887, 890; Ex. 17b, p. 896)

It was also noted that after the first MRI was inappropriately read, the parents and their health care professionals embarked on a several-year attempt to try to determine what was the problem with the child and that based on the wrongly interpreted MRI they had been given a

diagnosis of autism based on the fact that there had been an incorrect interpretation of the first MRI. After numerous tests were performed following the directions of physicians, and after the second MRI was performed, Mr. and Ms. Hysell, after meeting with physicians at Cincinnati Children's Hospital understood that their child had a hypoxic injury and cerebral palsy. (R. Hysell, p. 1467 - 1468; C. Hysell, p. 1354)

There were many findings at birth and in the nursery from which it is reasonable to conclude that this baby was not properly monitored during labor and certainly during the "pushing" stage; that the fetus was not being probably oxygenated for a significant period of time beginning when Ms. Hysell's SaO2 was low; that the baby was born hypoxic and not properly and timely treated and that such hypoxia was a cause of the injuries that resulted.

Dr. Rugino adequately explained the injuries that were and will be continuing into the future and described those injuries in his reports and before the jury. (Ex. 18a, b, and c)

Ms. Laura Lampton is a qualified health care planner who adequately described what health care the minor will need in the future; Mr. Chad Staller is an economist who calculated the value of such health care and the value of lost earnings suffered by the minor; that both Ms. Lampton and Mr. Staller followed the proper methodology of a life care planner and economist in preparing their opinions.

It was agreed that the baby had an SaO2 reading of 68 at least 13 minutes after delivery when it should have been at least 85 – 95 and that is a sign of hypoxia and a lack of sufficient oxygen perfusion.

The value of the minor's lost earning potential was provided as being in the range of $827,527.00 to $2,091,923.00 and the value of the future cost of health care was provided as being $10,660,012.00.

## Defendants' Experts' Credibility

Defendant called a Dr. Scher who made the following statements.

a) While defendant tries to claim that the MTHFR abnormality caused the injuries in this case, Dr. Scher himself said "It's not necessarily a cause, but an association with children who are autistic" (Scher, p. 1805).

b) When Dr. Scher was asked if the MRIs do show the result of hypoxia, he said "I know, I don't agree" which was contrary to just about everyone else who has testified in this case.

c) He admitted that there was "white matter abnormalities" (Scher, p. 1805).

d) He also admitted that all the issues that the child had at birth are known to be caused by hypoxia when he stated that "hypothetically that's true … ". (Scher p. 1807) He may not have believed it, or thought it was incorrect, but he agreed that her abnormalities are known to be caused by hypoxia (Scher, p. 1807).

e) The bottom line according to him was when asked about the causes of numerous issues including loss of balance, brushing problems, hygiene problems, inability to be potty trained, etc., stated "Well, the answer is cause I don't know." (Scher, p. 1808)

f) Dr. Scher clearly had answers contrary to defendant's position and also perhaps contrary to what made common sense in reality to a jury.

Defendant called a Dr. Sze, whose testimony ultimately supported the Plaintiffs. He noted:

a)   That PVL does NOT occur in a term infant, ever (Sze, p. 1745).  His position that he took on direct examination was that the injury shown in the MRIs simply do not ever happen in a term infant such as this child in this case.

b)   Then, however, he testified on cross-examination that it was possible that white matter could be injured at the time of delivery in a term baby (Sze, p. 1760).

c)   He eventually agreed that white matter injury as we have in this case as shown in the MRIs do indicate that " it can occur in term infants which is what I said, but we *generally* think of as it being typical on premature infants." That is certainly not consistent with "never".

d)   He also ended up agreeing that white matter had a wide range of severity in newborns (Sze, p. 1767) and that up to 20 percent of newborns with periventricular leukomalacia may be full term (Sze, p. 1768).

e)   All of the foregoing was a complete reversal of the fact that he previously said that PVL does not occur in term infants.

f)   This alone was enough to allow the jury to disbelieve anything that he said and he later admitted when asked "you can get the same injury to the white matter whether the child is preterm or term" and said "Yes, you are correct". (Sze, p. 1771)

g) The jury basically could have disregarded his testimony because it's conflicted within his own statements and also could have accepted his statements about white matter injury as being accurate.

Another of defendant's experts, Dr. Landon, also made statements such that the jury could easily discredit him and also enhance plaintiff's case.

a) Dr. Landon himself testified that he may have seen a few mild decelerations which could indicate core compression (Landon, p. 1912).

b) He also testified in light of everything else that had been heard in this case, that he thought it was highly unlikely that the child had hypoxia (Landon, p. 1917). But, he also agreed that the period around the time of birth accounts for 75 percent of the causation in these kinds of cases (Landon p. 1930).

c) On cross-examination when asked what the duties were of the midwife for whom he was testifying, he incredibly stated her duties were to be in close proximity to monitor onsite and be available (Landon, p. 1933), not even saying one word about the duties to monitor the patient appropriately.  This alone could have destroyed his credibility.

d) He agreed that there could have been cord compression for the last 5 minutes in light of what he saw on the monitor, supporting Plaintiffs' theory of the case.  He also agreed, consistent with Ms. Hysell's testimony that lying on the mother's chest doing nothing would be an example of encephalopathy (Landon, p. 1940).

e) He agreed that the Sa02 that was discovered being 68 in the nursery at least 14 minutes after delivery should have been over 90 when in fact it was 68

(Landon, p. 1944) which he agreed also would be caused by hypoxia (Landon, p. 1850) and he agreed that the baby did need oxygen (Landon, p. 1945).

f)  He even agreed that a dusty color can be caused by hypoxia (Landon, p. 1945).

g)  He agreed that the monitor strips went at least from 12:22 to 13:00 just getting the mother's heartbeat and that one needed to know both the fetal heart rate and the facts concerning the contractions in order to properly monitor (Landon, p. 1948).

h)  He also agreed that the baby was tachycardic before birth with a heartbeat of 175 (Landon, p. 1952) and he agreed that this baby did need to be resuscitated when asked "Question" Is that your feeling, that this baby had to be resuscitated?  Answer:  I believe so".

Another Defense expert, Dr. Alan Bedrick was cross-examined.

a)  He agreed that babies who are 10 or 15 minutes old should have saturations in the high 80s or low 90s (even though this baby's Sa02 was 68 (Bedrick, p. 1742) and he admitted that hypoxia is simply a low-level concentration of oxygen in the blood (Bedrick, p. 1836).

b)  He then agreed that the extent of the injury would depend upon the duration and extent of the hypoxia (Bedrick, p. 1837). In order to help defendant, he cleverly indicated that "often" babies stay in the nursery if they suffer a hypoxia process before delivery.  "Often" is not always.

c)  He also testified that he testified 60 times in the last 5 years.

d)  And consistent with plaintiff's theory of the case, he agreed that the cord could simply be moved out of place to get to a delivery (Bedrick, p. 1854).

e)  He indicated that a 68 Sa02 is an indication of hypoxia such that he even agreed that 14 minutes after delivery the baby was still suffering from hypoxia which he agrees does cause brain damage (Bedrick, p. 1858).

f)  He also agreed that partial prolonged hypoxia can occur over a course of over 30 minutes (Bedrick, p. 1860) and he agreed that he would defer to a neuroradiologist for the type of hypoxia injury that occurred here (Bedrick, p. 1861).

g)  He alone disagreed that the World Health Organization growth charts are generally supposed to be used in determining a head circumference (Bedrick, p. 1863) and instead used a different growth chart that had never been mentioned before, nor thereafter.

Dr. Gropman was the geneticist who testified for the defendant hospital.  Her testimony was also questionable and allowed the jury to disregard all of it if it wished to do so.

a)  She testified that the MRIs did not indicate hypoxia (Gropman, p. 728).

b)  She testified that there were dysmorphic features (Gropman, p. 728).

c)  She testified that this was not a hypoxic situation; therefore, it must be genetic (Gropman, p. 730).

d)  She admitted that dysmorphic never appeared in her report (Gropman, p. 744).

e)  She disagreed with Dr. Manser, who said perinatal hypoxia was more likely (Gropman, p. 746).

26

f)  She did conclude that many doctors, however, thought this was a hypoxic situation (Gropman, p. 749).

g)  She conceded that normocephalic means the head is between the 5th and 95th percentile (Gropman, p. 759).

h)  She agreed that the child was always at about the 5th percentile (Gropman, p. 760).

i)  She admitted that hypoxia can cause this kind of injury (Gropman, p. 762).

j)  She agreed that an SAO2 of 68 suggests lack of perfusion (Gropman, p. 765), and she conceded that hypoxia can cause what is shown in the MRI (Gropman, p. 771).

k)  She agreed that if hypoxia caused the problem, it happened at delivery (Gropman, p. 772).

Another expert for the Defendants, was Dr. Giannone:

a)  He said that irregular breathing doesn't really mean irregular breathing (Giannone, p. 1574).

b)  He also agreed that the baby should not get a 2 on the Apgar score if it is not crying well (Giannone, p. 1576), which, of course, puts into question the entire scoring system relied upon by various experts.

c)  He said he would want to see the baby's SAO2 at 85 to 95 at 10 minutes after birth, not 68 (Giannone, p. 1578).

d)  He also agreed that one could have severe injury and not have seizures (Giannone, p. 1578).

e) He agreed that you had to have both a fetal heartrate and uterine contractions in order to meet the standard of care (Giannone, p. 1580).

f) He never addressed microcephaly in his report (Giannone, p. 1596), and he did no plotting of head circumferences until May 19, after the trial started

g) He agreed that the baby had hypoxemia, which is low level of oxygen in the blood (Giannone, p. 1599).

Defendant called a Dr. Graham as an expert.

a) He agreed that if you want to assess the fetus, you have to monitor the fetal heartrate and the contraction pattern Graham, p. 1088).

b) He didn't see any dysmorphic features Graham, p. 1099).

c) Not all babies that have hypoxia brain injuries have seizures or organ failure (Graham, p. 1098), and

d) The child did not have to be comatose in order to have hypoxic damage (Graham, p. 1100).

Dr. Trock was another expert for the defense. He spent all of 23 minutes examining the child (Hysell, p. 1479).

a) He said that the periventricular leukomalacia *always* occurs, at the latest, at 36 weeks (Trock, p. 972), only to be contradicted later by other defendants' experts, such as Dr. Sze.

b) He admitted he did not recognize any genetic syndrome (Trock, p. 972).

c) He found no dysmorphic features, contrary to Dr. Gropman (Trock, p. 999).

d) He said you *must* be unconscious to have brain damage, which was contradicted by other experts for the defense (Trock, p. 1001).

e)  He thought that the blue hands and feet was just irrelevant (Trock , p. 1003).

f)  He didn't recall the parents or the grandmother saying anything about the baby not crying (Trock, p. 1005), and he says one can only go by the records (Trock, p. 1006).

g)  Incredibly, he also stated that autism is the cause of bowel and bladder problems that her child exhibited (Trock, p. 1011).

h)  He thought prenatal hypoxia insult could cause mild cerebral palsy (Trock, p. 1012), and he agreed that paraventricular leukomalacia and cerebral palsy are perfusion abnormalities (Trock, p. 1014).

i)  He really didn't care what the individual Apgar findings were (Trock, p. 1016).

j)  He admitted that association does not mean causation (Trock, p. 1016)

k)  He also agreed that the damage from hypoxia depends on how much insufficiency of oxygen there is and the length of time it goes on (Trock, p. 1017), and he admitted he did not know the cause of the autism (Trock, p. 1017).

Defendant also called a Dr. Shimony as a witness.  According to him,

a)  the MRI injury occurred second or beginning of the third trimester, because it couldn't have occurred after that, again, to be disputed by Dr. Sze, another defense expert (Shimony, p. 1257).

b)  He did not know that the midwife had put her hand in the birth canal (Shimony, p. 1293).

c)  He did not know if there was irregular breathing (Shimony, p. 1293).

d) But he did agree that paraventricular leukomalacia can occur at term (Shimony, p. 1295).;

e) Hypoxia can cause pariventricular leukomalacia, and she had that (Shimony, p. 1297).

f) He did not ever look at the Access baby records (Shimony, p. 1299).

g) He agrees that at 2 years of age, Dr. Hummel said that the baby does not have microcephaly (Shimony, p. 1303).

h) He agreed that a 31.9-centimeter reading is a 5th percentile and that 3 days later, it was in the 10th percentile (Shimony, p. 1305).

i) He agreed that the literature only says that a gene can be "associated" with a defect (Shimony, p. 1309).

j) He admitted just because something was unusual and rare doesn't mean it can't occur (Shimony, p. 1314).

The court correctly informed the jury that they were the sole judges of the credibility of witnesses (Tr., p. 1921).  The Court also told the jury that they had a right to distrust the testimony of any witness and could reject it based upon the credibility or lack thereof that they thought was appropriate (Tr., p. 1923).  The Court also noted that if the jury felt that the reasons given in support of an opinion were not sound, the opinion could be disregarded.

Contrary to defendants' position that this child was born with microcephaly, it was clearly strongly disputed.  Even defendant's own experts did not agree that there was microcephaly or had different theories as to how one would arrive at the idea of microcephaly. And there was testimony and records that there was not microcephaly; notwithstanding, that we already also have a child who shows no signs of microcephaly at this time.

The statement that the injury that the plaintiff had and as shown on the MRI "is not caused by hypoxia at birth" (defendants Paragraph 19) was shown to be absolutely false through Dr. Sze's cross-examination and testimony of numerous other expert witnesses.

In short, the jury, according to the Court's instructions, had a right to accept any portion of the experts testimony that they wanted to accept and disregard any or all of the rest. The jury did not have to accept the words of large curriculum, frequently testifying expert witnesses. The jury could easily have accepted Plaintiffs' theory of the case that there was untreated hypoxia and that it was shown in the MRIs and was the cause of the brain injury that was shown therein based only on defendants cross-examination testimony or they could have simply decided to disregard such testimony because of the contradictions of the defendants experts that they made on cross-examination.

Any argument about the testimony concerning Dr. Schorry is specious as the defendants' experts were cross examined on the same issue and gave the same answers. Everyone agreed that all of the findings at birth occur with hypoxia. That should not even be disputed. The issue concerning the verdict form is also specious. The jury did consider the defendants individually and even had different fault percentages for the defendants.

There was dispute over the fetal monitor strips and what they showed and the jury clearly had a reason to accept plaintiff's interpretation of the same as opposed to defendants. There was a dispute over whether or not the child had microcephaly and the jury was free to accept plaintiff's version of the facts. If there was any dispute over whether or not the child had hypoxia at birth, the jury certainly has sufficient evidence in which they could decide that there was hypoxia. It seems to be absurd to even suggest that all of the findings consistent with hypoxia are meaningless. And there seems to be no question that if there was hypoxia, it was not treated

sufficiently and in fact was allowed to occur through much time as it was clear that even the mother was not receiving sufficient oxygen early in the delivery process, so neither could the fetus.  All of these facts were entitled to be credited and believed by the jury.  The opinion that it was the negligence of the nurses that was a cause of the development of the hypoxia and injury was certainly supported by the evidence and could be accepted by the jury. This was a unanimous seven-person jury which paid close attention to the evidence and reached a decision with which the Defendant just disagrees.

## CONCLUSION

There was evidence from which the jury could conclude that the monitoring of the fetal monitor strip during delivery was below the standard of care; that Ms. Hysell had a low oxygen blood content for several hours which limited the oxygenation of the fetus; that the nurse and midwife were negligent in their monitoring of Ms. Hysell; that the fetus was stuck in the birth canal for an unknown period of time and that there was cord compression limiting the supply of oxygen to the fetus; that the midwife and nurse were busy with other patients and did not give proper attention to Ms. Hysell; that as a result the baby was hypoxic at birth; that the MRIs revealed that the baby had suffered  hypoxia at birth; that the damage shown on the MRI does happen in term babies who do not get sufficient oxygenation; that the nursing care from birth until sometime in the nursery was below the standard of care; and that as a result, the baby developed a brain injury from untreated hypoxia that occurred when Ms. Hysell was not being properly monitored that produced permanent damage as explained by the experts. The jury had a right to determine what testimony it wanted to accept and it clearly accepted the Plaintiffs' version that Defendants were negligent and such negligence was a cause of the claimed injuries. Defendant's Motions should be denied.

Respectfully submitted,

PAULSON & NACE, PLLC


 /s/  Barry J. Nace
Barry J. Nace, Esq. #7313
Christopher T. Nace, Esq. #11464
1025 Thomas Jefferson St., NW
Suite 810
Washington, DC 20007
202-463-1999 – Telephone
202-223-6824 – Facsimile
*bjn@paulsonandnace.com*
*ctnace@paulsonandnace.com*
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of July, 2021 I caused a true and exact copy of the

foregoing to be served via CM/ECF upon:

Mr. Fred B. Westfall, Jr., Esq.
Jason S. Bailey, Esq.
Jennifer M. Mankins, Esq.
United States Department of Justice
Robert C. Byrd United States Courthouse
300 Virginia Street, East
Suite 4000
Charleston, WV  25301
Phone: (304) 345-2200
Fax: (304) 347-5443
Email Address: fred.westfall@usdoj.gov
Email Address: jason.bailey2@usdoj.gov
Email Address: jennifer.mankins@usdoj.gov
*Counsel for USA*

Bryan Essary, Esq.
C.J. Gideon, Jr., Esq.
Gideon, Essary, Tardio & Carter PLC
315 Deaderick Street
Suite 1100
Nashville, TN  37238
Phone: (615) 254-0400
Fax: (615) 254-0459
Email Address: bryan@getclawfirm.com
Email Address: cg@getclawfirm.com
*Counsel for RGH*

D. C. Offutt, Jr., Esq.
Jody O. Simmons, Esq.
Shawna N. Pinkerton, Esq.
Offutt Nord Ashworth, PLLC
949 Third Avenue
Suite 300
PO Box 2862
Huntington, WV  25728
Phone: (304) 529-2868
Fax: (304) 529-2999
Email Address: dcoffutt@offuttnord.com
Email Address: jsimmons@offuttnord.com
Email Address: snpinkerton@offuttnord.com
*Counsel for RGH*

*/s/  Barry J. Nace*
Barry J. Nace, Esq.