## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**RYAN HYSELL and CRYSTAL HYSELL,** :
on behalf of their daughter**, A.H.,**
a minor,                                     :
          **Plaintiffs,**       :

**v.**                                       :          **Case No. 5:18-cv-01375**

**RALEIGH GENERAL HOSPITAL, and**   :
**THE UNITED STATES OF AMERICA,**   :

        **Defendants.**

## DEFENDANT, RALEIGH GENERAL HOSPITAL'S, REPLY TO PLAINTIFFS' RESPONSE TO ITS MOTIONS FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULES 50(a) and 50(b) OF THE FED. R. CIV. P.

Defendant, Raleigh General Hospital (RGH), by counsel, D.C. Offutt, Jr., Jody Simmons, and the law firm of Offutt Nord, PLLC, and C.J. Gideon, Bryan Essary and the law firm of Gideon, Essary, Tardio & Carter, PLC, hereby respectfully submits this Reply to Plaintiffs' Response to Its Motions for Judgment as a Matter of Law Pursuant to Rules 50(a) and 50(b) of the Fed. R. Civ. P.

### Introduction

Plaintiffs filed a collective response [Doc. 326] to RGH's Motion for Judgment as a Matter of Law Pursuant to Rule 50(a) [Docs. 306 and 307], Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) [Docs. 309 and 310], and RGH's Motion for New Trial Pursuant to Rule 59 [Docs 311 and 312].  This reply addresses the response to the Rule 50(a) and Rule 50(b) motions.  A separate reply will be filed to address the response to the Rule 59 motion.

The central issue in this trial was whether a breach of the standard of care by

the Defendants was a proximate cause of Aubrie Hysell's developmental and cognitive delays. Aubrie was diagnosed at Cincinnati Children's Hospital as suffering from autism and cerebral palsy. The exact cause of autism is unknown, but, as testified to by both Plaintiffs' and Defendants' experts, it is thought to have some association with a genetic defect or defects. What is known about autism is that it is not caused by hypoxia. No expert testified at trial that autism is caused by hypoxia or even associated with a hypoxic event. Dr. Barakos, frequent expert witness testifying for plaintiffs in brain injury cases around the country, admitted that there is no known association between hypoxia and autism. [Tr. Trans. 1182: 16 – 1183: 2]. Not much more is known about the cause of cerebral palsy. As testified to by Dr. Arthur, treating child neurologist at Cincinnati Children's Hospital, a diagnosis of cerebral palsy is simply a description of a constellation of symptoms and the fact that a condition is labeled as cerebral palsy does not indicate anything about the cause of the condition. [Tr. Trans. 464: 20 to 465: 4]. Many things other than hypoxia can cause developmental and cognitive delays, including genetic causes. [Tr. Trans., 548: 16 to 549: 1]. Throughout the trial, Plaintiffs' counsel questioned experts about whether Aubrie Hysell's developmental and cognitive delays *"could have"* been caused by hypoxia or were consistent with a hypoxic event. The Court recognized Plaintiffs' trial strategy on the record – "It's not lost on the Court what the plaintiffs' are attempting to do here to try to link up hypoxia generally to this plaintiff in particular through some type of a specific causation that, well, she has these conditions, she must have had hypoxia." [Tr. Trans. 511: 8 – 12].

The Court's observation about the Plaintiffs' trial strategy was absolutely correct.   All Plaintiffs demonstrated at trial was that Aubrie Hysell has developmental and cognitive delays which they contend must have been caused by hypoxia because hypoxia at birth "*can*" cause developmental and cognitive delays. That strategy fails because it does not address an essential element of Plaintiffs' proof, *i.e.* that some failure to meet the standard of care by the Defendants was a proximate cause of all or some of Aubrie Hysell's developmental and cognitive delays to a reasonable degree of medical probability.

Just like their trial strategy, Plaintiffs' collective response to the Rule 50 motions is a rambling hodgepodge of disconnected arguments attempting to demonstrate that their evidence proved the Defendants were negligent and that said negligence was "a" cause of Aubrie Hysell's cerebral palsy.   They even make the audacious claim that the medical expert witnesses called by the defense offered expert opinions at trial "proving" their claim.   Just as they did at trial, Plaintiffs' response loosely throws around the terms "*negligenc*e," "*hypoxia,*" "*brain injury,*" "*negligent monitoring,*" and claims that the baby was "*blue at birth,*" "*was not crying,*" and "*was lifeless,*" without any context or reference to the standard of care.   The reference to Dr. Barakos' testimony of "*can be*" and "*consistent with*" [Doc 326, p. 17] clearly ignores the fact that these "*opinions*" are insufficient to prove causation as a matter of law.   The reference to Dr. Sze's "*can be*" testimony [Doc. 326, p. 18] reflects the same cavalier inattention to the binding standards of proof regarding causation. The emphasis on statements made by defense experts called by the United States

such as "*hypothetically that's true*," "*is known to cause*," "*can be*" and "*could be*" [Doc 326, pp 22 -26] is a clear effort to confuse the causation issue and misstates the legal standard for proving causation. The Court must recognize that obtaining an admission that something is possible does not, in fact, impeach other testimony as to what is probable. The lengthy discussion of Dr. Rugino's testimony [Doc. 326, pp. 18-19] blatantly ignores the stipulation that Dr. Rugino would not offer any opinions at trial regarding "when a hypoxic injury to Aubrie Hysell may have occurred." [Doc. 267]. These misstatements at trial may have confused the jury into believing that some act or failure to act on the part of the Defendants caused the child's current neurological condition, but it should not confuse this Court.

The Plaintiffs start their response with the claim the Defendants' experts misrepresented the science regarding MRI interpretations. [Doc. 326, p. 2]. What was the misrepresentation? Every expert who testified about the MRI findings, including Dr. Barakos [Tr. Tran.1193: 17 - 21] and Dr. Rugino [Tr. Trans. 1029: 21-24], retained experts for the Plaintiffs, agreed the MRI studies demonstrated injury to an area of the brain usually seen in pre-mature infants, periventricular leukomalacia (PVL), which is injury to the white matter of the brain around the ventricles, and rarely seen in full-term infants. The experts agreed that this type of injury usually occurs when the white matter is developing, from 24 to 34 weeks gestation. All of the experts agreed that there was no gray matter or brain stem injury demonstrated on the MRIs which would normally be seen if the injury had been to a more mature fetal brain occurring around the time of birth. The defense

4

correctly argued to the jury that the "fingerprints" of a hypoxic injury to the brain occurring around the time of birth simply were not present on the MRI studies which is a true and accurate statement of the science, not a misrepresentation.

Plaintiffs continue to insist that there was no microcephaly and that Aubrie Hysell had a normal sized head and brain at the time of birth. The evidence at trial established conclusively that Aubrie Hysell's head circumference measured at the time of her birth was 31.9 cm. This is clearly is microcephalic (below the fifth percentile) as admitted unequivocally by Plaintiffs' child neurology expert, Dr. Rugino, [Tr. Trans. 1058: 9 – 21], and by Dr. Barakos, [Tr. Trans. 1185: 6 – 15]. No matter how much Plaintiffs try to make this fact magically disappear from the case, it is an irrefutable fact and it is just as irrefutable that a brain damaged at birth by a hypoxic insult will not immediately become microcephalic as a result.

As an another example of this attempt to confuse the Court, the Plaintiffs cite a nearly 100-year-old West Virginia Supreme Court of Appeals case to suggest that a claim of negligent medical monitoring, in and of itself, is sufficient to support a plaintiff's verdict in a medical malpractice case. The law set forth in the case is outdated and does not comply with the proof of causation requirements as required by the West Virginia Medical Professional Liability Act (MPLA), W. Va. Code § 55-7B-3. Specifically, they cite the case of *Jenkins v. Charleston General Hospital and Training School*, 90 W. Va. 230, 110 S.E. 560 (1922), for the proposition that a health care provider is liable for negligence resulting from a failure to monitor a patient and failure to discover what a careful investigation would have disclosed. [Doc. 326, pp.

5

4-5].  A failure to monitor, in and of itself, cannot be the basis for liability in a medical malpractice case.  First, it must be proven by expert testimony that monitoring was required in order to comply with the standard of care.  Second, it must be proven that the negligent failure to monitor proximately caused injury to the patient.

At trial in this case, Plaintiffs tried to establish that the fetal heart monitoring during labor was inadequate because it was not always picking up the fetal heart rate or mother's contraction pattern.  However, there was absolutely no proof that the alleged monitoring failures proximately caused any injury to Aubrie Hysell.  Where is the proof that that inadequate monitoring was a proximate cause of any injury to Aubrie Hysell, including cerebral palsy?  There is none.  The arguments concerning alleged monitoring failures and the citation to a 99-year-old outdated opinion are simply smoke and mirror distractions to take this Court's focus away from the real issue presented in RGH's Rule 50 motions – failure to prove causation.

W. Va. Code § 55-7B-3, clearly sets forth the elements of proof regarding negligence and causation imposed upon the plaintiff in a medical malpractice case.

§ 55-7B-3. Elements of proof.

(a) The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care:

(1)    The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

(2)    Such failure was a proximate cause of the injury or

death.

W.V. Code § 55-7B-3.

The Plaintiffs spent an excessive amount of time in their response brief discussing trial testimony about "hypoxia" and whether it was or might possibly have been the cause of Aubrie Hysell's brain injury, but they go no further to examine whether their experts actually testified at trial that some act omission by the RGH nurses was a proximate cause of the brain injury.  While the Plaintiffs arguably offered expert testimony at trial that the Defendants allegedly failed to meet the standard of care with regard to the recognition and treatment of hypoxia in the labor and delivery room after Aubrie Hysell's birth, that testimony is insufficient to meet the Plaintiffs' burden proof regarding causation.  Where is the proof that the failure to treat hypoxia, if it existed, was a proximate cause of Aubrie Hysell's cerebral palsy?  No such testimony exists in the trial record.  Nowhere in their collective response to RGH's Rule 50 motions do the Plaintiffs point out or even try to argue that any of their experts testified that a specific failure to follow the standard of care by the RGH nurses was a proximate cause of Aubrie Hysell's cerebral palsy.  The reason for this omission is that such testimony, clearly required by the MPLA, simply does not exist anywhere in the trial record.

Instead of addressing the lack of proof on causation issue head-on, Plaintiffs make the blatantly false statement that it was uncontested that the only signs and symptoms of hypoxia were at the time of birth.  [Doc 326, p. 15].  Nothing could be further from the truth.  Nine experts called by the defense testified there were no

signs of symptoms of hypoxia or neonatal encephalopathy at the time of birth and ample evidence of an earlier hypoxic injury to the brain occurring well before birth on the MRI studies.  Aubrie Hysell's Apgar scores of 7 at one minute and 8 at five minutes, and the fact that she did not have neonatal encephalopathy, in and of themselves, refute the allegations of hypoxia at birth.  The peer reviewed publication, *Neonatal Encephalopathy and Neurologic Outcome,* confirms the consensus expert view that neonatal encephalopathy ***must*** be present to attribute cerebral palsy to hypoxic ischemia that occurs during labor and delivery.  This authoritative text jointly published in 2014 by the American Academy of Pediatrics and the American College of Obstetrics and Gynecology and which was not refuted or addressed in any manner by Plaintiffs at trial, also states that an Apgar score of 7, or better, at five minutes of life, leads to the widely accepted conclusion that hypoxia is not a probable cause of later diagnosed cerebral palsy.  [Tr. Trans. 952: 4 – 15].

### Failure of the Expert Testimony Offered by Plaintiffs at Trial to Prove Causation to a Reasonable Degree of Medical Probability

The only causation testimony offered by an expert called by the Plaintiffs at trial came solely from Dr. O'Meara, a pediatrician.  Every single expert who testified at trial regarding the timing of Aubrie's injury, with the exception of Dr. O'Meara, testified that it occurred in utero, many weeks before the labor and delivery period. Plaintiffs make broad sweeping statements about Dr. O'Meara's opinions in their response, but a careful examination of her trial testimony shows that Dr. O'Meara failed to testify that Aubrie Hysell suffered from cerebral palsy or any other injury caused by a breach of the standard of care on the part of the RGH nurses, or any other

8

healthcare provider for that matter:

> **Mr. Nace:** In your opinion, within a reasonable degree of medical probability, should they (suction and blow-by oxygen) have been done in the delivery room?
>
> **Dr. O'Meara**: Yes.  Within the first few minutes of delivery, yes.
>
> **Mr. Nace:**  And the failure to do that Doctor, is that a violation of the typical standard of care?
>
> **Dr. O'Meara:**  Yes, it is.
>
> *Tr. Trans: 577: 8 – 14.*
>
> **Mr. Nace:**  …. [d]oes this give – enable you to give us an opinion within a reasonable degree of medical probability as to whether or not the child had hypoxia at the time of delivery?
>
> **Dr. O'Meara:   ….**[y]es, within a reasonable degree of medical probability, that is the only thing that's identified and it's more than likely the cause of the injury.
>
> *Tr. Trans. 580: 3 – 6 and 581: 9 – 12.*
>
> **Mr. Nace:**  Okay.  Within a reasonable degree of medical probability, then, do you have an opinion as to whether or not there was, in fact, hypoxia here at the time of delivery?
>
> **Dr. O'Meara**:  Because the infant is having trouble breathing and her muscle tone is so low, it make me very concerned that there was a period of hypoxia and acidosis.  In the process of being born, there was some compromise to the blood flow to her and to her levels of oxygen in order to make her that depressed or have that kind of a slow start.  And so, yes, within a reasonable degree of medical probability – within a reasonable degree of medical probability, more likely than not that – that caused that.
>
> *Tr. Trans. 582: 17 to 583: 4.*

Viewed in a light most favorable to Plaintiffs, Dr. O'Meara opined that Aubrie Hysell suffered from hypoxia at birth and that the RGH nurses deviated from the

standard of care by failing to treat the hypoxia in the delivery room.  However, there is no testimony by any expert that the failure to treat the hypoxia was a proximate cause of Aubrie Hysell's permanent brain injury.

The Plaintiffs' response discusses hypoxia extensively – when it may have been present, what may have caused it, and what was done or not done to treat it. Plaintiffs offered no expert opinion to a reasonable degree of medical probability as to the cause of the hypoxia.  They offered speculation that it "*could*" have been caused by umbilical cord compression, or "*was consistent*" with cord compression, but no expert testified that it was caused by cord compression.  Again, assuming that the jury jumped to the conclusion that cord compression caused the hypoxia, what did the RGH nurses do or fail to do address the cord compression?   Should the delivery have been expedited in some manner, perhaps by a c-section?  If Aubrie had been delivered earlier, would she not have suffered from hypoxia or not suffered her permanent brain injury?  No expert offered this opinion.  Certainly the RGH nurses did not cause the hypoxia and there is no expert testimony to suggest that they could have prevented the hypoxia from occurring by some sort of medical treatment or intervention.  Once again the jury was left to speculate that the hypoxia itself was caused by some act or failure to act by the RGH nurses, and to further assume if resuscitation efforts had been undertaken more rapidly, Aubrie Hysell would not have suffered cerebral palsy to a reasonable degree of medical probability.

One "red herring" piece of evidence offered and at trial and repeated in Plaintiffs' response, is a continued reference to the mother's "low" oxygen saturations

of 89% and 87% at 8:23 a.m., and 8:36 a.m., the time she was getting her epidural which occurred many hours before delivery.  Plaintiffs' only obstetrical expert, Nurse Midwife Fassett, testified that the fetal heart tracing from the beginning of the monitoring up until 12:22 p.m. would be classified as a Category I strip, [Tr. Trans. 345: 3 – 6], meaning it's a normal tracing strongly predictive of a normal fetal acid-base status and that the fetus is getting adequate supply of oxygen.  [Tr. Trans. 369: 12 – 21].  To continue to argue that two isolated oxygen saturation readings of the mother is "proof" of hypoxia in the fetus is simply audacious.  As board certified maternal-fetal medical specialist Earnest Graham, M.D., explained to the jury, "if the mother is moving around, the gauge on her finger may not pick up well.  She may be wearing fingernail polish.  There's no complaints of any problems here, no shortness of breath, so I don't think that's clinically significant . . ." [Tr. Trans. 932: 1 – 7].

In the Causation section of their response brief, Plaintiffs make extensive reference to the testimony of Dr. Jerome Barakos, a pediatric neuroradiology expert, and argue that he testified that the findings on Aubrie Hysell's two MRI studies were "*consistent*" with what is found when a term baby has developmental cognitive delays as a result of hypoxia.   [Doc. 326, p. 17].  "*Consistent with*" does not rise to the reasonable probability causation standard required under West Virginia law.  In terms of the timing of the injury to Aubrie Hysell's brain shown on the MRI studies, Dr. Barakos testified that it occurred sometime between 26 to 28 weeks gestation to two years of age.  [Tr. Trans. 1173: 2 – 6; 1192:  6 – 10].  Thomas Arthur, M.D., treating child neurologist, testified that the MRI studies show something happened

11

sometime before 18 months of age, but nothing more definitive. [Tr. Trans. 460: 9 – 12]. Dr. Barakos' opinion about the timing of an injury to Aubrie Hysell's brain based on the MRI findings adds nothing to the central causation question presented in this case - when did the brain damage occur? It "*could have*" happened at the time of labor and delivery or it "*could have"* happened while the child was in utero, weeks or months before her birth, or it "*could have*" happened sometime in the child's first 18 months of life. In their response brief, Plaintiffs make reference to testimony by Dr. Shorry, treating geneticist from Cincinnati Children's Hospital regarding a "*possible problem with the cord*" and her "*suspicion*" of a possible perinatal insult around the time of birth based on her interaction with Aubrie Hysell's parents. [Doc. 326, p. 12]. Speculation by a subsequent treating physician about what happened, based solely on a history given by the child's parents, is not proof of anything, and certainly not proof of causation. The Plaintiffs simply failed to establish that this injury was caused by any action or supposed inaction attributable to the Hospital's nurses and their Response attempts to conceal and confuse this issue.

## Conclusion

As RGH set forth is its Motions for Judgment as a Matter of Law Pursuant to Rule 50(a) and 59(b), the jury made a leap from the testimony of Dr. O'Meara, a critical care pediatrician who has not delivered a baby since medical school over 20 years ago and who has not worked in a newborn nursery since 2004, that Aubrie should have received resuscitation sooner, to the conclusion that had resuscitation commenced earlier, Aubrie would not have suffered from cerebral palsy. Dr. O'Meara

did not express that opinion to the jury, nor did any other expert.  Due to this fatal flaw in Plaintiffs' proof, the Court should enter judgment in favor of Raleigh General as a matter of law, or in the alternative, certify this important question to the West Virginia Supreme Court of Appeals as the Court suggested during trial when it denied the Rule 50(c) motion by the United States. [Tr. Trans. 1645: 19 – 1646: 10].

**WHEREFORE**, for the reasons set forth above, Raleigh General Hospital respectfully requests that this Court enter an Order granting judgment in its favor as a matter of law, and any additional relief that this Court deems just.

**RALEIGH GENERAL HOSPITAL,**

**By Counsel**

**/s/D.C. Offutt, Jr.**
D.C. Offutt, Jr. (W.Va. Bar No. 2773)
Jody Offutt Simmons (W.Va. Bar No. 9981)
Offutt Nord, PLLC
949 Third Avenue, Suite 300
P. O. Box 2868
Huntington, WV 25728-2868
*(Counsel for Raleigh General Hospital)*

C.J. Gideon, Jr.
Bryan Essary
Gideon, Essary, Tardio & Carter, PLC
315 Deaderick Street
Suite 1100
Nashville, TN 37238
*(Pro Hac Vice Counsel for Raleigh General Hospital)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**RYAN HYSELL and CRYSTAL HYSELL,** :
on behalf of their daughter**, A.H.,**
a minor,                                                   :
            **Plaintiffs,**          :

**v.**                                                         :          **Case No. 5:18-cv-01375**

**RALEIGH GENERAL HOSPITAL,** and
**THE UNITED STATES OF AMERICA,**     :

        **Defendants.**

## CERTIFICATE OF SERVICE

The undersigned, counsel for Defendant, Raleigh General Hospital, hereby certifies that a true and exact copy of the foregoing, **"Defendant, Raleigh General Hospital's, Reply to Plaintiffs' Response to Its Motions for Judgment As a Matter of Law Pursuant to Rules 50(a) and 50(b) of the Fed. R. Civ. P.,"** has been served upon counsel of record via electronic filing, this **6th** day of **August, 2021**:

Christopher T. Nace, Esq.
Barry J. Nace, Esq.
Matthew A. Nace, Esq.
***Paulson & Nace, PLLC***
1025 Thomas Jefferson St., NW, Suite 810
Washington, DC 20007
*Counsel for Plaintiffs*

Lisa G. Johnston, Esq.
Fred B. Westfall, Jr., Esq.
Office of the United States Attorney
Southern District of West Virginia
Post Office Box 1713
Charleston, West Virginia 25326
*Counsel for The United States of America*

**/s/** D. C. Offutt, Jr.
D. C. Offutt, Jr., Esquire (WV #2773)