UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

RYAN HYSELL and CRYSTAL HYSELL,
*on behalf of their daughter*, A.H., *a minor*,

Plaintiffs,

v.                                                    CIVIL ACTION NO.  5:18-cv-01375

RALEIGH GENERAL HOSPITAL and
THE UNITED STATES OF AMERICA,

Defendants.

### MEMORANDUM OPINION AND ORDER

Pending are Defendant Raleigh General Hospital's ("RGH") Motion for Judgment

as a Matter of Law [Doc. 309]; Renewed Motion for Judgment as a Matter of Law Pursuant to

Rule 50(a) [Doc. 306]; Motion for New Trial [Doc. 311]; Renewed Motion to Strike Trial

Testimony of Thomas Rugino, M.D., and Laura Lampton, R.N. [Doc. 316]; and Motion for

Remittitur [Doc. 315].[1] The matters are ready for adjudication.

I.

On October 23, 2018, the Hysells, on behalf of A.H., instituted this action against

Defendants Raleigh General Hospital ("RGH") and Access Health. A.H. is the daughter of

Plaintiffs Ryan and Crystal Hysell. She was born at RGH on October 29, 2010. The Hysells

alleged that RGH and Access Health employees failed to properly monitor A.H. during the

---

[1] Also pending are RGH's Motion to Stay Pending a Collateral Sources Hearing **[Doc. 313]**, which the Court **DENIES WITHOUT PREJUDICE**, and RGH's Motion to Exceed the Page Limitations **[Doc. 330]**, which the Court **GRANTS**.

birthing process. They also allege a failure to oxygenate A.H. immediately following birth, causing hypoxia-related brain injuries.

Mrs. Hysell had a "normal" pregnancy. [Trial Trans. at 1849 (hereinafter "Tr. at __")]. She suffered from morning sickness but was otherwise healthy, as confirmed by a mid-pregnancy stress test. [Tr. at 1334–35]. At the time of delivery, Mrs. Hysell was 41 weeks pregnant [Tr. at 1570].

Mrs. Hysell arrived at RGH around 5:00 a.m. on October 29, 2010. An electronic fetal heartrate monitor was placed soon after she was admitted. A properly operating fetal heartrate monitor simultaneously tracks both the mother's uterine contractions and the baby's heartrate. [Tr. at 266]. By tracking both of those inputs concurrently, delivery staff can effectively monitor the safety of the unborn child through the birthing process. The fetal heartrate monitor produces fetal monitoring strips ("FMS") which are to be checked frequently by delivery staff. If the strips show signs of distress, the delivery staff intervenes.

Beginning at 8:00 a.m., at shift change, Mrs. Hysell fell under the care of Nurse Alice Perkowski, an employee of RGH, and Certified Nurse Midwife Debra Crowder ("Midwife Crowder"), an employee of Access Health. [Tr. at 90]. At approximately 8:25 a.m., Mrs. Hysell received an epidural. [Tr. at 141]. At one point during the delivery near the time of the epidural, Mrs. Hysell's oxygen saturation level ("Sa02") dropped and was between 87% and 89% [Tr. at 85]. Ideal Sa02 levels in a laboring patient are "95 or greater." [Tr. at 293].

By 12:50 p.m., Mrs. Hysell was fully dilated and felt pressure to begin pushing. [Tr. at 155]. Prior to delivery, Nurse Kathy Ball, an employee of RGH, appeared to assist Nurse Perkowski. [Tr. at 106]. During this time, specifically between 12:20 p.m. and 2:19 p.m., a period of nearly two hours during labor, the FMS were uninterpretable, some of which while

2

Mrs. Hysell was actively pushing. [Tr. at 313]. More specifically, the FMS were erroneously picking up Mrs. Hysell's heart rate, rather than that of A.H. [Tr. at 313]. As noted, a properly operating fetal heart rate monitor simultaneously tracks both the mother's uterine contractions and the baby's heart rate. [Tr. at 266]. "[I]f the fetal monitor is monitoring the mother's rate and not the baby's heart rate, then we really don't know what the baby's heart rate is." [Tr. at 1853]. Thus, for a period of two hours, the nurses and midwife were not tracking the status of A.H. and did not have enough information to know whether intervention was necessary. At 2:19 p.m., Nurse Perkowski placed internal fetal scalp electrodes on A.H. to better monitor the fetal heart rate. [Tr. at 158].

Approximately five minutes before A.H. was delivered, Midwife Crowder arrived at Mrs. Hysell's room. [Tr. at 96]. Midwife Crowder verbally noted that the umbilical cord was impeding delivery and took steps to reposition the cord and A.H. in the birth canal so that the delivery could progress. [Tr. at 1112, 1434]. A.H. was delivered through a spontaneous vaginal delivery at 2:55 p.m. [Tr. at. 173, 477].

Immediately following birth, A.H. was laid on Mrs. Hysell's chest. [Tr. at 1346]. Mrs. Hysell recalled that A.H. did not move or cry. [Tr. at 1346]. A.H. did not begin breastfeeding at that time. [Tr. at 1348]. A.H. was then removed from Mrs. Hysell to be evaluated by the delivery staff. A.H.'s APGAR scores were taken collectively by the delivery staff in the delivery room and were transcribed by Nurse Perkowski. [Tr. at 106]. At one minute post-birth, A.H.'s first APGAR score was seven. [Tr. at 106]. The nurses performing the evaluation noted A.H.'s respiratory rate was slow and irregular and her extremities were blue. [Tr. at 104]. At five minutes post-birth, A.H.'s second APGAR score was eight. [Tr. at 201].

Again, hospital staff noted slow and irregular breathing. No APGAR score was noted at ten minutes post-birth. [Tr. at 107].

While babies are normally placed into a wheeled carrier to be transported to the nursery [Tr. at 177], A.H. was carried by Nurse Buchanan to the nursery. [Tr. at 210]. When A.H. arrived at the nursery approximately 14 minutes after birth [Tr. at 1000], Nurse Buchanan noted that A.H. had a dusky color, [Tr. at 212], and that she was not crying, [Tr. at 215–16]. A.H. had an Sa02 level of 68% when she arrived at the nursery. [Tr. at 218, 764]. She was given blow-by oxygen and bulb suction, bringing her Sa02 level up to an acceptable level of at least 85% within 60 seconds of deploying such measures. [Tr. at 220, 223]. A.H.'s Sa02 levels did not reach that normal threshold until after those two more intensive actions were implemented in the nursery. [Tr. at 220, 223]. No measures were used to raise A.H.'s Sa02 levels in the delivery room; A.H. did not receive any such resuscitative measures until she arrived at the nursey 14 minutes after birth. A.H. was not returned to the Hysells until four hours after birth and was not seen by a pediatrician until the next day. [Tr. at 220, 223]. Mrs. Hysell and A.H. were discharged from the hospital two days after birth.

Throughout her life, A.H. consistently failed to meet developmental milestones. The Hysell family was dedicated to discerning the underlying cause. At 16 months old, A.H. underwent an MRI scan of her brain; the results were reported as normal. [Tr. at 459]. A.H. later underwent genetic testing, which also came back as normal. [Tr. at 512]. The Hysells eventually brought A.H. to Cincinnati Children's Hospital, where a second MRI was performed. The second MRI revealed periventricular white matter gliosis, or low white matter volume in the brain. [Tr. at. 463, 470, 479]. Upon a more careful review, the earlier MRI exhibited the same abnormalities

[Tr. at. 463, 470, 479]. This finding explained her delayed development. Ultimately, A.H. was diagnosed with cerebral palsy and autism spectrum disorder. [Tr. at 1467–68, 1354].

On October 23, 2018, the Hysells instituted this action against Defendants, alleging a claim pursuant to the West Virginia Medical Professional Liability Act ("MPLA"). The Hysells contend that A.H.'s injuries are a result of medical malpractice that took place during the later stages of delivery and immediately post-delivery by Nurse Perkowski, Nurse Ball, and Midwife Crowder. A.H.'s cerebral palsy is the sole brain injury at issue.

The Court conducted a jury trial from May 18 through June 2, 2021. Following deliberations, the jury returned a verdict for the Hysells and awarded them a total of $10,837,527 in damages, distributed as follows: (1) $837,527 for future lost earnings; (2) $9,000,000 for future medical treatment, attendant care, and other therapies; and (3) $1,000,000 for noneconomic losses. The jury attributed 70% of the fault to RGH and 30% to the United States.[2]

RGH orally moved for judgment as a matter of law pursuant to *Federal Rule of Civil Procedure* 50(a) at the close of the Hysells' case on May 27, 2021. [Tr. at 1362]. The Court deferred ruling. RGH renewed its motion on the same grounds at the close of its case on June 1,

---

[2] The jury's verdict as to the United States is advisory only. *See* Fed. R. Civ. P. 39(c). The Court has accepted the advisory verdict for purposes of its Findings of Fact and Conclusions of Law. The Court has not done so for either consistency or convenience sake. Instead, the decision was driven in part by the seriousness with which the jury discharged its duties and the exceptional attention it paid during this very lengthy trial. The Court observed as much at the conclusion of the trial:

> I've been with the federal courts for almost three decades, and this is one of the lengthiest trials that I've participated in as court staff or a judge. And I would tell you that you are, perhaps, the most attentive jury I have ever seen. At various times I would look over and I never once, that I can recall, saw that your attention was diverted. So, again, we thank you for your service sincerely. We know this has been a significant disruption to your lives.

[Tr. at 2144–45].

2021. [Tr. at 2001]. The Court again deferred ruling. RGH also filed additional motions following the close of trial. These matters are now ready for adjudication.

## II.

### A.     *Motion for Judgment as a Matter of Law*

#### 1.   Standard

Pursuant to *Federal Rule of Civil Procedure* 50, a court may grant judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). In other words, a trial judge must grant judgment as a matter of law "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When considering a party's motion for judgment as a matter of law, the court must "view the evidence in the light most favorable" to the non-moving party and "draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Baynard v. Malone*, 268 F.3d 228, 234 (4th Cir. 2001). If a reasonable jury could find in favor of the non-moving party, judgment as a matter of law is inappropriate. *Id*. The motion may be granted only if the evidence points so overwhelmingly in favor of the moving party that no reasonable person could draw a contrary conclusion. "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Anderson*, 477 U.S. at 250–51.

### 2.  Discussion

RGH contends that Plaintiffs did not prove a departure from the degree of care and skill through competent opinion testimony or that such a departure was a proximate cause of A.H.'s cerebral palsy. [Doc. 310 at 2]. Specifically, RGH asserts that Dr. O'Meara was the only expert witness on behalf of the Plaintiff that attempted to link any negligence on the part of RGH to A.H.'s injuries, and that Dr. O'Meara's testimony was unreliable and should thus be disregarded. [Doc. 309 at 3–4]. RGH also contends that there is no evidence of fetal hypoxia during the birthing process or immediately after birth, and that if there was, A.H. would have exhibited neonatal encephalopathy. Further, RGH asserts that the cerebral palsy could be caused by a genetic condition and that A.H. was microcephalic since birth, which indicates an injury in utero. For reasons explained more fully below, the Court **DENIES** RGH's Motion for Judgment as a Matter of Law [**Doc. 309**].

### B.  *Renewed Motion for Judgment as a Matter of Law*

#### 1.  Standard

*Federal Rule of Civil Procedure* 50(b) provides "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), . . . the movant may file a renewed motion for judgment as a matter of law." Fed. R. Civ. P. 50(b). It is well-established that "any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a)" and that "a party cannot assert grounds in the renewed motion that it did not raise in the earlier motion." *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 813 (11th Cir. 2015). When a jury verdict is returned, judgment as a matter of law may be granted "only if, viewing

the evidence in a light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party." *Int'l Ground Transp. v. Mayor & City Council of Ocean City*, 475 F.3d 214, 218–19 (4th Cir. 2007); *see also Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002). In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b).

"Judgment as a matter of law is a remedy to be applied sparingly and only in the most extraordinary circumstances." *Sawyer v. Asbury*, 861 F. Supp. 2d 737, 745 (S.D. W. Va. May 18, 2012). "A court . . . may not disturb the [jury] verdict where there was sufficient evidence for a reasonable jury to find in the non-movant's favor." *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 292 (4th Cir. 2009). "Generally, a judgment as a matter of law is appropriate 'when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment.'" *CSX Transp., Inc. v. Peirce*, 974 F. Supp. 2d 927, 933 (N.D. W. Va. Sept. 25, 2013) (quoting *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 562 F.3d 295, 305 (4th Cir. 2009)). However, "[i]f the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof," the movant is entitled to judgment pursuant to Rule 50(b). *Wheatley v. Wicomico Cnty.*, 390 F.3d 328, 332 (4th Cir. 2006) (internal citations omitted).

## 2. Discussion

The Hysells pled a claim for relief under the MPLA. The MPLA requires the Hysells to have proven by a preponderance of the evidence that RGH, through its labor and

delivery nurses, (1) failed to exercise that degree of care, skill and learning required or expected of reasonable, prudent nurses acting in the same or similar circumstances, and (2) that such failure was a proximate cause of A.H.'s injuries. *See* W. Va. Code § 55-7B-3(a). The Hysells bore the burden of demonstrating "by a preponderance of the evidence that the defendant was negligent and that such negligence was the proximate cause of the injury." *Sexton v. Grieco*, 216 W. Va. 714, 716, 613 S.E.2d 81, 83 (2005) (internal quotation marks omitted). That burden is "satisfied when the plaintiff shows the physician's acts or omissions increased the risk of harm to the plaintiff and that such increased risk of harm was a substantial factor in bringing about the ultimate injury to the plaintiff." *Bellomy v. United States*, 888 F. Supp. 760, 766 (S.D. W. Va. 1995) (internal quotation marks omitted) (quoting Syl. Pt. 5, *Thornton v. CAMC*, 172 W. Va. 360, 361, 305 S.E.2d 316, 318 (1983)).

As to standard of care testimony, the MPLA provides:

The applicable standard of care and a defendant's failure to meet the standard of care, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court. A proposed expert witness may only be found competent to testify if the foundation for his or her testimony is first laid establishing that: (1) The opinion is actually held by the expert witness; (2) the opinion can be testified to with reasonable medical probability; (3) the expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed; (4) the expert witness's opinion is grounded on scientifically valid peer-reviewed studies if available; (5) the expert witness maintains a current license to practice medicine with the appropriate licensing authority of any state of the United States: *Provided,* That the expert witness's license has not been revoked or suspended in the past year in any state; and (6) the expert witness is engaged or qualified in a medical field in which the practitioner has experience and/or training in diagnosing or treating injuries or conditions similar to those of the patient. If the witness meets all of these qualifications and devoted, at the time of the medical injury, sixty percent of his or her professional time annually to the active clinical practice in his or her medical field or specialty, or to teaching in his or her medical field or specialty in an accredited university, there shall be a rebuttable presumption that the witness is qualified as an expert. The parties shall have the opportunity to impeach any witness's qualifications as an expert.

> Financial records of an expert witness are not discoverable or relevant to prove the amount of time the expert witness spends in active practice or teaching in his or her medical field unless good cause can be shown to the court.

W. Va. Code § 55-7B-7(a).

Viewed in the light most favorable to the Plaintiffs, the RGH delivery nurses breached the standard of care. The FMS were uninterpretable for nearly two hours of Mrs. Hysell's second stage of labor. [Tr. at 313]. It is true that some of the FMS introduced at trial were interpretable as either Category I or Category II, meaning that intervention was unnecessary. Importantly, however, for a two-hour period the strips were inconclusive; A.H.'s heart rate was not being tracked. That fact, and the damning, accompanying, and reasonable inferences, are apparent. A properly operating fetal heart rate monitor simultaneously tracks both the mother's uterine contractions and the baby's heart rate. By tracking both of those inputs concurrently, delivery staff is armed with the tools to effectively monitor the safety of the unborn child. If the FMS show signs of distress, the delivery staff intervenes. The standard of care for delivery nurses requires adequate monitoring of the FMS. [Tr. at 424–25]. The lack of intervention here -- namely the two-hour time period when the FMS were uninterpretable -- was an unmistakable breach of the standard of care. [Tr. at 410].

In its Renewed Motion for Judgment as a Matter of Law, RGH also contends that the Hysells failed to prove proximate cause. [Doc. 307 at 8]. It asserts that "without direct expert testimony from the Plaintiffs to create a link between the alleged negligence and the injuries to [A.H.], the jury was left to determine proximate cause through pure speculation." [*Id*. at 12].

"Proximate cause" is defined as "that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained, without which the wrong would not have occurred." *Mays v. Chang*, 213 W. Va. 220, 224, 579 S.E.2d 561, 566 (2003). The plaintiff

need not show that the defendant's negligence was the only proximate cause -- only that it was *a* proximate cause. *See*, *e.g.*, *id.*

   The Supreme Court of Appeals of West Virginia has observed that "[m]edical testimony to be admissible and sufficient to warrant a finding by the jury of the proximate cause of an injury," needs to "be of such character as would warrant a reasonable inference by the jury that the injury in question was caused by the negligent act or conduct of the defendant." *Pygman v. Helton*, 148 W. Va. 281, 286–87, 134 S.E.2d 717, 721 (1964). Such medical testimony "is not required to be based upon a reasonable certainty that the injury resulted from the negligence of the defendant." *Id.* Thus, unlike standard of care, proximate cause may be established through a "reasonable inference" of causation. *Sexton*, 216 W. Va. at 718-20, 613 S.E.2d at 85–87.

   As the Supreme Court of Appeals further observed in the *Sexton* decision, "*Pygman* specifically rejected the requirement that the [expert] tie the injury to the negligence by way of . . . any rigid incantation or formula." *Sexton*, 216 W. Va. at 720, 613 S.E.2d at 87. Indeed, the Supreme Court of Appeals has held that an attorney's failure to ask a direct question regarding proximate cause is not fatal if "the expert testimony was 'of such character' as to permit" a reasonable inference that the defendant's negligence caused the injury in question. *Sexton,* 216 W. Va. at 720, 613 S.E.2d at 85. And "permitting a jury to draw inferences from evidence is not the functional equivalent of speculation." *Dellinger v. Pediatrix Med. Grp., P.C.*, 232 W. Va. 115, 124 n.15, 750 S.E.2d 668, 677 n.15 (2013). While the better practice is certainly "to ask an expert a direct question as to whether or not an injury was the proximate cause of medical negligence," *Sexton*, 216 W. Va. at 720, 613 S.E.2d at 87 n.4, failure to do so is not determinative.

Turning to the evidence of record in the light most favorable to the Plaintiffs, Dr. O'Meara, qualified as an expert as "a pediatrician and specifically with respect to resuscitation of infants," [Tr. at 566], explicitly testified that A.H.'s condition during labor, delivery, and the short time after delivery was caused by hypoxia:

> Q. Do you deal with babies who may need resuscitation because of lack of oxygen?
>
> A. Yes.
>
> . . .
>
> Q. Are you required to know the symptoms of hypoxia?
>
> A. Yes, very much so.
>
> . . .
>
> Q. Okay. Within a reasonable degree of medical probability, then, do you have an opinion as to whether or not there was, in fact, hypoxia here at the time of delivery?
>
> A. Because the infant is having trouble breathing and her muscle tone is so low, it makes me very concerned that there was a period of hypoxia and acidosis. In the process of being born, there was some compromise to the blood flow to her and to her levels of oxygen in order to make her that depressed or have that kind of a slow start. And so, yes, within a degree of medical probability -- within a reasonable degree of medical probability, more likely than not it was hypoxemia that -- that caused that.

[Tr. at 563, 582].

Dr. O'Meara then elaborated further respecting hypoxia: "[P]utting that all together, yes, you know, you're looking for some sort of insult. And without any other explanation for it, yes, within a reasonable degree of medical probability, that is the only thing that's identified and it's more than likely the cause of the injury." [Tr. at 581]. Additionally, Dr. Bedrick stated that a pulse oximeter reading of 68%, the reading of A.H. 14 minutes after birth, is a sign of hypoxia. [Tr. at 1854–55].

That expert testimony alone provided the jury sufficient basis to find that A.H.'s symptoms during delivery and after birth resulted from a hypoxic event. But the record contains more. For instance, Midwife Crowder verbally noted that the umbilical cord was impeding delivery and took steps to reposition the cord and A.H. in the birth canal so that the delivery could progress. [Tr. at 1112, 1434]. As John Fassett, CNM, testified, when cord compression occurs, "[y]ou have less blood flow. . . . [Y]ou can have less oxygen." [Tr. at 312; *see also id.* at 581-82 (Dr. O'Meara: "That makes me wonder whether or not there was a compromise or an issue with the umbilical cord, which is the baby's lifeline and what gives them their blood flow and oxygen.")]. Other experts testified that hypoxia could cause the brain injuries from which A.H. suffers. Dr. Scher testified that perinatal hypoxia-ischemia can affect cognitive outcomes, as well as other deficits. [Tr. at 1806]. Dr. Barakos showed the effects of the hypoxic injury on A.H.'s MRI scans [Tr. at 1166–67, 1174]. Significantly, Dr. Schorry, a treating physician of A.H., testified to the following:

Q. What about, does autism cause global developmental delay?

A. Autism is usually associated -- is often associated with global developmental delay but not always.

Q. Does it cause it?

A. I'm sorry.

Q. Does it cause it?

A. Does autism cause global developmental delay? No.

Q. We talked about microcephaly. Fine motor delay. That could be caused by hypoxia, correct?

A. Yes, it could.

Q. Language impairment could be caused by hypoxia, correct?

A. Yes.

Q. Dysphagia could be caused by hypoxia, correct?

A. It could be.

Q. Mixed receptive-expressive language disorder, that could be caused by hypoxia?

A. Yes.

Q. Static encephalopathy --

A. Yes.

Q. -- could be caused by hypoxia, right?

A. Yes.

Q. Aphasia. What is aphasia?

A. It means lack of speech.

Q. It can be caused by hypoxia, can't it?

A. Yes, it could be.

Q. And the diagnoses here: Global developmental delay; muscle hypertonicity; autism spectrum; movement disorder; microcephaly. Now, without getting into microcephaly, that's already been discussed, that isn't caused by hypoxia, is it?

A. Microcephaly? It can be.

Q. And movement disorder and muscle hypertonicity and lack of global development, all could be caused by hypoxia, right?

A. They can be, yes.

[Tr. at 532–33].

And the record contains further evidence supporting the breach and causation Defendants assert are absent. Dr. Gropman, qualified as an expert in pediatric neurology and pediatric neurogenetics, biogenetics, imaging of children's brain, causation of lack thereof of the claims, and the resources reasonably necessary in the future, [Tr. at 724], testified to the following:

Q. Doctor, do you agree that hypoxia can cause MRI abnormalities?

A. Yes, it can.

Q. And do you agree that hypoxia can cause acrocyanosis at birth?

A. It can.

Q. It can cause a duskiness at birth?

A. It can.

Q. It can cause a baby to not cry at birth?

A. It can.

Q. It can cause a weak suck, can't it?

A. It can.

Q. It can cause a low Sa02, can't it?

A. It could.

Q. It can cause a need for -- for blow-by oxygen, can't it?

A. It could.

Q. It can cause a child to breathe irregularly upon birth; isn't that correct?

A. It could, one of the causes.

Q. It can cause slow, irregular respiratory rates, correct?

A. One cause.

Q. It can cause a lack of muscle tone; isn't that correct?

A. One of many causes, correct.

Q. It can cause the extremities to be blue when the baby is born at one minute, correct?

A. One of many causes, correct.

. . .

Q. You don't deny that all of those results that I mentioned do -- do indeed get represented as being there in this case; isn't that right?

A. Many of those, correct.

[Tr. at 761–63].

This is thus a record of the type contemplated by the decision in *Sexton*; while a direct causation question was not asked, the expert testimony was "of such character" as to readily permit an inference of causation as authorized by *Pygman*.

Moreover, it is worth noting that it is RGH's position that gives rise to speculation. For instance, RGH also speculates that A.H.'s injuries were "during the premature phase earlier in gestation," but its expert admits that an MRI "cannot pin down the exact time . . . the injury occurred" and that the time of delivery "cannot [be] absolutely exclude[d]]" from the window of likelihood as to when the injury occurred. [Tr. at 1770–72]. Additionally, RGH contends that inasmuch as "the jury was presented with a specific alternative causation argument by the defense based on genetic evidence," it was "improper for the jury to simply speculate that perinatal hypoxia was the cause of [A.H.'s] cerebral palsy." [Doc. 307 at 14]. Close scrutiny of the defense experts on that point, however, raises multiple concerns. Dr. Gropman asserted that "more likely than not [A.H.'s] autism, her cerebral palsy, her general features are due to a

genetic defect"; Dr. Gropman then candidly confessed, however, that she "does not know which [genetic defect]." [Tr. at 742]. Additionally, Dr. Trock "did not identify [any] genetic syndrome." [Tr. at 1012–13]. Dr. Schorry, a geneticist, was also unable to identify a genetic cause. [Tr. at 493]. Further, the Hysells actually introduced expert testimony to refute RGH's argument regarding a genetic abnormality: Dr. Barakos acknowledged that, "by saying lack of regression, [Dr. Arthur is] saying the child's not getting worse over time, which is reassuring that she does not have a declining condition that would be an inheritable or genetic process . . . . If she's not declining, this must be a static injury." [Tr. at 1159].

While RGH asserts the unknown abnormality in A.H.'s MTHFR gene caused A.H.'s injuries, its own expert, Dr. Scher, stated that "[i]t's not necessarily a cause, but an *association* with children who are autistic." [Tr. at 1793 (emphasis added)]. Dr. Trock also testified as to the MTHFR gene:

> Q. Now, given this information, do you have an opinion, to a reasonable degree of medical probability, whether this MTHFR genetic mutation contributes to [A.H.]'s current condition?
> . . .
>
> A. It does contribute. No one has identified the exact mechanism, but it's known, from statistical studies across all ethnic and racial groups, that the MTHFR gene has a higher association with the autism spectrum.

[Tr. at 982]. Not only is this critical in illustrating that the MTHFR is not a *cause* of autism, but also that the mere association is *specific to autism*. Thus, even if the MTHFR gene did cause her autism, it fails to disprove A.H.'s injuries -- Plaintiffs presented extensive testimony that A.H.'s injuries are due to her cerebral palsy, not her autism. [Tr. at 1043–46, 855].

RGH also contends that the absence of neonatal encephalopathy[3] proves that A.H.'s cerebral palsy is not from an acute hypoxic event at birth.[4] Despite RGH's contentions, there was evidence presented that is consistent with neonatal encephalopathy. For instance, RGH cites to A.H.'s high APGAR scores as evidence that A.H. did not show any signs of neonatal encephalopathy, but Crystal Hysell and Ryan Hysell, A.H.'s parents, and Cindy Remines, A.H.'s grandmother, testified with absolute certainty that A.H. did not cry in the delivery room. [Tr. at 1375, 1499, 1114]. Based on such testimony, A.H.'s one-minute APGAR score should have been a five and her five-minute APGAR score should have been a six. It was within the province of the jury to resolve any credibility issues respecting the recollections of Mr. and Mrs. Hysell and Ms. Remines on the one hand and the APGAR scoring decisions of delivery personnel on the other. It may well have been that the jury distrusted the birth and documentation processes at RGH, given the aforementioned failure to perform so basic a task as repositioning the fetal heart rate monitor for approximately two hours. The additional testimony regarding the infant's care immediately post-delivery and thereafter might also have caused the jury to question the level of care provided at RGH and the accuracy of the APGAR scoring.

And the matter of scoring was central to the outcome in this matter. According to a publication introduced by RGH, "if the Apgar score at five minutes is greater than or equal to seven, [only then is it] unlikely that peripartum hypoxia-ischemia played a major role in causing neonatal encephalopathy." [Tr. at 624].

---

[3]     Neonatal encephalopathy is "a disturbance in the neurologic activities of [a] baby at birth." [Tr. at 1550–51]. According to one of RGH's experts, "these disturbances manifest as either comatose or very decreased cognitive state. They manifest as seizures after the first several hours of life. They can manifest as decreased muscle tone, as well as problems starting to breathe after birth . . . ." [*Id.*]

[4]     RGH claims that "neonatal encephalopathy must be present to attribute cerebral palsy to conditions of labor and delivery." [Doc. 310 at 16].

In addition to the credibility finding, however, some of the expert testimony introduced by RGH actually tied the condition of the infant to neonatal encephalopathy consistent with a hypoxic event. For example, Dr. Ernest Graham, testified that "if the baby has hypoxic brain injury, it's going to be a very flaccid baby, not moving and very blue, and it's going to have a score a lot lower than seven." [Tr. at 952]. The nurses performing A.H.'s APGAR evaluation noted that her respiratory rate was slow and irregular and her extremities were blue. [Tr. at 104]. Also, RGH makes much of the fact that the infant lacked seizure activity that would be expected to accompany a hypoxic injury. But its expert Dr. Peter Giannone admitted that while seizures are common in a severe hypoxic injury, they are not as common in a less severe hypoxic injury and are not required at all in order to have severe consequences result. [Tr. at 1578]. Thus, consistent with a permissible credibility finding by the jury, along with testimony elicited by RGH, there is sufficient evidence that A.H. suffered from neonatal encephalopathy.

RGH next contends that the periventricular leukomalacia ("PVL") shown on A.H.'s MRI indicates an injury sustained prior to labor and birth. However, Dr. Sze, another of RGH's expert witnesses, testified that it was possible that white brain matter, a sign of PVL, could be injured at the time of delivery in a term baby. [Tr. at 1760]. Further, when asked if hypoxia caused periventricular white matter gliosis, Dr. Gropman testified that "hypoxia, a prolonged partial . . . can cause white matter abnormality." [Tr. at 771]. When asked if the PVL was from a perinatal hypoxic-ischemic injury, Dr. Barakos answered in the affirmative. [Tr. at 1174]. Additionally, RGH witness Dr. Shimony testified:

Q. Doctor, considering that this child had periventricular leukomalacia, and she also had ventricles that were expanded, all of that is consistent with an hypoxic event, isn't it?

A. Well, I -- yes, I believe I answered that question.

[Tr. at 1307].

RGH points next to microcephaly as an alternative cause of A.H.'s cerebral palsy. As an initial matter, the Court notes that three different growth charts were used by the experts to plot the head circumference, and thus the microcephaly, of A.H.: the Centers for Disease Control and Prevention ("CDC") chart, the World Health Organization ("WHO") chart, and the Olsen chart. The CDC recommends that health care providers use the WHO growth charts to monitor growth for infants ages zero to two years in the United States.[5]

First, Nurse Perkowski, the labor and delivery nurse who tended to Mrs. Hysell and A.H., stated the following:

Q. And so, ma'am, you never saw anything that indicated microcephaly, did you?

A. No, sir.

[Tr. at 110].  Nurse Conners also testified to the same effect:

Q. . . . Is that microcephalic?

A. . . .  I don't believe so, no.

. . .

Q. Do you see anything in there that indicates microcephaly?

A. Not that I could diagnose, no.

Q. Okay. Or that anybody else diagnosed?

---

[5]   *WHO Growth Charts*, Centers for Disease Control and Prevention https://www.cdc.gov/growthcharts/who_charts.htm (last visited Mar. 23, 2022).

A. I don't see anything in the record according to that.

[Tr. at 419, 444].

Additionally, Dr. O'Meara testified that according to the hospital records and pediatric records after birth as well as the photographs of the baby, the baby was not microcephalic within a reasonable degree of medical certainty. [Tr. at 591, 596–97]. Dr. Shimony, an expert who testified that A.H. was microcephalic, admitted that he did *not* "do anything to determine whether or not there was microcephal[y]." [Tr. at 1298]. Further, even though experts did testify that A.H.'s measurements were considered microcephalic per the CDC chart, Dr. Barakos stated, "it would be totally false and inappropriate to claim that just having a single data point of microcephaly at birth proves that there is some insult in utero." [Tr. at 1218].

Based upon the foregoing, the expert testimony presented by the Hysells was of such character as would warrant a reasonable inference by the jury that the injury in question was caused by the negligent conduct of RGH. The foregoing testimony could lead a reasonable juror to infer that, due to the negligence of RGH, (1) A.H. suffered a hypoxic event at birth, and (2) the hypoxic event at birth was a cause of the brain injuries sustained -- namely her cerebral palsy. Further, inasmuch as each of RGH's alternative causation arguments were countered, at times by RGH's own experts, it is apparent that the jury did not "simply speculate" in reaching its conclusion.

In viewing the evidence in a light most favorable to the Hysells, and in support of the jury's verdict, and drawing every legitimate inference in the Hysells' favor, a reasonable jury could have found in favor of the Hysells. *See Int'l Ground Transp.*, 475 F.3d at 218–19. The Court **DENIES** RGH's Renewed Motion for Judgment as a Matter of Law [**Doc. 306**].

21

## C.    *Motion for a New Trial*

### 1.  **Standard**

Rule 59(a) of the *Federal Rules of Civil Procedure* provides, in pertinent part, that "[t]he court may, on motion, grant a new trial for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(a); *see also Walker v. W. Pub. Corp.*, No. 5:09-cv-723, 2012 WL 3927029, at *1 (S.D. W. Va. Sept. 7, 2012). Our Court of Appeals has observed that a district court may only grant a new trial "(1) if the verdict is against the clear weight of the evidence; (2) is based upon false evidence; or (3) will result in a miscarriage of justice." *Campbell v. BP Amoco Polymers, Inc.*, 75 F. App'x 907, 910 (4th Cir. 2003) (citing *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998). A district court's determination of a motion for a new trial is discretionary, and a court is "permitted to weigh the evidence and consider the credibility of witnesses." *Cline*, 144 F.3d at 301 (citing *Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989)). Substantial errors in the "admission or rejection of evidence" may support a new trial. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

The decision regarding a motion for a new trial "is within the sound discretion of the trial court." *Cline*, 144 F.3d at 301. Further, the discretion conferred under Rule 59 "should be exercised sparingly." *United States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir. 1985); *see also United States v. Perea*, 458 F.2d 535, 536 (10th Cir. 1972) ("A motion for a new trial is generally not regarded with favor, and is granted only with great caution.").

## 2.  Discussion

RGH first contends Plaintiffs failed to produce expert testimony on a deviation in the standard of care that caused A.H.'s injuries. [Doc. 312 at 3].  The discussion found in Section II.B.2. forecloses the contentions. The testimony there recited raises inferences that, due to the negligence of RGH, (1) A.H. suffered a hypoxic event at birth, and (2) that hypoxic event was a cause of the injuries sustained. The verdict is not against the clear weight of the evidence respecting these issues.

RGH next asserts that Dr. O'Meara lacked a scientific basis to opine that hypoxia immediately prepartum caused A.H.'s injury. [Doc. 312 at 5]. It contends that Dr. O'Meara "admitted at trial that none of her opinions were tested against peer-reviewed literature." [Doc. 312 at 7]. The assertion is troubling inasmuch as the record explicitly discloses otherwise. When asked, "Did you test any of your opinions against specific peer-reviewed literature?", Dr. O'Meara responded, "Yes." [Tr. at 615; *see also id.* ("Well, I've looked through Harriet Lane. I've looked through the American Academy of Pediatrics. . . . I've just done literature searches.")]. The contention is meritless.

RGH next asserts the Court erred in permitting certain testimony, admitting certain evidence, and including both Defendants on the Special Interrogatory Form. [Doc. 312 at 18–20]. The challenges as to the testimony of Dr. Rugino, Nurse Lampton, and Dr. O'Meara are addressed in the next section as a part of RGH's separate motion to strike their testimony. As to the contention that Dr. Schorry's deposition testimony was improperly allowed, the Court reiterates its bench ruling:

> Well, 401, as we all know, is a pretty broad gateway. And if what is sought to be admitted tends to make a fact of consequence more or less probable, then it comes in assuming it doesn't offend 403. Hypoxia is relevant in this case. It's not necessarily at this point probably relevant to whether the plaintiff has it or not, but

23

based on the evidence that's come heretofore the jury needs to have an understanding of what hypoxia is. I don't so much classify what is being said in the deposition as opinion as much as it is dogma. I don't think anyone will challenge, unless you told me otherwise, what hypoxia in general can be caused by or what it can result in once it occurs. So I think it gets in under 401. And then Mr. Westfall, of course, raised 403, and I think raised it on the grounds of unfair prejudice and also on confusion. And one's a little closer, for sure, but the rule uses the words substantially outweighed and I don't believe that the danger of unfair prejudice and the confusion that we're concerned about is so overwhelming that it swamps, in other words, the relevance of hypoxia to the inquiry. And so I would overrule the 403 objection as well . . . .

[Tr. at 510–11].

Respecting any perceived error in the Special Interrogatory Form, three questions were posed to the jury, concluding with an opportunity to quantify damage awards. After each question, the jury was asked to answer as to RGH and then as to the United States. RGH contends that "these questions should have been separated as to each defendant and answered separately by the jury as to each Defendant prior to moving on to calculate damages." [Doc. 312 at 20]. It asserts that the Special Interrogatory Form "likely confused the jury and impaired [its] ability to consider the questions regarding each Defendant." [*Id.*]

First, the jury was instructed to alert Court staff to any questions or concerns it had during its deliberations, a privilege it exercised during the course of deliberations. No inquiry was made about the Special Interrogatory Form. Further, the jury had the opportunity to allocate any damage awards separately, which it did. The jury allocated 70% of fault to RGH. This unavoidably indicates the jury considered each of the Defendants separately.

In sum, the verdict is not against the clear weight of the evidence, based upon false evidence, or possibly resulting in a miscarriage of justice. Based upon the foregoing discussion, and having carefully considered the entirety of the record, the Court **DENIES** RGH's Motion for New Trial [**Doc. 311**].

24

### D. Motion to Strike

#### 1. Standard

*Federal Rule of Evidence* 702 imposes a gatekeeping obligation on the court to ensure the "relevance and reliability" of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Advisory Committee note to Rule 702 states as follows:

> As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Likewise, this amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert.

Fed. R. Evid. 702 Advisory Committee Note (citations omitted). Longstanding, controlling precedent is in accord. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).

Nevertheless, the opinion must be based on scientific, technical, or other specialized knowledge -- not simply belief or speculation. *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); *see also Daubert*, 509 U.S. at 593. The testimony must "rest on a reliable foundation and [be] relevant to the task at hand." *Nease v. Ford Motor Co.*, 848 F.3d

25

219, 229 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 593); *see also Kumho Tire Co., Ltd.*, 526 U.S. at 141.

 *Daubert* mentions specific factors to guide the overall relevance and reliability determinations that apply to all expert evidence. They include (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *In re Ethicon, Inc.*, No. 2:12-MD-02327, 2014 WL 186872, at *2 (S.D. W. Va. Jan. 15, 2014) (*citing United States v. Crisp*, 324 F.3d 261, 266 (4th Cir. 2003) (internal citations omitted)).

## 2.   Discussion

 In the title of its motion, RGH moves the Court to strike the entirety of Dr. Rugino's and Nurse Lampton's testimony. The renewed motion, however, omits any support for striking the testimony of Dr. Rugino.

 Dr. Rugino testified that he had recommended Nurse Lampton remove two of the line items on the original life care plan ("the Plan"), given the MTHFR gene abnormality discovery. It appears that Nurse Lampton continued to include those two items in the final version of the Plan. RGH argues that "the Trial Life Care Plan and related evidence were inappropriately offered and admitted during trial." [Doc. 316 at 12]. RGH relies on *In re Ethicon, Inc.*, No. 2:12-MD-02327, 2014 WL 186872 (S.D. W. Va. Jan. 15, 2014), to assert that the Plan does not rest on a reliable foundation and is unhelpful in determining any issue in the case. [*Id*. at 10–11].

The Hysells urge that the motion be denied inasmuch as RGH "fails to establish that either Dr. Rugino or Nurse Lampton's testimony was not reasonably reliable." [Doc. 325 at 1]. They assert that Dr. Rugino did indeed provide support for all items in the Plan except for childhood speech and occupational therapy and, therefore, there is no basis to strike the entirety of the testimony. [*Id*. at 8]. The Hysells support their proposition with the following testimony of Dr. Rugino:

Q: Is it your opinion that the motor finding deficits are, within a reasonable degree of medical probability, due to hypoxia?

A: That will be the most reasonable conclusion, yes.

. . .

Q: Did there come a time that you discussed [A.H.'s] current total needs with Ms. Lampton, the life care planner?

A: Yes, of course.

. . .

Q: And you go through in your report and you indicate what she needs and you talk about, as I see in here, that she will never be independent; is that correct?

A: Oh, she cannot be independent. Her motor problems, her cognitive problems, her expressive communication problems, they're pretty much permanent.

. . .

Q: And you say: Due to the severity of her gross motor, fine motor adaptive deficits, home modifications, bathroom equipment and/or bathroom modification are and will be necessary to ensure safe showering, bathing, toiletry and mobility. And is it correct, then, Doctor, what you're saying here, all these things that she has that are gross motor dysfunctions and are a necessity of being dependent on others, in your opinion, within a reasonable degree of medical certainty, is it due to the hypoxia that existed here?

A: I believe that -- yes, that she's reached the point of being this far dependent on other people due to cognitive -- "cognitive" meaning brain problem-solving ability -- and motor problems that were far greater, that were made far more -- far

worse than she would have had in the absence of the brain injury. So I think it is the brain injury and an hypoxic event that have gotten her to this point.

Q: Okay. The autistic situation is not a brain injury, is it?

A: No, there's no -- autism has not been associated with any specific brain injuries at this point. There's lots of studies that describe dysfunction of certain areas of the brain, but really it has not been associated with any specific pathophysiologic injuries.

[Tr. at 1044–46].

The Hysells observe that the jury took the testimony into consideration when determining damages. "The total value of the life care plan, after its reduction to present value, was $10,660,012.00. The jury elected to award $9,000,000.00, clearly indicating that they made deductions from the life care plan, as they were encouraged to do by Plaintiffs' counsel, if they felt it was consistent with the evidence." [Doc. 325 at 8].

RGH replies that Ms. Lampton's "Trial Life Care Plan, Ms. Lampton's testimony, and the resultant calculations of Mr. Staller should not have been presented at trial or admitted into evidence" inasmuch as "they all failed to accurately reflect Dr. Rugino's supposedly supporting opinions." [Doc. 329 at 7–8]. It concludes that the "evidence failed to satisfy the initial hurdle of admissibility under Fed. R. Civ. P. 702." [*Id.*]

First, RGH mischaracterizes *In re Ethicon*. There, plaintiff's expert life care planner and certified nurse offered a life care plan at trial. Such plan included items that were supported by the testimony of medical experts, as well as items that were not. The defendant moved to strike the entirety of the plan on the basis of *Federal Rule of Evidence* 702. The defendant argued that the plan could not be based on a reliable medical foundation as some items were not supported by expert medical testimony. The court, however, in fact *admitted* the

recommendations that *were* grounded in the doctor's expert medical opinions, excluding *only* those items that were not supported by such testimony. The entirety of the report was not struck.

Just as in *In re Ethicon*, Ms. Lampton's Plan was required to have been based on "reliable principles and methods" applied to the facts of the case. Fed. R. Evid. 702. Specifically, because the Plan described medical services, "there must be a medical foundation for her recommendations. In other words, a doctor or medical expert must opine to a reasonable degree of medical certainty that the items listed in the life care plan are necessary." *In re Ethicon, Inc.*, at *2584. Here, Dr. Rugino provided a medical foundation for all but two of the Plan's items -- namely childhood speech therapy and childhood occupational therapy:

> Q: Have you had the opportunity to see Ms. Lampton's life care plan and discuss it with her?
>
> A: Yes, I did.
>
> Q: And do you agree that this is reasonable and necessary for [A.H.] going into the future within a reasonable degree of certainty?
>
> A: Yes, but subsequently we -- after finding out about the MTHFR, there were a few things that we agreed should be -- that are not applicable any longer.
>
> Q: Okay.
>
> A: So, for instance -- for instance, the big ones are she was going to get speech therapy and occupational therapy, in childhood anyway, so I would tend to recommend to take those out of the life care plan.

[Tr. at 1048–49].

As evidenced above, Dr. Rugino testified that, among others, home modifications, bathroom modifications, attendant care, and leg braces are reasonably medically certain. The remainder of the Plan items were supported through extensive conversations between Dr. Rugino and Nurse Lampkin following Dr. Rugino's thorough evaluation of A.H. and her years of

medical records. Dr. Rugino's only recommendation was that the childhood speech and childhood occupational therapy items be removed.

Based upon the foregoing, the Court **DENIES IN PART** RGH's motion as it applies to the totality of Dr. Rugino's testimony, the totality of Nurse Lampton's testimony, and the Plan's recommendations specifically grounded in Dr. Rugino's medical opinion. The Court, however, **GRANTS IN PART** RGH's motion such that the childhood speech therapy and childhood occupational therapy items in the Plan [Doc. 281-9 at 4] are hereby **EXCLUDED**.

### E.    *Remittitur*

#### 1.   Standard

"If a reviewing court concludes that a verdict is excessive, it is the court's duty to require a remittitur or order a new trial." *Cline*, 144 F.3d at 305. Remittitur "is a process . . . by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award." *Id*. (citing *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 593(4th Cir. 1996)). "A federal district court reviews such an award by applying the state's substantive law of punitive damages under standards imposed by federal procedural law." *Atlas Food Syd. & Servs., Inc.*, 99 F.3d at 593.  Therefore, the role of the district court is "to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Id*. (citing *Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 279 (1989)). The MPLA provides that:

> The plaintiff may recover compensatory damages for noneconomic losses in excess of the limitation described in subsection (a) of this section, *but not in excess of $500,000 for each occurrence*, regardless of the number of plaintiffs or the number of defendants . . . where the damages for noneconomic losses suffered

by the plaintiff were for [inter alia] . . . (3) permanent physical or mental functional injury that permanently prevents the injured person from being able to independently care for himself or herself and perform life-sustaining activities.

W. Va. Code § 55-7B-8(b) (emphasis added). This cap is modified by subsection (c), which states that the cap on compensatory damages "shall increase to account for inflation by an amount equal to the Consumer Price Index published by the United States Department of Labor, not to exceed one hundred fifty percent of the amounts specified in said subsections." *Id.* § 55-7B-8(c).

### 2. Discussion

RGH asserts it would be a miscarriage of justice to award Plaintiffs an amount greater than that permitted by the governing statute. It asserts that the appropriate award, considering the United States Bureau of Labor Statistics CPI Inflation Calculator, is $719,818.38. The Hysells respond that inasmuch as final judgment has not been entered, the pending motion should be denied as premature.

Here, A.H. suffered from a permanent injury that has, for all time, prevented her from being independent. The MPLA, however, does indeed set a cap for damages when the person suffers a permanent physical or mental functional injury that permanently prevents the person from being able to independently care for herself and perform life-sustaining activities. *See* W. Va. Code § 55-7B-8(b)–(c). Thus, the award for compensatory damages for noneconomic losses is within contemplation of the MPLA limiter.

Accordingly, the Court **GRANTS** RGH's Motion for Remittitur [**Doc. 315**] and proposes to the Hysells an award for noneconomic loss in the amount of $719,818.38, in accordance with the MPLA and the application of the United States Bureau of Labor Statistics

CPI Inflation Calculator. Inasmuch as the jury found that RGH was liable for 70% of the Hysell's damages, it would be responsible for $503,872.87 of the noneconomic loss.

Additionally, in light of the Court's excision of the childhood speech therapy and childhood occupational therapy items from the Plaintiffs' lifecare Plan, remittitur is also appropriate to slightly reduce the jury award for future medical treatment. The Court proposes to the Hysells a reduction in the jury award for future medical treatment by $292,005.00, for a total award of $8,707,995.00 for future medical treatment.

## III.

Based on the foregoing discussion, the Court **ORDERS** as follows respecting this matter:

1. That RGH's Motion for Judgment as a Matter of Law **[Doc. 309]** is **DENIED**;

2. That RGH's Renewed Motion for Judgment as a Matter of Law **[Doc. 306]** is **DENIED**;

3. That RGH's Motion for New Trial **[Doc. 311]** is **DENIED**;

4. That RGH's Renewed Motion to Strike **[Doc. 316]** is **DENIED IN PART** and **GRANTED IN PART**; and

5. That RGH's Motion for Remittitur **[Doc. 315]** is **GRANTED**.

The Clerk is directed to send a copy of this written opinion and order to counsel of record and to any unrepresented party.

ENTER:          March 31, 2022

Frank W. Volk
United States District Judge

32