UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

RYAN HYSELL and CRYSTAL HYSELL,
*on behalf of their daughter*, A.H., *a minor*,

    Plaintiffs,

v.           CIVIL ACTION NO. 5:18-cv-01375

RALEIGH GENERAL HOSPITAL and
THE UNITED STATES OF AMERICA,

    Defendants.

## MEMORANDUM OPINION AND ORDER

  The Court conducted a bench trial in this action from May 18, 2021, through June 2, 2021. On July 15, 2021, Defendant United States submitted its proposed findings of fact and conclusions of law. [Doc. 308]. On that same date, Plaintiffs submitted their proposed findings of fact and conclusions of law. [Doc. 318].

### I.  FINDINGS OF FACT

  The following discussion represents the Court's findings of fact. Each finding is made by a preponderance of the evidence.

### A.  *The Parties*

  A.H. is the daughter of Plaintiffs Ryan and Crystal Hysell. She was born at Raleigh General Hospital ("RGH") on October 29, 2010. On March 11, 2019, the United States moved to substitute itself as the party Defendant in lieu of Access Health and Debra Crowder. The motion

was predicated on Access Health and Debra Crowder being deemed federal employees by the United States Department of Health and Human Services. On July 16, 2019, the Court dismissed Access Health and Debra Crowder, substituting the United States in their steads.

### B.   Birth of A.H.

Mrs. Hysell had a "normal" pregnancy. [Trial Trans. at 1849 (hereinafter "Tr. at ___")]. She suffered from morning sickness but was otherwise healthy, as confirmed by a mid-pregnancy stress test. [Tr. at 1334–35]. At the time of delivery, Mrs. Hysell was 41 weeks pregnant [Tr. at 1570].

Mrs. Hysell arrived at RGH around 5:00 a.m. on October 29, 2010. An electronic fetal heart rate monitor was placed soon after she was admitted. A properly operating fetal heart rate monitor simultaneously tracks both the mother's uterine contractions and the baby's heart rate. [Tr. at 86]. By tracking both of those inputs concurrently, delivery staff can effectively monitor the safety of the unborn child through the birthing process. The fetal heart rate monitor produces fetal monitoring strips ("FMS"), which are to be checked frequently by delivery staff. If the strips show signs of distress, the delivery staff intervenes.

Beginning at 8:00 a.m., at shift change, Mrs. Hysell fell under the care of Nurse Alice Perkowski, an employee of RGH, and Certified Nurse Midwife Debra Crowder ("Midwife Crowder"), an employee of Access Health. [Tr. at 90]. At approximately 8:25 a.m., Mrs. Hysell received an epidural. [Tr. at 141]. At 8:36 a.m., Mrs. Hysell's oxygen saturation level ("Sa02") dropped from 89% to 87%. [Tr. at 94]. Ideal Sa02 levels in a laboring patient are "95 or greater." [Tr. at 293]. Midwife Crowder was momentarily present around 11:40 a.m. but was otherwise busy delivering other babies. [Tr. at 95].

2

By 12:50 p.m., Mrs. Hysell was fully dilated and felt pressure to begin pushing. [Tr. at 155]. Between 12:20 p.m. and 2:19 p.m., a period of nearly two hours during labor, the FMS were uninterpretable, some of which was while Mrs. Hysell was actively pushing. [Tr. at 313]. More specifically, the FMS were erroneously picking up Mrs. Hysell's heart rate, rather than that of A.H. [*Id.*] A properly operating fetal heart rate monitor simultaneously tracks both the mother's uterine contractions and the baby's heart rate. [Tr. at 86]. "[I]f the fetal monitor is monitoring the mother's rate and not the baby's heart rate, then we really don't know what the baby's heart rate is." [Tr. at 1853]. Thus, for a period of two hours, the nurses and midwife were not tracking the status of A.H. and did not have enough information to know whether intervention was necessary. At 2:19 p.m., Nurse Perkowski placed internal fetal scalp electrodes on A.H. to better monitor the fetal heart rate. [Tr. at 158].

At 2:51 p.m., approximately five minutes before A.H. was delivered, Midwife Crowder arrived at Mrs. Hysell's room. [Tr. at 96]. Midwife Crowder verbally noted that the umbilical cord was impeding delivery and took steps to reposition the cord and A.H. in the birth canal so that the delivery could progress. [Tr. at 1112, 1434]. As John Fassett testified, when cord compression occurs, "[y]ou have less blood flow. . . . [Y]ou can have less oxygen." [Tr. at 312; *see also id.* at 581-82 (Dr. O'Meara: "That makes me wonder whether or not there was a compromise or an issue with the umbilical cord, which is the baby's lifeline and what gives them their blood flow and oxygen.")]. A.H. was delivered through a spontaneous vaginal delivery at 2:55 p.m. [Tr. at. 173, 477].

Immediately following birth, A.H. was placed on Mrs. Hysell's chest. [Tr. at 1346]. Mrs. Hysell recalled that A.H. did not move or cry. [*Id.*] A.H. did not begin breastfeeding at that time. [Tr. at 1348]. A.H. was then removed from Mrs. Hysell to be evaluated by the delivery staff.

A.H.'s APGAR scores were taken collectively by the delivery staff in the delivery room and were transcribed by Nurse Perkowski. [Tr. at 106]. At one minute post-birth, A.H.'s first APGAR score was seven. [Tr. at 106]. The nurses performing the evaluation noted A.H.'s respiratory rate was slow and irregular and her extremities were blue. [Tr. at 104]. At five minutes post-birth, A.H.'s second APGAR score was eight. [Tr. at 201]. Again, hospital staff noted slow and irregular breathing. No APGAR score was noted at ten minutes post-birth. [Tr. at 107].

One of the items in determining the APGAR score is "response to stimulation," for which two points are awarded if the baby cries. [Tr. at 1094]. The APGAR score of A.H. for both the one-minute and five-minute points reflect that A.H. cried. [Tr. at 1375]. If a baby does not cry, zero points should be awarded. [Tr. at 108]. Crystal Hysell and Ryan Hysell, A.H.'s parents, testified with absolute certainty that A.H. did not cry in the delivery room. [Tr. at 1375, 1499]. Cindy Remines, A.H.'s grandmother, testified to the same with an equal level of certainty. [Tr. at 1114]. These three witnesses, despite their familial relationship with A.H. and their interests in her care for the remainder of her life, were exceptionally credible. There was no gilding of the lily. Their manners of speech, the details associated with their recollection, and the consistency of their accounts struck one as simply a truthful retelling of a story. And that story was one that would have been fixed firmly in their minds, a frightening and confusing birth episode of one of their own. Based on that and testimony elicited during trial, the APGAR scores are unreliable.

The APGAR scores should have been a five and six respectively because the APGAR scores indicated that A.H. cried when in fact she did not. [Tr. at 1575–76]. According to testimony elicited at trial, "if the Apgar score at five minutes is greater than or equal to seven, it is unlikely that peripartum hypoxia-ischemia played a major role in causing neonatal encephalopathy." [Tr. at 624]. Thus, A.H.'s APGAR scores do not rule out hypoxia or the presence

4

of neonatal encephalopathy but rather indicate that A.H. suffered a hypoxic event in utero during the birthing process. Some of the expert testimony introduced by RGH also tied the condition of the infant to neonatal encephalopathy consistent with a hypoxic event. For example, Dr. Ernest Graham, testified that "if the baby has hypoxic brain injury, it's going to be a very flaccid baby, not moving and very blue, and it's going to have a score a lot lower than seven." [Tr. at 952]. The nurses performing A.H.'s APGAR evaluation noted that her respiratory rate was slow and irregular and her extremities were blue. [Tr. at 104]. Additionally, Dr. Peter Giannone admitted that while seizures are common in a severe hypoxic injury, they are not as common in a less severe hypoxic injury and are not required at all in order to have severe consequences result. [Tr. at 1578]. Thus, there is sufficient evidence that A.H. suffered from neonatal encephalopathy.

While normally babies are placed into a wheeled carrier to be transported to the nursery, [Tr. at 177], A.H. was carried by Nurse Buchanan to the nursery. [Tr. at 210]. When A.H. arrived at the nursery approximately 14 minutes after birth, Nurse Buchanan noted that A.H. had a dusky color, [Tr. at 212], and that she was not crying. [Tr. at 215–16]. A.H. had an Sa02 level of 68%. [Tr. at 764]. She was given blow-by oxygen and bulb suction, bringing her Sa02 level up to an acceptable level of at least 85%. [Tr. at 223]. A.H.'s Sa02 levels did not reach that normal threshold until after those two more intensive actions were deployed in the nursery. [*Id.*] All of these findings further lend support to the earlier finding that three familial witnesses testified truthfully and, for reasons unknown, the APGAR scores were inaccurate.

It is also noteworthy that no measures were used to raise A.H.'s Sa02 levels in the delivery room; A.H. did not receive any such resuscitative measures until she arrived at the nursey 14 minutes after birth. A.H. was not returned to the Hysells until four hours after birth and was not seen by a pediatrician until the next day. [*Id.*] Mrs. Hysell and A.H. were discharged from the

hospital two days after birth. The care rendered to A.H. during the birthing process was palpably below the standard of care.

**C.**      *Early Life of A.H.*

Throughout her life, A.H. consistently failed to meet developmental milestones. The Hysell family was dedicated to discerning the underlying cause. At 16 months old, A.H. underwent an MRI scan of her brain; the results were reported as normal. [Tr. at 459]. A.H. later underwent genetic testing, which also came back as normal. [Tr. at 512]. The Hysells eventually brought A.H. to Cincinnati Children's Hospital, where a second MRI was performed. The second MRI revealed periventricular white matter gliosis, or low white matter volume in the brain [Tr. at 463, 470, 479]. Upon a more careful review, the earlier MRI exhibited the same abnormalities [*Id.*] This finding explained her delayed development. Ultimately, A.H. was diagnosed with cerebral palsy and autism spectrum disorder [Tr. at 1467–68, 1354].

**D.**      *The Inception of this Litigation*

On October 23, 2018, the Hysells, on behalf of A.H., instituted this action against Defendants RGH and Access Health, alleging a claim pursuant to the West Virginia Medical Professional Liability Act ("MPLA"). The Hysells allege that RGH and Access Health employees failed to properly respond to a fetal monitor warning of irregularities during the birthing process and failed to identify brain abnormalities resulting from hypoxia during birth. They contend that A.H.'s injuries are a result of the breach of the standard of care. A.H.'s cerebral palsy is the sole brain injury at issue in this action.

The Court conducted a jury trial in this action from May 18, 2021, through June 2, 2021. At the close of trial, the jury returned a verdict for the Hysells and awarded them a total of $10,837,527 in damages, distributed as follows: (1) $837,527 for future lost earnings; (2) $9,000,000 for future medical treatment, attendant care, and other therapies; and (3) $1,000,000 for noneconomic losses. The jury attributed 70% of the fault to RGH and 30% to the United States.[1]

## II.   CONCLUSIONS OF LAW

In order to prevail on its MPLA claim against the United States, the Plaintiffs must have proven the following two elements by a preponderance of the evidence:

(1)   That the United States, through Certified Nurse Midwife Debra Crowder, failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent Certified Nurse Midwife ("midwife") acting in the same or similar circumstances; and

(2)   That such failure was a proximate cause of the injuries to Plaintiffs.

W. Va. Code § 55-7B-3(a).

The Hysells bore the burden of demonstrating "by a preponderance of the evidence that the defendant was negligent and that such negligence was the proximate cause of the injury." *Sexton v. Grieco*, 216 W. Va. 714, 716, 613 S.E.2d 81, 83 (2005) (internal quotation marks omitted). That burden is "satisfied when the plaintiff shows the physician's acts or omissions increased the risk of harm to the plaintiff and that such increased risk of harm was a substantial factor in bringing about the ultimate injury to the plaintiff." *Bellomy v. United States*, 888 F. Supp.

---

[1] The jury's verdict as to the United States is advisory only. *See* Fed. R. Civ. P. 39(c). The Court accepts the decision of the advisory jury.

760, 766 (S.D. W. Va. 1995) (internal quotation marks omitted) (quoting Syl. Pt. 5, *Thornton v. CAMC*, 172 W. Va. 360, 361, 305 S.E.2d 316, 318 (1983)).

## A.     Standard of Care

The MPLA establishes the standard of care testimony that must be elicited during trial:

> The applicable standard of care and a defendant's failure to meet the standard of care, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court. A proposed expert witness may only be found competent to testify if the foundation for his or her testimony is first laid establishing that: (1) The opinion is actually held by the expert witness; (2) the opinion can be testified to with reasonable medical probability; (3) the expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed; (4) the expert witness's opinion is grounded on scientifically valid peer-reviewed studies if available; (5) the expert witness maintains a current license to practice medicine with the appropriate licensing authority of any state of the United States: *Provided,* That the expert witness's license has not been revoked or suspended in the past year in any state; and (6) the expert witness is engaged or qualified in a medical field in which the practitioner has experience and/or training in diagnosing or treating injuries or conditions similar to those of the patient. If the witness meets all of these qualifications and devoted, at the time of the medical injury, sixty percent of his or her professional time annually to the active clinical practice in his or her medical field or specialty, or to teaching in his or her medical field or specialty in an accredited university, there shall be a rebuttable presumption that the witness is qualified as an expert. The parties shall have the opportunity to impeach any witness's qualifications as an expert. Financial records of an expert witness are not discoverable or relevant to prove the amount of time the expert witness spends in active practice or teaching in his or her medical field unless good cause can be shown to the court.

W. Va. Code § 55-7B-7(a). "It is the general rule that in medical malpractice cases negligence or want of professional skill can be proved only by expert witnesses." Syl. Pt. 2, *Roberts v. Gale*, 149 W.Va. 166, 166, 139 S.E.2d 272, 272 (1964).

John Fassett, CNM, testified that, in his opinion, Midwife Crowder did not "fulfill her duty and her obligation and her responsibility within the standard of care of seeing that the baby was properly monitored." [Tr. at 334]. Concerning the FMS, Mr. Fassett testified that if a midwife is not monitoring the baby's heart rate, she is deviating from the standard of care. [Tr. at 314–15]. Mr. Fassett also testified that "an uninterpretable strip is not within the standard of care." [Tr. at 325]. Further, not knowing how the contractions are progressing as a result of faulty FMS is not within the standard of care. [Tr. at 329–30]. Mr. Fassett's testimony as to a breach in the standard of care is limited to the time period of 12:20 p.m. until 2:19 p.m., the time wherein the FMS were uninterpretable. All opinions of Mr. Fassett were testified to within a reasonable degree of medical probability.

The Court credits Mr. Fassett's testimony as it relates to the standard of care of certified nurse midwives. Mr. Fassett's demeanor during his testimony was forthright and the product of extensive education, research, and instruction on the subject. His qualifications and command of the subject matter were unequaled in comparison to the other testimony on the point at trial. Mr. Fassett studied midwifery at the University of California San Francisco, one of the top midwifery programs in the country. There he received his master's degree in nursing. He has participated in "thousands" of deliveries in the 27 years he has been practicing. [Tr. at 262]. Further, in his role as a California Board of Registered Nursing consultant, which he has held since 2000, he reviews charts to determine breaches in the standard of care. [Tr. at 264]. Mr. Fassett holds a similar consulting position with the California Medical Board where he reviews charts for deviations from the standard of care. [Tr. at 264–65]. The Court finds Mr. Fassett's testimony more credible, more authoritative, and more closely directed to the subject matter than Dr. Landon's for

the reasons above described; further, Mr. Fassett has spent his career considering the standards of acceptable conduct for midwivery.

Given Mr. Fassett's testimony and his credibility in the field, the Court finds that Midwife Crowder failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent midwife acting in the same or similar circumstances when she did not properly monitor the FMS or act upon discovery of the uninterpretable FMS. Thus, the Court finds by a preponderance of the evidence that Midwife Crowder's inaction fell below the standard of care.

## B.    Proximate Cause

"Proximate cause" is defined as "that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained, without which the wrong would not have occurred." *Mays v. Chang*, 213 W. Va. 220, 224, 579 S.E.2d 561, 566 (2003). The plaintiff need not show that the defendant's negligence was the only proximate cause -- only that it was *a* proximate cause. *See*, *e.g.*, *id.* at 224, 579 S.E.2d at 566.

According to the Supreme Court of Appeals of West Virginia, for "[m]edical testimony to be admissible and sufficient to warrant a finding by the jury of the proximate cause of an injury," it needs to "be of such character as would warrant a reasonable inference by the jury that the injury in question was caused by the negligent act or conduct of the defendant." *Pygman v. Helton*, 148 W. Va. 281, 286–87, 134 S.E.2d 717, 721 (1964). Such medical testimony "is not required to be based upon a reasonable certainty that the injury resulted from the negligence of the defendant." *Id.* Thus, proximate cause may be established through a "reasonable inference" of causation. *Sexton*, 216 W. Va. at 718–20, 613 S.E.2d at 85–87.

10

"*Pygman* specifically rejected the requirement that the [expert] tie the injury to the negligence by way of . . . any rigid incantation or formula." *Sexton*, 216 W. Va. at 720, 613 S.E.2d at 87. More specifically, the Supreme Court of Appeals has held that an attorney's failure to ask a direct question regarding proximate cause is not fatal if "the expert testimony was 'of such character' as to permit" a reasonable inference that the defendant's negligence caused the injury in question. *Id.* And "permitting a jury to draw inferences from evidence is not the functional equivalent of speculation." *Dellinger v. Pediatrix Med. Grp., P.C.*, 232 W. Va. 115, 124 n.15, 750 S.E.2d 668, 677 n.15 (2013). While the better practice is certainly "to ask an expert a direct question as to whether or not an injury was the proximate cause of medical negligence," *Sexton*, 216 W. Va. at 720 n.4, 613 S.E.2d at 87 n.4, failure to do so is not determinative, particularly when the trier of fact is the Court and not lay jury members.

The Court finds by a preponderance of the evidence that Midwife Crowder's breach was a proximate cause of the brain injury that A.H. suffered. Given the testimony of the experts, such a reasonable inference can be readily drawn. First, Dr. O'Meara, qualified as an expert as "a pediatrician and specifically with respect to resuscitation of infants," [Tr. at 566], explicitly testified that A.H.'s condition during labor, delivery, and the short time after delivery was caused by hypoxia:

Q. Do you deal with babies who may need resuscitation because of lack of oxygen?

A. Yes.

. . .

Q. Are you required to know the symptoms of hypoxia?

A. Yes, very much so.

. . .

Q. Okay. Within a reasonable degree of medical probability, then, do you have an opinion as to whether or not there was, in fact, hypoxia here at the time of delivery?

A. Because the infant is having trouble breathing and her muscle tone is so low, it makes me very concerned that there was a period of hypoxia and acidosis. In the process of being born, there was some compromise to the blood flow to her and to her levels of oxygen in order to make her that depressed or have that kind of a slow start. And so, yes, within a degree of medical probability -- within a reasonable degree of medical probability, more likely than not it was hypoxemia that -- that caused that.

[Tr. at 563, 582]. When considering the totality of the circumstances, Dr. O'Meara went on to conclude the following about hypoxia: "and, so you know, putting that all together, yes, you know, you're looking for some sort of insult. And without any other explanation for it, yes, within a reasonable degree of medical probability, that is the only thing that's identified and it's more than likely the cause of the injury." [Tr. at 581].

The Court finds Dr. O'Meara very credible and qualified to offer this opinion. Dr. O'Meara is a Board-Certified pediatrician who was qualified as an expert without objection. [Tr. at 566]. Dr. O'Meara's training and experience is in Pediatric Critical Care and she is Board Certified. [Tr. at 558]. By definition, she specializes in the life support of babies and children from term birth and her research has been in brain surgery, [Tr. at 558], and she resuscitates babies on a regular basis.

Additionally, Dr. Bedrick stated that a pulse oximeter reading of 68%, the reading of A.H. 14 minutes after birth, is a sign of hypoxia. [Tr. at 1854–55]. Other experts also testified that hypoxia could cause the brain injuries that A.H. suffers from. Dr. Scher testified that perinatal

hypoxia-ischemia can affect cognitive outcomes, as well as other deficits. [Tr. at 1806]. Dr. Barakos showed the effects of the hypoxic injury on A.H.'s MRI scans [Tr. at 1166–67, 1174].

Significantly, Dr. Schorry, one of A.H.'s treating physicians, testified to the following:

Q. What about, does autism cause global developmental delay?

A. Autism is usually associated -- is often associated with global developmental delay but not always.

Q. Does it cause it?

A. I'm sorry.

Q. Does it cause it?

A. Does autism cause global developmental delay? No.

Q. We talked about microcephaly. Fine motor delay. That could be caused by hypoxia, correct?

A. Yes, it could.

Q. Language impairment could be caused by hypoxia, correct?

A. Yes.

Q. Dysphagia could be caused by hypoxia, correct?

A. It could be.

Q. Mixed receptive-expressive language disorder, that could be caused by hypoxia?

A. Yes.

Q. Static encephalopathy --

A. Yes.

Q. -- could be caused by hypoxia, right?

A. Yes.

Q. Aphasia. What is aphasia?

A. It means lack of speech.

Q. It can be caused by hypoxia, can't it?

A. Yes, it could be.

Q. And the diagnoses here: Global developmental delay; muscle hypertonicity; autism spectrum; movement disorder; microcephaly. Now, without getting into microcephaly, that's already been discussed, that isn't caused by hypoxia, is it?

A. Microcephaly? It can be.

Q. And movement disorder and muscle hypertonicity and lack of global development, all could be caused by hypoxia, right?

A. They can be, yes.

[Tr. at 532–33].

Equally as significant, Dr. Gropman, qualified as an expert in pediatric neurology and pediatric neurogenetics, biogenetics, imaging of children's brains, causation or lack thereof of the claims, and the resources reasonably necessary in the future, [Tr. at 724], testified to the following:

Q. Doctor, do you agree that hypoxia can cause MRI abnormalities?

A. Yes, it can.

Q. And do you agree that hypoxia can cause acrocyanosis at birth?

A. It can.

Q. It can cause a duskiness at birth?

A. It can.

14

Q. It can cause a baby to not cry at birth?

A. It can.

Q. It can cause a weak suck, can't it?

A. It can.

Q. It can cause a low Sa02, can't it?

A. It could.

Q. It can cause a need for -- for blow-by oxygen, can't it?

A. It could.

Q. It can cause a child to breathe irregularly upon birth; isn't that correct?

A. It could, one of the causes.

Q. It can cause slow, irregular respiratory rates, correct?

A. One cause.

Q. It can cause a lack of muscle tone; isn't that correct?

A. One of many causes, correct.

Q. It can cause the extremities to be blue when the baby is born at one minute, correct?

A. One of many causes, correct.

. . .

Q. You don't deny that all of those results that I mentioned do -- do indeed get represented as being there in this case; isn't that right?

A. Many of those, correct.

[Tr. at 761–63].

As to the Defendant's arguments that a genetic abnormality was the cause of A.H.'s injuries, Dr. Trock "did not identify genetic syndrome." [Tr. at 1013]. Dr. Schorry, a geneticist, was also unable to identify a genetic cause. [Tr. at 493]. Importantly, Dr. Barakos acknowledged that, "by saying lack of regression, [Dr. Arthur is] saying the child's not getting worse over time, which is reassuring that she does not have a declining condition that would be an inheritable or genetic process . . . . If she's not declining, this must be a static injury." [Tr. at 1159]. Additionally, while Dr. Gropman makes the assertion that "more likely than not [A.H.'s] autism, her cerebral palsy, her general features are due to a genetic defect," she "does not know which one." [Tr. at 742].

Concerning A.H.'s MTHFR abnormality specifically, Dr. Scher stated that "[i]t's not necessarily a cause, but an *association* with children who are autistic." [Tr. at 1793 (emphasis added)]. Dr. Trock also testified as to the MTHFR gene:

> Q. Now, given this information, do you have an opinion, to a reasonable degree of medical probability, whether this MTHFR genetic mutation contributes to [A.H.'s] current condition?
>
> . . .
>
> A. It does contribute. No one has identified the exact mechanism, but it's known, from statistical studies across all ethnic and racial groups, that the MTHFR gene has a higher association with the autism spectrum.

[Tr. at 982]. Not only is this critical in illustrating that the MTHFR is not a *cause* of autism, but also that the mere association is *specific to autism*. It is undisputed that A.H.'s cerebral palsy is the only issue in this case.

As to the periventricular leukomalacia ("PVL") as an alternative cause, Dr. Sze testified that it was possible that white brain matter, a sign of PVL, could be injured at the time of delivery in a term baby. [Tr. at 1760]. Further, when asked if hypoxia caused periventricular white matter gliosis, Dr. Gropman testified that, "hypoxia, a prolonged partial . . . can cause white matter abnormality." [Tr. at 771]. When asked if the PVL was from a perinatal hypoxic-ischemic injury, Dr. Barakos answered in the affirmative. [Tr. at 1174]. Additionally, Dr. Shimony testified:

> Q. Doctor, considering that this child had periventricular leukomalacia, and she also had ventricles that were expanded, all of that is consistent with an hypoxic event, isn't it?
>
> A. Well, I -- yes, I believe I answered that question.

[Tr. at 1307].

As to microcephaly as an alternate cause, the Court first notes that three different growth charts were used by the experts to plot the head circumference of A.H.: the Center for Disease Control and Prevention ("CDC") chart, the World Health Organization ("WHO") chart, and the Olsen chart. The CDC recommends that health care providers use the WHO growth charts to monitor growth for infants ages zero to two years in the United States.[2]

First, Nurse Perkowski, the labor and delivery nurse who tended to Mrs. Hysell and A.H., stated the following:

> Q. And so, ma'am, you never saw anything that indicated microcephaly, did you?
>
> A. No, sir.

[Tr. at 110]. Nurse Conners testified to the same effect:

---

[2] *WHO Growth Charts*, Centers for Disease Control and Prevention https://www.cdc.gov/growthcharts/who_charts.htm (last visited Mar. 23, 2022).

Q. . . . Is that microcephalic?

A. . . . I don't believe so, no.

. . .

Q. Do you see anything in there that indicates microcephaly?

A. Not that I could diagnose, no.

Q. Okay. Or that anybody else diagnosed?

A. I don't see anything in the record according to that.

[Tr. at 419, 444].

Additionally, Dr. O'Meara testified that according to the hospital records and pediatric records after birth as well as the photographs of the baby, the baby was not microcephalic within a reasonable degree of medical certainty. [Tr. at 591, 596–97]. Dr. Shimony, an expert who testified that A.H. was microcephalic, admitted that he himself did *not* "do anything to determine whether or not there was microcephalic." [Tr. at 1298]. Further, even though experts did testify that A.H.'s measurements were considered microcephalic per the CDC chart, Dr. Barakos stated, "it would be totally false and inappropriate to claim that just having a single data point of microcephaly at birth proves that there is some insult in utero." [Tr. at 1218]. Again, as previously noted, the CDC instructs providers to use the WHO chart.

Thus, the Court finds that the Hysells proved by a preponderance of the evidence that the United States breached its standard of care when it did not properly monitor or act upon the uninterpretable FMS, and that such breach was a proximate cause of A.H.'s injury.

### III.    FINDINGS ON DAMAGES

The Court conducted a jury trial in this action from May 18, 2021, through June 2, 2021. The Court advised the parties that it would be using the jury in a permissible advisory capacity pursuant to *Federal Rule of Civil Procedure* 39(c). At the close of trial, the jury returned a verdict for the Hysells and awarded them a total of $10,837,527 in damages, distributed as follows: (1) $837,527 for future lost earnings; (2) $9,000,000 for future medical treatment, attendant care, and other therapies; and (3) $1,000,000 for noneconomic losses. The jury, in its advisory capacity, attributed the United States with 30% of the damages.

### A.    *Amount Attributable to the United States*

The United States is liable for the actions and inactions of Midwife Crowder. But Midwife Crowder was not the only negligent party in this action. The jury has already determined that RGH was negligent and is 70% at fault. The jury's verdict as to the Government being 30% at fault is advisory only. After careful consideration, such apportionment of responsibility for A.H.'s injuries is appropriate. In making this determination, the Court considered that Midwife Crowder's duty to A.H. ended once she was born and that there was additional negligence following A.H.'s birth -- particularly the fact that resuscitative measures were not employed until A.H. was in the nursery. That failure rests solely with RGH. But RGH and the Government are equally at fault when it comes to the failure to monitor the FMS during the delivery of A.H. Thus, the Court finds by a preponderance of the evidence that the United States was 30% at fault.

### B.    *Non-Economic Loss*

In determining an award for non-economic losses, the Court considers the following: the nature and extent of the injuries; the disability, disfigurement, loss of enjoyment of

19

life experienced and which with reasonable certainty will be experienced in the future; and the physical, mental, and emotional pain and suffering experienced and which with reasonable certainty will be experienced in the future. The Court also notes that the MPLA non-economic damages cap applies to actions against the United States under the Federal Tort Claims Act ("FTCA") based on alleged medical malpractice at a federally-operated hospital.

The MPLA provides that:

> The plaintiff may recover compensatory damages for noneconomic losses in excess of the limitation described in subsection (a) of this section, *but not in excess of $500,000 for each occurrence*, regardless of the number of plaintiffs or the number of defendants . . . where the damages for noneconomic losses suffered by the plaintiff were for [inter alia] . . . (3) permanent physical or mental functional injury that permanently prevents the injured person from being able to independently care for himself or herself and perform life-sustaining activities.

W. Va. Code § 55-7B-8(b) (emphasis added). However, according to subsection (c), the cap on compensatory damages "shall increase to account for inflation by an amount equal to the Consumer Price Index published by the United States Department of Labor, not to exceed one hundred fifty percent of the amounts specified in said subsections." *Id.* § 55-7B-8(c). Thus, the maximum that the Hysells can recover in noneconomic damages is $719,818.38.

Here, A.H. suffers from permanent injuries. She is unable to live independently and will never be able to do so. She is dependent on others for feeding, changing diapers, basic hygiene, and getting clothed. She is unable to walk far distances alone and is most often wheelchair bound. She is unable to communicate verbally. She cannot interact with people. She will never gain control of her bladder and bowels; diapers will always be apart of her routine. She will never be able to feed herself, clean herself, or clothe herself.

In considering the nature and extent of the injuries, her disability and loss of enjoyment of life experienced and which with reasonable certainty will be experienced in the

20

future, and the physical, mental, and emotional pain and suffering experienced and which with reasonable certainty will be experienced in the future, the Court finds that the appropriate award of noneconomic damages is the maximum $719,818.38. As $503,872.87 has been attributed to RGH, the United States is responsible for $215,945.51.

C.      *Economic Loss*

In determining an award for economic losses, which includes future lost earnings and future medical treatment, the Court considers the following: the reasonable value of necessary medical treatment, attendant care, and other therapies which with reasonable certainty will be required in the future; and the reasonable value of loss in employment opportunities and earning capacity which with reasonable certainty will be lost in the future.

Ms. Lampton's Life Care Plan, Ms. Lampton's testimony, and the resultant calculations of Mr. Staller meticulously account for A.H.'s future losses. The Court finds that Ms. Lampton's Plan was based on reliable principles and methods applied to the facts of the case and that Dr. Rugino's testimony provided an adequate medical foundation for her recommendations. Dr. Rugino also testified that, among other things, home modifications, bathroom modifications, attendant care, and leg braces are reasonably medically certain. The remainder of the Plan items were supported through extensive conversations between Dr. Rugino and Nurse Lampkin following Dr. Rugino's thorough evaluation of A.H. and her years of medical records. Dr. Rugino's only recommendation was that the childhood speech and childhood occupational therapy items be removed, which has already been accounted for and reduced in the Court's Memorandum

Opinion and Order as to RGH's post-trial motions.[3] Thus, an award of $9,545,522.00 for economic damages is appropriate, of which the United States is responsible for $2,863,656.60.

### IV.    CONCLUSION

Based on the foregoing discussion, the Court **FINDS** that the United States was negligent, that such negligence caused A.H.'s injuries, and that A.H. has been injured in the amount of $10,265,340.38, of which the Government is responsible for **$3,079,602.11**.

The Clerk is directed to send a copy of this written opinion and order to counsel of record and to any unrepresented party.

ENTER:          March 31, 2022

Frank W. Volk
United States District Judge

---

[3] The jury awarded a total of $9,837,527.00 for economic loss, with 30% being attributed to the United States. However, the Court reduced the award of future medical treatment because the childhood speech therapy and childhood occupational therapy items from the Plaintiffs' lifecare Plan should have been omitted, and such reduction is also accounted for in the Court's calculations in this Memorandum Opinion and Order.