## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

RYAN HYSELL and CRYSTAL HYSELL,
on behalf of their daughter, A.H., a minor,

      Plaintiffs,

v.                                 Civil Action No. 5:18-cv-01375

RALEIGH GENERAL HOSPITAL,
and THE UNITED STATES OF AMERICA,

      Defendants.

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANT UNITED STATES OF AMERICA'S MOTION TO VACATE,
### ALTER, AND/OR AMEND THE JUDGMENT ENTERED
### IN THIS CIVIL ACTION AND/OR FOR NEW TRIAL

### I. INTRODUCTION

This medical malpractice case is subject to the West Virginia Medical Professional Liability Act ("MPLA"), W. Va. Code § 55-7B-1, *et seq.*, and applicable West Virginia and federal law.  The United States was substituted for midwife Debra Crowder, who was deemed an employee of the United States pursuant to 42 U.S.C. § 233.  *See* ECF No. 73.  During the course of this trial, experts testified on behalf of the plaintiffs.  Only one of those experts, John Fassett, testified on the standard of care applicable to midwives.  Even then, Mr. Fassett was only critical of the midwife for a single period of time of less than two hours during labor.  Further, he had no opinions on causation.  Tr. at 358.[1]  In fact, *none* of the plaintiffs' experts testified on the issue of causation with regard to the midwife involved in this case.  Not a single expert called by the plaintiffs testified to a reasonable degree of medical probability that any act or omission by the midwife caused an injury to the plaintiffs.  Nor did any expert called by the plaintiffs testify that

---

[1] References to "Tr." are to the trial transcript.

any act or omission by the midwife was causally connected to the injuries alleged by the plaintiffs.  The only testimony regarding alleged causation, such as that by Dr. O'Meara, was linked to the period of time after birth and not to the period during which Mr. Fassett was critical of the midwife's actions.  Quite simply, the plaintiffs failed to meet their burden of causation with respect to the midwife, and, therefore, the judgment entered on March 31, 2022, against the United States should be altered, amended, and/or vacated and judgment should be entered in favor of the United States and against the plaintiffs.

## II. PLAINTIFFS FAILED TO MEET THEIR BURDEN OF PROOF ON PROXIMATE CAUSATION AS REQUIRED BY W. VA. CODE § 55-7B-3 OF THE MPLA

### A. The Required Burden Of Proof Under West Virginia Law

Under West Virginia law, negligence actions involving health care services rendered by a health care provider such as the midwife are governed by the MPLA.  The burden of proof imposed upon plaintiffs seeking to recover damages for alleged medical negligence is set forth under the MPLA in W. Va. Code § 55-7B-3, which states:

§ 55-7B-3. Elements of proof.

(a) The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care:

(1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

(2) Such failure was a proximate cause of the injury or death.

§ 55-7B-3(a).  *See also Butts v. United States*, 930 F.3d 234, 238–39 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 1113 (2020); *Rubin v. United States*, 88 F. Supp. 2d 581, 597 (S.D. W. Va. 1999); *MacDonald v. City Hosp., Inc.*, 715 S.E.2d 405, 423 n.22 (W. Va. 2011).  Other aspects

2

of this action are governed by the common law of West Virginia. *See Bellomy v. United States*, 888 F. Supp. 760, 763–64 (S.D. W. Va. 1995).

To prevail on a claim under the MPLA, the burden is on the plaintiff to prove, by a preponderance of the evidence, that the defendant was negligent (breached the applicable standard of care) and that the negligence (breach of the applicable standard of care) was a proximate cause of the plaintiff's injury. *See Butts*, 930 F.3d at 238–39; *Sexton v. Greico*, 613 S.E.2d 81, 83 (W. Va. 2005) (per curiam) (quoting Syl. pt. 2, *Walton v. Given*, 215 S.E.2d 647 (W. Va. 1975)). The failure to prove either of these elements is fatal to plaintiffs' case.

### B. Expert Testimony Was Required To Establish Proximate Causation

To establish proximate causation in a medical negligence case, a plaintiff must prove such causal link through expert witness testimony. *See Fitzgerald v. Manning*, 679 F.2d 341, 350 (4th Cir. 1982) ("Just as negligence or violation of the standard of care must ordinarily rest on expert opinion evidence, so proof of causation—that is that the defendant's negligence was 'more likely' or 'more probably' the cause of the plaintiff's injury—requires expert testimony." (footnote omitted)); *Bellomy*, 888 F. Supp. at 764 (malpractice case and causation must ordinarily be proved through expert testimony). The failure to prove the causal link by expert witness testimony between the alleged negligence and the alleged injury means that the plaintiff has a fatal defect in his or her case, which requires dismissal of the case. *See Nottingham v. United States*, No. 2:16-cv-03022, 2017 WL 3026926, at *7 (S.D. W. Va. July 17, 2017) (dismissing medical malpractice case because the plaintiff failed to provide proper expert testimony under W. Va. Code § 55-7B-3 to establish a breach in the standard of care and that the purported breach proximately caused the alleged injury); *Dellinger v. Pediatrix Med. Grp.*, 750

S.E.2d 668, 677 (W. Va. 2013)  ("The lack of expert medical testimony as to causation was therefore equally fatal to petitioner's case as her failure to present a disputed issue of material fact on medical negligence."); *Farley v. Shook*, 629 S.E.2d 739, 745 (W. Va. 2006) ("Thus, because Dr. Weihl was the only expert designated to provide standard of care and causation testimony against the emergency room physician and the hospital, and because he was unable to provide the necessary causal links, the Farleys were unable to prove their case against these two appellees. The circuit court was correct in awarding summary judgment to Dr. Fornari and St. Mary's, and we accordingly affirm the circuit court's ruling."); *Short v. Appalachian OH–9, Inc.*, 507 S.E.2d 124, 131–32 (W. Va. 1998) (failure to present expert witness testimony on causation was fatal to plaintiff's case and required entry of summary judgment); *Hicks v. Chevy*, 358 S.E.2d 303, 305 (W. Va. 1987) ("Proof that the negligence or want of professional skill was the proximate cause of the injury of which the plaintiff complains must ordinarily be by expert testimony as well.").  Even if an injury has occurred, if that injury is not causally linked by proper evidence to a breach in the standard of care by the plaintiff through expert witness testimony, then a plaintiff has not met her burden of proof under W. Va. Code § 55-7B-3, and judgment must be entered for the defendant.  *See Fitzgerald*, 679 F.2d at 350; *Bellomy*, 888 F. Supp. at 764; *Dellinger*, 750 S.E.2d at 676; *Farley*, 629 S.E.2d at 745; *Short*, 507 S.E.2d at 131–32; *Hicks*, 358 S.E.2d at 305.

The Court has suggested that proximate causation can be inferred in medical malpractice cases under West Virginia law.  However, there must be at least *some* testimony from an expert "causally connecting" the health care provider's alleged negligence to the alleged injury to permit an inference of proximate causation.  As the West Virginia Supreme Court of Appeals

4

held in *Dellinger*, there must be specific expert testimony connecting the alleged negligence to the alleged injury.   If no such testimony exists, then there is no evidence on which to base any inferences, and the plaintiff has failed to meet her burden of proof.  *Dellinger*, 750 S.E.2d at 677. That is precisely the situation in this case.  Not a single expert witness called by the plaintiffs (or the defendants) testified that the midwife's alleged negligence caused an injury to the plaintiffs. *Dellinger* makes it clear that where a plaintiff has not offered a single medical witness whose testimony causally connects the alleged negligence of a health care provider to the alleged injury, the plaintiff has failed to meet her burden of proof.  *Id.*

### C.     Plaintiffs Did Not Provide Any Expert Testimony That Any Alleged Negligence By The Midwife Proximately Caused An Injury

Two important failures of proof by the plaintiffs on causation are evident.  First, there was no testimony at trial that an expedited delivery or cesarean section would have altered the outcome.  Second, there was no testimony linking any alleged negligence by the midwife to the child's outcome.  No expert testified at trial that any alleged negligence of the midwife caused or contributed to cause the child's outcome in this case.  The defense experts called by the United States all testified that the midwife did not do anything which caused an injury to the child.  Tr. at 1795-99, 1839-40, 1924, 1943.  RGH's experts likewise concluded that the midwife did not do anything which caused an injury to the child.  Tr. at 927, 953, 995, 1564-65, 1583.  The record is completely devoid of any expert testimony on causation to support the plaintiffs' claims against the midwife.  Quite simply, plaintiffs completely failed to meet their causation burden of proof requirement under W. Va. Code § 55-7B-3(a)(2).

While the Court discusses the opinions of Dr. O'Meara, plaintiffs' pediatric and pediatric resuscitation expert, Dr. O'Meara never testified that any alleged negligence of the midwife

proximately caused an injury to the child or affected the outcome.  First, Dr. O'Meara was not offered as a standard of care expert with regard to the midwife.  Tr. at 566, 662.  She never testified that the midwife had any duty regarding the resuscitation of the baby after the delivery.  Dr. O'Meara's testimony focused on the baby's condition after delivery and the need for resuscitation.  Plaintiffs' midwife expert, John Fassett, also testified that the midwife's duty of care ended once delivery occurred and the midwife handed the baby to the nursery staff.  Tr. at 345, 348.  Second, Dr. O'Meara never testified that the midwife's alleged negligence regarding the fetal monitoring of the baby affected the outcome.  She never testified that the baby was hypoxic during the period from 12:20 p.m. to 2:19 p.m.  In fact, plaintiffs' midwife expert, John Fassett, testified that he could not state that the child was in fetal distress during that period of time.  He stated, rather, that it was not possible to opine on what was happening with the baby during that period of time.  Tr. at 334, 343, 356, 360-61.  Third, Dr. O'Meara readily testified, "My expertise is not in fetal monitoring."  Tr. at 649.  As a result, her testimony could not have any relevance during that period of time from 12:20 p.m. to 2:19 p.m. prior to the child's birth.  Since she has no expertise in fetal monitoring, she could not and did not link that alleged negligence to the child's outcome.  Thus, there is no basis to conclude from the plaintiffs' experts that anything occurred during that less-than-two-hour period which proximately caused an injury to the baby.  Dr. O'Meara's testimony does not have any factual bases to form legitimate inferences that the midwife's alleged negligence proximately caused an injury to the baby.

The plaintiffs' other experts also had no relevant testimony on causation that would connect the child's injuries to any act or omission by the midwife.  As previously stated,

plaintiffs' midwife expert, John Fassett, had no opinions on causation.  Tr. at 358.  Plaintiffs'

nursing expert, Patricia Connors, likewise had no opinions on causation.  Tr. at 446.  While

plaintiffs' neuroradiology expert, Dr. Barakos, testified that the child experienced hypoxia at

some point between 26 and 28 weeks of gestation and one or two years of age, he never testified

that the child's alleged injuries were causally linked to any alleged negligence by the midwife.

Tr. at 1173, 1192, 1207-08.  Dr. Barakos readily admitted that he could not narrow the time

frame during which he believed hypoxia may have occurred.  Tr. at 1179-80, 1200-01, 1207-08.

In addition, plaintiffs' pediatric rehabilitation expert did not offer any opinions as to when a

hypoxic injury occurred to the child.  *See* ECF No. 267.  The plaintiffs' damages experts, life

care planner Laura Lampton and economist Chad Staller, offered no opinions on the standard of

care or causation.  In sum, no expert called by the plaintiffs presented any testimony causally

linking any alleged negligence by the midwife to any injury allegedly experienced by the child

and/or the plaintiffs.

> **D.      Proximate Causation Could Not Be Inferred In This Case**

As the Supreme Court and the Fourth Circuit have held, expert testimony that is

speculative is inadmissible, lacks probative value, and should be excluded.  Moreover, an

expert's opinion is inadmissible when it is based on assumptions that are speculative and are not

supported by the record.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–91

(1993) (speculative expert testimony is not admissible); *Tyger Const. Co. Inc. v. Pensacola

Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) (expert testimony that is based on speculation is not

admissible under Fed. R. Evid. 702); *Vincent v. United Techs. Corp.*, 854 F.2d 1318 (4th Cir.

1988) (per curiam) (unpublished table opinion) (expert testimony that was speculation properly

excluded as being inadmissible and lacking in probative value).  If an expert witness cannot testify to a reasonable degree of probability or certainty regarding an opinion, then that opinion is inadmissible and should be excluded.  *See Waffen v. U.S. Dep't of Health & Human Servs.*, 799 F.2d 911, 918 (4th Cir. 1986) ("The mere possibility that a defendant's conduct may have caused injury does not provide sufficient causation as a basis for liability. The plaintiff has the burden of introducing evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. When the matter remains one of pure speculation or conjecture, the court must direct a verdict for the defendant."); *Spain v. Powell*, 90 F.2d 580, 582 (4th Cir. 1937) ("We have then an uncertainty as to the inferences which may fairly be drawn from the evidence, and the judgment as a matter of law must go against the party upon whom rests the necessity of showing that he is entitled to recover."); *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 729 (S.D. W. Va. 2014) (expert could not say one way or the other whether prior back surgery was related to patient's pelvic pain complaints and so the court held the testimony of the expert inadmissible stating, "Not only is her opinion speculation, but it is not helpful to the jury because it is not made to a reasonable degree of medical certainty.").

Realizing the clear lack of expert testimony stating that the midwife committed some negligence which proximately caused an injury to the child, the Court nevertheless has supported a finding of liability against the United States by holding that causation can be "inferred" from the expert testimony presented at trial.  Beyond Dr. O'Meara's irrelevant testimony focusing on the time after birth, the Court's opinion in this case relies on a series of questions posed to a treating physician and other experts about the "possible" outcomes of hypoxia.  However, the

answers to those questions are not sufficient proof to establish proximate causation. Furthermore, none of these questions specifically referenced the midwife or her conduct. Rather, the questions focused on hypoxia as a potential cause of an alleged injury and are devoid of any causal linkage to the midwife's conduct. To say that the presence of hypoxia necessarily means that negligence has occurred is nothing more than abject speculation and fails to establish proximate causation under W. Va. Code § 55-7B-3. *See Wallace v. Cmty. Radiology*, No. 1:09-0511, 2016 WL 1563041, at *8 (S.D. W. Va. April 18, 2016) (refusing to agree that a delay always proximately causes an injury).

This determination by the Court is flawed on several levels. First, the approach utilized by the Court has been rejected as a matter of West Virginia law. The West Virginia Supreme Court of Appeals squarely rejected the approach that a plaintiff need only establish proximate causation under W. Va. Code § 55-7B-3 by use of a "reasonable inference" approach and that expert witness testimony is not necessary to causally link an alleged breach of the standard of care to an alleged injury. In *Dellinger v. Pediatrix Med. Grp.*, 750 S.E.2d 668 (W. Va. 2013), the West Virginia Supreme Court of Appeals held that even under the "reasonable inference" approach, a plaintiff must still prove the necessary causal link between an alleged breach in the standard of care and an alleged injury by appropriate expert witness testimony to meet the burden of proof under W. Va. Code § 55-7B-3. Otherwise, as the West Virginia Supreme Court of Appeals noted, a factfinder could engage in "abject speculation." Accordingly, the failure to present expert witness testimony to establish the necessary causal link is fatal under W. Va. Code § 55-7B-3 and requires dismissal of the action:

> *While petitioner urges that the jury may nonetheless infer proximate cause notwithstanding her lack of medical testimony on this issue, we find there is*

> *quite simply nothing upon which a jury may make such an inference beyond abject speculation. **The lack of expert medical testimony as to causation was therefore equally fatal to petitioner's case as her failure to present a disputed issue of material fact on medical negligence.** See Hicks v. Chevy,* 178 W.Va. 118, 121, 358 S.E.2d 202, 205 (1987) ("Proof that the negligence or want of professional skill was the proximate cause of the injury of which the plaintiff complains must ordinarily be by expert testimony as well."); *Short,* 203 W.Va. at 254, 507 S.E.2d at 132 (finding failure to produce expert testimony on causation in opposition to summary judgment fatal); *Farley v. Shook,* 218 W.Va. 680, 686, 629 S.E.2d 739, 745 (2006) (finding summary judgment proper in medical malpractice case where plaintiffs' expert "was unable to link any of the[ ] alleged breaches in care to the ultimate outcome"); *cf. Totten v. Adongay,* 175 W.Va. 634, 639–40, 337 S.E.2d 2, 8 (1985) (distinguishing cases where causation is "reasonably direct or obvious" as obviating need for expert medical testimony). ***Accordingly, we likewise find no error in the circuit court's conclusion that petitioner failed to present evidence of proximate cause sufficient to survive summary judgment.***

*Id.* at 677–78 (emphasis added) (footnote omitted).

West Virginia has long adhered to the rule that expert testimony about possibilities does not meet the level of proof necessary to establish a causal link and, thus, proximate causation. While it is not erroneous to allow counsel to ask about "possibilities," such testimony does not establish causation. *See Rutherford v. Huntington Coca-Cola Bottling Co.*, 97 S.E.2d 803, 809 (W. Va. 1957) ("It was not error to permit Dr. Hibbard to testify as to the 'possible' causal relationship between plaintiff's condition at the time he treated her and the alleged drinking of a coca-cola with particles of glass in it, but that evidence, standing alone was not sufficient to establish such relationship."). As the West Virginia Supreme Court of Appeals has made clear, the mere possibility of causation is not sufficient to establish the causal link and proximate causation necessary for a reasonable factfinder to find causation. *See Tolley v. ACF Indus., Inc.*, 575 S.E.2d 158, 168 (W. Va. 2002); *see also Hayzlett v. Westvaco Chlorine Prods. Corp.*, 25 S.E.2d 759 (W. Va. 1953) ("[M]edical testimony as to possibility of a causal relation between a

given accident or injury and the subsequent death or impaired physical or mental condition of the person injured *is not sufficient, standing alone, to establish such relation*." (emphasis in original)).

The process of extrapolating "possibilities" to try to establish causation where medical testimony is needed is not sufficient under the law and is not the type of inferences which can establish causation:

> To support causation in the face of a summary judgment challenge, the plaintiff must identify evidence which amounts to a probability of causation, rather than a mere possibility of it, to guard against "raw speculation" by the fact finder. *Sakaria v. TWA*, 8 F.3d 164, 172–73 (4th Cir. 1993) ("In a long line of decisions in this circuit we have emphasized that proof of causation must be such as to suggest 'probability' rather than mere 'possibility[]' . . . . Where resolution of a causation issue depends on expert opinion, it must meet [that standard.]").
>
> Here, the plaintiff has relies [sic] solely on possibilities of exposure and has not provided sufficient evidence to support a reasonable probability of exposure to Dow chemical products. Summary judgment in favor of the Dow defendants is therefore appropriate. Because there are no competing inferences that may be drawn from the underlying evidence, no purpose would be served by permitting the plaintiff to present speculative circumstantial evidence to a trier of fact. The plaintiff does not simply attempt to make "justifiable inferences" from the record. *See Anderson* [*v. Liberty Lobby, Inc.*], 477 U.S. [242,] 255 [(1986)]. Rather, the plaintiff unjustifiably extrapolates from one fact to another unsupported one in an effort to prove causation.

*White v. Dow Chem. Co.*, No. 2:05–cv–00247, 2007 WL 6948824, at *5–6 (S.D. W. Va. Nov. 29, 2007), *aff'd*, 321 F. App'x 266 (4th Cir. 2009).

Second, the Court's "reasonable inference" approach to link a "possible cause" and convert it into a "probable cause" has also been rejected by the Fourth Circuit. For example, the Fourth Circuit explained in *Fitzgerald v. Manning*, 679 F.2d 341 (4th Cir. 1982):

> However, as Prosser at 245 pointedly observed, the plaintiff under this exception "must introduce evidence which affords a reasonable basis for the conclusion that *it is more likely than not that the conduct of the defendant was a substantial factor*

11

*in bringing about the result.* **A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant** (Italics added)[.]" **And there are many examples of the application of this rule in medical malpractice cases, that, where there are a number of possible causes for a plaintiff's disability, the physician's negligence will be regarded as the proximate cause** *only if the evidence is that it is "more likely" or "probable" that his negligence was such cause than the other possible causes.*

679 F.2d at 348 (emphasis added) (footnote omitted) (citing *Prosser on Torts* 245 (3d ed. 1964)).

*See Sakaria v. Trans World Airlines*, 8 F.3d 164, 172–73 (4th Cir. 1993) ("In a long line of decisions in this circuit, we have emphasized that proof of causation must be such as to suggest 'probability' rather than mere 'possibility,' precisely to guard against raw speculation by the fact-finder."), *cert. denied*, 511 U.S. 1083, *petition for reh'g denied*, 512 U.S. 1247 (1994).

Here, the Court cited sparse testimony from some of the experts to support its opinion on causation. However, all of that testimony was based on speculation and not based on any probabilities. Just because "negligence" or "malpractice" "could" have caused a child to experience hypoxia, a fact-finder must have more to support a finding of causation. *See Ortega v. United States*, No. 16-cv-8402, 2021 WL 4477896, at *9 (N.D. Ill. Sept. 30, 2021) (testimony of expert that alleged malpractice "might have caused hypoxia, asphyxia, or metabolic acidosis" resulting in brain injury and death of child too speculative and insufficient to "pass muster" under *Daubert*). Here, the expert testimony cited by the Court does not even mention negligence by the midwife. Rather, the testimony cited only relates to particular problems which *might possibly* be caused by hypoxia. The cited testimony never links any alleged negligence by the midwife to an injury suffered by the child involved in this case, nor do the experts cited for such testimony opine that any negligence by the midwife caused the child's alleged injuries.

12

The Court cited a series of "possibility" questions presented to Dr. Schorry, a treating physician.  These questions involved whether hypoxia could possibly cause some of the types of problems experienced by the child.  While she agreed that some of the conditions could be caused by hypoxia, she agreed that the conditions could be caused by many other things as well, including infectious and genetic causes.  Tr. at 516, .  She also could not rule out a potential genetic cause or causes.  Tr. at 516, 520, 530-33, 543-44, 548-49.  She also testified that whether hypoxia had caused a brain injury was outside her field of expertise.  Tr. at 540.  Further, the Court failed to note that Dr. Schorry testified that she was unable to determine the etiology of the child's condition and that her actual suspicion was genetic anomaly.  Tr. at 489.  In *Dellinger*, the West Virginia Supreme Court of Appeals held that inferences could not be used as a basis for causation where the expert has stated that he or she is unable to testify as to an opinion on causation.  *See* 750 S.E.2d at 677.  Again, Dr. Schorry was a treating physician in this case.  This "possibility" testimony is also the classic type of testimony which the Fourth Circuit has held to be insufficient to prove causation.  *See Sakaria*, 8 F.3d at 172–73; *Fitzgerald*, 679 F.2d at 348.

The Court likewise stated in its opinion that the testimony of Dr. Gropman, a genetics expert called by co-defendant Raleigh General Hospital, supported proof of causation because she stated that hypoxia can possibly cause some of the conditions experienced by the child.  Tr. at 761-63.  Again, Dr. Gropman only testified that these were mere possibilities.  Importantly, she testified to a reasonable degree of medical probability that the baby did not experience brain damage due to hypoxia.  She explained that the usual indicators of hypoxic brain injury during labor and delivery were not present.  Tr. at 727-29, 773-76.  Dr. Gropman testified that it was her opinion to a reasonable degree of medical probability that the cause of the child's condition was

due to an underlying genetic disorder. Tr. at 728-36.  It is irrelevant that Dr. Gropman could not

testify as to an exact genetic defect causing the child's outcome because, as she stated, the child

in this case has not undergone all relevant genetic testing.  Tr. at 732-35, 769-70.  Again, the

Court's reliance on "possibility" testimony cannot be the basis for proving causation, particularly

when the expert providing that testimony has reached a conclusion to a reasonable degree of

probability that the actual cause was not the suggested "possibility."  *Dellinger*, 750 S.E.2d at

677.

The Court referenced certain testimony from Dr. Bedrick, a pediatric and neonatology

expert called by the United States, that a transient low oxygen saturation level of 68% well after

delivery was an indication of hypoxia at some point in time, but that reading did not indicate that

the baby experienced hypoxia leading to a brain injury—particularly at a period of time prior to

the child's birth.  As Dr. Bedrick explained, the child was proceeding through the transition from

intrauterine life to extrauterine life, and some transient low oxygen saturation readings after birth

can occur naturally.  He testified to a reasonable degree of medical probability that any hypoxia

which may have occurred during labor and delivery and up to the time the child was discharged

from the hospital was not the cause of the child's brain injuries.  Tr. at 1834-48, 1854-55.  Again,

the Court cited to a "possibility" type question while ignoring the entirety of Dr. Bedrick's

testimony, which clearly demonstrated that his opinion, to a reasonable degree of medical

probability, was that nothing during labor and delivery and through the child's stay in the nursery

caused her brain injuries.  Tr. at 1839-40.  It should also be noted that the low oxygen saturation

rate of 68% detected in the nursery cannot be causally linked to the midwife because it occurred

***after*** delivery.  All of the experts testifying on the standard of care agreed that the midwife's

14

duty to the child ended at the time of delivery.[2]  They all also agreed that the midwife did not

deviate from the standard of care after delivery.  Tr. at 345, 348, 1915, 1924.  The Court likewise

held that plaintiffs' allegations of negligence by the midwife involved only a two-hour period

well before delivery.  (*See* ECF No. 335 at 9.)

　　　　While the Court discusses the opinions of plaintiffs' pediatric and resuscitation expert,

Dr. O'Meara, regarding hypoxia, it should be noted—as explained in more detail above—that

Dr. O'Meara never testified that any act or omission by the midwife caused an injury to the

child.  In fact, she did not have any opinions about the care rendered by the midwife.  Tr. at 566,

662.[3]  Therefore, it was erroneous for the Court to rely on her opinion to determine proximate

causation as to the negligence of the midwife.  Dr. O'Meara was offered as an expert to provide

opinions related to the resuscitation issues, which occurred *after* delivery.  Tr. at 565.

　　　　In *Fitzgerald*, the Fourth Circuit cited *Dick v. Lewis*, 506 F. Supp. 799 (D.N.D. 1980),

*aff'd*, 636 F.2d 1168 (8th Cir. 1981), which is particularly illustrative of the plaintiffs' failure in

this case.  In *Dick*, the plaintiffs alleged that obstetrical negligence resulted in perinatal asphyxia

(hypoxia) which caused a brain injury resulting in the baby developing cerebral palsy.  However,

the court concluded that the plaintiffs failed to meet their burden of proving proximate causation:

> Plaintiff has failed to prove Steven's cerebral palsy was caused or could have
> been avoided by the manner in which Dr. Lewis conducted his delivery. It has not
> been shown by a fair preponderance of the evidence that Steven's cerebral palsy
> would not have occurred if a caesarean section had been performed. Nor has it

---

[2] Because the midwife's duty of care ended at the time of delivery, it was improper for the Court to make specific findings of fact regarding an alleged failure to provide resuscitative measures in the delivery room after the child's birth or failure to return the child to her parents in a more expeditious manner.  *See* ECF No. 335 at 5.  Further, the Court acknowledged in its opinion that plaintiffs' evidence only alleged that the midwife was negligent prior to delivery.  *See* ECF No. 335 at p. 9.

[3] While the Court mentions testimony from the father and grandmother that there was some indication that the umbilical cord may have been compressed during delivery, Tr. at 1111-12, 1395, 1434, the plaintiffs' evidence also indicated that the cord was expeditiously moved and that delivery occurred shortly thereafter.  Tr. at 339.  There was no testimony at trial from any expert that the midwife improperly managed any handling of the umbilical cord.

been shown that failing to perform a caesarean section was a substantial factor in bringing about Steven's condition. In establishing proximate cause, the plaintiff must adduce evidence that shows plaintiff's theory of causation is reasonably probable, not merely possible, and more probable than any other theory based thereon. . . . In light of the factual findings of the court, plaintiff has failed to meet this burden. Speculation and conjecture are not sufficient to establish causation.

506 F. Supp. at 805–06.  Here, as in *Dick*, there was no evidence that any alleged negligence by the midwife proximately caused an injury, an earlier delivery would have changed the outcome, or that any delay in delivery was a substantial factor in this child's outcome.  In addition, plaintiffs' counsel asked several "possibility" questions, but none of those questions were based on probabilities or causally linked to any alleged negligence by the midwife.

The Fourth Circuit also cited *Bryant v. Rankin*, 468 F.2d 510 (8th Cir. 1972), in *Fitzgerald*.  The court in *Bryant* stated the following:

[T]he issue of proximate cause is ordinarily for the jury where there is substantial evidence of a defendant's negligence. . . . But the evidence adduced by the plaintiff must show that "plaintiff's theory is reasonably probable, not merely possible, and more probable than any other theory based thereon. It is not necessary that the proof be conclusive or exclude every other suggested or possible cause." *Stickleman v. Synhorst*, *supra*, 52 N.W. at 507.

In this case, the evidence may have shown that it was possible that the failure to diagnose and treat the infection contributed to the disability of Mrs. Bryant, but it certainly could not be interpreted as having shown that it was reasonably probable or "more probable than any other theory" to have been the cause of Mrs. Bryant's condition.

468 F.2d at 515.  The evidence in this case did not even reach the minimal threshold in *Bryant.* Here, the testimony was that hypoxia—not any alleged negligence by the midwife—might have caused the child's brain abnormalities.  There also was no testimony narrowing the timing of a possible hypoxic-ischemic episode to a period when the midwife owed the plaintiffs a duty of care.  Thus, the plaintiffs' "possibility" evidence fails even under the standard approved by the

Fourth Circuit's citation to the *Bryant* case.

In summary, the plaintiffs failed to prove proximate causation in this case.  None of the questions regarding "possible" linkage of hypoxia to this child's brain abnormalities were connected to the midwife, and none of those questions could be considered as establishing proximate cause under the law.  These "possibility" questions are the foundation of the Court's opinion imposing liability on the United States.  Thus, the Court erred in concluding that the plaintiffs proved that the alleged negligence proximately caused an injury to the child (plaintiffs) involved in this case.

> **E.  The Court's Recalculation Of The Apgar Scores Of The Child Is Not Supported By The Evidence And Is Contrary To The Expert Testimony Presented At Trial**

The Court also decided, based on the testimony of family members, that the Apgar scores must have been miscalculated and that the Apgar scores were actually lower and, thus, suggestive of possible hypoxia.  This determination is flawed for several reasons.  First, the determination of an Apgar score is beyond the knowledge of a lay person and would be beyond the scope of a layperson.  Second, the experts testified at some length regarding the calculation of the Apgar scores.  Plaintiffs' expert on Apgar scores, nursing expert Patricia Connors, clearly stated that the Apgar score at was at least 7 at 1 and 5 minutes after birth.  Tr. at 435-36, 442.  In addition, the midwife expert for the plaintiffs, John Fassett, found the Apgar scores to be normal and did not challenge their calculation being 7 at 1 minute and 8 at 5 minutes after birth.  Tr. at 360.  No expert for the plaintiffs challenged the Apgar score at 1 or 5 minutes after birth being at least 7.  Tr. at 360, 414, 432, 436.  The experts for the defendants all testified that the Apgar scores were calculated correctly as 7 at 1 minute and 8 at 5 minutes.  Tr. at 940-41, 1003, 1081,

1093, 1297, 1840.   Thus, there was no expert testimony to justify the Court's finding that the

Apgar score at 5 minutes was less than 7.

The Court indicated in its opinion that its recalculated Apgar score was evidence that the

child experienced hypoxia in utero.  (ECF No. 335 at 5.)  However, that is an improper

interpretation and application of an Apgar score.  In addition, an Apgar score is a calculation by

medical professionals based on the medical interpretation of clinical conditions of a child *after*

birth.  It is an assessment of a baby's immediate condition *after* birth.  Tr. 1841.  In fact, the

West Virginia Supreme Court of Appeals recently stated, "'The Apgar score provides an

accepted and convenient method for reporting the status of the newborn infant ***immediately after***

***birth*** and the response to resuscitation if needed.  The Apgar score alone cannot be considered to

be evidence of or a consequence of asphyxia, does not predict individual neonatal mortality or

neurologic outcome, and should not be used for that purpose. . . .  This scoring system provided a

standardized assessment for infants *after* delivery.'"  *Smith v. Clark*, 828 S.E.2d 900, 907 n.5

(W. Va. 2019) (quoting *Committee Opinion No. 644: The Apgar Score*, American College of

Obstetricians and Gynecology (Oct. 2015) (reaffirmed 2019), *available at* http://www.acog.org/

(last visited May 9, 2019) (emphasis added).  The Court's use of the Apgar score in this manner

is in clear contradiction of the purpose of an Apgar score.  This Court's substitution of its

judgment for that of the expert testimony in this case is a violation of the rule that expert

testimony is needed to address such technical medical matters because such matters involve a

"question [that] involves a technical medical decision," which is beyond the knowledge of a

layperson.  *See Banfi v. Am. Hosp. for Rehab.*, 529 S.E.2d 600, 606 (W. Va. 2000).  Plaintiffs'

own experts testified that the Apgar scores were designed to provide an assessment of the baby's

immediate condition after birth and to tell the practitioner if the baby needs help transitioning to life outside the womb.  Tr. at 414, 432, 941.  Defense experts testified that Apgar scores were designed for that purpose as well.  Tr. at 1841.  The Court's use of the Apgar score to predict hypoxia during labor and prior to delivery is in direct contravention of the evidence presented by the experts called by the parties at trial.

The reason that an Apgar score of 7 at 5 minutes is important is that the medical literature evidence presented at trial indicated that a Category 2 electronic fetal monitor strip (the plaintiffs' experts on electronic fetal monitoring did not dispute that the electronic fetal monitoring strip involved in this case was no worse than a Category 2, Tr. at 357, 431) with an Apgar score of at least 7 at 5 minutes indicates that hypoxia played no role at the time of labor and delivery.  Tr. at 1919-20.  This literature is based on various medical studies.  The Court's ruling regarding the Apgar score rewrites the evidence despite this uncontroverted literature to support its liability ruling.  However, the Court is not an expert on this issue, and the calculation of Apgar scores is a medical matter beyond the scope of a layperson, and, therefore, the Court erred in recalculating that score without any expert testimony to support such a result.

## III. THE COURT'S ENTRY OF JUDGMENT PRIOR TO THE COLLATERAL OFFSET HEARING WAS IMPROPER PURSUANT TO W. VA. CODE § 55-7B-9a

The Court entered the judgment order prior to the completion of the collateral source hearing required by W. Va. Code § 55-7B-9a.  Under that statute, judgment is not to be entered in MPLA cases until after the collateral source hearing has been completed.  *See* W. Va. Code § 55-7B-9a(a), (h).  While the Court's judgment order contemplated an amended judgment order after the completion of the collateral source hearing, that process is clear error under the statute. The statute specifically states that judgment is to be entered only after the collateral source

hearing has been completed.  The premature entry of the judgment order is reversible error, and

the judgment order entered on March 31, 2022, should be vacated.  *See Simms v. United States*,

839 F.3d 364, 370–73 (4th Cir. 2016).

## IV. CONCLUSION

The plaintiffs failed to meet their burden of proving proximate causation under W. Va.

Code § 55-7B-3.  They did not produce any expert testimony which causally linked any alleged

negligence of the midwife to the injuries alleged by the plaintiffs.  Therefore, the judgment

entered by the Court against the United States should be altered, modified, and/or vacated, and

judgment should be entered in favor of the United States.

Respectfully submitted,

**WILLIAM S. THOMPSON**
**United States Attorney**

**s/Fred B. Westfall, Jr.**
WV State Bar No. 3992
Assistant United States Attorney
Attorney for United States
P.O. Box 1713
Charleston, WV  25326
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: fred.westfall@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT BECKLEY**

RYAN HYSELL and CRYSTAL HYSELL,
on behalf of their daughter, A.H., a minor,

      Plaintiffs,

v.                                                                        Civil Action No. 5:18-cv-01375

RALEIGH GENERAL HOSPITAL,
and THE UNITED STATES OF AMERICA,

      Defendants.

**CERTIFICATE OF SERVICE**

      I, Fred B. Westfall, Jr., Assistant United States Attorney for the Southern District of West Virginia, hereby certify that on April 28, 2022, I electronically filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT UNITED STATES OF AMERICA'S MOTION TO VACATE, ALTER, AND/OR AMEND THE JUDGMENT ENTERED IN THIS CIVIL ACTION AND/OR FOR NEW TRIAL** with the Clerk of the Court using the CM/ECF system which will send notification to the following CM/ECF participants:

      Christopher T. Nace
      Matthew A. Nace
      Paulson & Nace, PLLC
      1025 Thomas Jefferson Street NW
      Suite 810
      Washington, D.C. 20007
      Counsel for Plaintiffs

      D.C. Offutt, Jr.
      Jody O. Simmons
      Offutt Nord PLLC
      949 Third Avenue, Suite 300
      P. O. Box 2868
      Huntington, WV 25728-2868
      Counsel for defendant Raleigh General Hospital

      C.J. Gideon, Jr.
      Bryan Essary
      Gideon, Essary, Tardio & Carter, PLC
      315 Deaderick Street
      Suite 1100
      Nashville, TN 37238

*Pro Hac Vice* Counsel for Defendant Raleigh
General Hospital

**s/ Fred B. Westfall, Jr.**
Fred B. Westfall, Jr. (WV Bar No. 3992)
Assistant United States Attorney
P.O. Box 1713
Charleston, WV  25326
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: fred.westfall@usdoj.gov
*Counsel for Defendant United States of America*